## U.S. Bankruptcy Court Opinions

IN RE NEW CENTURY TRS HOLDINGS, INC. (Del. 7-2-2008)

In re NEW CENTURY TRS HOLDINGS, INC., et al.[fn1] CHAPTER 11 Debtors.

Case No. 07-10416 (KJC) (Jointly Administered).

United States Bankruptcy Court, D. Delaware.

July 2, 2008

[fn1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home 123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. On August 3, 2007, New Century Warehouse Corporation, a California corporation, which is also known as "Access Lending," filed a voluntary chapter 11 bankruptcy petition. These entities are referred to herein as the "Debtors," collectively, or any individual entity may be referred to herein as the "Debtor."

### OPINION ON CONFIRMATION[fn2]

[fn2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L).

KEVIN CAREY, Bankruptcy Judge

New Century TRS Holdings, Inc. and its affiliates filed voluntary petitions for relief under chapter 11 of the United

Case: 09-05050, Doc# 51-1, Filed: 08/22/09, Entered: 08/22/09 16:09:27 Page 1 of 34

States Bankruptcy Code on April 2, 2007.[fn3] The First Amended

**Page 2**

Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors (the "First Amended Joint Plan") (docket no. 5405) was filed on March 18, 2008. A number of parties filed objections to the First Amended Joint Plan and, in order to resolve many of the objections, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008 (the "Plan") (docket no. 6412).

   A hearing on confirmation of the Plan was held on April 24 and 25, 2008. The sole remaining unresolved objection to the Plan is the objection by the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (the "Ad Hoc Committee") (docket no. 6338).[fn4] The Ad Hoc Committee objects to confirmation of the Plan, arguing that: (i) the Plan provides for substantive consolidation of the Debtors in violation of the Third Circuit Court of Appeals' decision *In re Owens Corning,* 419 F.3d 195 (3d Cir. 2005), (ii) the Plan does not comply with Bankruptcy Code § 1123(a)(4), as required by § 1129(a)(1), because it treats the claims within its class differently, and (iii) the Plan proponents have not proved that creditors represented by the Ad Hoc Committee, who voted against the Plan, will receive a distribution that is not less than the value those creditors would receive if the Debtors were liquidated under chapter 7.

   The Debtors and the Creditors' Committee (the "Plan Proponents") ask that the Court approve the Plan. They argue that the Plan is not a substantive consolidation of the Debtors, but

**Page 3**

contains a series of negotiated settlements that should be approved pursuant to Bankruptcy Rule 9019, Fed.R.Bankr.P. 9019, and that the Plan meets all requirements for confirmation and may be confirmed pursuant to Bankruptcy Code § 1129(b), notwithstanding rejection by one impaired class of creditors. For the reasons set forth below, the Plan will be confirmed.

BACKGROUND

<u>The Debtors' pre-bankruptcy operations.</u>[fn5]

   Prior to the bankruptcy filings, the Debtors originated, serviced and purchased mortgage loans and sold mortgage loans through whole loan sales and securitizations. The Debtors often retained residual economic interests in the loan securitizations.

(a) <u>Loan origination and purchase.</u>

   The Debtors' business of originating and purchasing loans was accomplished through two divisions: the Wholesale Division and Retail Division. The Wholesale Division, which was operated by debtor New Century Mortgage Corporation ("NCMC"), originated and purchased mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its

account executives. As of December 31, 2006, the Wholesale
Division had approved more than 57,000 independent mortgage
brokers for submission of loan applications, operated through 34
regional operating centers located in 20 states, and employed
approximately 1,087 account executives. In 2006, the Wholesale
Division was responsible for approximately 85% of the mortgage
loans originated by the Debtors.

**Page 4**

   The Retail Division, which was operated by debtor Home 123
Corporation, originated mortgage loans through direct contact
with consumers at branch offices as well as through referrals
from builders, realtors, and other third parties. As of December
31, 2006, the Retail Division employed approximately 1,702 retail
loan officers located in 262 branch offices and three central
telemarketing processing centers.

   (1) <u>Master Repurchase Agreements.</u>

   The Debtors used master repurchase agreements ("Master
Repurchase Agreements") and their own working capital to fund the
origination and purchase of mortgage loans and to hold these
loans pending sale or securitization. Prior to the bankruptcy
filings, the Master Repurchase Agreements provided the Debtors
with the capacity to fund approximately $17.4 billion of mortgage
loans. Each Master Repurchase Agreement provided that the Debtors
would sell mortgage loans to a "Repurchase Counterparty" and
commit to repurchase these loans on a specified date for the same
price paid, plus a fee for the time value of money, termed a
"Price Differential." The Price Differential was specified in a
pricing side letter and was generally set at a floating rate
based on LIBOR, **[fn6]** plus a spread. The Master Repurchase Agreements
typically provided that the Debtors were required to repurchase
each loan on the facility at a date specified in the individual
commitment (generally 30 or 60 days after the sale to the
Repurchase Counterparty). For mortgage loans of less quality or
as market conditions deteriorated, the Repurchase
Counterparties were willing to pay less than the face principal amount of the
mortgage loan, in which case the Debtors financed a portion of
the principal amount of the loans

**Page 5**

with their own working capital (termed the "haircut").

   Under the Master Repurchase Agreements, in the event of
default, each of the Repurchase Counterparties had a right to
accelerate the Debtors' obligations to repurchase the loans
subject to the facility. If the Debtors did not pay those
repurchase obligations, the agreements generally provided that
the Repurchase Counterparties could sell the mortgage loans to
third parties (often on short notice) or retain the mortgage
loans for their own accounts and credit the value of the mortgage
loans against the Debtors' repurchase obligations (termed a
"buy-in"), in effect foreclosing the Debtors' rights to
repurchase such mortgage loans. The Master Repurchase Agreements
also provided that if the Debtors' repurchase obligations were
not fully satisfied by a third party or a buy-in, any Debtor
which was a party to the Master Repurchase Agreement was liable
for any deficiency.

(b) <u>Whole loan sales and securitizations.</u>

The Debtors sold most of the mortgage loans they originated in the secondary mortgage market through whole loan sales or securitizations. In a whole loan sale, the selling Debtor typically sold a group of mortgage loans to a financial institution that would either hold the loans for investment or pool the loans (often with loans bought from other originators) for subsequent securitizations. In a securitization, the selling Debtor typically sold a group of loans to a trust for a cash purchase price and a residual interest ownership in the trust (an "OTC" or a "residual"). The securitization trusts were separate entities not included in the Debtors' chapter 11 filings.

The loan sale agreements used by the Debtors often provided that the selling Debtor would repurchase or substitute a loan if (i) the borrower committed a payment default shortly after the loan was sold or (ii) the selling Debtor breached a representation or warranty contained

**Page 6**

in the loan sale agreement.**[fn7]** The Debtors subsequently resold many such repurchased mortgage loans in discounted loan sales.

(c) <u>Loan servicing.</u>

The Debtors serviced mortgage loans through NCMC. NCMC serviced loans both for loan buyers (whole loan purchasers and securitization trusts) and for Repurchase Counterparties. As of the petition date, the Debtors serviced approximately $19 billion of loans owned by the securitization trusts pursuant to Master Servicing Agreements. Loan servicing included a host of activities designed to collect payments from borrowers and to ensure that the borrowers repaid mortgage loans in accordance with their respective terms.

(e) <u>Events leading to the chapter 11 cases.</u>

On February 7, 2007, NCFC announced that its previously filed financial statements for the quarters ended March 31, June 30, and September 30, 2006 must be restated to correct errors discovered in its application of generally accepted accounting principles regarding NCFC's allowance for loan repurchase losses. NCFC also announced that it expected to post a fourth quarter loss and a loss for all of 2006.

The announcements resulted in the filing of various securities class action lawsuits alleging that NCFC and other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCFC, thereby artificially

**Page 7**

inflating market prices of its common stock.

On March 2, 2007, NCFC announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2006 by March 1, 2007, without unreasonable effort and expense. On March 13, 2007, the staff of the New York Stock Exchange issued a press release announcing the delisting of NCFC's common stock, its Series A Cumulative Redeemable Preferred Stock and its Series B Cumulative Redeemable Preferred Stock.

The announcements caused a variety of issues with the Repurchase Counterparties to the Debtors' Master Repurchase Agreements, including margin calls,[fn8] restricting and ultimately terminating funding for loans originated by the Debtors, and replacing the Debtors as the servicer for the mortgage loans. This exacerbated the Debtors' liquidity situation and, by March 5, 2007, the Debtors were able to fund only a portion of their loan originations. The Debtors' inability to originate loans and the exercise of remedies by the Repurchase Counterparties left the Debtors in a severe liquidity crisis. On April 2, 2007, the Debtors (other than Access Lending) filed chapter 11 bankruptcy cases.

<u>The Examiner.</u>

On June 1, 2007, this Court ordered the United States Trustee for Region 3 (the "U.S. Trustee") to appoint an examiner to, *inter alia,* "investigate any and all accounting and financial

**Page 8**

statement irregularities, errors, or misstatements" and to prepare a report.[fn9] The U.S. Trustee appointed Michael J. Missal as Examiner, which appointment was approved by this Court on June 7, 2007. The Examiner filed a First Interim Report on November 21, 2007, addressing the possible unauthorized post-petition use of cash collateral by the Debtors. *(Id.* at 1-2). The Examiner completed his investigation and filed the Final Report of Michael J. Missal, Bankruptcy Court Examiner, February 29, 2008 (Docket No. 5518) (the "Examiner's Report").[fn10]

Founded in 1995, NCFC grew to employ over 7,200 people. Examiner's Report at 40. The loan origination part of the business grew so large that, between April 2005 and December 2006, NCFC funded more than $200 million in loans almost every business day. *(Id.* at 116). The Examiner's Report describes the Debtors' business prior to the bankruptcy filings, in part, as follows:

New Century [Financial Corporation] was the second largest originator of subprime residential mortgage loans, which are loans made to borrowers who represent a high level of credit risk. The Company had grown at an incredible pace since inception, from originating $357 million in mortgage loans in its first year of operation in 1996 to approximately $60 billion in 2006. New Century's equity securities were traded on the New York Stock Exchange ("NYSE"), the Company had a market capitalization of over $1 billion in February 2007, and it had credit facilities of $17.4 billion to finance its activities. New Century reported net earnings of $411 million for 2005 and $276 million for the nine months ended September 30, 2006.

