Desmond J. Hinds, Esq. (SBN: 105831)
dhinds@hinshawlaw.com
David C. Hunter, Esq. (SBN: 208155)
dhunter@hinshawlaw.com
HINSHAW & CULBERTSON LLP
11601 Wilshire Blvd., Suite 800
Los Angeles, CA 90025
Telephone:    310-909-8000
Facsimile:    310-909-8001

Attorneys for Defendants
SAXON MORTGAGE SERVICES INC.;
DEUTSCHE BANK NATIONAL TRUST
COMPANY AS TRUSTEE FOR
MORGAN STANLEY, MSAC 2007-NC3

FAKED COPY

**FILED**

SEP 1 5 2009

CLERK
United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In Re<br><br>RICHARD SOUZA CAPORALE<br>and ISABEL SOUZA CAPORALE,<br><br>Debtors.<br><br><br>RICHARD SOUZA CAPORALE<br>and ISABEL SOUZA CAPORALE,<br><br>Plaintiffs,<br><br>vs.<br><br>SAXON MORTGAGE SERVICES<br>INC., DEUTSCHE BANK<br>NATIONAL TRUST COMPANY AS<br>TRUSTEE FOR MORGAN<br>STANLEY, MSAC 2007-NC3;<br>AND DOES 1-10,<br><br>Defendants. | Adversary Case No. 09-05050<br><br>(Related Chapter 7 Case No. 07-54109)<br><br>Assigned to Judge Arthur S. Weissbrodt<br><br>**DECLARATION OF DAVID HUNTER IN SUPPORT OF SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO APPLICATION FOR RESTRAINING ORDER**<br><br>Date:        October 9, 2009<br>Time:        2:15 p.m.<br>Courtroom:   3020 |

1

HUNTER DECLARATION IN SUPPORT OF OPPOSITION TO TRO

31148836v1 68313

I, DAVID HUNTER, hereby declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts of the State of California. I am an associate with the law firm of Hinshaw & Culbertson LLP, counsel of record for Defendants SAXON MORTGAGE SERVICES INC. and DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR MORGAN STANLEY, MSAC 2007-NC3 (hereinafter "Defendants") in this matter. The following information is known to me of my own personal knowledge, unless indicated otherwise, and if called and sworn as a witness I could testify competently thereto.

2.      This Declaration is submitted in support of Defendants' Second Supplemental Opposition to Plaintiffs' request for a Temporary Restraining Order/Permanent Injunction prohibiting them from foreclosing on the Subject Property.

3.      A true and correct copy of the Order Approving (i) The Sale of Debtors' Servicing Business to Carrington Capital Management, LLC and Carrington Mortgage Services, LLC Pursuant to the Second Amended and Restated Asset Purchase Agreement, Dated as of May 21, 2007, Free and Clear of Liens, Claims, Encumbrances, and Interests, and (ii) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Carrington as Part of Such Sale entered May 23, 2009 is attached hereto as **Exhibit A.**

4.      A true and correct copy of the Prospectus Supplement, Mortgage Pass Through Certificates, Series 2007-NC3 (Morgan Stanley ABS Capital I Inc. Trust 2007-NC3) is attached hereto as **Exhibit B.**

5.      The promissory note at issue is indorsed in blank. Please see a true and correct copy of this indorsement, previously submitted to the Court, attached hereto as **Exhibit C.**

6.      Given the above Defendants have a duly transferred, recorded and perfected lien interest in the property. The restraining Order currently in effect must be lifted and Defendants must be allowed to foreclose.

Case: 09-05050    Doc# 53    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 2 of 22

1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2    is true and correct. Executed on this September 15, 2009 at Los Angeles, California.

3

4                                            _____

5                                                    David Hunter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HUNTER DECLARATION IN SUPPORT OF OPPOSITION TO TRO

Case: 09-05050    Doc# 53    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 3 of 22

**EXHIBIT "A"**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Related Docket Nos. 70, 340** |
| | : | |

## ORDER PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING (i) THE SALE OF DEBTORS' SERVICING BUSINESS TO CARRINGTON CAPITAL MANAGEMENT, LLC AND CARRINGTON MORTGAGE SERVICES, LLC PURSUANT TO THE SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, DATED AS OF MAY 21, 2007, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (ii) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO CARRINGTON AS PART OF SUCH SALE

