the Debtors or any of their respective affiliates and any counterparty to any Assumed Contract and the Assumed Contracts, upon assignment to Carrington or its designees, shall be deemed valid and binding and in full force and effect in accordance with their terms.

13.     Without limiting the generality of the provisions of the Carrington Agreement or the other provisions of this Sale Order, Carrington shall not be deemed to have assumed any liability under, or otherwise be deemed liable in any manner whatsoever with respect to any, contract or lease of any Debtor that is not explicitly designated as an Assumed Contract, absent Carrington's written agreement as to the subsequent inclusion of any specifically identified contract or lease as an Assumed Contract and the satisfaction of the requirements of section 365 of the Bankruptcy Code with respect to any such contract or lease. Specifically, other than as set forth in section 3.1(d) of the Carrington Agreement and solely to the extent that the PTO liability thereunder could be deemed to constitute part of a Benefit Plan, Carrington shall assume no liability whatsoever under or otherwise with respect to any Collective Bargaining Agreements or Benefit Plans, the rejection of which being an express condition precedent to Carrington's obligations to perform under the Carrington Agreement.

14.     Nothing contained herein shall be construed to limit Carrington's obligation to perform the obligations of the servicer under the Servicing Agreements from and after the Closing Date based on the status of the Mortgage Loans at that time, although such performance obligation shall not deemed to cause Carrington to assume any liability for any act or omission of the Debtors (whether as originator, servicer or otherwise), the trustees or indenture trustees or any other person arising on or before the Closing Date with respect to such Servicing Agreements; provided, however, and for the avoidance of doubt, nothing contained in

RLF1-3364850-1     Case: 09-05050     Doc# 53-1     Filed: 09/15/09     Entered: 09/16/09 11:36:44     Page 1 of 23

25

this sentence is intended to relieve Carrington from its indemnification obligations under the Servicer Indemnity arising after the Closing Date.

15.    The contemplated transactions have been undertaken by Carrington and the Sellers at arm's-length, without collusion, and Carrington will acquire the Purchased Assets pursuant to the Carrington Agreement and the Disposition Documents, in good faith, within the meaning of section 363(m) of the Bankruptcy Code and is, and shall be, entitled to all of the protections in accordance therewith.

16.    The consideration provided by Carrington for the Purchased Assets under the Carrington Agreement is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

17.    To the extent any payment is required of any outstanding Obligations owed under the Debtor-in-Possession Loan and Security Agreement dated as of April 13, 2007 (the "DIP Financing Agreement") by and among Debtor New Century Financial Corporation, Certain of its Affiliates, and the Lenders Party thereto (the "DIP Lenders"), the Debtors are hereby directed to comply with section 2.06(d) thereof. Without limiting the generality of the foregoing, the Debtors shall use commercially reasonable efforts to calculate the Net Cash Proceeds (as defined in the DIP Financing Agreement) resulting from the sale to Carrington, whenever received, and shall promptly pay any such Net Cash Proceeds to the Administrative Agent under the DIP Financing Agreement as and in the manner required by section 2.06(d) of the DIP Financing Agreement to the extent any payment is required of any outstanding Obligations owed under the DIP Financing Agreement.

18.    Notwithstanding anything to the contrary in this Sale Order or the Carrington Agreement, the proceeds of the Sale will be used, in part, to pay off all Obligations

20

(as defined in the Servicer Advance Facility) due and owing under the Servicer Advance Facility as set forth on Schedule 8.3(l) to the APA; provided, however, that nothing herein shall determine, or be deemed to be an admission by any party as to, the amount, extent, validity, enforceability, perfection or priority of any claim or lien asserted by Citigroup with respect to the Servicer Advance Facility, and all rights of all parties with respect to such issues are reserved. For the purpose of clarity, the payment of all Obligations (as defined in the Servicer Advance Facility) to Citigroup shall be deemed to have been made from the sale proceeds attributable to the First Lien Advances Amount, but in any event, all Obligations (as defined in the Servicer Advance Facility) to Citigroup shall be paid at Closing.

19.     After the payment or reservation of the Cure Amounts, if any, by (i) Carrington, with respect to the Assigned Contracts and (ii) the Debtors, with respect to the Servicing Agreements and any Ancillary Servicing-Related Agreements, the Debtors are not and will not be in default in any of their obligations under the Assumed Contracts with the possible exception of defaults identified in section 365(b)(2) of the Bankruptcy Code, which defaults, if any, are null and void and without effect.

20.     The maximum potential liability the Debtors may have for cure costs as of May 14, 2007 (the "Maximum Cure Amounts") with respect to each Assigned Contract is either the amount as set forth on the Cure Notice or, with respect those counter-parties that filed objections to or otherwise served on the Debtors a statement asserting a cure amount different from that listed in the Cure Notice prior to the Sale Hearing, the amount set forth on Exhibit C (provided that such Maximum Cure Amounts are with respect to certain counterparties as specified on Exhibit C only for the period through such earlier date as specifically identified therein). Carrington has agreed to pay the cure costs related to the Assigned Contracts in

RLF1-3154880-1
Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 3 of 23

accordance with and pursuant to section 2.7 of the Carrington Agreement, to the extent Carrington elects to have such contract assumed and assigned to it. In accordance with the terms of section 2.7 of the Carrington Agreement, and on the Contract Determination Date, Carrington shall pay the Maximum Cure Amount to each counter-party to an Accepted Contract (or such lesser amounts as agreed to by the parties or ordered by the Court) (collectively, the "Final Cure Amounts"). To the extent that any Cure Amount accrues on any Assigned Contract after May 14, 2007 (or, if applicable, after the date through which its respective Maximum Cure Amount has accrued as identified on Exhibit C) but before the Closing Date, such Cure Amount, to the extent allowed, will be paid (i) if such Assigned Contract becomes an Accepted Contract, by Carrington or (ii) if such Assumed Contract does not become an Accepted Contract, by the Debtors as an allowed administrative claim, to the extent it satisfies conditions for administrative priority in accordance with section 503(b)(1) of the Bankruptcy Code. The Debtors shall have no liability or obligation to pay cure amounts to any other party or have any other monetary obligation to non-debtor parties to Accepted Contracts arising for the period before the Closing Date, and except for Carrington's obligation to pay the Final Cure Amounts, Carrington shall have no liability or obligation to pay cure amounts to any other party or have any other monetary obligation to non-debtor parties to Assumed Contracts arising for the period before the Closing Date.