**Page 9**

*(Id.* at 1). On February 7, 2007, NCFC announced that it needed to restate its 2006 interim financial statements. On March 8, 2007, the company reported that it was unable to satisfy approximately $70 million of approximately $150 million margin calls from its warehouse lenders *(id.* at 105), and stopped accepting new loan applications *(id.* at 1). On March 13, 2007, the company's securities were delisted by the New York Stock Exchange. *(Id.).*

As of March 31, 2007, the company's outstanding repurchase obligations under Master Repurchase Agreements with warehouse lenders exceeded $7 billion. *(Id.* at 106). This "caused a dramatic and swift descent of the [Debtors]," leading to the chapter 11 filings on April 2, 2007.**[fn11]** *(Id.)* The Examiner's Report identifies potential causes of action against KPMG LLP ("KPMG"), the Debtors' independent auditor until its resignation on April 27, 2007, "for professional negligence and negligent misrepresentation based on KPMG's breach of its professional standard of care in carrying out its audit and reviews of the [Debtors'] financial statements and its related systems of internal controls." *(Id.* at 2). The Examiner also identifies potential causes of action against some former officers of NCFC "to recover certain of the bonuses paid to them in 2005 and 2006 that were tied, directly or indirectly, to New Century's incorrect financial statements." *(Id.).* The Examiner wrote that the potential claims "could seek millions of dollars in recoveries." *(Id.).*

### PLAN SUMMARY

The Plan is the result of extensive negotiations between the Debtors, the Creditors'

**Page 10**

Committee (which was comprised of a cross-section of creditors with claims against various Debtors and claims of various types), as well as other creditor groups.**[fn12]** The Plan provides for distributions to creditors of the sixteen companies that are debtors-in-possession in the chapter 11 cases. It also provides for payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims and leaves Allowed Secured Claims unimpaired.**[fn13]** On the other end of the spectrum, holders of interests in NCFC and Bankruptcy Code § **510**(b) claims will receive no distribution under the Plan and, therefore, were deemed to reject the Plan. The source of controversy is the Plan's treatment of certain unsecured creditors of NCFC who are represented by the Ad Hoc Committee.

(a) <u>The Debtor Groups</u>

The Plan structure separates the Debtors into three groups (each, a "Debtor Group") to facilitate the distributions to the unsecured creditors: (1) the Holding Company Debtors, (2) the

**Page 11**

Operating Debtors, and (3) Access Lending.

The Holding Company Debtors consist of NCFC, New Century TRS Holdings, Inc. ("TRS Holdings"), New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). The Holding Company Debtors were real estate investment entities that typically held residual interests in securitization trusts, owned stock in the Operating Debtors, and provided overall direction and management to the Operating Debtors. (Disclosure Statement, Section I.A.2).

The Operating Debtors are NCMC, NC Capital Corporation ("NC Capital"), Home 123 Corporation ("Home 123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC

Case: 09-05050, Doc# 51-1, Filed: 08/22/09, Entered: 08/22/09 16:09:27 Page 6 of 34

REO III"), NC Residual III Corporation ("NC Residual III"), New
Century Mortgage Ventures, LLC ("NCM Ventures"), and Ncoral, L.P.
("Ncoral"). The Operating Debtors were generally the entities
that conducted the Debtors' business operations, including
originating, purchasing and selling loans, and servicing loans
for third parties. *(Id.).*

The third "Debtor Group" consists only of Access Lending, a
subsidiary that provided warehouse financing to independent
mortgage companies. It was acquired by TRS Holdings in early
2006.

(b) <u>Classification of Claims</u>

The Plan classifies claims based upon the three Debtor Groups.
Claims against the Holding Company Debtors are placed in classes
HC1 through HC13, as follows:

**Page 12**

| Class | Description | Status |
|-------|-------------|--------|
| HC1 | Class HC1 consists of Priority Claims against NCFC | Unimpaired — not entit vote |
| HC2 | Class HC2 consists of Secured Claims against NCFC | Unimpaired — not entit vote |
| HC3a | Class HC3a consists of Special Deficiency Claims against NCFC | Impaired — entitled to |
| HC3b | Class HC3b consists of Other Unsecured Claims against NCFC | Impaired — entitled to |
| HC4a | Class HC4 consists of Series A Preferred Stock Interests | Deemed to reject — not entitled to vote |
| HC4b | Class HC4b consists of Series A 510(b) Claims | Deemed to reject — not entitled to vote |
| HC4c | Class HC4c consists of Series B Preferred Stock Interests | Deemed to reject — not entitled to vote |
| HC4d | Class HC4d consists of Series B 510(b) Claims | Deemed to reject — not entitled to vote |
| HC4e | Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims | Deemed to reject — not entitled to vote |
| HC5 | Class HC5 consists of Priority Claims against TRS Holdings | Unimpaired -not entitl vote |
| HC6 | Class HC6 consists of Secured Claims against TRS Holdings | Unimpaired — not entit vote |
| HC7 | Class HC7 consists of Other Unsecured Claims against TRS Holdings | Impaired — entitled to |
| HC8 | Class HC8 consists of Priority Claims against NC Credit | Unimpaired — not entit vote |

| | | |
|---|---|---|
| HC9 | Class HC9 consists of Secured Claims against NC Credit | Unimpaired — not entit vote |
| HC10a | Class HC10a consists of Special Deficiency Claims against NC Credit | Impaired — entitled to |

**Page 13**

| | | |
|---|---|---|
| HC10b | Class HC10b consists of Other Unsecured Claims against NC Credit | Impaired — entitled to |
| HC11 | Class HC11 consists of Priority Claims against NC Residual IV | Unimpaired — not entit vote |
| HC12 | Class HC12 consists of Secured Claims against NC Residual IV | Unimpaired — not entit vote |
| HC13 | Class HC13 consists of Other Unsecured Claims against NC Residual IV | Impaired — entitled to |

The claims against the Operating Debtors are placed in classes OP1 through OP12, as follows:

| Class | Description | Status |
|---|---|---|
| OP1 | Class OP1 consists of Priority Claims against NCMC | Unimpaired — not entit vote |
| OP2 | Class OP2 consists of Secured Claims against NCMC | Unimpaired — not entit vote |
| OP3a | Class OP3a consists of Special Deficiency Claims against NCMC | Impaired — entitled to |
| OP3b | Class OP3b consists of EPD/Breach Claims against NCMC | Impaired — entitled to |
| OP3c | Class OP3c consists of Other Unsecured Claims against NCMC | Impaired — entitled to |
| OP4 | Class OP4 consists of Priority Claims against NC Capital | Unimpaired — not entit vote |
| OP5 | Class OP5 consists of Secured Claims against NC Capital | Unimpaired — not entit vote |
| OP6a | Class OP6a consists of Special Deficiency Claims against NC Capital | Impaired — entitled to |
| OP6b | Class OP6b consists of EPD/Breach Claims against NC Capital | Impaired — entitled to |
| OP6c | Class OP6c consists of Other Unsecured Claims against NC Capital | Impaired — entitled to |

**Page 14**

| | | |
|---|---|---|
| OP7 | Class OP7 consists of Priority Claims against Home 123 | Unimpaired — not entit vote |
| OP8 | Class OP8 consists of Secured claims against | Unimpaired — not entit |

|  | Home 123 | vote |
|------|-----------|------|
| OP9a | Class OP9a consists of Special Deficiency Claims against Home 123 | Impaired — entitled to |
| OP9b | Class OP9b consists of Other Unsecured claims against Home 123 | Impaired — entitled to |
| OP10 | Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and Ncoral | Unimpaired- not entitl vote |
| OP11 | Class OP11 consists of Secured claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and Ncoral | Unimpaired- not entitl vote |
| OP12 | Class OP12 consists of Other Unsecured claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and Ncoral | Impaired — entitled to |

The claims against Access Lending are placed in classes AL1 through AL 3 as follows:

| Class | Description | Status |
|-------|-------------|--------|
| AL1 | Class AL1 consists of Priority Claims against Access Lending | Unimpaired — not entit vote |
| AL2 | Class AL2 consists of Secured Claims against Access Lending | Unimpaired — not entit vote |
| AL3 | Class AL3 consists of Other Unsecured Claims against Access Lending | Impaired — entitled to |

(c)  Treatment of unsecured claims.

   The Plan provides for distribution of the net cash available from the assets of the Debtors in each Debtor Group to the holders of allowed unsecured claims against the Debtors in that
Page 15
Debtor Group. The Disclosure Statement estimates recoveries for unsecured creditors of the Holding Company Debtors to average between 2.2% and 15.9%, and unsecured creditors of the Operating Debtors to average between 2.5% and 17.1%. (Disclosure Statement, Section I.A.4). Generally, the cash available to distribute to the holders of allowed unsecured claims in each Debtor Group is calculated based on the gross proceeds obtained from the disposition of that Debtor Group's assets, less (i) the amount of allowed administrative, priority and secured claims, (ii) expenses of administering the Debtors' estates during the chapter 11 cases, and (iii) expenses of the Liquidating Trust established by the Plan, which, in each case, will be allocated among the Debtor Groups pursuant to the negotiated allocation as set forth in the Plan.

   The amount of an allowed unsecured claim is determined according to a formula set forth in Article 4 of the Plan for

Case: 09-05050, Doc# 51-1, Filed: 08/22/09, Entered: 08/22/09 16:09:27 Page 9 of 34

each class, which establishes the claim's "Determined
Distribution Amount." The calculations used to arrive at the
Determined Distribution Amounts are also subject to certain
protocols established in the Plan, including the following:

(a) <u>The Multi-Debtor Claim Protocol.</u> The Multi-Debtor
Claim Protocol, described in Article 6 of the Plan, is
a protocol that adjusts the Determined Distribution
Amount of creditors holding allowed unsecured claims
for which more than one Debtor is jointly and/or
severally liable. The Multi-Debtor Claim Protocol was
designed to reduce the expense of administering claims
resolution and to take into account the legal rights of
creditors holding guarantees, or other valid joint and
several contractual arrangements with the Debtors. (Tr.
4/24/08 at 122:19 — 123:21).