Upon the motion, dated April 4, 2007 (the "Motion"), of New Century Financial

Corporation ("New Century") and its affiliated debtors and debtors-in-possession (collectively,

the "Debtors"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for approval of (i) the sale of New Century's mortgage loan

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

servicing business (the "Servicing Business")[2] to Carrington Capital Management, LLC ("CCM") and Carrington Mortgage Services, LLC ("CMS" and, together with CCM, "Carrington") under the terms of the Asset Purchase Agreement, originally dated April 2, 2007, as amended and restated pursuant to an Amended and Restated Asset Purchase Agreement dated as of April 19, 2007, between New Century Financial Corporation and New Century Mortgage Corporation, as Sellers, and Carrington, as Purchaser (as so amended and restated, the "Original APA"), or to a successful bidder through an alternate transaction, free and clear of liens, claims, encumbrances, and interests (except for the Surviving Permitted Encumbrances (as such term is defined in the APA)), (ii) the institution of bidding procedures (the "Bidding Procedures"), including a break-up fee (as such term is defined in the APA, the "Break-Up Fee") and expense reimbursement (as such term is defined in the APA, the "Expense Reimbursement") payable to Carrington, and (iii) the assumption and assignment of certain executory contracts and unexpired leases of the Debtors (the "Assumed Contracts") to Carrington or alternatively to the successful bidder for the Servicing Business as part of such sale; and the Court having entered an order on April 20, 2007 (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures with respect to the sale of the Servicing Business and notice thereof; and pursuant to the Bidding Procedures, the Debtors' having received what they determined, after consultation with the official committee of unsecured creditors (the "Committee") and after certain clarifying changes to such bids, to be three Qualified Topping Bids for the Servicing Business, from Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley"), Ellington Management Group, L.L.C. ("Ellington"), and Credit-Based Asset Servicing and Securitization LLC and Barclays Bank PLC ("C-BASS/Barclays" and, collectively, with Morgan Stanley and Ellington, the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Carrington Agreement (as defined herein).

Case 1-09-05050   Doc# 53   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 6 of 22

"Other Bidders") respectively, each of which constituted a higher and better bid for the Servicing Business than that represented by the Original APA; and New Century, on behalf of the Debtors and after consultation with its professionals and the Committee and its professionals, having determined that the bid of Morgan Stanley was the highest and best Qualified Topping Bid and having advised the Qualified Bidders of that determination on May 14, 2007 pursuant to the Bidding Procedures; and New Century, on behalf of the Debtors, having then conducted the Auction on May 16, 2007 as required pursuant to the Bidding Procedures; and Ellington and C-BASS/Barclays each having withdrawn its or their respective bids during the course of the Auction, with Morgan Stanley and Carrington having remained in the Auction through multiple rounds of bidding; and the Debtors (after consultation with the Committee) having agreed during such rounds of bidding at the Auction, in order to induce further bidding from Morgan Stanley, to exercise their discretion, pursuant to Paragraph 24 of the Bidding Procedures, not to require Morgan Stanley to close as the Runner-Up Bidder in the event that the Carrington Agreement does not close; and Carrington subsequently having prevailed at the Auction as ultimately having the highest and otherwise best bid for the Servicing Business, determined by the Debtors, after consultation with their investment banking firm, Lazard Freres & Co. and the Committee, including total cash consideration to the Debtors' estates of approximately $184 million, plus a $4 million credit for its Breakup Fee and Expense Reimbursement, based on the APA as amended and restated pursuant to the Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007 (as so amended and restated together with the exhibits and schedules thereto and incorporated by reference therein, the "Carrington Agreement"), a copy of which is attached hereto, exclusive of exhibits and certain schedules, as Exhibit A, which Carrington Agreement, with all exhibits and schedules, is incorporated by reference herein; and a hearing

3

having been held on May 21, 2007 (the "Hearing") to consider approval of the sale of the Servicing Business to Carrington pursuant to the terms and conditions of the Carrington Agreement; and it appearing that notice of the Motion was good and sufficient under the circumstances and that no other or further notice need be given; and the Court having reviewed the Motion and all objections thereto, and having heard the statements in support of the relief requested therein at the Hearing; and it appearing that entry of this Order is in the best interests of the Debtors, their estates, and all parties in interest; and upon the Motion and the record of the Hearing and all other proceedings had before the Court, at which, among other things, the withdrawal or resolution of all objections to the Motion, as approved by this Order, was confirmed; and after due deliberation and good cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Time is of the essence in consummating the transactions contemplated by the Carrington Agreement and a sale of the Servicing Business within the time constraints set forth in the Motion is in the best interests of the Debtors and their estates. The terms of the Carrington Agreement are the best terms that have been offered for sale of the Servicing Business. (Each subsequent reference in this Sale Order to "Servicing Business" or "Servicing Business Assets" in relation to Carrington and/or the Carrington Agreement shall be deemed to be a reference to the Purchased Assets).