21.     Any non-debtor party to an Assumed Contract is hereby barred, enjoined and prohibited from asserting any Claim or Debt against the Debtors or their property or estates other than the Maximum Cure Amount or from offsetting, seeking to offset, recoup, deduct or set-off any Claims such party may have against the Debtors from any amounts that may be or may become due in the future to Carrington under such Assumed Contract.

22

22. The failure of the Debtors or Carrington to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Carrington's rights to enforce every term and condition of the Assumed Contracts.

23. Compliance with the so-called "bulk-sale" laws in all applicable jurisdictions are waived or such laws are inapplicable as to the contemplated transactions and the transactions contemplated in the Carrington Agreement are hereby deemed to be under or in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code.

24. The provisions of this Sale Order are nonseverable and mutually dependent.

25. This Sale Order and all provisions of the Disposition Documents shall be binding upon any successors and assigns of the Debtors, including without limitation, any trustee appointed for any of the Debtors in its chapter 11 case or in any superseding proceeding under chapter 7 of the Bankruptcy Code.

26. Nothing contained in any chapter 11 plan confirmed in the chapter 11 case of any Debtor or any order of this Court confirming such plan or any other order entered in these chapter 11 cases shall conflict with or derogate from the provisions of the Carrington Agreement, to the extent modified by this Sale Order, or the terms of this Sale Order.

27. The Carrington Agreement, the Disposition Documents, or other instruments relating thereto may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that (i) the Committee shall have consented in writing thereto (such

23

consent not to be unreasonably withheld), and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors or their estates.

28.     From and after the date hereof, each Debtor shall act in accordance with the terms of the Carrington Agreement, and each Debtor, to the extent it already has not done so, shall execute the Carrington Agreement (or any related agreement or instrument) at or prior to Closing.

29.     The failure specifically to include any particular provisions of the Carrington Agreement or the Disposition Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Carrington Agreement and the Disposition Documents be authorized and approved in their entirety.

30.     To the extent of any inconsistency between the provisions of this Sale Order and the Carrington Agreement, the Disposition Documents or any documents executed in connection therewith, the provisions contained in this Sale Order shall govern.

31.     Other than the Remaining Objections, all objections to the entry of this Sale Order, to the extent not waived or resolved, are overruled.

32.     Without limiting in any manner the effect of the other provisions of this Order (including, without limitation, the effect of the provisions of Paragraph 3 of this Order), any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing or otherwise asserting a Lien in, to, or against the Purchased Assets shall be, and hereby is, directed to deliver to the Debtors prior to Closing, in proper form for filing after Closing and executed by the appropriate parties, termination statements, instruments of satisfaction, mortgage or deed of trust releases, or similar instruments as appropriate to cause the release of any such Lien as of record, and, in the event that any such

RLF1-3154880-1
Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 6 of
23

30

person or entity fails to comply with the direction set forth in this Paragraph, then, at the option of Carrington, Carrington either may seek to have such person or entity held in contempt of this Court or shall be hereby authorized without the requirement of any further action (including any further Order of this Court) either to execute and file or record such statements, instruments, releases, and other documents on behalf of such person or entity releasing such asserted Lien in, to, or against the Purchased Assets or to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the termination or release of any such Lien in, to, or against the Purchased Assets.

33.     Consistent with, but not in limitation of, the foregoing, each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated with Carrington Agreement and the Disposition Agreements.

34.     So long as otherwise permitted by applicable nonbankruptcy law, to the extent Carrington needs to operate under or use the benefits of any Assumed Contract before it becomes an Accepted Contract (or as provided in section 2.5 of the Carrington Agreement), the Debtors hereby grant Carrington full authority, up to the Contract Notification Deadline and at Carrington's sole cost and expense, to use or operate under such Assumed Contract necessary for operating the Servicing Business; provided, however, that the granting of such license shall not be deemed to constitute an de facto assignment or assumption of such Assumed Contract until such time as such Assumed Contract becomes an Accepted Contract. Notwithstanding the foregoing, and specifically with respect to Oracle, Carrington shall undertake to work with Oracle (and the Debtors shall be ordered and directed to reasonably cooperate with such efforts), in advance of the Closing Date, to identify the pertinent Oracle leases and contracts, to then

25

determine whether Carrington seeks to treat such leases and contracts as Assigned Contracts and/or to use the underlying intellectual property pending determination of such assumption and assignment, and to attempt to reach a consensual resolution of such matters with Oracle. In the event Carrington intends to use the underlying intellectual property after the Closing Date in the absence of any such consensual resolution, Carrington shall notify Oracle in writing of such intent at least three (3) Business Days prior to the Closing Date and Oracle shall be entitled to an emergency hearing on any objection without the necessity of filing of any motion or further objection on no less than 24 hours' notice to Carrington, with such hearing to be conducted, if necessary, by teleconference. In the event that the Court's calendar will not permit such hearing to occur and be resolved prior to Closing, and if agreement to extend the Closing Date cannot be reached with the Debtors and the Committee to permit the hearing to be conducted prior to the Closing, Carrington will not use the subject intellectual property after Closing without the written consent of Oracle pending the resolution of such hearing.

35. All persons or entities who or that are in possession of some or all of the Purchased Assets of the Debtors on the Closing are hereby directed to surrender possession of those Purchased Assets to Carrington at the Closing.