Under the Multi-Debtor Claim Protocol, a creditor with
allowed unsecured

<span style="color:red">Page 16</span>

claims (other than special deficiency claims, as
defined in the Plan) for which Holding Company Debtors
NCFC and NC Credit are jointly and/or severally liable
will be assigned a Determined Distribution Amount of
130% of the amount of its allowed unsecured claim
against NCFC, and a Determined Distribution Amount of
0% with respect to its claim against NC Credit.
Unsecured creditors holding allowed unsecured claims
against Operating Debtors are treated similarly.
Therefore, if a creditor holds allowed unsecured claims
(other than special deficiency claims, as defined in
the Plan) against NCMC, NC Capital and Home 123, for
which those Debtors are jointly and/or severally
liable, those creditors will receive a Determined
Distribution Amount of 130% against NCMC and a
Determined Distribution Amount of 0% on account of its
other unsecured claims against Operating Debtors.

(b) <u>The Intercompany Claim Protocol.</u> The Intercompany
Claim Protocol, described in Article 7 of the Plan, is
a protocol to address claims held by one Debtor against
another Debtor. The claims appear on the Debtors' books
and records, but there are no promissory notes or
instruments evidencing the debt between the companies.
(Tr. 4/24/08 at 141:19-21). Intercompany claims are
dealt with in the Plan partly through Determined
Distribution Amounts. (Disclosure Statement,
Sec. I.A.3.c.) Claims by one holding company against another
within the Holding Company Debtor Group are assigned a
Determined Distribution Amount of 0%. *(Id.).* Similarly,
claims of one operating company against another in the
Operating Debtor Group are assigned a Determined
Distribution Amount of 0%. *(Id.).*

<span style="color:red">Page 17</span>

The settlement of intercompany claims took into account
factors such as joint and several claims against
multiple Debtors, and the intercompany claims that may
result therefrom, by adjusting a creditor's Determined
Distribution Amounts. *(See* Tr. 4/24/08 at 119:23 —

121:25). For example, NCMC was the Debtor entity that
originated most loans. NC Capital, however, sold most
of the loans on the secondary market. Creditors argued
that the loans they purchased from NC Capital had
certain representations and warranties issued by NCMC
to NC Capital and, therefore, the NC Capital creditors
argued that NCMC was also liable for their claims. (Tr.
4/24/08 206:18 — 208:4). As a result, EPD/Breach
claimants with claims against NC Capital are afforded a
50% Determined Distribution Amount against the
Operating Debtors in recognition of the potential
intercompany claims of NC Capital against NCMC. (Tr.
4/24/08 at 119:14 — 120:23). This approach zeroes out
the intercompany claims, but deals with the potential
merits of intercompany claims by increasing or
decreasing the distributions to affected creditors.
*(Id.).*

The Intercompany Claim Protocol also was developed, in
part, because various members of the Creditors'
Committee questioned whether the intercompany claims of
the Debtors should be treated as debt or equity. (Tr.
4/24/08 at 190:19 — 192:3). The intercompany account
between NCFC and NCMC began in October 2004 and, by the
petition date, approximately 2,390 transactions had
occurred between the two entities. (Declaration of Todd
Brents in Support of Confirmation of the Second Amended
Joint Chapter 11 Plan of

**Page 18**

Liquidation dated as of April 23, 2008 (docket
no. 6396) (the "Brents Declaration"), ¶ 29, as admitted by
stipulation at Tr. 4/25/08 at 74:16-20). After
adjustment, the net receivable owed to NCFC by NCMC on
the petition date was $320.1 million. *(Id.).* Under the
settlement embodied in the Intercompany Claim Protocol,
NCFC (as a member of Holding Company Debtor Group) will
receive 50% of its intercompany claims against NCMC
(one of the Operating Company Group), despite the
substantial argument that the intercompany claims
should be recharacterized as equity. (Etlin
Declaration, ¶ 24).

(c) <u>The EPD/Breach Claim Protocol.</u> The EPD/Breach Claim
Protocol, explained in Exhibit B to the Plan, is a
protocol to calculate the amount of damages for
EPD/Breach Claims. An "EPD/Breach Claim" is defined in
Article 1 of the Plan as "a Claim arising under an
agreement between one or more of the Debtors and a loan
buyer or securitization party for (i) breach of a
representation or warranty under such agreement made by
one or more of the Debtors or (ii) a right under such
an agreement to resell a loan to one or more of the
Debtors based on a payment default by the borrower on
such loan." The cost of litigating these claims would
be enormous, given that the Debtors sold hundreds of
thousands of loans with principal balances exceeding
$200 billion. (Etlin Declaration, ¶ 22).**[fn14]** Adoption of
this method to calculate the EPD/Breach claims saves
the estate from incurring substantial litigation
expenses, which would certainly reduce the amount

**Page 19**

otherwise available for creditors. *(Id.).* The
EPD/Breach Claim Protocol is interrelated with other
compromises in the Plan. *(Id.).* For example, disputes
over whether the EPD/Breach Claim Protocol generated
dollar calculations that were perceived as too high or
too low were resolved in connection with the compromise
on the allocation of the Litigation Proceeds among the
EPD/Breach claimants and other classes of creditors.
*(Id. See also* Tr. 4/24/08 at 210:15 — 211:21).

(d)  <u>The Debtors' Assets.</u>

On the date the Debtors filed their bankruptcy petitions, the
Debtors had approximately $62 million of cash in their operating
accounts. (Disclosure Statement, Section V.A. 1.). During these
chapter 11s, the Debtors held several asset sales under
Bankruptcy Code § 363, described below, which generated proceeds
of approximately $230.4 million:

| Description of Assets | Date Sale Closed | Approximate Net Proceeds (millions) |
|---|---|---|
| Servicing Assets and Servicing Platform | 6/29/2007 | $155.9[fn15] |
| Mortgage Assets | 5/18/2007 and 6/29/2007 | $57.0 |
| Access Lending Assets | 4/27/2007 | $4.5[fn16] |

**Page 20**

| | | |
|---|---|---|
| Technology Assets | 7/31/2007 | $8.1 |
| Miscellaneous Assets | various | $2.8 |
| Additional LNFA Loans[fn17] | closing pending | $1.2 |
| Broker and Loan Data Asset Sales | various | $0.9 |
| **Total Proceeds** | | **$230.4** |

[fn15] This amount is net only of servicing advances and does not include deductions
pursuant to the order approving the sale to Carrington Mortgage Services, LLC dated
(docket no. 844), or amounts paid to reconcile accounts, as discussed in the Disclos
Section III.C.6.b. *(Id.).*


[fn16] As of the filing of the Disclosure Statement, the Debtors received approximat
of this amount. As discussed in Disclosure Statement, Section III.C.6.e, the Debtors
entitled to receive at least $4.5 million from the buyer, Access Holdings Corporatio
the sale of Access Lending's assets. The Plan Proponents allege that Access Holdings
default of the purchase agreement. *(Id.).*


[fn17] LNFA is an acronym for "loans not financed anywhere." (Disclosure Statement,
Section III.C.6.a.).

*(Id.)*. The asset purchase agreements for the § 363 sales often listed both NCFC and NCMC as the sellers. *(See* Disclosure Statement, Section III.C.6.). The Plan, however, provides that the proceeds of those sales are assets of the Operating Debtors. (Disclosure Statement, Section V.A.1.).

The Plan provides for the transfer of all of the Debtors' remaining assets (except the assets of Access Lending, but including the capital stock in Access Lending) into a liquidating trust. (Etlin Declaration, ¶ 11). The liquidating trust will be held and administered for the benefit of the holders of Holding Company Debtor Unsecured Claims and the holders of Operating Debtor Unsecured Claims. *(See* The Plan, Art. 8, ¶ E).

The Debtors' assets are divided for distribution between the Holding Company Debtors and the Operating Debtors.**[fn18]** During the Plan negotiations, issues arose about which Debtor

**Page 21**

entities owned which assets. (Tr. 4/24/08 at 196-97). Much of the uncertainty, particularly with respect to the Holding Company Debtors, centers around changes arising from a 2004 merger that shifted the ultimate parent corporation of the Debtor entities from TRS Holdings, a Delaware Corporation, to NCFC, a Maryland real estate investment trust. (The Brents Declaration, ¶ 6 as revised by stipulation. *See* Tr. 4/25/08 at 55:14-57:3).

New Century Financial Corporation was formed as a Delaware corporation in 1995. (Brents Declaration, ¶ 6). It was the parent corporation of the Debtor entities. On October 1, 2004, New Century Financial Corporation was reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes. *(Id.)*. In anticipation of the REIT conversion, New Century REIT, Inc. a Maryland corporation with REIT status, and its wholly-owned subsidiary, NC Merger Sub, Inc., a Delaware corporation, were established. *(Id.)*. To effect the conversion, on October 1, 2004, NC Merger Sub was merged into New Century Financial Corporation (the 1995 Delaware corporation), and its name was changed to New Century TRS Holdings, Inc. *(Id.)*. TRS Holdings, the surviving corporation of the merger, was now a wholly-owned subsidiary of New Century REIT, Inc. *(Id.)*. At the time of the merger, New Century REIT, Inc.'s name was changed to "New Century Financial Corporation" *(Id.)*. After the merger and conversion, the Debtors' general ledger system identified the legal entity now known as NCFC as "REIT", but continued to identify TRS Holdings as "NCFC", its former name. (Tr. 4/25/08 at 57:22-58:18).

(1) Holding Company Assets.

The Holding Company assets, as asserted on the respective bankruptcy schedules, consist mostly of intercompany receivables, the Carrington Interests, and the Deferred Compensation

**Page 22**

Trust. The confusion over whether TRS Holdings or NCFC owned the Carrington Interests and the Deferred Compensation Trust contributed, primarily, to the decision to aggregate the assets of the Holding Company Debtors for purposes of distribution under the Plan. (Tr. 4/24/08 at 109:18-110:3).