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

C.     Upon the closing of the Carrington Agreement, the assets to be sold and the interests to be assigned will have been acquired by Carrington in good faith and as the result of arm's-length negotiations.

D.     The sale of the Servicing Business is necessary to the consummation of any chapter 11 plan of reorganization or liquidation that may be proposed by the Debtors and confirmed by the Court.

E.     Reasonable notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion as it pertains to the sale of the Servicing Business has been afforded to all interested persons and entities, including, but not limited to: (i) the United States Trustee for the District of Delaware, (ii) the attorneys for the Debtors, (iii) the attorneys for the Committee, (iv) the attorneys for Carrington, (v) any party, who, in the past three months, expressed in writing to New Century an interest in acquiring the Servicing Business, and who New Century and its representatives reasonably and in good faith determined potentially to have the financial wherewithal to effectuate the transaction contemplated in the Original APA, (vi) all parties who are known to possess or assert a Lien against, or control over, any assets of the Servicing Business, (vii) the Internal Revenue Service, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, (ix) all applicable state and local taxing authorities, and (x) all other parties who have timely filed requests for notice under Bankruptcy Rule 2002.

F.     Notice, as specified in the preceding paragraph and as evidenced by the affidavits of service and affidavits of publication filed with the Bankruptcy Court, has been in the form and manner specified in the Motion and required by the Bidding Procedures Order, and such notice is reasonable and adequate.

5

G.    No consents or approvals are required for the Debtors to consummate the sale of the Servicing Business other than the consent and approval of this Court and those set forth in the Carrington Agreement. Neither the execution of the Carrington Agreement nor the consummation of the sale of the Servicing Business in accordance with its terms will constitute a violation of any provision of the organizational documents of any Debtor or any other instrument, law, regulation or ordinance by which any Debtor is bound.

H.    The Bidding Procedures have been complied with in all material respects by New Century, on behalf of the Sellers, and Carrington.

I.    Upon entry of this Order (the "Sale Order"), the Debtors shall have full power and authority to consummate the sale contemplated by the Carrington Agreement. The Carrington Agreement and the sale have been duly and validly authorized by all necessary action of the Debtors and no shareholder vote, board resolution or other corporate action is required of the Debtors for the Debtors to consummate such sale or the other transactions contemplated in the Carrington Agreement.

J.    This Sale Order and the consummation of the contemplated transactions are supported by good business reasons, and will serve the best interests of the Debtors, their estates and creditors by maximizing the values to be obtained from the Servicing Business.

K.    The Carrington Agreement was negotiated, proposed and entered into by Carrington without collusion, in good faith and from an arm's-length bargaining position. The relations, if any, of affiliates of Carrington and the Debtors and the Debtors' former or current officers and directors have been fully disclosed, and do not affect the findings of good faith and no collusion contained in this Sale Order. The Debtors and Carrington have not engaged in any

6

conduct that would cause or permit the Carrington Agreement to be avoided under section 363(n) of the Bankruptcy Code.

      L.    Carrington is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) Carrington recognized that the Debtors were free to deal with any other party interested in acquiring the Debtors' Servicing Business; (b) Carrington agreed to provisions in the Carrington Agreement that would enable the Debtors to accept a higher and better offer for the Servicing Business, that in fact produced three other Qualified Bids for the Servicing Business, and that provided for the Auction ultimately resulting in a substantially higher and better bid for the Servicing Business than that represented by the Original APA; (c) other than with respect to conditions contained in the agreement requiring the commencement of this case, Carrington in no way induced or caused the chapter 11 filing of the Debtors; (d) Carrington made the highest and best bid for the Servicing Business at the Auction conducted pursuant to the provisions of the Bidding Procedures; (e) all payments to be made by Carrington and other agreements or arrangements entered into by Carrington in connection with the transactions have been disclosed; and (f) the negotiation and execution of the Carrington Agreement and any other agreements or instruments related thereto was in good faith and an arm's-length transaction between Carrington and the Debtors and/or the Committee.