36. Without limiting the generality of the other provisions of this Sale Order, and except solely to the extent provided by other U.S. federal law, Carrington under no circumstances shall be deemed to be a successor of the Debtors (and Carrington expressly has disclaimed in the Carrington Agreement any such liability with respect to the Debtors). Accordingly, Carrington shall have no successor or vicarious liabilities of any kind or character with respect to the Purchased Assets or otherwise with respect to the Servicing Business except

26

solely to the extent provided by superseding U.S. federal law, and all persons and entities shall be hereby enjoined from asserting any such claims against Carrington.

37.     Notwithstanding anything to the contrary in this Order or the Carrington Agreement, to the extent any of the Purchased Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), Carrington shall remain subject to the same claims and defenses that are related to such consumer credit transaction or such consumer credit contract to the same extent as Carrington would be subject to such claims and defenses of the consumer if such interest had not been purchased pursuant to section 363, as provided for in section 363(o) of the Bankruptcy Code.

38.     The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe and enforce the provisions of the Carrington Agreement, the Disposition Documents, and the Sale Order in all respects and, further, to hear and determine any and all disputes between any Debtor and/or Carrington, as the case may be, and any non-seller party to, among other things, any Assumed Contracts, concerning inter alia, assignment thereof by the pertinent Debtor to Carrington or its designees under the Carrington Agreement, and any claims against any Debtor or any creditor or other third party arising under any agreements relating to Retained Liabilities and any dispute between Carrington and any Debtor as to their respective obligations with respect to any asset or liability of or claim against any Debtor or otherwise arising hereunder.

39.     The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or

27

obligations under the Carrington Agreement, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

40. Nothing contained in this Sale Order, the Carrington Agreement or the Disposition Documents shall be deemed to release, discharge or prejudice claims, if any, Wells Fargo or DBNTC may have against (i) the original or pre-Closing non-Debtor parties to the pertinent securitization documents, (ii) Debtor entities other than the Debtors who are party to the Assumed Contracts, or (iii) Debtor entities who are party to the Assumed Contracts for claims that do not arise under such Assumed Contracts.

41. Any claim under the Carrington Agreement against the Debtors not satisfied pursuant to section 11.6(c) of the Carrington Agreement shall constitute an allowed administrative claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be treated with such priority if the above-captioned bankruptcy cases convert to cases under chapter 7 of the Bankruptcy Code; provided, however, if any such claim is not known by Carrington as of the time of confirmation of any plan of reorganization for any Debtor, such claim shall not be discharged pursuant to the confirmation of any such plan of reorganization but instead shall continue as a liability of the reorganized entity, subject in all respects to the time limitations on any such claim set forth in the Carrington Agreement.

42. This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6006(d), 7062 or otherwise.

Dated: _Mar 23_, 2007
Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

34

EXHIBIT "B"

**$1,021,000,000**

***Mortgage Pass-Through Certificates, Series 2007-NC3***
***Morgan Stanley ABS Capital I Inc. Trust 2007-NC3***
***Issuing Entity***
***Morgan Stanley ABS Capital I Inc.***
***Depositor***
***Morgan Stanley Mortgage Capital Inc.***
***Sponsor***
***Wells Fargo Bank, National Association***
***Master Servicer and Securities Administrator***
***Saxon Mortgage Services, Inc.***
***Servicer***

*The following classes of certificates are being offered pursuant to this prospectus supplement and the accompanying prospectus:*

| Class | Original Class Certificate Balance | Pass-Through Rate |
|-------|-----------------------------------|-------------------|
| Class A-2a ............................ | $ 398,580,000 | Variable |
| Class A-2b ............................ | $ 115,980,000 | Variable |
| Class A-2c ............................ | $ 149,110,000 | Variable |
| Class A-2d ............................ | $ 77,560,000 | Variable |
| Class M-1 ............................. | $ 51,520,000 | Variable |
| Class M-2 ............................. | $ 48,259,000 | Variable |
| Class M-3 ............................. | $ 28,694,000 | Variable |
| Class M-4 ............................. | $ 25,434,000 | Variable |
| Class M-5 ............................. | $ 24,129,000 | Variable |
| Class M-6 ............................. | $ 22,825,000 | Variable |
| Class B-1 ............................. | $ 22,173,000 | Variable |
| Class B-2 ............................. | $ 19,564,000 | Variable |
| Class B-3 ............................. | $ 17,608,000 | Variable |
| Class B-4 ............................. | $ 19,564,000 | Variable |

> *You should read the section entitled "Risk Factors" starting on page S-15 of this prospectus supplement and page 7 of the accompanying prospectus and consider these factors before making a decision to invest in the certificates.*
>
> *The certificates represent interests in the issuing entity only and are not interests in or obligations of any other person.*
>
> *Neither the certificates nor the underlying mortgage loans will be insured or guaranteed by any governmental agency or instrumentality.*

**Assets of the Issuing Entity**
- *The issuing entity is a trust whose assets consist primarily of two groups of fixed and adjustable rate, first-lien and second-lien mortgage loans secured by residential real properties.*

**The certificates —**
- *The certificates represent beneficial interests in the assets of the issuing entity, as described in this prospectus supplement; and*
- *The certificates will accrue interest at a rate equal to one-month LIBOR plus a related fixed margin, subject to certain caps, as described in this prospectus supplement under "Summary—Pass-Through Rates."*

**Credit enhancement —**
- *Subordination as described in this prospectus supplement under "Description of the Certificates—Priority of Distributions Among Certificates,"*
- *Overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions," and*
- *Excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."*

**Interest Rate Support —**
- *An interest rate swap agreement and an interest rate cap agreement with Morgan Stanley Capital Services Inc., as interest rate swap provider and interest rate cap provider, respectively, for the benefit of the certificates as described in this prospectus supplement under "Description of the Certificates—Interest Rate Swap Agreement" and "—Interest Rate Cap Agreement."*