(a) The Carrington Interests.

The Carrington Interests are two different partnership interests owned by the Debtors, and consist of a general partnership interest valued on the Debtors' schedules at approximately $8 million dollars, and a limited partnership interest valued on the Debtors' schedules at approximately $42.5 million dollars. (Tr. 4/24/08 at 84:16; Tr. 4/25/08 at 60:3 — 60:19). The Debtors' accounting records show that the Carrington Interests are owned by TRS Holdings, although other legal documentation after conversion to the REIT makes it unclear which entity owned the Carrington Interests. (Tr. 4/24/08 at 84:16 — 85:2, Tr. 4/25/08 at 60:20 — 62:23, and 65:9-19). The income stream realized by the Debtors on account of the limited partnership interest is presently being realized by NCFC, the Maryland REIT. (Tr. 4/24/08 at 97:22 — 98:8). However, NCMC (the primary operating company) advanced the money that TRS Holdings used to buy the original limited partnership interest in Carrington. (Tr. 4/24/08 at 135:23 — 136:4). The Creditors' Committee raised the issue that the entity that funded the purchase of the interest should be entitled to that interest. (Tr. 4/24/08 137:3-12).

In March 2008, the Debtors, assisted by Alix Partners, amended their Schedules of Assets and Liabilities. In doing so, they adjusted the intercompany claims to reflect uncertainties about the ownership of the Carrington Interests and the Deferred Compensation Trust. Those amendments, however, did not change the entry on Schedule B for NCFC which shows the

**Page 23**
Carrington Interests as an asset of TRS Holdings. (Docket no. 1005).

(b) The Deferred Compensation Trust.

In January 1999, New Century Financial Corporation, a Delaware Corporation (now, TRS Holdings) entered into "The New Century Financial Corporation Supplemental Benefit and Deferred Compensation Trust Agreement" with Wells Fargo Bank, N.A. to establish a funding source for benefit plans adopted by TRS Holdings (the "Deferred Compensation Trust"). (See Ex. Ad Hoc 7).[fn19] The Debtors' accounting records show that the Deferred Compensation Trust was owned by TRS Holdings. (Tr. 4/25/08 at 66:13-18). The Agreement and Plan of Merger dated as of April 21, 2004 between TRS Holdings and NCFC (Ex. Ad Hoc 11) provided that NCFC would assume the Deferred Compensation Plan, although the Deferred Compensation Trust is not referenced in that agreement. (Tr. 4/24/08 at 154:18 — 155:11).

The monies paid into the Deferred Compensation Trust were funded by NCMC. (Tr. 4/24/08 at 137:13-22). If a beneficiary of the deferred compensation plan left the employ of the Debtors, NCMC paid the amount due to the employee under the deferred compensation plan and, thereafter, NCMC sought reimbursement of that amount from the trustee of the Deferred Compensation Trust. (Tr. 4/24/08 at 137:23 — 138:23). As with the Carrington Interests, the Creditors' Committee questioned whether the entity that funded the Deferred Compensation Trust should have ownership of that asset. (Tr. 4/25/08 at 24:24 — 25:7).

Although the Debtors' Schedules were amended in March 2008,

Case: 09-05050, Doc# 51-1, Filed: 08/22/09, Entered: 08/22/09 16:09:27 Page 14 of 34

Schedule B for NCFC continues to list the Deferred Compensation
Trust as being owned by NCFC (See docket

**Page 24**

no. 1004; Tr. 4/25/08 at 76:1 — 79:3). However, members of the Ad
Hoc Committee commenced an adversary proceeding against the
Debtors (Adv. No. 07-51598), arguing that the Deferred
Compensation Trust is not an asset of NCFC's bankruptcy estate,
but is "held in trust for the exclusive benefit of the
Beneficiaries regardless of any language in the . . . [agreement
creating the Trust] or the Plan to the contrary." (Adv. Pro
07-51598, Complaint ¶ 40. See also Disclosure Statement,
Section III.C.10.c. and the section, infra., entitled "The Ad Hoc
Committee"). The issues raised in the Ad Hoc Committee's
adversary proceeding, now in the discovery stage, are unresolved.

(2) <u>Operating Company Assets.</u>

The assets of the Operating Debtors include proceeds from the
sales of the Debtors' servicing business and mortgage loans not
subject to repurchase transactions. (Disclosure Statement,
Section I.A.2.). Further, after much discussion during Plan
negotiations, it was agreed that any potential tax refunds owed
to the Debtors should go to NCMC, one of the Operating Company
Debtors. (Tr. 4/24/08 at 200:16 — 202:13).

(3) <u>Litigation Proceeds.</u>

The net proceeds generated from any litigation (other than that
belonging to Access Lending) are referred to in the Plan as
"Litigation Proceeds" and include any net proceeds from avoidance
actions, as well as any net proceeds of litigation arising from
NCFC's announced need to restate its 2006 financial statements.
(Disclosure Statement, Section I.A.2.). Various members of the
Creditors' Committee had differing views on which Debtor entity
was entitled to the Litigation Proceeds. (Tr. 4/24/08 at 202:21
— 203:13). Ultimately, the parties compromised and agreed to
allocate the net Litigation Proceeds by distributing 45% to the
EPD/Breach Claimants

**Page 25**

with claims against NC Capital, 27.5% to the Holding Company
Debtors, and 27.5% to the Operating Company Debtors, excluding NC
Capital's EPD/Breach Claimants. (Tr. 4/24/08 at 204:2-10).

This particular settlement is illustrative of the
interrelationship of the various settlements contained in the
Plan. The Debtors and Creditors' Committee's agreement to split
the Litigation Proceeds is but one component of the overall Plan
structure. Allocation of the Litigation Proceeds was conditioned
upon compromise on the EPD/Breach Protocol and the allocation of
administrative costs. (Tr. 4/24/08 at 72:15 — 73:21).

(e) <u>Voting Results.</u>

Pursuant to the Solicitation Procedures Order entered by this
Court on March 18, 2008, (docket no. 5396), the Claims and
Noticing Agent tabulated the timely, validly-executed ballots
received, and prepared a summary which showed that every class of
creditors entitled to vote accepted the Plan, except Class HC3b
(consisting of "Other Unsecured Claims against NCFC"). (See
Declaration of Jamie L. Edmonson Regarding Tabulation of Votes

(docket no. 6406) (the "Edmonson Declaration")). While 95.42% in *amount* of the claims in Class HC3b voted to accept the Plan, 73.02% of the *number* of claims voting in Class HC3b voted to reject the Plan. (Etlin Declaration, ¶ 32). Therefore, the vote failed the numerosity test, although an overwhelming majority of the claims, in terms of dollars, voted to accept the Plan ($395 million). *(Id.)*. Of the 203 negative votes cast by Class HC3b (in the amount of $15.9 million), 200 were cast by Deferred Compensation Beneficiaries.

   The Debtors submitted this summary of the voting results:

**Page 26**

| Class | Ballots Cast | Number Accepting | Number Rejecting | Dollar Amount Accepting | Dollar Amount Rejecting |
|-------|-------|-------|-------|-------|-------|
| AL3 | 5 | 4 (100%) | 0 (0%) | $19,083,658.00 (100%) | $0.00 (0%) |
| HC3a | 1 | 1 (100%) | 0 (0%) | $20,000,000.00 (100%) | $0.00 (0%) |
| HC3b | 295 | 75 (26.98%) | 203 (73.02%) | $395,060,366.38 (95.42%) | $18,955,681.06 (4.58%) |
| HC7 | 111 | 94 (91.26%) | 9 (8.74%) | $8,643,310.10 (95.79%) | $379,797.92 (4.21%) |
| HC10a | 1 | 1 (100%) | 0 (0%) | $20,000,000.00 (100%) | $0.00 (0%) |
| HC10b | 4 | 4 (100%) | 0 (0%) | $204,278,102.87 (100%) | $0.00 (0%) |
| HC13 | 1 | 1 (100%) | 0 (0%) | $16,494,811.17 (100%) | $0.00 (0%) |
| OP3a | 1 | 1 (100%) | 0 (0%) | $20,000,000.00 (100%) | $0.00 (0%) |
| OP3b | 9 | 9 (100%) | 0 (0%) | $44,299,123.00 (100%) | $0.00 (0%) |
| OP3c | 224 | 195 (94.20%) | 12 (5.80%) | $302,680,803.78 (99.60%) | $1,201,140.77 (0.40%) |
| OP6a | 1 | 1 (100%) | 0 (0%) | $20,000,000.00 (100%) | $0.00 (0%) |
| OP6b | 10 | 10 (100%) | 0 (0%) | $144,689,062.00 (100%) | $0.00 (0%) |
| OP6c | 12 | 12 (100%) | 0 (0%) | $160,727,752.81 (100%) | $0.00 (0%) |
| OP9a | 1 | 1 (100%) | 0 (0%) | $20,000,000.00 (100%) | $0.00 (0%) |
| OP9b | 212 | 182 (95.29%) | 9 (4.71%) | $271,493,064.56 (99.94%) | $154,606.17 (0.06%) |

```
OP12        12           5           0        $269,061,982.05          $0.00
                      (100%)       (0%)          (100%)               (0%)
```

(Edmonson Declaration, at 5-6).
Page 27

### THE AD HOC COMMITTEE

   The Ad Hoc Committee is comprised of beneficiaries (the
"Deferred Compensation Beneficiaries") of The New Century
Financial Corporation Deferred Compensation Plan and/or The New
Century Financial Corporation Supplemental Executive
Retirement/Savings Plan (the "Deferred Compensation Plan").
Amounts contributed to and/or withheld[fn20] under the Deferred
Compensation Plan from the participants' salaries, bonuses, and
commissions were placed in the Deferred Compensation Trust. As of
December 31, 2006, the Deferred Compensation Trust contained in
excess of $43 million dollars. On June 20, 2007, members of the
Ad Hoc Committee filed an adversary proceeding (Adv.
No. 07-51598) against the Debtors,[fn21] Wells Fargo Bank, N.A. as
Trustee ("Wells Fargo"), the Compensation Committee of the Board
of Directors of New Century Financial Corporation as Plan
Administrator (the "Compensation Committee") and the Creditors'
Committee. In the adversary proceeding complaint, the Ad Hoc
Committee seeks a declaration that the Deferred Compensation Plan
is not a "top hat" plan as defined by the Employee Retirement
Income Security Act of 1974, as amended ("ERISA"), and therefore,
is subject to all substantive requirements of ERISA and
Bankruptcy Code § 541(b)(7).[fn22]

   If the Deferred Compensation Plan is not a top hat plan, then,
the Ad Hoc Committee
Page 28
argues, the Deferred Compensation Trust is not an asset of the
estate.[fn23] In the alternative, the Ad Hoc Committee argues that
the terms of the Deferred Compensation Plan and the Trust provide
that the Deferred Compensation Trust is available only to the
*general* creditors of NCFC, and not to other types of creditors of
NCFC or of creditors of the other Debtors, including other
Holding Company Debtors.