      M.    The consideration to be provided by Carrington pursuant to the Carrington Agreement: (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Servicing Business; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the Uniform Fraudulent Conveyance Act (7A part II, U.L.A. 2 (1999)) or

NY1:F1-3154880-1    Case: 09-05050    Doc# 53    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 11 of 22

13

the Uniform Fraudulent Transfer Act (7A part II, U.L.A. 66 (1999)) or any similar laws of any state or other jurisdiction whose law is applicable to the contemplated transactions.

      N.      The approval of the Carrington Agreement and the contemplated transactions is fair and reasonable.

      O.      The Carrington Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

      P.      The consummation of the sale pursuant to the Carrington Agreement will be a legal, valid, and effective sale of the Purchased Assets to Carrington, and, in the case of the assets of the Debtors, vests or will vest Carrington with all right, title, and interest in and to those Purchased Assets free and clear of Liens in accordance with section 363(f) of the Bankruptcy Code because one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All parties with Liens against the Purchased Assets of the Debtors, if any, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code, and all parties with Liens against the Purchased Assets of the Debtors who objected to the Motion, but who did not withdraw any such objection can be compelled to accept a monetary satisfaction of their Liens within the meaning of section 363(f)(5) of the Bankruptcy Code, and, in each case, are enjoined from taking any action against Carrington, Carrington's affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against New Century, any of the other Debtors, or any of their respective affiliates (except that the payment in full of all Obligations (as such term is defined in the Servicer Advance Facility) owed under the Servicer Advance Facility at closing is a condition of the Carrington

8

Agreement and New Century is hereby authorized to make such payment, subject to the verification of such amount by the Debtors and the Committee). Failure to sell the Purchased Assets of the Debtors free and clear of Liens and the Retained Liabilities would be substantially less benefit to, and would adversely affect, the Debtors' estates.

Q.     By virtue of the Carrington Agreement or otherwise, Carrington will not acquire any liabilities of the Debtors, other than the Assumed Liabilities and the Carrying Costs and Cure Amounts relating to each Assigned Contract (collectively, hereinafter referred to as the "Carrington Assumed Liabilities").

R.     Without limiting the generality of the foregoing, other than any Carrington Assumed Liabilities, Carrington would not have entered into the Carrington Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to Carrington and the assignment of the Assumed Contracts to Carrington were not, except the Carrington Assumed Liabilities, free and clear of all claims, liens, or interests of any kind or nature whatsoever, or if Carrington would or in the future could, be liable for any of claims, liens, or interests including, but not limited to (1) any employment or labor agreements; (2) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of any Debtor; (3) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation claims that might otherwise arise under or pursuant to (A) the Employee Retirement, Income, Security Act of 1974, as amended, (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Worker Adjustment and Retraining Act of 1988,

9

(G) the Age Discrimination and Employee Act of 1967, or (H) the Consolidated Omnibus Budget Reconciliation Act of 1985; (4) any products liability or similar claims, whether pursuant to any state or federal laws or otherwise, including without limitation, asbestos claims; (5) environmental claims or liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* or similar state statute (except solely to the extent of any liability to any governmental entity under police, regulatory, or other statutory requirements to which any entity would be subject as the owner or operator of property constituting part of the Purchased Assets after the Closing unless and to the extent previously compromised), (6) any bulk sales or similar law and (7) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended.

        S.      The Carrington Agreement is a valid and binding commitment by Carrington to purchase the Purchased Assets, and is enforceable according to its terms.

        T.      Subject to Paragraph 7, to the extent an Assigned Contract becomes an Accepted Contract pursuant to section 2.7 of the Carrington Agreement, such Accepted Contracts shall automatically be deemed, if and when the Cure Amount is paid by Carrington to the counterparty to such Accepted Contract, to have been assumed and assigned by the respective Debtor to Carrington as of the date of such payment (or, if the Cure Amount is zero, as of the date of the Contract Notification Deadline or such earlier date as Carrington provides written notice of such assumption and assignment to the Debtors and to the counterparty to such Accepted Contract) without further order of this Court. The Cure Amounts are deemed the

RLF1-3154880-1
Case: 09-05050   Doc# 53   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 14 of 22

amounts necessary to "cure" (within the meaning of section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assumed Contracts.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is granted and approved in all respects (other than with respect to matters already addressed by the Bidding Procedures Order or as modified by the terms of this Order).