**THE SECURITIES AND EXCHANGE COMMISSION AND STATE SECURITIES REGULATORS HAVE NOT APPROVED OR DISAPPROVED OF THE OFFERED CERTIFICATES OR DETERMINED IF THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING PROSPECTUS ARE TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

Morgan Stanley ABS Capital I Inc. will not list the certificates on any securities exchanges or on any automated quotation system of any securities association. Each class of certificates will receive monthly distributions of interest, principal or both, commencing on June 25, 2007. The certificates offered by this prospectus supplement will be purchased by Morgan Stanley & Co. Incorporated and offered from time to time to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the offered certificates are anticipated to be approximately $1,017,937,000 before the deduction of expenses payable by the depositor, estimated to be approximately $800,000. The offered certificates will be available for delivery to investors in book entry form through the facilities of The Depository Trust Company, Clearstream Banking, société anonyme and Euroclear Bank, as operator of the Euroclear System, on or about May 31, 2007.

**MORGAN STANLEY**

*May 29, 2007*

# TABLE OF CONTENTS

IMPORTANT NOTICE ABOUT THE
  INFORMATION PRESENTED IN
  THIS PROSPECTUS SUPPLEMENT
  AND THE ACCOMPANYING
  PROSPECTUS ............................................ S-4
EUROPEAN ECONOMIC AREA ........................ S-5
UNITED KINGDOM ........................................ S-5
NOTICE TO UNITED KINGDOM
  INVESTORS .............................................. S-6
SUMMARY ................................................... S-7
RISK FACTORS ............................................. S-15
THE MORTGAGE LOAN POOL ....................... S-29
  General ................................................... S-29
  Prepayment Premiums ............................... S-30
  Adjustable Rate Mortgage Loans ................ S-30
  The Index ................................................ S-31
  New Century ............................................ S-31
  The Mortgage Loans in the Aggregate ........ S-46
  The Group I Mortgage Loans ..................... S-47
  The Group II Mortgage Loans .................... S-48
  Credit Scores ........................................... S-49
THE SPONSOR .............................................. S-49
STATIC POOL INFORMATION ........................ S-50
THE DEPOSITOR ........................................... S-51
THE ISSUING ENTITY .................................... S-51
THE SERVICERS ........................................... S-51
  General ................................................... S-51
  Saxon Mortgage Services, Inc. ................... S-51
THE MASTER SERVICER ................................ S-56
THE SECURITIES ADMINISTRATOR ............... S-56
THE TRUSTEE ............................................... S-57
INTEREST RATE SWAP PROVIDER
  AND INTEREST RATE CAP
  PROVIDER ............................................... S-57
DESCRIPTION OF THE CERTIFICATES ........... S-58
  General ................................................... S-58
  Book-Entry Registration ............................ S-59
  Definitive Certificates ............................... S-62
  Assignment of the Mortgage Loans ............. S-62
  Delivery of Mortgage Loan Documents ....... S-63
  Representations and Warranties
    Relating to the Mortgage Loans .............. S-64
  Payments on the Mortgage Loans ............... S-67
  Distributions ........................................... S-69
  Administration Fees .................................. S-69
  Priority of Distributions Among
    Certificates ......................................... S-69
  Distributions of Interest and Principal ........ S-70
  Allocation of Principal Payments to
    Class A Certificates .............................. S-75
  Swap Account .......................................... S-76
  Calculation of One-Month LIBOR ............... S-77
  Excess Reserve Fund Account .................... S-77

Interest Rate Swap Agreement ..................... S-78
Interest Rate Cap Agreement ....................... S-81
Overcollateralization Provisions................... S-81
Reports to Certificateholders ...................... S-82
THE POOLING AND SERVICING
  AGREEMENT ............................................ S-84
  General ................................................... S-84
  Subservicers ............................................ S-84
  Servicing and Trustee Fees and Other
    Compensation and Payment of
    Expenses ............................................ S-84
  Compensation of the Master Servicer
    and the Securities Administrator ........... S-85
  P&I Advances and Servicing Advances ....... S-85
  Prepayment Interest Shortfalls.................... S-86
  Servicer Reports ...................................... S-87
  Collection and Other Servicing
    Procedures .......................................... S-88
  Hazard Insurance ..................................... S-88
  Realization Upon Defaulted Mortgage
    Loans ................................................. S-89
  Optional Purchase of Delinquent
    Mortgage Loans .................................... S-89
  Removal and Resignation of a Servicer....... S-89
  Master Servicer Indemnification and
    Third Party Claims .............................. S-91
  Limitation on Liability of the Master
    Servicer .............................................. S-92
  Assignment or Delegation of Duties by
    the Master Servicer; Resignation........... S-92
  Master Servicer Events of Default;
    Waiver; Termination ............................. S-93
  Eligibility Requirements for Trustee
    and Securities Administrator;
    Resignation and Removal of
    Trustee................................................ S-94
  Termination; Optional Clean-up Call .......... S-95
  Certain Matters Regarding the
    Depositor, the Servicers, the Master
    Servicer, the Securities
    Administrator and the Trustee ............... S-96
  Amendment .............................................. S-96
PREPAYMENT AND YIELD
  CONSIDERATIONS .................................... S-97
  Structuring Assumptions ............................ S-97
  Defaults .................................................. S-104
  Prepayment Considerations and Risks........ S-104
  Overcollateralization Provisions................. S-105
  Subordinated Certificates .......................... S-106
  Effect on Yields Due to Rapid
    Prepayments ........................................ S-106
  Weighted Average Lives of the LIBOR
    Certificates ......................................... S-107