### DISCUSSION

   The requirements for confirmation are set forth in § 1129 of
the Bankruptcy Code. The plan proponent bears the burden of
establishing the plan's compliance with each of the requirements
set forth in § 1129(a), while the objecting parties bear the
burden of producing evidence to support their objections. *In re
Exide Technologies*, 303 B.R. 48, 58 (Bankr.D.Del. 2003) citing
*Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99
(Bankr.D.Del. 2001); *Matter of Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213, 221 (Bankr.D.N.J. 2000) (citations omitted).
Because an impaired class did not vote to accept the plan, the
plan proponents must also show that the plan meets the additional
requirements of § 1129(b), including the requirements that the
plan does not unfairly discriminate against dissenting classes
and the treatment of the dissenting classes is fair and
equitable. *Id.*

The Ad Hoc Committee objects to confirmation of the Plan,
arguing that the Plan's creation of Debtor Groups and
consolidation of assets and claims against each Debtor Group for
distribution is a "deemed substantive consolidation" which has
been precluded by the Third

**Page 29**

Circuit Court of Appeals' decision *In re Owens Corning,*
**419 F.3d 195** (3d Cir. 2005) and violates Bankruptcy Code § **1129**(a)(1) and
(3). The Ad Hoc Committee further argues against confirmation
because (i) the Plan does not provide for the same treatment of
all claims within Class HC3b and, therefore, violates
§ 1123(a)(4) of the Bankruptcy Code, and (ii) the Plan Proponents
failed to prove that Class HC3b claimants will receive as much
under the Plan as they would receive if the Debtors were
liquidated under chapter 7, thereby violating § 1129(a)(7).

(a) Substantive Consolidation.

Substantive consolidation is a construct of federal common law
that emanates from equity. *Owens Corning,* **419 F.3d at 205**. "It
`treats separate legal entities as if they were merged into a
single survivor left with all the cumulative assets and
liabilities (save for inter-entity liabilities which are erased).
The result is that claims of creditors against separate debtors
morph to claims against the consolidated survivor.'" *Id.* quoting
*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health
Ventures, Inc.),* **402 F.3d 416**, **423** (3d Cir. 2005). Substantive
consolidation can be "bad news for certain creditors, [because]
instead of looking to assets of the subsidiary with whom they
dealt, they now must share those assets with all creditors of all
consolidated entities, raising the specter for some of a
significant distribution diminution." *Owens Corning,*
**419 F.3d at 206**.

In *Owens Corning,* a bank group that had extended a $2 billion
unsecured loan to Owens Corning and certain of its subsidiaries
objected to the proposed consolidation. The banks had obtained
separate guaranties from certain subsidiaries of Owens Corning
that would be eliminated in the proposed consolidation. The Third
Circuit Court of Appeals reversed the district court's ruling
approving a "deemed consolidation" of Owens Corning and seventeen
of

**Page 30**

its subsidiaries "for purposes of valuing and satisfying
creditor claims, voting for or against the plan, and making
distributions for allowed claims under [the plan]." *Id.* at 202.
The consolidation was "deemed" because the plan "would not result
in the merger of or the transfer or commingling of any assets of
any of the [d]ebtors or [n]on-debtor [s]ubsidiaries, . . .
[which] will continue to be owned by the respective [d]ebtors or
[n]on-debtor [s]ubsidiaries." *Id.* The *Owens Corning* Court
recognized that each Owens Corning subsidiary was a separate
legal entity that observed governance formalities and, further,
that different entities were created for different purposes. For
example, some existed to limit liability concerns (such as those
related to asbestos), others to gain tax benefits, and still
others had regulatory reasons for their formation. *Id.* at 200.

The *Owens Corning* Court reviewed the history of substantive

consolidation and the various factors many courts considered when
confronted with a request for substantive consolidation. The
Third Circuit, however, declined to adopt a discreet list of
factors for use in evaluating substantive consolidation, writing
that "too often the factors in a checklist fail to separate the
unimportant from the important, or even to set out a
standard. . . . [t]his often results in rote following of a form
containing factors where courts tally up and spit out a score
without an eye on the principles that give the rationale for
substantive consolidation (and why, as a result, it should so
seldom be in play)." *Id.* at 210. The guiding principles
articulated by the Court included the following:

> (1) Limiting cross-creep of liability by respecting
> entity separateness is a `fundamental ground
> rule.' . . . As a result, the general expectation of
> state law and of the Bankruptcy Code, and thus of
> commercial markets, is that courts respect entity
> separateness absent compelling circumstances calling
> equity (and even then only possibly substantive
> consolidation) into play.

> (2) The harms substantive consolidation addresses are
> nearly always those caused by *debtors* (and entities
> they control) who disregard separateness. Harms caused
> by creditors typically are remedied by provisions found
> in the Bankruptcy Code *(e.g.,* fraudulent transfers,
> §§ 548 and 544(b)(1), and equitable subordination,
> § 510(c)).

> (3) Mere benefit to the administration of the case (for
> example, allowing a court to simplify a case by
> avoiding other issues or to make postpetition
> accounting more convenient) is hardly a harm calling
> substantive consolidation into play.

> (4) Indeed, because substantive consolidation is
> extreme (it may affect profoundly creditors' rights and
> recoveries) and imprecise, this `rough justice' remedy
> should be rare and, in any event, one of last resort
> after considering and rejecting other remedies (for
> example, the possibility of more precise remedies
> conferred by the Bankruptcy Code).

> (5) While substantive consolidation may be used
> defensively to remedy the identifiable harms cause by
> entangled affairs, it may not be used offensively (for
> example, having a primary purpose to disadvantage
> tactically a group of creditors in the plan process or
> to alter creditor rights).

*Id.* at 211. With these principles in mind, the *Owens Corning*
Court held that, absent consent, what must be proven regarding
the entities for whom substantive consolidation is sought is that
(1) prepetition they disregarded separateness so significantly
their creditors relied on the breakdown of entity borders and
treated them as one legal entity, or (2) postpetition their
assets and liabilities are so scrambled that separating them is
prohibitive and hurts all creditors. *Id.* at 212.

The *Owens Corning* Court decided that neither of the foregoing tests was met in that case. The Court found no evidence of prepetition disregard of the Owens Corning entities' separateness; instead, it concluded that the banks had relied on the entities' separateness when negotiating the loan. *Id.* at 212-13. Moreover, the Court found "no meaningful evidence postpetition of hopeless commingling of the debtors' assets and liabilities." *Id.* at 214. The Court wrote: "Neither the impossibility of perfection in untangling the affairs of the entities nor

**Page 32**

the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation." *Id.* The Court decided that consolidation is justified only if it benefits *every* creditor, writing "the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short." *Id.*

In analyzing the Plan before me, I must first consider whether it provides for substantive consolidation, and, if so, whether such consolidation is justified based upon the principles enunciated in *Owens Corning*. The Plan Proponents argue that the Plan does not substantively consolidate all the assets and liabilities of the Debtors, but, instead, consists of a series of interrelated settlements of numerous complex disputes, such as which Debtor owns particular assets, which Debtor should get the benefit of certain litigation proceeds, whether intercompany claims by one Debtor against another should be recharacterized as capital contributions, and which Debtor is entitled to retain certain substantial tax refunds. The Plan Proponents argue that these layers of compromises cannot be peeled off and examined in isolation because each affects — and is conditioned upon — the others. The Plan Proponents argue that the Plan does not propose substantive consolidation, but, instead, embodies a global settlement which benefits all creditors by resolving a myriad of issues without the costs, delay and uncertainty of litigation. In short, I must determine whether the Plan is a clever attempt to disguise that which is forbidden by *Owens Corning,* or, whether the Plan Proponents have conceived a proper framework for the fair and economically beneficial resolution of complex issues, both existing and potential, among the various Debtors and among the various creditor constituencies.

Typically, substantive consolidation takes a form in which separate entities are merged

**Page 33**

into a single survivor, which is then left with the assets and liabilities of all. In contrast, the Plan here does not propose to combine the assets and liabilities of all sixteen Debtors, but fashions three Debtor Groups, based upon each entity's function and in an attempt to resolve intercompany claims and issues regarding ownership of certain assets. The Plan framework recognizes the separate business functions and creditor bodies of the respective entities. The Holding Company Debtors consist of entities which generally operated as real estate investment entities, frequently holding residual interests in securitization trusts realized by the Debtors from the securitization of pools

of mortgage loans. The Operating Company Debtors consist of entities that conducted the Debtors' business operations, including originating, purchasing and selling loans and servicing loans for third parties. Access Lending stands by itself because it operated largely autonomously from the other Debtors by providing warehouse financing to other loan originators. The procedures approved by the Court also required creditors to file claims against specific Debtors, which allowed creditors with claims against more than one Debtor to file claims against each of those entities. I conclude that the Plan does not propose substantive consolidation *inform*.