2. Pursuant to sections 363 and 365 of the Bankruptcy Code, the sale, conveyance and assignment of the Purchased Assets of and by the Debtors, including the assumption and assignment of the Assumed Contracts of the Debtors, pursuant to the Carrington Agreement (the "Sale"), is approved, and each Debtor is authorized and directed to execute any and all documents, instruments and papers and to take all actions necessary and appropriate to effectuate, implement and consummate the transactions contemplated by the Carrington Agreement in consideration of the purchase price specified therein, including assigning and transferring to Carrington or its designees all of the Debtors' right, title and interest (including common law rights) in and to all of the Debtors' tangible and intangible property included among the Purchased Assets except as otherwise explicitly provided by the Carrington Agreement. Following consummation of the Sale, Purchaser shall be authorized, to the extent permitted by applicable non-bankruptcy law, including without limitation, to the extent permitted by the state statutes listed on Exhibit B attached hereto, to service the mortgage loans that are the subject of the Servicing Agreements as the agent and thus, person acting as fiduciary or representative or in a similar capacity of or for the nondebtor parties to such Servicing

11

Agreements, with the specific duties and obligations of Purchaser to be as set forth in such agreements. Without limiting the foregoing, each of the Debtors is authorized and directed to close and consummate the Carrington Agreement and all other agreements and documents related to and contemplated thereby (collectively, the "Disposition Documents"), which Disposition Documents, to the extent they have been consented to by the Committee (such consent not to be unreasonably withheld), hereby are authorized and approved in all respects.

        3.      The transfer(s) of the Purchased Assets of and by the Debtors to Carrington or one or more of its designees are legal, valid and effective transfers and shall vest Carrington or its designees with all right, title and interest of the Debtors in and to the Purchased Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for the Carrington Assumed Liabilities and except as set forth in Paragraph 37, of any and all liens, security interests, pledges, hypothecations, encumbrances or other interests or claims (including but not limited to any and all "claims" as defined in section 101(5) of the Bankruptcy Code, including any and all warranty claims and any and all of the other Retained Liabilities, including those described in Paragraph R of this Sale Order) and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether arising before, on or after the date on which this chapter 11 case was commenced, whether known or unknown, including Liens of any of the creditors, vendors, suppliers, employees, or lessors of any of the Debtors or any other third party. Any and all such Liens (including, without limitation, any adequate protection liens, claims, or rights in connection therewith) shall attach to the proceeds of the Sale, with the same priority, validity, force and effect as they now have against the Purchased Assets (except that the payment in full of all Obligations (as such term is defined in the Servicer Advance Facility) under the Servicer

RLF1-3154880-1

Advance Facility at Closing is a condition of the Carrington Agreement and New Century is hereby authorized to make such payment (subject to the Debtors' and Committee's verification of the amount of such payment); provided, however, that nothing herein shall determine, or be deemed to be an admission by any party as to, the amount, extent, validity, enforceability, perfection or priority of any claim or lien asserted by Citigroup Global Markets Realty Corp. ("Citigroup") with respect to the Servicer Advance Facility, and all rights of all parties with respect to such issues are reserved. The Debtors further shall reserve from the proceeds of the sale (i) the outstanding balance as of the Petition Date due to General Electric Capital Corporation ("GECC") under the Master Security Agreement and related promissory notes relating to the Purchased Assets, which balance as of the petition date totaled $7,558,887.80 and (ii) $559,611.88 with respect to amounts that may be due to National City Commercial Capital Company LLC ("National City") in respect of its asserted secured claim relating to the Purchased Assets (collectively, the "Secured Claim Reserve"). The aforementioned asserted secured claims (and the amounts reserved therefor) are separate and distinct from the lease cure amounts, if any, owing to GECC or National City. Consistent with the foregoing, the Liens of GECC and National City against the Purchased Assets (including, without limitation, any adequate protection liens, claims, or rights in connection therewith) shall also attach to the Secured Claim Reserve with the same priority, validity, force and effect as they now have against the Purchased Assets. Such Secured Claim Reserve shall otherwise remain free and clear of all other Liens, and shall not be the subject of any distributions, pending agreement of the Debtors, the Committee and GECC or National City, as may be applicable, or further order of the Court. GECC and National City reserve their respective rights to assert claims against the Secured Claim Reserve up to the full amount of such reserve allocable to their respective claims