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 13
of 23

36

Decrement Tables .........................................S-107
Hypothetical Available Funds and
    Supplemental Interest Rate Cap
    Table..............................................................S-115
Final Scheduled Distribution Date .............S-120
FEDERAL INCOME TAX
    CONSIDERATIONS ..................................S-120
    General .......................................................S-120
    Taxation of Regular Interests .....................S-120
    Status of the LIBOR Certificates...............S-121
    The Basis Risk Contract Component..........S-121
    Withholding and Backup Withholding.......S-123
STATE AND LOCAL TAXES .........................S-123
ERISA CONSIDERATIONS ...........................S-123
LEGAL INVESTMENT......................................S-125

PLAN OF DISTRIBUTION...............................S-126
LEGAL MATTERS ...........................................S-127
REPORTS TO CERTIFICATEHOLDERS.......S-127
RATINGS...........................................................S-127
GLOSSARY ......................................................S-128

ANNEX I – CERTAIN U.S. FEDERAL
    INCOME TAX DOCUMENTATION
    REQUIREMENTS .......................................I-1
ANNEX II – INTEREST RATE SWAP
    SCHEDULE ................................................ II-1
ANNEX III – INTEREST RATE CAP
    SCHEDULE ............................................... III-1
ANNEX IV – MORTGAGE LOAN
    TABLES......................................................IV-1

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 14
of 23

## IMPORTANT NOTICE ABOUT THE INFORMATION PRESENTED IN THIS
## PROSPECTUS SUPPLEMENT AND THE ACCOMPANYING PROSPECTUS

We provide information to you about the certificates in two separate documents that provide more detail in progression: (1) the accompanying prospectus, which provides general information, some of which may not apply directly to your series of certificates, and (2) this prospectus supplement, which describes the specific terms of your series of certificates. **If the accompanying prospectus contemplates multiple options, you should rely on the information in this prospectus supplement as to the applicable option.**

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the Morgan Stanley ABS Capital I Inc. Trust 2007-NC3, Mortgage Pass-Through Certificates, Series 2007-NC3 in any state or other jurisdiction where the offer is not permitted.

**For 90 days following the date of this prospectus supplement, all dealers selling certificates will deliver a prospectus supplement and prospectus. This requirement is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters of the certificates with respect to their unsold allotments or subscriptions.**

We cannot sell the certificates to you unless you have been given the opportunity to receive both this prospectus supplement and the accompanying prospectus.

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further information concerning a particular topic. The table of contents in this prospectus supplement and the table of contents in the prospectus provide the pages on which these captions are located.

Some of the terms used in this prospectus supplement are capitalized. These capitalized terms have specified definitions, which are included at the end of this prospectus supplement under the heading "*Glossary*."

In this prospectus supplement, the terms "depositor," "we," "us" and "our" refer to Morgan Stanley ABS Capital I Inc.

All annexes and schedules to this prospectus supplement are a part of this prospectus supplement.

Morgan Stanley ABS Capital I Inc.'s principal offices are located at 1585 Broadway, New York, New York 10036, and its phone number is (212) 761-4000.

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 15 of 23

## EUROPEAN ECONOMIC AREA

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "**Relevant Implementation Date**") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## UNITED KINGDOM

The underwriter has represented and agreed that:

(a) (i) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (ii) it has not offered or sold and will not offer or sell the offered certificates other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the offered certificates would otherwise constitute a contravention of Section 19 of the Financial Services and Markets Act 2000 ("FSMA");

(b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the FSMA does not apply to the issuer; and

(c) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

Case: 09-05050   Doc# 53-1   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 16 of 23

## NOTICE TO UNITED KINGDOM INVESTORS

The distribution of this prospectus supplement if made by a person who is not an authorized person under the FSMA, is being made only to, or directed only at persons who (1) are outside the United Kingdom, or (2) have professional experience in matters relating to investments, or (3) are persons falling within Articles 49(2)(a) through (d) ("high net worth companies, unincorporated associations, etc.") or 19 (Investment Professionals) of the Financial Services and Market Act 2000 (Financial Promotion) Order 2005 (all such persons together being referred to as the **"Relevant Persons"**). This prospectus supplement must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this prospectus supplement relates, including the offered certificates, is available only to Relevant Persons and will be engaged in only with Relevant Persons.

Potential investors in the United Kingdom are advised that all, or most, of the protections afforded by the United Kingdom regulatory system will not apply to an investment in the trust fund and that compensation will not be available under the United Kingdom Financial Services Compensation Scheme.

S-6

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 17 of 23

# SUMMARY

This summary highlights selected information from this prospectus supplement and does not contain all of the information that you need to consider in making your investment decision. You should read this entire prospectus supplement and the accompanying prospectus carefully to understand all of the terms of the offering of the certificates.

## The Transaction Parties

*Sponsor.* Morgan Stanley Mortgage Capital Inc., a New York corporation with its principal executive offices at 1585 Broadway, New York, New York 10036, telephone number (212) 761-4000.

*Depositor.* Morgan Stanley ABS Capital I Inc., a Delaware corporation with its principal executive offices at 1585 Broadway, New York, New York 10036, telephone number (212) 761-4000.

*Issuing Entity.* Morgan Stanley ABS Capital I Inc. Trust 2007-NC3.

*Trustee.* Deutsche Bank National Trust Company, a national banking association with its corporate trust offices at 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Trust Administration MS07C3, telephone number (714) 247-6000. The trustee will have the custodial responsibility with respect to the mortgage files for all of the mortgage loans.

*Securities Administrator and Master Servicer.* Wells Fargo Bank, National Association, a national banking association with its corporate trust office located (i) for purposes of certificate transfers, at Wells Fargo Center, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 and (ii) for all other purposes, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attn: MSAC 2007-NC3, telephone number (410) 884-2000.

*Servicers.*

- Saxon Mortgage Services, Inc., a Texas corporation with its principal executive offices at 4708 Mercantile Drive, Forth Worth, Texas 76137, telephone number (817) 665-7200.