   Neither does the Plan, *in effect,* result in substantive consolidation. Usually, creditors who rely upon the corporate separateness of subsidiaries are harmed by consolidation, which eliminates the benefit of obtaining satisfaction of a claim from more than one entity. This Plan, however, avoids that harm by creating the Multi-Debtor Claim Protocol. The Multi-Debtor Claim Protocol is applicable when a creditor has valid claims against more than one Debtor and, therefore, has claims in multiple classes. The Multi-Debtor Claim Protocol adjusts the Determined Distribution Amount of the multiple claims to a single claim that is less than 100%

**Page 34**

of each claim against the Debtors, but more than 100% of a single claim against the combined Debtor Group. Furthermore, substantive consolidation usually cancels any inter-entity liabilities. The Plan before me includes a compromise on this issue by providing for the Intercompany Claim Protocol, which resolves many disputes over intercompany claims but does not cancel them entirely. Here, but for consent of the Deferred Compensation Beneficiaries, the Debtors have achieved a global agreement, settling all key intercreditor and inter-estate disputes through the use of numerous, tailored, interrelated protocols. This effect is far from the imprecise, "rough justice" of substantive consolidation against which *Owens Corning* warns; neither is there any evidence that the purpose of the Plan is to disadvantage tactically any group of creditors. Instead, as demonstrated by the record before me, the Plan embodies thoughtful compromises that carefully preserve creditors' rights, rather than diminish or eliminate them.

   Upon analysis of the Plan's framework, viewed in light of the principles articulated by the Court of Appeals, I conclude that the Plan does not provide for substantive consolidation of the Debtors, "deemed" or otherwise.**[fn24]**

(b) Section 1123(a)(4).

   The Ad Hoc Committee argues that the Plan cannot be confirmed because it does not satisfy § 1129(a)(1), which mandates that a plan must comply with all provisions of the Bankruptcy Code. Specifically, the Ad Hoc Committee contends that the Plan does not comply

**Page 35**

with § 1123(a)(4), which provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." **11 U.S.C. § 1123**(a)(4). The Ad Hoc Committee argues that the

Multi-Debtor Claim Protocol adjusts the Determined Distribution Amount of some unsecured claims of creditors of NCFC to value those claims at 130% of the allowed amount of their claims, while the claims of other unsecured creditors (such as the creditors represented by the Ad Hoc Committee) are valued at 100% of the allowed amount. The Ad Hoc Committee contends that this violates the plain language of Bankruptcy Code § **1123**(a)(4).

The Plan Proponents argue in response that the Multi-Debtor Claim Protocol does not provide some creditors in the same class with better treatment, but, instead, actually provides those creditors with less favorable treatment. For creditors in Class HC3b (such as the creditors represented by the Ad Hoc Committee), the Plan provides that "[t]he Determined Distribution Amount for each Allowed Class HC3b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol, (ii) the Intercompany Claim Protocol, and (iii) with respect to Holders of Capital Trust Claims, to Article 4.C.3 of this Plan."

The Multi-Debtor Claim Protocol adjusts the Determined Distribution Amount and provides that creditors holding claims for which more than one Holding Company Debtor is liable are treated as follows:

Where a Creditor holds Allowed Holding Company Debtor Unsecured Claims for which more than one Holding Company Debtor is jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one of its Allowed Holding Company Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in

**Page 36**

which the Creditor's Allowed Holding Company Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims; <u>provided however,</u> that where a Creditor holds Allowed Holding Company Debtor Unsecured Claims, other than Allowed Class HC3a Claims and Allowed Class HC10a claims, for which both NCFC and NC Credit are jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution amount on account of its Allowed Unsecured Claims against NCFC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims.

The Plan, Section 6.A. This provision recognizes that some creditors can assert the same claim against multiple Debtor entities,**[fn25]** and recognizes that each Debtor entity's assets could be greatly reduced by the inter-company claims. (*See* Tr. 4/24/08 at 126:8 — 127:3). By way of illustration, instead of receiving a 100% Determined Distribution Amount on account of its HC3b claim against NCFC and a 100% Determined Distribution Amount on account of its HC10b claim against NC Credit (for a total Determined Distribution Amount of 200%), a creditor holding a claim for which both NCFC and NC Credit are liable has agreed to accept one claim against the Holding Company Debtors' assets with

a 130% Determined Distribution Amount. *(See* Tr. 4/24/08 at 122:16 — 124:10, Tr. 4/25/08 at 45:1 — 45:22). Rather than grant more favorable treatment to some Class HC3b creditors, the Multi-Debtor Claim Protocol represents a compromise under which some creditors, with their consent, are receiving less favorable treatment.

The Ad Hoc Committee's reliance on *ACC Bondholder Group v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.),* 361 B.R. 337 (S.D.N.Y. 2007) and *The Finova Group, Inc. v. JP*
**Page 37**
*Morgan Chase Bank (In re The Finova Group, Inc.),* 304 B.R. 630 (D.Del. 2004) to support its position are unpersuasive, because the facts of each case are distinguishable. Those decisions address additional benefits given to creditors in a single class, whereas, under this Plan, the Multi-Debtor Claim Protocol applies to reduce overall distributions to creditors with claims in more than one class.**[fn26]**

The argument by the Plan Proponents is persuasive. The effect of the Multi-Debtor Claim Protocol represents a compromise in which some creditors *(not* including the Deferred Compensation Beneficiaries) have agreed to receive less favorable treatment of their multiple claims. The Multi-Debtor Claim Protocol for creditors of the Holding Company Debtors does not violate Bankruptcy Code § **1123**(a)(4).

(c) Section 1129(a)(7).
**Page 38**

The Ad Hoc Committee also objects to confirmation of the Plan for its failure to comply with § 1129(a)(7), also referred to as the "best interests of creditors test," which provides, in pertinent part:

(7) With respect to each impaired class of claims or interests —

(A) each holder of a claim or interest of such class —

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

**11 U.S.C. § 1129**(a)(7). "The `best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.),* 329 B.R. 491, 500 (D.N.J. 2005) quoting *Bank of America Nat. Trust & Sav. Ass `n v. 203 North LaSalle St. Partnership,* **526 U.S. 434**, **442** n. 13 (1999). Here, I must consider whether the Deferred Compensation Beneficiaries, who voted against the Plan, would receive more under the Plan as members of Class HC3b than they would if NCFC were liquidated on its own in a chapter 7 case. This confirmation requirement has been described as follows:

This section `is an individual guaranty to each
creditor or interest holder that it will receive at
least as much in *reorganization* as it would in
*liquidation.* 7 Collier on Bankruptcy ¶ 1129.03[7][b]
p. 1129-43 (15th ed. rev. 2002) (emphasis added).
Paragraph (7) of subsection (a) requires a
*comparison* between what each member of a class will
receive under *a plan* and what such claimant would
receive in *liquidation.*' 7 Collier on Bankruptcy
¶ 1129.03[7][c] p. 1129-48 (15th ed. rev. 2002)
(Emphasis added). Thus if a plan fails the § 1129(a)(7)
test then the creditors are better off in a
liquidation.

*In re Stone and Webster, Inc.*, 286 B.R. 532, 545 (Bankr.D.Del.
2002).[fn27] The Plan Proponents

**Page 39**

have the burden of proving compliance with § 1129(a)(7). *Lisanti
Foods,* 329 B.R. at 500; *In re Global Ocean Carriers Ltd.,*
251 B.R. 31, 46 (Bankr.D.Del. 2000).

Attached as Exhibit E to the Disclosure Statement were two
liquidation analyses showing projected recoveries in a chapter 7
liquidation, including a "high recovery case" and a "low recovery
case." (Ad Hoc Ex. 10) ("Exhibit E"). The high and low
liquidation scenarios correspond to the projected range of
recovery for creditors under the Plan, as set forth in
Section I.A.4. of the Disclosure Statement. In that section, the Plan
Proponents project that unsecured creditors with claims in Class
HC3b will receive a distribution under the Plan in a range
between 1.9% and 14.3% of their claims. (Disclosure Statement,
Section I.A.4). Exhibit E shows projections that, in a chapter 7
liquidation, the range of recovery for NCFC's unsecured creditors
would be between 0% and 13.7%.

The underlying assumptions for the liquidation scenarios were
explained in the Etlin Declaration and in Ms. Etlin's live and
proffered testimony.[fn28] The Ad Hoc Committee argues that the Plan
Proponents have provided insufficient foundation to support the
liquidation scenarios to meet their burden of proof regarding
§ 1129(a)(7)'s best interests of creditors test. However, the
admissible portions of the Etlin Declaration and Etlin's live
testimony presented at the confirmation hearing provide
sufficient evidence to support the Plan Proponents' estimates,
and, ultimately, their contention that the Plan complies with
Bankruptcy Code § 1129(a)(7).

**Page 40**

The "asset recoveries" in the low and high liquidation
scenarios are the same as the estimates for recovery under the
Plan, with two exceptions.[fn29] (Etlin Declaration, ¶ 19). The
expected value of the Debtors' tax refunds and the value of the
Carrington Interests have been decreased by 25% and 35%,
respectively, in the liquidation scenarios.[fn30] *(Id.).* Ms. Etlin
testified that the amount of recovery projected for these two
items is based upon extensive and delicate negotiations, which
would likely falter if the case were converted to chapter 7.
*(Id.).* Although the Ad Hoc Committee argued that there was no

reason to believe that a chapter 7 trustee could not negotiate the same settlements, I find the Debtors' position to be more realistic due to the fragility and interrelatedness of the Plan's settlements. (Tr. 4/24/08 at 160:13 — 160:19, Etlin Declaration, ¶ 19).

The liquidation scenarios contain assumptions about the asset recoveries that are favorable for creditors of NCFC. For example, both the high and low liquidation scenarios assume that NCFC's intercompany claim against NCMC will be allowed at 100% (as opposed to the 50% provided for in the Plan). (Etlin Declaration, ¶ 27). Both liquidation scenarios also assume that NCFC has complete ownership of the Deferred Compensation Trust and 50% ownership of the Carrington Interests. (Etlin Declaration, ¶ 28). Evidence presented at the confirmation hearing shows that NCFC's ownership of these assets and the validity of the

Page 41

intercompany claim are less than clear and, as the record demonstrates, the subject of legitimate debate.