13

19

(i.e., $7,558,887.80 as to GECC and $559,611.88 as to National City), and neither the entry of this Sale Order, nor anything contained herein shall preclude GECC or National City from asserting and pursuing claims against the Secured Claim Reserve up to the full amount of such reserve allocable to their respective claims (i.e., $7,558,887.80 as to GECC and $559,611.88 as to National City). The Debtors and the Committee reserve all rights (i) to object to or dispute the claims and liens of GECC and National City and their entitlement to any portion of the Secured Claim Reserve or (ii) to seek to reduce the amount of the Secured Claim Reserve either by agreement of the parties or further order of the Court, provided that GECC and National City each shall have the right to contest any such reduction to the extent not based upon an agreement of the parties.

4.      The Sale pursuant to this Sale Order and the Disposition Documents shall be binding upon the Debtors, Carrington, all creditors, members, and owners of the Debtors, all persons having or asserting a claim or Lien against, or an interest in, the Debtors or the Purchased Assets of the Debtors, and all parties to any actions or proceedings that directly or indirectly contest the power or authority of the Debtors to sell, assign and convey the Purchased Assets or that seek to enjoin any such sale, assignment or conveyance.

5.      Any party having the right to consent to the assumption or assignment of the Assumed Contracts and the Accepted Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code; *provided* that with the exception of the Servicing Agreements (to the extent any is or would be deemed an Assumed Contract), the assumption and assignment of each Assumed Contract is subject to and conditioned upon such Assumed Contract becoming an Accepted Contract on or before the Contract Notification Deadline

14

pursuant to section 2.7(b) of the Carrington Agreement, including, without limitation, the payment by Carrington of the Cure Amount due with respect to such Accepted Contract to the counterparty to such Accepted Contract (which Cure Amount, if any, shall be the amount set forth by the Debtors in the Cure Notice or other notification of proposed cure amounts to such counterparty with respect to such counterparty).

6.  With respect to all Assumed Contracts (other than Servicing Agreements to the extent any are or would be deemed an Assumed Contract) for which the counter-party to such Assumed Contract was served with and filed an objection to the proposed cure amount scheduled by the Debtors in their Notice of New Century's Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection With the Proposed Sale of Its Servicing Business and the Fixing of Cure Costs Associated Therewith (the "Cure Notice"), the assumption and assignment of such Assumed Contract shall be subject to and conditioned upon such Assumed Contract becoming an Accepted Contract on or before the Contract Notification Deadline for such contract pursuant to section 2.7 of the Carrington Agreement, including, without limitation, the payment by Carrington of the Cure Amount due (if the Cure Amount is greater than $0) with respect to such Assumed Contract to the counterparty to such Accepted Contract.

7.  With respect to all Assumed Contracts (other than Servicing Agreements to the extent any are or would be deemed an Assumed Contract) for which the counter-party to such Assumed Contract was served with the Cure Notice and timely filed (a) an objection to the proposed assumption and assignment of such Assumed Contract on grounds relating to the proposed cure amount scheduled by the Debtors in the notice or (b) an objection to the effect that the pertinent executory contract or unexpired lease cannot be assigned to Carrington by virtue of

15

section 365(c)(1) or section 365(c)(2) of the Bankruptcy Code because applicable law excuses the nondebtor party from accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession and the nondebtor party in fact has not consented to the proposed assignment to Carrington (each, a "Remaining Objection"), the hearing on the assumption and assignment of such Assumed Contract (which shall include any Assumed Contract and any other agreement, contract or license to which Oracle USA, Inc. ("Oracle") or Union Bank of California ("UBOC") is a party) and the Remaining Objection is hereby adjourned to June 27, 2007 at 10:00 a.m. For the avoidance of doubt, all rights and objections of Oracle and UBOC concerning the Assumed Contracts, including, without limitation, the assumability thereof and the amount of claims owing in connection therewith, are reserved for resolution at such hearing, to the extent they are not resolved by agreement of the Debtors, the Committee, Carrington and Oracle or UBOC, as applicable, or further order of the Court prior to such hearing. AT&T Inc. and its affiliates ("AT&T") reserve all of their rights to challenge whether service of the Motion or Cure Notice on AT&T was proper and with respect to any effects resulting from such improper service, if such challenge is sustained by this Court.