- Countrywide Home Loans Servicing LP, a Texas limited partnership with its principal executive offices at 7105 Corporate Drive, Plano, Texas 75024, telephone number (972) 526-6285.

*Original Loan Seller.* NC Capital Corporation, a California corporation with its principal executive offices at 18400 Von Karman, Suite 1000, Irvine, California 92612, telephone number (949) 440-7030.

*Interest Rate Swap Provider and Interest Rate Cap Provider.* Morgan Stanley Capital Services Inc., a Delaware corporation with its principal executive offices at 1585 Broadway, New York, New York 10036, telephone number (212) 761-4000. Morgan Stanley Capital Services Inc. conducts business in the over-the-counter derivatives market, engaging in a variety of derivatives products, including interest rate swaps, currency swaps, credit default swaps and interest rate options with institutional clients.

The following diagram illustrates the various parties involved in the transaction and their functions.



## The Offered Certificates

The Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 will issue the Mortgage Pass-Through Certificates, Series 2007-NC3. Fourteen classes of the certificates – the Class A-2a, Class A-2b, Class A-2c, Class A-2d, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates – are being offered to you by this prospectus supplement. The offered certificates, together with the Class A-1 certificates, are referred to as the "LIBOR certificates" in this prospectus supplement. The Class A-1 certificates generally represent interests in the group I mortgage loans. The Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates generally represent interests in the group II mortgage loans. The Class M and Class B certificates represent interests in all of the mortgage loans.

S-7

**The Other Certificates**

The issuing entity will also issue five other classes of certificates – the Class A-1, Class X, Class P, Class R and Class RX certificates – which will not be offered under this prospectus supplement.

The Class A-1 certificates will have an initial aggregate principal balance of approximately $218,730,000. The Class A-1 certificates initially evidence an interest of approximately 16.77% of the aggregate scheduled principal balance of the mortgage loans in the trust.

The Class X certificates will have an initial aggregate principal balance of approximately $64,564,661, which is approximately equal to the initial overcollateralization required by the pooling and servicing agreement. The Class X certificates will initially represent an interest of approximately 4.95% of the aggregate scheduled principal balance of the mortgage loans in the issuing entity.

The Class P certificates will not have an aggregate principal balance and will not be entitled to distributions in respect of principal or interest. The Class P certificates will be entitled to all prepayment premiums or charges received in respect of the mortgage loans.

The Class X and Class P certificates will represent undivided interests in the assets of the trust, which will consist primarily of the mortgage loans.

**Structural Overview**

The following chart illustrates generally the distribution priorities and the subordination features applicable to the LIBOR certificates and the Class X certificates.



---

\* Interest and principal distributions will be allocated among the Class A certificates as further described in this prospectus supplement. Losses will not be allocated to the Class A certificates until the final distribution date.

**Closing Date**

On or about May 31, 2007.

**Cut-off Date**

May 1, 2007.

**Distribution Date**

Distributions on the certificates will be made on the 25th day of each month, or, if the 25th day is not a business day, on the next business day, beginning in June 2007, to the holders of record on the preceding record date.

**Final Scheduled Distribution Date**

The final scheduled distribution date is the distribution date occurring in May 2037. See *"Prepayment and Yield Considerations—Final Scheduled Distribution Date"* in this prospectus supplement.

**Record Date**

The record date for the LIBOR certificates will be the business day preceding the related distribution date, unless the LIBOR certificates are issued in definitive form, in which case the record date will be the last business day of the month preceding the month in which the related distribution date occurs.

**Pass-Through Rates**

The Class A-2a certificates will have a pass-through rate equal to the least of (i) one-month LIBOR plus 0.0600% (0.1200% after the first distribution date on which the optional clean-up call is exercisable), (ii) the Group II Loan Cap and (iii) the WAC Cap.

The Class A-2b certificates will have a pass-through rate equal to the least of (i) one-month LIBOR plus 0.1400% (0.2800% after the first distribution date on which the optional clean-up call is exercisable), (ii) the Group II Loan Cap and (iii) the WAC Cap.

The Class A-2c certificates will have a pass-through rate equal to the least of (i) one-month LIBOR plus 0.1900% (0.3800% after the first distribution date on which the optional clean-up call is exercisable), (ii) the Group II Loan Cap and (iii) the WAC Cap.

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 19 of 23

The Class A-2d certificates will have a pass-through rate equal to the least of (i) one-month LIBOR plus 0.2600% (0.5200% after the first distribution date on which the optional clean-up call is exercisable), (ii) the Group II Loan Cap and (iii) the WAC Cap.

The Class M-1 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.2700% (0.4050% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class M-2 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.3100% (0.4650% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class M-3 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.3300% (0.4950% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class M-4 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.4000% (0.6000% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class M-5 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.5500% (0.8250% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class M-6 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 0.8500% (1.2750% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class B-1 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 1.5000% (2.2500% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class B-2 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 2.0000% (3.0000% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class B-3 certificates will have a pass-through rate equal to the lesser of (i) one-month

LIBOR plus 2.0000% (3.0000% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

The Class B-4 certificates will have a pass-through rate equal to the lesser of (i) one-month LIBOR plus 2.2500% (3.3750% after the first distribution date on which the optional clean-up call is exercisable) and (ii) the WAC Cap.

Interest will accrue on the LIBOR certificates on the basis of a 360-day year and the actual number of days elapsed in the applicable interest accrual period. See *"Description of the Certificates—Distributions of Interest and Principal"* in this prospectus supplement.

**Interest Accrual Period**

The interest accrual period for the LIBOR certificates for any distribution date will be the period from and including the preceding distribution date (or, in the case of the first distribution date, the closing date) through and including the day before the current distribution date.