The liquidation scenarios also estimate that the amount of the asset recoveries available for distribution to unsecured creditors would be greatly reduced after conversion to chapter 7 due to the additional fees and costs that would have to be paid to one or more chapter 7 trustees and their professionals.[fn31] (Etlin Declaration, ¶ 20) In addition to chapter 7 administrative claims, unsecured creditors' distributions would be impacted by payment of the administrative claims incurred during the chapter 11. (See 11 U.S.C. § 726(b)). The low liquidation scenario reflects that NCFC will pay a greater share of the chapter 11 administrative expenses than that contemplated by the Plan. (Etlin Declaration, ¶ 27). The Holding Company Debtors' allocated share of the chapter 11 administrative expenses in the Plan was the result of a series of compromises made during the Plan negotiations as creditors argued over which Debtors should be held responsible for which portion of the administrative expenses. (Id., ¶ 25, as admitted).

Overall, the evidence presented at the confirmation hearing supports the liquidation scenarios and the conclusion that the objecting creditors will receive more under the Plan than they would in a chapter 7 liquidation. Conversion to chapter 7 would not increase the asset recoveries, but would add substantial costs and delay to the process before unsecured creditors would receive any distribution. More importantly, it is clear from the evidence that the intricate negotiated settlements included in the Plan are liable to collapse if the bankruptcy estates were

Page 42

turned over to chapter 7 trustees with competing interests.[fn32] As Ms. Etlin testified:

[M]y personal knowledge of how difficult it was to broker deals with those parties and . . . the continuing fragility of those deals in light of the deals we cut, . . . ., causes me to believe and caused me to make the estimates [about increased administrative costs] which are encompassed in this liquidation analysis.

And while parties under my direction prepared it and

```
     put the numbers on the page, I was involved in almost
     every meeting associated with this and ultimately
     approved the amounts that went into it and was very
     much part of the discussion and composition of how much
     we thought these additional expenses would be if all
     these settlements fell
apart.
```

(Tr. 4/24/08 at 160:12 — 161:1). The uncertainty and increased costs of a chapter 7 liquidation would not be in the best interests of the NCFC creditors, including the Deferred Compensation Beneficiaries. I conclude that the Plan's treatment of the objecting creditors satisfies § 1129(a)(7).

(d) Approval of settlements in a plan.

   The Plan Proponents posit that the Plan is a "series of interrelated compromises that together comprise a global settlement of key intercompany and intercreditor disputes" (Plan Proponents' Reply Brief (docket no. 6395) at 29) and satisfy the requirements for approval of settlements under Bankruptcy Rule 9019, applied in the plan confirmation context.

   Bankruptcy Code § 1123(b)(3)(A) states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). See also Protective Comm. For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) ("Compromises are `a normal part of the process of reorganization.'"). When considering
Page 43
confirmation of a proposed chapter 11 plan, it is the "duty of the Bankruptcy Court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." Exide, 303 B.R. at 67 quoting In re Cellular Information Systems, Inc., 171 B.R. 926, 947-48 (Bankr.S.D.N.Y. 1994), in turn quoting TMT Trailer, 390 U.S. at 424.

   When considering whether a proposed settlement is fair and equitable, the Third Circuit has instructed that the Court should consider four factors: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors. Exide 303 B.R. at 67 citing In re RFE Industries, Inc., 283 F.3d 159, 165 (3d Cir. 2002).[fn33] These factors continue to be applied by courts in this Circuit. See, e.g., Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006), In re RNI Wind Down Corp., 2007 WL 949647, *4 (Bankr.D.Del. March 29, 2007).[fn34] After application of the
Page 44
relevant factors to the various settlements proposed in the Plan, I conclude that the settlements are fair and equitable to all creditors, including the Deferred Compensation Beneficiaries.

   The evidence presented at the confirmation hearing demonstrated that the Debtors and the Creditors' Committee undertook a

detailed analysis of the Debtors' assets and the transactions giving rise to the potential claims among the Debtors and the claims held by others against the Debtors. *(See, e.g,* Tr. 4/24/08 190:19 — 192:18, 202:3 — 204:10, 213:2 — 18 (Testimony of Star regarding research and analysis performed by Creditors' Committee in analyzing the compromises)). As a result of that process, the various and diverse constituencies negotiated the Plan as a global settlement of the various claims and issues, which global settlement is likely to fail if any one of the compromises is not approved. *(See* Tr. 4/24/08 at 160:12 — 161:1, Etlin Declaration, ¶ 22, ¶ 42). The Plan's negotiated settlements include issues regarding: (i) ownership of the Carrington Interests and the Deferred Compensation Trust arising from the lack of clarity in the Debtors' records regarding whether TRS Holdings, NCFC or NCMC owns, or is entitled to, those assets, (ii) allocation among the Debtors of proceeds that may result from potential litigation arising from NCFC's announced need to restate its 2006 financial statements, (iii) which Debtor is entitled to receive substantial tax refunds, (iv) claims held by one Debtor against another, including the lack of instruments evidencing the debt or reclassifying debt to equity, (v) which Debtor should be liable (and in what proportion) to pay the administrative expenses of this bankruptcy case, and (vi) the defense of potential breach of contract lawsuits by loan buyers or securitization parties arising from the hundreds of thousands of loans sold by the Debtors prepetition.

In evaluating the merits of the potential litigation, the Court's task is not to "decide the

**Page 45**

numerous questions of law and fact raised by [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Exide,* 303 B.R. 67, citing *In re Neshaminy Office Bldg. Assoc.,* 62 B.R. 798, 803 (E.D.Pa. 1986) quoting *In re W. T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983). The compromises negotiated in the Plan are clearly reasonable, which conclusion becomes more clear as the other factors are examined.

The Plan Proponents argue that the likely difficulty of collection, while at first appearing not to apply to this analysis, actually weighs in favor of approval of the settlements. The Plan Proponents argue that:

The disputes being settled are largely intercompany litigation among liquidating Debtors. . . . [E]ach of the Debtors could expend its remaining assets on the litigation of these complex claims — such that by the time a judgment is reached the prevailing Debtor may find that the defendant Debtor has exhausted its assets.

Plan Proponents Reply Brief (docket no. 6395) at 32. Many of the issues and claims described above arise between and among the various Debtors and, while it is difficult to tell whether litigation would render such claims "uncollectible," the substantial expense would adversely impact even those creditors on the side of the victorious Debtor.

In *Nutraquest,* the Court noted that "[i]t is axiomatic that

settlement will almost always reduce the complexity and inconvenience of litigation." *Nutraquest,* [434 F.3d at 646](). However, given the number of settlements contained in the Plan and the interrelatedness of those settlements, this factor is particularly applicable in this case. The size and complexity of these potential claims would certainly lead to lengthy, expensive trials. The "cost" of such litigation would fall upon the unsecured creditors, both in terms of a significant reduction in assets available for distribution and delay in receiving that distribution.

**Page 46**

Finally, consideration of the paramount interest of creditors leads me to conclude that the Plan settlements should be approved. The voting results show vividly that the Plan is supported broadly by a diverse creditor body. Only one class of the sixteen entitled to vote on the Plan voted against the Plan: the Deferred Compensation Beneficiaries represented by the Ad Hoc Committee.**[fn35]** Of this single dissenting class, 75 members with claims of $395 million in amount voted in favor, while the 203 who voted against the Plan (all but three of whom are Deferred Compensation Beneficiaries) hold only $18.9 million of claims. The assenting creditors in this class include a broad cross-section of unsecured creditors, including Master Repurchase Agreement counterparties, an indenture trustee, trade creditors and a major landlord. To be sure, the interests of the objectors are entitled to the full benefit of the protections afforded by applicable law. I conclude, nonetheless, that the Plan settlements are fair and equitable and provide benefits to the entire creditor body.

<u>**CONCLUSION**</u>

The Plan will be confirmed. The order which follows will require submission by the Plan Proponents, in consultation with interested parties, of a proposed confirmation order, which

**Page 47**

will be considered at the hearing already scheduled for July 14, 2008.

[fn3] By Order dated April 3, 2007, the Court granted the motion by New Century TRS Holdings, Inc. and its affiliates for joint administration of the related chapter 11 cases. *(See* docket no. 52). The Order was amended on August 8, 2007 to include Access Lending in the joint administration. *(See* docket no. 2199).

[fn4] At the close of the evidentiary record, the objection of New York State Teachers' Retirement System (docket no. 6307) was still outstanding, but has since been resolved. Other objections were resolved prior to or at the time of the confirmation hearing.

[fn5] Except where noted otherwise by specific citation, most of the information included in this section is taken from Section III of the Debtors' disclosure statement, approved by Order dated March 18, 2008 (docket no. 5396) and attached as Exhibit C to the Certificate of Counsel filed on March 18, 2008 (docket no. 5395) (the "Disclosure Statement").

[fn6] LIBOR, a common benchmark interest rate index, is the acronym for London Interbank Offered Rate. LIBOR is the rate at which banks offer to lend money to one another in the wholesale money markets in London, England.

[fn7] Upon default, the other parties to these agreements held claims against the Debtors, known in the Plan as the "EPD/Breach Claims." An "EPD/Breach Claim" is defined in Article 1 of the Plan as "a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan." EPD stands for "early payment default."

[fn8] The Master Repurchase Agreements allowed the Repurchase Counterparties to mark to market the mortgage loans that were subject to these facilities. If the market value of the loans times an "advance rate" was less than the repurchase obligations owed by the Debtors on repurchase, the Repurchase Counterparties were entitled to make a margin call. The Debtors could satisfy a margin call through a cash payment or by delivering additional mortgage loans to bring the facility back into balance.

[fn9] The U.S. Trustee had requested appointment of a chapter 11 trustee. After an evidentiary hearing, I decided that appointment of a chapter 11 trustee was not warranted, but ordered, instead, appointment of an examiner. *See* 11 U.S.C. § 1104(c).

[fn10] I take judicial notice of certain parts of the Examiner's Report pursuant to Fed.R.Evd. 201, made applicable here pursuant to Fed.R.Bankr.P. 9017. "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact `not subject to reasonable dispute' . . . [and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.,* 61 F.3d 197, 205 (3d Cir. 1995). Because some of the Examiner's factual findings and conclusions may serve as the basis for future litigation, I refer to such information for background purposes only, and which appears, for purposes of confirmation, to be undisputed.