8.     With respect to the objection filed by Wells Fargo Bank, N.A. ("Wells Fargo") to the Cure Amount relating to the Servicing Agreements under which Well Fargo serves as trustee, in consideration for Wells Fargo withdrawing its objection to such Cure Amount, the Debtors shall hold in reserve from the Purchase Price the sum of $150,000, which represents the maximum potential liability the Debtors may have (i) for the Cure Amount and (ii) to pay Wells Fargo's reasonable out-of-pocket costs and expenses incurred during the period through the end of the term of the Transition Services Agreement in connection with the assumption and assignment of the Servicing Agreements to which it is a party (the "Wells Fargo

16

RLF1-3154880-1

Reserve"). Wells Fargo shall be entitled to seek reimbursement for its reasonable out-of-pocket costs and expenses as trustee in connection with the assumption and assignment of the Servicing Agreements to which it is a party from the Wells Fargo Reserve, and the Debtors and the Committee reserve the right to object to such reimbursement claim. Nothing shall be paid out of the Wells Fargo Reserve absent (a) the agreement of Wells Fargo, the Debtors, and the Committee, or (b) entry of a order of this Court. With respect to the objection filed by Deutsche Bank National Trust Company ("DBNTC") as to the cure amounts, if any, owing to it in its capacity as indenture trustee, the Debtor shall hold a reserve in an amount either agreed by the parties or determined Court order, which amount shall be deemed to be the maximum Cure Amount with respect to DBNTC's objection.

9.     Adequate assurance of future performance has been demonstrated by or on behalf of Carrington with respect to Servicing Agreements that are Assumed Contracts. Consequently, the Purchaser shall be entitled to have the Debtors assume such Servicing Agreements, pursuant to Section 365 of the Bankruptcy Code, on the Closing and have such Servicing Agreements assigned to Carrington on such Closing, provided that the conditions set forth in Section 5.02 or Section 6.02 (as applicable) of the respective Servicing Agreement relating to merger or consolidation of the servicer party thereto shall have been satisfied on or before the Closing. The Wells Fargo Reserve and the maximum Cure Amount with respect to DBNTC (either as designated by agreement of the parties or by order of the Court) related to the Servicing Agreements shall be the sole responsibility of the Debtors and shall be reserved by the Debtors out of the Purchase Price. The assumption by Debtors and assignment to Carrington of any Ancillary Servicing-Related Agreements shall be effective without further order of the Court upon the agreement of the parties thereto. Absent such agreement, the procedure for the

RLF1-3154800-1
Case: 09-03050     Doc# 53     Filed: 09/15/09     Entered: 09/16/09 11:36:44     Page 21 of 22

a3

assumption and assignment shall be in accordance with section 2.7(e) of the Carrington Agreement. Without limiting the generality of the foregoing, Carrington shall have no liability to pay any cure amounts, and shall have no other monetary obligations, relating to such Servicing Agreements (or any Ancillary Servicing-Related Agreements) arising during the period prior to the Closing Date.

10. Carrington has agreed to provide to each of Wells Fargo and DBNTC, in their respective capacity as trustee or indenture trustee, monthly written reports regarding the status of Carrington's state licensing progress, with the first such report to be delivered within one calendar month of the Closing and such obligation to terminate upon the earlier of (i) the end of the term of the Transition Services Agreement and (ii) Carrington's having obtained all then necessary state licenses. Such monthly reports shall include a certification by Carrington to the effect that the information provided in such report is accurate and that Carrington continues to proceed in good faith to obtain any remaining necessary state licenses.

11. Adequate assurance of future performance has been demonstrated by or on behalf of Carrington with respect to the Assigned Contracts, and the Purchaser shall be entitled to have the Debtors assume such Assigned Contracts, pursuant to section 365 of the Bankruptcy Code, and to have such Assigned Contracts assigned to Carrington upon satisfaction of the conditions for such Assigned Contract to become an Accepted Contract on or before the Contract Notification Deadline pursuant to section 2.7 of the Carrington Agreement.

12. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Carrington or its affiliates or designees as a result of the assumption or assignment by the Debtors to Carrington or its designees of the Assumed Contracts, and the validity of such assumption or assignment shall not be affected by any dispute between any of

18

24