**Distribution Priorities**

Distributions on the certificates are required to be made monthly on each distribution date from available funds (after giving effect to the payment of any fees and expenses of the servicers, the master servicer, the securities administrator and the trustee) to the classes of certificates in the following order of priority:

(a)  to an account for payment to the interest rate swap provider of certain amounts payable to the interest rate swap provider;

(b)  from the portion of available funds allocable to interest payments on the mortgage loans, (i) first, concurrently as further described in this prospectus supplement, to the Class A-1, Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates, their accrued certificate interest for the related interest accrual period and any unpaid interest amounts from prior distribution dates, payable first from the interest payments on the mortgage loans in the applicable loan group related to those classes of certificates, and in the case of the Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates, allocated *pro rata* based upon their respective entitlements to those amounts, and (ii) second, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2,

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 20
of 23

Class B-3 and Class B-4 certificates, in that order, their accrued certificate interest;

(c) (1) on each distribution date prior to the Stepdown Date or on which a Trigger Event is in effect, an amount equal to the principal distribution amount (as further described in *"Description of the Certificates—Distributions of Interest and Principal"* in this prospectus supplement) (i) first, to the Class A certificates, pursuant to the allocation described below, until their respective class certificate balances have been reduced to zero, and (ii) second, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates, in that order, until their respective class certificate balances have been reduced to zero;

(2) on each distribution date on and after the Stepdown Date and on which a Trigger Event is not in effect, (i) first, to the Class A certificates, pursuant to the allocation described below, the lesser of the principal distribution amount and an amount equal to the principal distribution entitlement for the Class A certificates (each as further described in *"Description of the Certificates—Distributions of Interest and Principal"* in this prospectus supplement), until their respective class certificate balances have been reduced to zero, and (ii) second, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates, in that order, in each case, the lesser of the principal distribution amount and an amount equal to the principal distribution entitlement for that class of certificates (as further described in *"Description of the Certificates—Distributions of Interest and Principal"* in this prospectus supplement), until their respective class certificate balances have been reduced to zero;

(d) any amount remaining after the distributions in clauses (a), (b) and (c) above, (i) first, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates, in that order, any unpaid interest amounts and principal amounts written down from prior distribution dates for those classes, (ii) second, to the excess reserve fund account, an amount equal to any Basis Risk Payment (as defined in the *"Glossary"* in this prospectus supplement) for that distribution date, (iii) third, from funds on deposit in the excess reserve fund account, an amount equal to any basis risk carryforward amounts with respect to the LIBOR certificates for that distribution date in the same order and priority in which accrued certificate interest is allocated among

those classes of certificates, with the allocation to the Class A certificates being *pro rata* based on their respective class certificate balances and then based on their respective basis risk carryforward amounts, and (iv) fourth, to the interest rate swap provider or the Class P, Class X, Class R or Class RX certificates, any remaining amounts.

Principal distributions on the Class A-1 certificates will generally be made from principal distributions on the group I mortgage loans. Principal distributions on the Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates will generally be made from principal distributions on the group II mortgage loans, and such distributions will be paid sequentially, to the Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates, in that order, until their respective class certificate balances have been reduced to zero. However, from and after the distribution date on which the aggregate class certificate balances of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates and the principal balance of the Class X certificates have been reduced to zero, any principal distributions allocated to the Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates are required to be distributed *pro rata* among those classes, based on their respective class certificate balances, until their class certificate balances have been reduced to zero.

*"Stepdown Date"* is defined in the *"Glossary"* in this prospectus supplement and generally means the later to occur of (i) the earlier to occur of (a) the distribution date in June 2010 and (b) the distribution date following the distribution date on which the aggregate class certificate balances of the Class A certificates have been reduced to zero and (ii) the first distribution date on which the subordination below the Class A certificates is greater than or equal to 52.80% of the aggregate stated principal balance of the mortgage loans for that distribution date.

*"Trigger Event"* is defined in the *"Glossary"* in this prospectus supplement and generally means either a "cumulative loss trigger event" or a "delinquency loss trigger event." A "cumulative loss trigger event" with respect to any distribution date means the circumstances in which the aggregate amount of realized losses incurred since the cut-off date through the last day of the related prepayment period divided by the aggregate stated principal balance of the mortgage loans as of the cut-off date exceeds the applicable cumulative loss percentages described in the definition of "Cumulative Loss Trigger Event" in the *"Glossary"* in this prospectus

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 21 of 23

44

supplement. A "delinquency loss trigger event" with respect to any distribution date means the circumstances in which the quotient (expressed as a percentage) of (x) the rolling three-month average of the aggregate unpaid principal balance of mortgage loans that are 60 days or more delinquent (including mortgage loans in foreclosure and mortgage loans related to REO property) and (y) the aggregate unpaid principal balance of the mortgage loans, as of the last day of the related due period, equals or exceeds the applicable percentages described in the definition of "Delinquency Loss Trigger Event" in the *"Glossary"* in this prospectus supplement.

In addition to the distributions set forth above, distributions will be required to be made to certificateholders from any payments received by the issuing entity under the interest rate swap agreement. Such payments will be made in the order and priority described under *"Description of the Certificates— Swap Account"* in this prospectus supplement.

**Credit Enhancement**

The credit enhancement provided for the benefit of the holders of the certificates consists solely of:

- the use of excess interest, after taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement described below and certain payments received by the trust pursuant to the interest rate cap agreement described below, to cover losses on the mortgage loans and as a distribution of principal to restore the required level of overcollateralization;

- the subordination of distributions on the more subordinate classes of certificates to the required distributions on the more senior classes of certificates; and

- the allocation of losses on the mortgage loans to the most subordinate classes of certificates.