[fn11] Measured by the value of its pre-petition assets, New Century's bankruptcy filing was the largest chapter 11 filing in 2007, and, by the same measure, as of the date of the Examiner's Report, was the ninth largest of all time. (Examiner's Report, at 107). I take judicial notice that the Debtors listed their pre-petition assets at $12,905,606,046.91 and liabilities at $11,476,388,868.31 (as taken from the "total assets" and "total liabilities" columns on the Summary of Schedules page of each Debtor's bankruptcy schedules) (docket nos. 1004 — 1018; docket no. 2845).

[fn12] On April 9, 2007, the U.S. Trustee appointed the Creditors' Committee, consisting of seven creditors holding claims of various types against different Debtors, "reflecting a broad cross-section of the Debtors' capital structure. . . ." (Declaration of Holly Felder Etlin In Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation dated as of April 23, 2008 (docket no. 6407), as admitted, in part, pursuant to the Court's ruling at the confirmation hearing on April 25, 2008 (Tr. 4/25/08 at 5:8 — 8:23) (the "Etlin Declaration"), ¶ 12; Tr. 4/24/08 at 65:8-21; *See also* docket no. 143)

   The Creditors' Committee consists of three creditors of NCFC ((i) Credit Suisse First Boston Mortgage Capital LLC, a Master Repurchase Agreement claimant ($124 million claim); (ii) Wells Fargo Bank, N.A., an indenture trustee for junior subordinated noteholders ($90 million claim); and (iii) McGuire Properties — Park-Place, LLC, a substantial landlord ($15 million claim)); and four creditors of NCMC (Fidelity Mutual Information Services, Inc., Credit-Based Asset Servicing and Securitization, LLC, Residential Funding Company, LLC and Deutsche Bank National Trust Company). Fidelity Mutual also holds a claim against Home 123. (Tr. 4/24/08 at 186-190, testimony of Samuel E. Star from FTI Consulting, the Creditors' Committee's financial advisor.)

[fn13] Certain administrative claims will be paid according to a settlement, known as the Joint Administrative Expense Share, which allocates joint administrative expenses among the Debtor Groups (discussed *infra.)* and resolves the parties' disputes over which debtor entities should be responsible for administrative costs. (The Etlin Declaration, ¶ 25).

[fn14] Deutsche Bank, alone, asserts EPD/Breach claims of more than $75 million. (Tr. 4/24/08 at 190:3-4 (Testimony of Samuel Star).

[fn18] Access Lending's assets now consist primarily of the proceeds from the liquidation of its assets in April 2007 *(see* Disclosure Statement, Section III.C.6.e.) and the cash in its operating account as of the bankruptcy filing date. (Disclosure Statement, Section IV.A.1.a.).

[fn19] The Deferred Compensation Trust is referred to in the transcript of the confirmation hearing and some filings as the "Rabbi Trust."

[fn20] There is a dispute in the adversary proceeding, discussed *infra.,* about whether any sums were actually "withheld" from any participant's compensation.

[fn21] The Ad Hoc Committee lists New Century Holdings, Inc., a Delaware corporation, as the first defendant on the complaint, along with the other Debtors. However, New Century Holdings, Inc.

is not one of the Debtors and is not known to be a corporate entity related to the Debtors. At confirmation hearing, counsel for the Ad Hoc Committee characterized this as a "typo." Tr. 4/24/08 at 156:3 — 158.14.

[fn22] ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." **29 U.S.C. § 1051**(2).

[fn23] If the Deferred Compensation Plan is not a top hat plan and is subject to ERISA requirements, then the Ad Hoc Committee argues that any employee contributions "shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." **29 U.S.C. § 1103**(c)(1).

[fn24] The Plan Proponents argue, alternatively, that, even if the Plan is considered to be a substantive consolidation, it does not run afoul of *Owens Corning.* The Plan Proponents assert that the cost and delay of unscrambling ownership of the assets and the validity of intercompany claims and liabilities postpetition is prohibitive and would only harm creditors. I will not determine this alternative argument, first, because I decide that the Plan does not propose a substantive consolidation, and, second, because the record made by the Plan Proponents better supports their primary argument that, here, there is no substantive consolidation.

[fn25] For example, Bank of America., N.A., as buyer and agent, asserted claims against Holding Company Debtors and Operating Company Debtors in excess of $38 Million. *(See* Docket Nos. 8035 and 8220).

[fn26] In *Adelphia,* the proposed plan offered a class of senior noteholders the same pro rata distribution from the pool of available assets, but also offered broad releases and exculpations from the debtors and other claimants to those noteholders who voted in favor of the plan. The bankruptcy court decided that the plan did not violate § 1123(a)(4) by offering the releases because each noteholder received the same distribution regardless of whether they voted to accept or reject the plan. The *Adelphia* Court, considering whether to grant a stay pending appeal of the confirmation order, decided that:

Section 1123(a)(4) guarantees that each class member will be treated equally regardless of how it votes on a proposed plan. Where the receipt of valuable benefits in a plan is conditioned on a vote to accept *that plan,* there is a very real possibility of dissuading or silencing opposition to the plan. In this context, the Bankruptcy Court's semantic distinction between the treatment of claims and claimants goes against the spirit of section 1123(a)(4) and what it seeks to

protect.

*Adelphia,* 361 B.R. at 363-64 (emphasis in original). The concerns of the *Adelphia* Court are not present in this case. Instead of receiving extra benefits by voting for the Plan, creditors with claims in multiple classes that can be asserted against more than one Debtor entity have agreed to accept a lesser distribution on their second claim.

In the *Finova* decision, the Court determined that a plan proposing to pay interest to some members of the class, but not to pay utilization fees to other members, violated § 1123(a)(4) because it found that the credit agreements' utilization fees and interest payments were essentially the same. *Finova,* 304 BR. at 636. Again, this case does not consider treatment of creditors with claims in more than one class.

[fn27] In *Stone and Webster,* Judge Walsh decided that if substantive consolidation was appropriate, then the hypothetical chapter 7 analysis likewise should be prepared on a consolidated basis. *Stone and Webster,* **286 B.R. at 545**. In this case, the chapter 7 analysis was prepared for each debtor on a stand alone basis and, since no objection has been raised on those grounds, the issue is not before me.

[fn28] Ms. Etlin's testimony was presented in three forms: a proffer by the Debtors' counsel, live testimony, which included cross-examination, and the Etlin Declaration. In response to the Ad Hoc Committee's objections, the Court ruled that portions of the Etlin Declaration were inadmissible. *(See* Tr. 4/25/08 at 5:8 — 8:10). Ms. Etlin is a managing director of AlixPartners, LLP and presently engaged as President, Chief Executive Officer and Chief Restructuring Officer of NCFC. She was a knowledgeable, authoritative (although not called or treated as an "expert"), and credible witness for the Plan Proponents.

[fn29] The Ad Hoc Committee faulted the liquidation scenarios for failing to include a value for potential Litigation Proceeds. However, the potential value of the Litigation Proceeds were not included in either the estimated Plan recovery or the estimated liquidation recovery. Therefore it was appropriate to exclude potential Litigation Proceeds from the liquidation scenarios for purposes of deciding whether the best interests of creditors test is met.

[fn30] The estimated decrease in value in the Carrington Interests affects only the high recovery liquidation scenario, because the low recovery scenario (both under the Plan and in the hypothetical liquidation) assumes that the Debtors would not receive any recovery from the Carrington Interests. (Etlin Declaration, ¶ 19).

[fn31] It is beyond peradventure that conversion of the Debtors' cases to chapter 7 would result in substantial chapter 7 administrative costs. In an analysis under § 1129(a)(7), the

costs of the chapter 7 case must be taken into account. *Lisanti Foods,* 329 B.R. at 500.

[fn32] Under the circumstances before me, the potential need for appointment of multiple chapter 7 trustees is not remote.

[fn33] In *Exide,* I also considered a seven-factor test set forth in the decision *In re Texaco, Inc.,* **84 B.R. 893**, **902** (Bankr.S.D.N.Y. 1988). For the most part, the *Texaco* factors overlap the Third Circuit's four-factor test. One factor, i.e., the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, is not at issue here. The remaining two factors — (i) the competency and experience of counsel who support the settlement, and (ii) the extent to which the settlement is truly the product of "arms length" bargaining, and not of fraud or collusion — weigh heavily in favor of approval by virtue of the extensive efforts and constructive engagement among the Debtors, the Creditors' Committee, and other creditor constituencies.

[fn34] Both *Nutraquest* and *RNI Wind Down* refer to these factors as *Drexel-TMT Trailer-Martin* factors, since they were set forth in the often-cited decision *Myers v. Martin (In re Martin),* **91 F.3d 389**, **393** (3d Cir. 1996), and further noting that the *Martin* Court "t[ook its] cue" from *TMT Trailers,* but the origin of the four factors can be traced back to the 1929 Eighth Circuit case *Drexel v. Loomis,* **35 F.2d 800**, **806** (8ᵗʰ Cir. 1929). *Nutraquest,* **434 F.3d at 645**, *RNI Wind Down,* 2007 WL 949647 at *4. In *Nutraquest,* the Third Circuit decided that its prior decisions did not limit application of the factors to settlement of claims held by a debtor, and further determined that the factors are often applied to review settlements involving claims held *against* a debtor. *Nutraquest,* **434 F.3d at 645** (citations omitted). The settlements in this case involve a variety of claims, including claims held by one debtor against another, and claims held by creditors against more than one debtor.

[fn35] This group is described by the Plan Proponents as "a group of former senior managers [who are trying] . . . to hold hostage a plan that has been overwhelmingly approved by the creditor body in order to obtain perceived leverage in their adversary proceeding, especially since, as they acknowledge, if they prevail in that litigation, the Plan would have no impact on them." Post-hearing brief of Plan Proponents, at 12 (docket no. 6649). The Plan Proponents argue "that the largest dollar claims held by the Deferred Compensation Claimants are asserted by former senior executives whose deferred compensation was calculated based upon reported financial results for the Debtors that turned out to be inflated and needed to be restated. Tr. 4/24/08 at 76:25 — 78:1." *(Id.).*

Copyright © 2009 Loislaw.com, Inc. All Rights Reserved