**Interest Rate Swap Agreement**

On the closing date, the issuing entity will enter into an interest rate swap agreement with Morgan Stanley Capital Services Inc., the interest rate swap provider, whose payment obligations are 100% guaranteed by Morgan Stanley. Morgan Stanley is rated "Aa3" by Moody's Investors Service, Inc. and

"A+" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

Under the interest rate swap agreement, on or before each distribution date commencing with the distribution date in May 2008 and ending with the distribution date in May 2013, the issuing entity will pay to the interest rate swap provider a fixed payment at a rate of 5.10% per annum, determined on a "30/360" basis, and the interest rate swap provider will pay to the issuing entity a floating payment at a rate of one-month LIBOR (as determined pursuant to the interest rate swap agreement), determined on an "actual/360" basis, in each case calculated on the product of the scheduled notional amount and the multiplier set forth on the schedule attached as Annex II to this prospectus supplement for that distribution date. To the extent that the fixed payment exceeds the floating payment payable with respect to any distribution date during such period, amounts otherwise available for payments on the certificates will be applied on or prior to such distribution date to make a net payment to the interest rate swap provider, and to the extent that the floating payment exceeds the fixed payment payable with respect to any distribution date during such period, the interest rate swap provider will make a net payment to the issuing entity on or prior to such distribution date. Any net amounts received by or paid out from the issuing entity under the interest rate swap agreement will either increase or reduce the amount available to make payments on the certificates, as described under *"Description of the Certificates—Swap Account"* in this prospectus supplement. The interest rate swap agreement is scheduled to terminate following the distribution date in May 2013.

For further information regarding the interest rate swap agreement, see *"Description of the Certificates—Interest Rate Swap Agreement"* in this prospectus supplement.

**Interest Rate Cap Agreement**

The LIBOR certificates will have the benefit of an interest rate cap agreement provided by Morgan Stanley Capital Services Inc., the interest rate cap provider, whose payment obligations are guaranteed by Morgan Stanley. The payments, if any, pursuant to the interest rate cap agreement will be available to cover certain shortfalls in interest that may result from the pass-through rates on the LIBOR certificates being limited by the cap on those pass-through rates. All obligations of the issuing entity under the interest rate cap agreement will be paid on or prior to the closing date. For further information regarding the

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 22 of 23

interest rate cap agreement, see *"Description of the Certificates—Interest Rate Cap Agreement"* in this prospectus supplement.

## The Mortgage Loans

The mortgage loans to be included in the issuing entity will be primarily fixed and adjustable rate subprime mortgage loans secured by first-lien and second-lien mortgages or deeds of trust on residential real properties. All of the mortgage loans were purchased by the sponsor from NC Capital Corporation, which in turn acquired the mortgage loans from its affiliate New Century Mortgage Corporation. Morgan Stanley Mortgage Capital Inc. will make certain representations and warranties relating to the mortgage loans.

On the closing date, the sponsor will transfer the mortgage loans to the depositor and the issuing entity will acquire all of the mortgage loans from the depositor. The aggregate scheduled principal balance of the mortgage loans as of the cut-off date will be approximately $1,304,294,661. Approximately 22.51% of the mortgage loans are fixed rate and approximately 77.49% of the mortgage loans are adjustable rate. Approximately 94.02% of the mortgage loans are first-lien mortgage loans, and approximately 5.98% of the mortgage loans are second-lien mortgage loans.

The information regarding the mortgage loans set forth below that is based on the principal balance of the mortgage loans as of the cut-off date assumes the timely receipt of principal scheduled to be paid on the mortgage loans on or prior to the cut-off date and no delinquencies, defaults or prepayments from April 1, 2007 through the cut-off date.

The mortgage loans have original terms to maturity of not greater than 360 months, have a weighted average remaining term to scheduled maturity of 355 months and have the following approximate characteristics as of the cut-off date:

| | | | |
|---|---|---|---|
| Range of interest rates: | 5.500% | to | 13.450% |
| Weighted average interest rate: | 8.217% | | |
| Range of gross margins of adjustable rate mortgage loans: | 5.000% | to | 9.999% |
| Weighted average gross margin of adjustable rate mortgage loans: | 6.189% | | |
| Range of minimum interest rates of adjustable rate mortgage loans: | 5.500% | to | 12.350% |
| Weighted average minimum interest rate of adjustable rate mortgage loans: | 8.044% | | |
| Range of maximum interest rates of adjustable rate mortgage loans: | 12.500% | to | 19.350% |
| Weighted average maximum interest rate of adjustable rate mortgage loans: | 15.042% | | |
| Range of principal balances: | $16,732 | to | $963,968 |
| Average principal balance: | $192,034 | | |
| Range of combined original loan-to-value ratios: | 7.05% | to | 100.00% |
| Weighted average combined original loan-to-value ratio: | 82.03% | | |
| Weighted average next adjustment date of adjustable rate mortgage loans: | March 2009 | | |

Primarily for the purpose of calculating principal distributions on the Class A certificates, as further described in this prospectus supplement, the mortgage loans will be divided into two subpools, designated as "group I mortgage loans" and "group II mortgage loans." The group I mortgage loans will consist only of those mortgage loans with principal balances that conform to Fannie Mae and Freddie Mac guidelines. The group II mortgage loans will consist of all other remaining mortgage loans, which may or may not have principal balances that conform to Fannie Mae and Freddie Mac guidelines.

After an initial fixed rate period, the interest rate on all of the adjustable rate mortgage loans will adjust semi-annually on each adjustment date to equal the sum of six-month LIBOR and the gross margin for that mortgage loan subject to periodic and lifetime limitations. See *"The Mortgage Loan Pool— The Index"* in this prospectus supplement.

For the adjustable rate mortgage loans, the first adjustment date will occur only after initial periods of approximately two years, three years or five years, as more fully described under *"The Mortgage Loan Pool"* in this prospectus supplement. For additional information regarding the mortgage loans, see *"The Mortgage Loan Pool"* in this prospectus supplement.

Information about the characteristics of the mortgage loans in each group is described under *"The Mortgage Loan Pool"* in this prospectus supplement.

Case: 09-05050    Doc# 53-1    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 23 of 23