## Servicing of the Mortgage Loans and Securities Administration

Wells Fargo Bank, National Association will act as master servicer with respect to all of the mortgage loans and will be required to monitor the performance of each servicer pursuant to the pooling and servicing agreement. Saxon Mortgage Services, Inc. will act as servicer with respect to approximately 98.46% of the mortgage loans. Countrywide Home Loans Servicing LP will act as servicer with respect to approximately 1.54% of the mortgage loans. Each servicer will be obligated to service and administer the applicable mortgage loans on behalf of the issuing entity, for the benefit of the holders of the certificates.

Wells Fargo Bank, National Association, acting as the securities administrator, will be required to act as paying agent, transfer agent and certificate registrar. See *The Pooling and Servicing Agreement* in this prospectus supplement.

## Optional Termination of the Issuing Entity

Subject to the satisfaction of the conditions described under *The Pooling and Servicing Agreement—Termination; Optional Clean-up Call* in this prospectus supplement, Saxon Mortgage Services, Inc. may, at its option, purchase the mortgage loans and terminate the issuing entity on any distribution date when the aggregate stated principal balance, as further described in this prospectus supplement, of the mortgage loans as of the last day of the related due period is equal to or less than 5% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. That purchase of the mortgage loans would result in the payment on that distribution date of the final distribution on the certificates and a termination of the issuing entity.

## Advances

Each servicer will be required to make cash advances with respect to delinquent payments of principal and interest on the mortgage loans serviced by it, unless the applicable servicer reasonably believes that the cash advances cannot be repaid from future payments on the applicable mortgage loans. The master servicer acting as successor servicer will advance its own funds to make advances if the applicable servicer fails to do so (unless it deems the advances to be nonrecoverable) as required under the pooling and servicing agreement. These cash advances are only intended to maintain a regular flow

of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. Each servicer (and the master servicer as successor servicer and any other successor servicer, if applicable) will not be required to make any advance that it determines would be nonrecoverable. Each servicer will also be required to pay compensating interest to cover prepayment interest shortfalls to the extent of its servicing fee.

## Denominations

The LIBOR certificates will be issued and available only in book-entry form, in denominations of $25,000 initial principal balance and integral multiples of $1 in excess of $25,000, except that one certificate of each class may be issued in an amount less than $25,000.

## Servicing, Master Servicing, Securities Administration and Trustee Fees

Each servicer will be entitled with respect to each mortgage loan serviced by it to a monthly servicing fee, which will be retained by the applicable servicer from such mortgage loan or payable monthly from amounts on deposit in the related collection account. The servicing fee for each servicer will be an amount equal to interest at one-twelfth of a rate equal to 0.50% on the stated principal balance of each mortgage loan serviced by that servicer.

The master servicer will be entitled with respect to each mortgage loan to a monthly master servicer fee, which will be retained by the master servicer monthly from amounts on deposit in the distribution account. The master servicer fee will be an amount equal to one-twelfth of a rate not greater than 0.02% on the aggregate stated principal balance of each mortgage loan. Additionally, the master servicer will be entitled to retain any net interest or other income earned on deposits in the distribution account. The securities administrator and the trustee will be entitled to compensation payable by the master servicer from its own funds.

## Optional Purchase of Delinquent Mortgage Loans

The applicable servicer (or its assignee) or the holders of a majority of the Class X certificates will have the option to purchase from the issuing entity any mortgage loan that is 90 days or more delinquent or that has converted to an REO property, as described in this prospectus supplement under *The*

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 1 of 23

*Pooling and Servicing Agreement—Optional Purchase of Delinquent Mortgage Loans.*"

**Required Repurchases or Substitutions of Mortgage Loans**

Morgan Stanley Mortgage Capital Inc. has made or will make certain representations and warranties relating to the mortgage loans. If with respect to any mortgage loan any of the representations and warranties made by Morgan Stanley Mortgage Capital Inc. are breached in any material respect as of the date made, or there exists any uncured material document defect, Morgan Stanley Mortgage Capital Inc. will be obligated to repurchase, or substitute for, the mortgage loan as further described in this prospectus supplement under "*Description of the Certificates—Representations and Warranties Relating to the Mortgage Loans*" and "*—Delivery of Mortgage Loan Documents.*"

**ERISA Considerations**

Subject to the conditions described under "*ERISA Considerations*" in this prospectus supplement, the offered certificates may be purchased by an employee benefit plan or other retirement arrangement subject to Title I of ERISA or Section 4975 of the Internal Revenue Code. Prior to termination of a separate trust account which holds any proceeds from the interest rate swap agreement, a benefit plan which meets the requirements of an investor-based class exemption may purchase the offered certificates.

In making a decision regarding investing in any class of offered certificates, fiduciaries of such plans or arrangements should consider the additional requirements resulting from the interest rate swap agreement as discussed under "*ERISA Considerations*" in this prospectus supplement.

**Federal Tax Aspects**

Cadwalader, Wickersham & Taft LLP is acting as tax counsel to the depositor and is of the opinion that:

- portions of the issuing entity will be treated as multiple real estate mortgage investment conduits, or REMICs, for federal income tax purposes; and

- the LIBOR certificates will represent regular interests in a REMIC, which will be treated as debt instruments of a REMIC, and will

represent interests in certain basis risk carry forward payments, pursuant to the payment priorities in the transaction. Each interest in basis risk carry forward payments will be treated as payments under a notional principal contract for federal income tax purposes.

**Legal Investment**

The offered certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended. If your investment activities are subject to legal investment laws and regulations, regulatory capital requirements, or review by regulatory authorities, then you may be subject to restrictions on investment in the offered certificates. You should consult your own legal advisors for assistance in determining the suitability of and consequences to you of the purchase, ownership, and sale of the offered certificates. See "*Legal Investment*" in this prospectus supplement and in the prospectus.

**Ratings**

In order to be issued, the offered certificates must be assigned ratings not lower than the following by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.:

| Class | S&P | Moody's |
|-------|------|---------|
| A-2a | AAA | Aaa |
| A-2b | AAA | Aaa |
| A-2c | AAA | Aaa |
| A-2d | AAA | Aaa |
| M-1 | AA+ | Aa1 |
| M-2 | AA | Aa2 |
| M-3 | AA | Aa3 |
| M-4 | AA- | A1 |
| M-5 | A+ | A2 |
| M-6 | A | A3 |
| B-1 | BBB+ | Baa1 |
| B-2 | BBB+ | Baa2 |
| B-3 | BBB | Baa3 |
| B-4 | BBB- | Ba1 |

A security rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by any of the rating agencies. The ratings set forth above do not take into account the existence of the interest rate cap agreement.

Case: 09-05050     Doc# 53-2     Filed: 09/15/09     Entered: 09/16/09 11:36:44     Page 2 of 23

# RISK FACTORS

In addition to the risk factors discussed in the prospectus, prospective certificateholders should consider, among other things, the following additional factors in connection with the purchase of the certificates. Unless otherwise noted, all percentages are based upon the scheduled principal balances of the mortgage loans as of the cut-off date, which is May 1, 2007. Unless otherwise indicated in this prospectus supplement, the information regarding the mortgage loans set forth in this prospectus supplement that is based on the principal balance of the mortgage loans as of the cut-off date assumes the timely receipt of principal scheduled to be paid on the mortgage loans on or prior to the cut-off date and no delinquencies, defaults or prepayments from April 1, 2007 through the cut-off date.

**Less stringent underwriting standards and the resultant potential for delinquencies on the mortgage loans could lead to losses on your securities.**

The mortgage loans were made, in part, to borrowers who, for one reason or another, are not able, or do not wish, to obtain financing from traditional sources. These mortgage loans may be considered to be of a riskier nature than mortgage loans made by traditional sources of financing, so that the holders of the certificates may be deemed to be at greater risk than if the mortgage loans were made to other types of borrowers. The underwriting standards used in the origination of the mortgage loans held by the issuing entity are generally less stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and in certain other respects. Borrowers on the mortgage loans may have an impaired or unsubstantiated credit history. As a result of this less stringent approach to underwriting, the mortgage loans purchased by the issuing entity will likely experience higher rates of delinquencies, defaults and foreclosures than mortgage loans underwritten in a manner which is more similar to the Fannie Mae and Freddie Mac guidelines.

In addition, as described below under "—*Recent developments regarding New Century Financial Corporation*," New Century Financial Corporation and its subsidiaries (which include NC Capital Corporation, the originator of the mortgage loans) have been experiencing severe financial difficulties. These difficulties may have adversely affected NC Capital Corporation's application of its underwriting standards in a manner that would have an adverse effect on the default and loss experience of the mortgage loans in the future.

**Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies and defaults; increased use of new mortgage loan products by borrowers may result in higher levels of delinquencies and losses generally.**

In recent years, borrowers have increasingly financed their homes with new mortgage loan products including interest-only loans and negative amortization loans, which in many cases have allowed them to purchase homes that they might otherwise have been unable to afford. Many of these new products feature low monthly payments during the initial years of the loan that can increase (in some cases, significantly) over the loan term. There is little historical data with respect to the performance of these new mortgage loan products, especially during a period of increased delinquencies or defaults for such mortgage loan products. Consequently, as borrowers face potentially higher monthly payments for the remaining terms of their loans, it is possible that, combined with other economic conditions such as increasing interest rates and deterioration of home values, borrower delinquencies and defaults could exceed levels anticipated by you.

Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies and defaults, and we cannot assure you that this will not continue. The increased levels of delinquencies and defaults, as well as a deterioration in general real estate market conditions, have also resulted generally in loan originators being required to repurchase an increasingly greater number of mortgage loans pursuant to early payment default and representation and warranty provisions in their loan sale agreements. This has led to a deterioration in the financial performance of many subprime loan originators, and in some cases, has caused certain loan originators to cease operations or file for bankruptcy. As described below under "—*Recent developments regarding New Century Financial Corporation*," New Century Financial Corporation, the parent of NC Capital Corporation, has recently experienced severe financial difficulties and has become the subject of various legal and governmental investigations and proceedings. Deterioration in the financial condition of New Century Financial Corporation and NC Capital Corporation could adversely affect the ability of NC Capital Corporation to repurchase mortgage loans as to which an early payment

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 3 of 23

default has occurred. If NC Capital Corporation is unable for any reason to satisfy its obligations to repurchase mortgage loans as to which an early payment default exists, neither the depositor nor any other person will be obligated to repurchase such loans. In addition, any such investigations or proceedings could adversely affect the ability of NC Capital Corporation to perform any other obligations with respect to the mortgage loans and could possibly impact the ability of the applicable servicer to collect or foreclose on mortgage loans. In light of the foregoing, you should consider the heightened risks associated with investing in the offered certificates, and the risk that your investment in the offered certificates may perform worse than you anticipate.

**Recent developments regarding New Century Financial Corporation.**

New Century Financial Corporation, parent of NC Capital Corporation, has recently experienced severe financial difficulties, and on April 2, 2007, New Century Financial Corporation filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. New Century Financial Corporation previously announced that its lenders will no longer provide financing to it or its subsidiaries, that these lenders have also notified New Century Financial Corporation of certain events of default under various mortgage loan financing arrangements, and that, as a result, these lenders have sold or intend to sell any outstanding mortgage loans subject to these financing arrangements. In addition, New Century Financial Corporation announced that it and its subsidiaries have ceased selling mortgage loans to or servicing mortgage loans for Federal Home Loan Mortgage Corp. and Federal National Mortgage Association. New Century Financial Corporation also announced that it has received cease and desist orders from numerous states alleging violations of state laws. In addition, the Securities and Exchange Commission and the U.S. Attorney's office have commenced investigations into certain of New Century Financial Corporation's financial statements. New Century Financial Corporation and certain of its subsidiaries have recently entered into a Stipulated Preliminary Injunction with the Ohio Attorney General and the Ohio Department of Commerce, Division of Financial Institutions which, among other things, restricts New Century Financial Corporation, its subsidiaries and their respective agents, officers, employees and anyone acting in concert or participation with them from initiating new foreclosure actions or continuing to prosecute pending foreclosure actions or evicting consumers in Ohio without prior approval from the state of Ohio. See *"The Mortgage Loan Pool—New Century—Recent Developments Regarding New Century"* in this prospectus supplement for further information regarding these developments.

As a result of the foregoing, we cannot assure you that these matters would not adversely affect the ability of NC Capital Corporation to purchase mortgage loans as to which an early payment default has occurred, or the ability of the applicable servicer to take actions (including foreclosure) that may be essential to preserve the value of the mortgage loans included in the trust that were purchased by the sponsor from NC Capital Corporation.

**Violation of various federal, state and local laws may result in losses on the mortgage loans.**

There has been a continuing focus by state and federal banking regulatory agencies, state attorneys general offices, the Federal Trade Commission, the U.S. Department of Justice, the U.S. Department of Housing and Urban Development and state and local governmental authorities on certain lending practices by some companies in the subprime industry, sometimes referred to as "predatory lending" practices. Sanctions have been imposed by state, local and federal governmental agencies for practices including, but not limited to, charging borrowers excessive fees, imposing higher interest rates than the borrower's credit risk warrants and failing to adequately disclose the material terms of loans to the borrowers.

Applicable state and local laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the originators. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

- the Federal Truth in Lending Act and Regulation Z promulgated under that Act, which require certain disclosures to the borrowers regarding the terms of the mortgage loans;

- the Equal Credit Opportunity Act and Regulation B promulgated under that Act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 4 of 23

assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience.

Violations of certain provisions of these federal, state and local laws, as well as actions by governmental agencies, authorities and attorneys general, may limit the ability of each servicer to collect all or part of the principal of, or interest on, the mortgage loans and in addition could subject the issuing entity to damages and administrative enforcement (including disgorgement of prior interest and fees paid). In particular, an originator's failure to comply with certain requirements of these federal and state laws could subject the issuing entity (and other assignees of the mortgage loans) to monetary penalties, and result in the obligors' rescinding the mortgage loans against either the issuing entity or subsequent holders of the mortgage loans.

Morgan Stanley Mortgage Capital Inc. has represented or will represent that each mortgage loan is in compliance with applicable federal, state and local laws and regulations. In addition, Morgan Stanley Mortgage Capital Inc. has also represented or will represent that none of the mortgage loans is covered by the Home Ownership and Equity Protection Act of 1994 or is classified as a "high cost home," "threshold," "covered," "high risk home" or "predatory" loan under any other applicable federal, state or local law. In the event of a breach of any of such representations, Morgan Stanley Mortgage Capital Inc. will be obligated to cure such breach or repurchase or replace the affected mortgage loan, in the manner and to the extent described in this prospectus supplement.

As described above under "—*Recent developments regarding New Century Financial Corporation*," a number of state regulatory authorities have taken action against New Century Financial Corporation and its subsidiaries, including NC Capital Corporation, for alleged violations of state laws. Certain of those actions prohibit New Century Financial Corporation from pursuing foreclosure actions, and in the future one or more additional states could seek similar limitations on the applicable servicer's ability to take actions (such as pursuing foreclosures) that may be essential to preserve the value of the mortgage loans on behalf of the trust. Any such limitations could adversely affect the issuing entity's ability to realize on the mortgage loans.

**Geographic concentration of the mortgage loans in particular jurisdictions may result in greater losses if those jurisdictions experience economic downturns.**

Different geographic regions of the United States from time to time will experience weaker regional economic conditions and housing markets, and, consequently, may experience higher rates of loss and delinquency on mortgage loans generally. Any concentration of the mortgage loans in a region may present risk considerations in addition to those generally present for similar mortgage-backed securities without that concentration. This may subject the mortgage loans held by the issuing entity to the risk that a downturn in the economy in this region of the country would more greatly affect the pool than if the pool were more diversified.

In particular, the following approximate percentages of mortgage loans were secured by mortgaged properties located in the following states:

*Group I Mortgage Loans*

| California | Florida | Arizona | New Jersey | New York |
|---|---|---|---|---|
| 28.88% | 12.12% | 5.74% | 5.71% | 5.46% |

*Group II Mortgage Loans*

| California | Florida | New York | Texas | New Jersey |
|---|---|---|---|---|
| 33.21% | 8.38% | 6.89% | 6.80% | 5.02% |

Because of the relative geographic concentration of the mortgaged properties within certain states, losses on the mortgage loans may be higher than would be the case if the mortgaged properties were more geographically diversified. For example, some of the mortgaged properties may be more susceptible to certain types of special

Case: 09-05050   Doc# 53-2   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 5 of 23

hazards, such as earthquakes, hurricanes, wildfires, floods, and other natural disasters and major civil disturbances, than residential properties located in other parts of the country.

Further, the concentration of the mortgage loans in one or more states may have a disproportionate effect on certificateholders if the regulatory authorities in any of those states take actions against the originator or any servicer that impair the ability of the issuing entity to realize on those mortgage loans. See "*—Violation of various federal, state and local laws may result in losses on the mortgage loans*" above.

In addition, the economies of the states with high concentrations of mortgaged properties may be adversely affected to a greater degree than the economies of other areas of the country by certain regional developments. If the residential real estate markets in an area of concentration experience an overall decline in property values after the dates of origination of the respective mortgage loans, then the rates of delinquencies, foreclosures and losses on the mortgage loans may increase and the increase may be substantial.

**Effect on yields caused by prepayments, defaults and losses.**

*Borrowers may prepay their mortgage loans in whole or in part at any time. We cannot predict the rate at which borrowers will repay their mortgage loans. A prepayment of a mortgage loan generally will result in a prepayment on the certificates.*

- If you purchase your certificates at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your certificates at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The rate of prepayments on the mortgage loans will be sensitive to prevailing interest rates. Generally, for fixed rate mortgage loans, if prevailing interest rates decline significantly below the interest rates on the fixed rate mortgage loans, the fixed rate mortgage loans are more likely to prepay than if prevailing rates remain above the interest rates on the fixed rate mortgage loans. Conversely, if prevailing interest rates rise significantly, prepayments on the fixed rate mortgage loans may decrease.

- The prepayment behavior of the adjustable rate mortgage loans and of the fixed rate mortgage loans may respond to different factors, or may respond differently to the same factors. If, at the time of their first adjustment, the interest rates on any of the adjustable rate mortgage loans would be subject to adjustment to a rate higher than the then prevailing mortgage interest rates available to borrowers, the borrowers may prepay their adjustable rate mortgage loans. The adjustable rate mortgage loans may also suffer an increase in defaults and liquidations following upward adjustments of their interest rates, especially following their initial adjustments.

- Approximately 74.27% of the group I mortgage loans and approximately 71.39% of the group II mortgage loans require the borrower to pay a prepayment charge in certain instances if the borrower prepays the mortgage loan during a stated period, which may be from one to three years after the mortgage loan was originated. A prepayment charge may or may not discourage a borrower from prepaying the related mortgage loan during the applicable period.

- Morgan Stanley Mortgage Capital Inc. may be required to purchase mortgage loans from the issuing entity in the event certain breaches of its representations and warranties occur or certain material document defects occur, which in each case have not been cured, and NC Capital Corporation may be required to purchase mortgage loans from the trust in the event certain early payment defaults occur. These purchases will have the same effect on the holders of the LIBOR certificates as a prepayment of those mortgage loans.

- Saxon Mortgage Services, Inc. may purchase all of the mortgage loans when the aggregate stated principal balance of the mortgage loans as of the last day of the related due period is equal to or less than 5% of the aggregate stated principal balance of the mortgage loans as of the cut-off date.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 6 of 23

*If the rate of default or the amount of losses on the mortgage loans is higher than you expect, then your yield may be lower than you expect.*

- As a result of the absorption of realized losses on the mortgage loans by excess interest, after taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement, and overcollateralization as described in this prospectus supplement, liquidations of defaulted mortgage loans, whether or not realized losses are incurred upon the liquidations, are likely to result in an earlier return of principal to the LIBOR certificates and are likely to influence the yield on the LIBOR certificates in a manner similar to the manner in which principal prepayments on the mortgage loans would influence the yield on the LIBOR certificates.

- The overcollateralization provisions are intended to result in an accelerated rate of principal distributions to holders of the LIBOR certificates then entitled to principal distributions at any time that the overcollateralization provided by the mortgage loan pool falls below the required level. An earlier return of principal to the holders of the LIBOR certificates as a result of the overcollateralization provisions will influence the yield on the LIBOR certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the LIBOR certificates.

- The multiple class structure of the LIBOR certificates causes the yield of certain classes of the LIBOR certificates to be particularly sensitive to changes in the rates of prepayments of mortgage loans. Because distributions of principal will be made to the classes of LIBOR certificates according to the priorities described in this prospectus supplement, the yield to maturity on those classes of LIBOR certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on those classes. In particular, the Class M and Class B certificates generally are not entitled to receive (unless the aggregate principal balance of the Class A certificates has been reduced to zero) any portion of the amount of principal payable to the LIBOR certificates prior to the distribution date in June 2010. On and after such date, subject to the loss and delinquency performance of the mortgage loan pool, the Class M and Class B certificates may continue (unless the aggregate principal balance of the Class A certificates has been reduced to zero) to receive no portion of the amount of principal then payable to the LIBOR certificates. After taking into account certain payments by the issuing entity pursuant to the interest rate swap agreement, the weighted average lives of the Class M and Class B certificates will therefore be longer than would otherwise be the case. The effect on the market value of the Class M and Class B certificates of changes in market interest rates or market yields for similar securities may be greater than for the Class A certificates.

*The value of your certificates may be reduced if the rate of default or the amount of losses is higher than expected.*

- If the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of the certificates may be lowered or withdrawn in the future. This may reduce the value of those certificates. No one will be required to supplement any credit enhancement or to take any other action to maintain any rating of the certificates.

*Newly originated mortgage loans may be more likely to default, which may cause losses on the LIBOR certificates.*

- Defaults on mortgage loans tend to occur at higher rates during the early years of the mortgage loans. Substantially all of the mortgage loans have been originated within the 12 months prior to their sale to the issuing entity. As a result, the issuing entity may experience higher rates of default than if the mortgage loans had been outstanding for a longer period of time.

*The credit enhancement features may be inadequate to provide protection for the LIBOR certificates.*

- The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Class A certificates, and to a limited extent, the holders of the Class M certificates and, to a lesser degree, the holders of the Class B certificates, will receive regular payments of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 7 of 23

53

defaults on the mortgage loans. If delinquencies or defaults occur on the mortgage loans, the servicers will not advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if the advances are not likely to be recovered.

- If substantial losses occur as a result of defaults and delinquent payments on the mortgage loans, you may suffer losses, even if you own Class A certificates.

**Interest generated by the mortgage loans may be insufficient to maintain the required level of overcollateralization.**

The weighted average of the net interest rates on the mortgage loans is expected to be higher than the weighted average of the pass-through rates on the LIBOR certificates. After taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement and payments received pursuant to the interest rate cap agreement, the mortgage loans are expected to generate more interest than is needed to pay interest owed on the LIBOR certificates and to pay certain fees and expenses of the issuing entity. Any remaining interest generated by the mortgage loans will then be used to absorb losses that occur on the mortgage loans. After these financial obligations of the issuing entity are covered, the available excess interest generated by the mortgage loans will be used to restore overcollateralization to the required level determined as provided in the pooling and servicing agreement. We cannot assure you, however, that enough excess interest will be generated to absorb losses or to maintain the required level of overcollateralization. The factors described below, as well as the factors described below under "—*Effect of interest rates on the mortgage loans and other factors on the pass-through rates of the LIBOR certificates*," will affect the amount of excess interest that the mortgage loans will generate:

- Every time a mortgage loan is prepaid in full, excess interest may be reduced because the mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

- Every time a mortgage loan is liquidated or written off, excess interest may be reduced because those mortgage loans will no longer be outstanding and generating interest.

- If the rates of delinquencies, defaults or losses on the mortgage loans turn out to be higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available to make required distributions on the LIBOR certificates.

- All of the adjustable rate mortgage loans have interest rates that adjust based on an index that is different from the index used to determine the pass-through rates on the LIBOR certificates, and the fixed rate mortgage loans have interest rates that do not adjust. In addition, the first adjustment of the interest rates for approximately 83.48% of the adjustable rate mortgage loans will not occur until two years after the date of origination, the first adjustment of the interest rates for approximately 16.16% of the adjustable rate mortgage loans will not occur until three years after the date of origination and the first adjustment of the interest rates for approximately 0.36% of the adjustable rate mortgage loans will not occur until five years after the date of origination. As a result, the pass-through rates on the LIBOR certificates may increase relative to the weighted average of the interest rates on the mortgage loans, or the pass-through rate on the LIBOR certificates may remain constant as the weighted average of the interest rates on the mortgage loans declines. In either case, this would require that more of the interest generated by the mortgage loans be applied to cover interest on the LIBOR certificates. The pass-through rates on the Class A-1, Class A-2a, Class A-2b, Class A-2c and Class A-2d certificates cannot exceed the lesser of the weighted average interest rate of the mortgage loans, reduced for net payments to the interest rate swap provider, in the applicable mortgage loan group or in the mortgage loan pool, in either case less certain fees and expenses payable by the trust, and the pass-through rates on the Class M and Class B certificates cannot exceed the weighted average interest rate of the mortgage loans, reduced for net payments to the interest rate swap provider, in the mortgage loan pool less certain fees and expenses payable by the issuing entity.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher interest rates than on the mortgage loans with relatively lower interest rates, the amount of excess interest generated by the mortgage loans will be less than would otherwise be the case.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 8 of 23

54

- Investors in the offered certificates, and particularly the Class B certificates, should consider the risk that the overcollateralization may not be sufficient to protect your certificates from losses.

**Effect of interest rates on the mortgage loans and other factors on the pass-through rates of the LIBOR certificates.**

The LIBOR certificates accrue interest at pass-through rates based on the one-month LIBOR index plus specified margins, but are subject to certain limitations. Those limitations on the pass-through rates for the LIBOR certificates are, in part, based on the weighted average of the interest rates on the mortgage loans reduced for net payments to the interest rate swap provider and net of certain fees and expenses of the issuing entity.

A variety of factors, in addition to those described above under "—*Interest generated by the mortgage loans may be insufficient to maintain the required level of overcollateralization*," could limit the pass-through rates and adversely affect the yield to maturity on the LIBOR certificates. Some of these factors are described below:

- The interest rates on the fixed rate mortgage loans will not adjust, and the interest rates on the adjustable rate mortgage loans are based on a six-month LIBOR index. All of the adjustable rate mortgage loans have periodic, minimum and maximum limitations on adjustments to their interest rates, and, as discussed above under "—*Interest generated by the mortgage loans may be insufficient to maintain the required level of overcollateralization*," the adjustable rate mortgage loans will not have the first adjustment to their interest rates until two years, three years or five years after the origination of those mortgage loans. As a result of the limit on the pass-through rates for the LIBOR certificates, those certificates may accrue less interest than they would accrue if their pass-through rates were based solely on the one-month LIBOR index plus the specified margins.

- The six-month LIBOR index may change at different times and in different amounts than one-month LIBOR. As a result, it is possible that interest rates on certain of the adjustable rate mortgage loans may decline while the pass-through rates on the LIBOR certificates are stable or rising. It is also possible that the interest rates on certain of the adjustable rate mortgage loans and the pass-through rates for the LIBOR certificates may decline or increase during the same period, but that the pass-through rates on these certificates may decline more slowly or increase more rapidly.

- The pass-through rates for the LIBOR certificates adjust monthly and are subject to maximum interest rate caps while the interest rates on the adjustable rate mortgage loans adjust less frequently and are also subject to maximum interest rate caps and the interest rates on the fixed rate mortgage loans do not adjust. Consequently, the limit on the pass-through rates for the LIBOR certificates may limit increases in the pass-through rates for those classes for extended periods in a rising interest rate environment.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher interest rates than on the mortgage loans with relatively lower interest rates, the pass-through rates on the LIBOR certificates are more likely to be limited.

- If the pass-through rates on the LIBOR certificates are limited for any distribution date due to a cap based on the weighted average net interest rates of the mortgage loans and, in the case of the Class A certificates also, on the weighted average net interest rates of the related loan group (in each case, reduced by certain fees and expenses and net payments to the interest rate swap provider), the resulting interest shortfalls may be recovered by the holders of these certificates on the same distribution date or on future distribution dates on a subordinated basis to the extent that on that distribution date or future distribution dates there are available funds remaining after certain other distributions on the LIBOR certificates and the payment of certain fees and expenses of the issuing entity. In addition, these shortfalls may be recovered from net payments, if any, from the interest rate swap provider. These shortfalls suffered by the LIBOR certificates may also be covered by amounts payable under the interest rate cap agreement. However, we cannot assure you that these funds, if available, will be sufficient to fully cover these shortfalls.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 9 of 23

55

**Effect on yields due to rapid prepayments; no assurance of amounts received under the interest rate swap agreement.**

Any net payment payable to the interest rate swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may reduce the pass-through rates on the LIBOR certificates. If the rate of prepayments on the mortgage loans causes the aggregate scheduled principal balance of the mortgage loans in the pool to be less than the amount on which payments due under the interest rate swap agreement are calculated, the relative proportion of interest collections on the mortgage loans that must be applied to make net payments to the interest rate swap provider would increase. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the LIBOR certificates.

In addition, certain swap termination payments arising under the interest rate swap agreement are payable to the interest rate swap provider on a senior basis and such payments may reduce amounts available for distribution to certificateholders.

Any amounts received under the interest rate swap agreement will be applied as described in this prospectus supplement to pay certain interest shortfalls, maintain overcollateralization and cover losses. However, no amounts will be payable to the issuing entity by the interest rate swap provider unless the floating payment owed by the interest rate swap provider for a distribution date exceeds the fixed payment owed to the interest rate swap provider for that distribution date. This will not occur except in a period where one-month LIBOR (as determined pursuant to the interest rate swap agreement) exceeds 5.10% per annum. We cannot assure you that any amounts will be received under the interest rate swap agreement, or that any such amounts that are received will be sufficient to cover interest shortfalls or losses on the mortgage loans, or to maintain the required level of overcollateralization.

See "*Description of the Certificates—Distributions of Interest and Principal*," "*—Swap Account*" and "*—Interest Rate Swap Agreement*" in this prospectus supplement.

**Prepayments on the mortgage loans could lead to shortfalls in the distribution of interest on your certificates.**

When a voluntary principal prepayment is made by the borrower on a mortgage loan (excluding any payments made upon liquidation of any mortgage loan), the borrower is charged interest on the amount of prepaid principal only up to the date of the prepayment, instead of for a full month. However, principal prepayments will only be passed through to the holders of the certificates once a month on the distribution date that follows the prepayment period in which the prepayment was received by the applicable servicer. In the event the timing of any voluntary prepayments in full would cause there to be less than one full month's interest, at the applicable interest rates, available to be distributed to certificateholders with respect to the prepaid mortgage loans, the applicable servicer is obligated to pay an amount, without any right of reimbursement, for the amount of shortfalls in interest collections payable on the certificates that are attributable to the difference between the interest paid by a borrower in connection with those principal prepayments in full and thirty days' interest on the prepaid mortgage loans, but only to the extent those shortfalls do not exceed the servicing fee for that distribution date payable to that servicer.

If the applicable servicer fails to make such payments or the shortfall exceeds the servicing fee payable to that servicer for the month, there will be fewer funds available for the distribution of interest on the certificates. In addition, no such payments from any servicer will be available to cover prepayment interest shortfalls resulting from partial prepayments or involuntary prepayments such as liquidation of a defaulted mortgage loan. Such shortfalls of interest, if they result in the inability of the issuing entity to pay the full amount of the current interest on the certificates, will result in a reduction of the yield on your certificates.

**Additional risks associated with the Class M and Class B Certificates.**

The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 certificates will be progressively more sensitive, in that order, to the rate and timing of borrower defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than anticipated by such holder based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage loans are consistent

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 10 of 23

with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the amount of excess interest, after taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement, and the amount of overcollateralization following distributions on the related distribution date, will reduce the aggregate principal balance of the Class B-4, Class B-3, Class B-2, Class B-1, Class M-6, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 certificates, in that order. As a result of this reduction, less interest will accrue on such class of certificates than would otherwise be the case. Once a realized loss is allocated to a certificate, no principal or interest will be distributable with respect to such written down amount, except to the extent of any subsequent recoveries received on liquidated mortgage loans after they are liquidated. However, the amount of any realized losses allocated to the Class M or Class B certificates may be paid to the holders of those certificates according to the priorities set forth under "*Description of the Certificates—Overcollateralization Provisions*" in this prospectus supplement.

Unless the aggregate principal balances of the Class A certificates have been reduced to zero, the Class M and Class B certificates will not be entitled to any principal distributions until at least June 2010 or a later date as provided in this prospectus supplement, or during any period in which delinquencies or cumulative losses on the mortgage loans exceed certain levels. As a result, the weighted average lives of the Class M and Class B certificates will be longer than would otherwise be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of the Class M and Class B certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels occur, it is possible for such certificates to receive no principal distributions even if no losses have occurred on the mortgage loan pool.

In addition, the multiple class structure of the Class M and Class B certificates causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment of the mortgage loans. Because distributions of principal will be made to the holders of such certificates according to the priorities described in this prospectus supplement, the yield to maturity on such classes of certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes. The yield to maturity on such classes of certificates will also be extremely sensitive to losses due to defaults on the mortgage loans (and the timing of those losses), to the extent such losses are not covered by excess interest, after taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement, payments received by the issuing entity pursuant to the interest cap agreement, the Class X certificates or a class of Class M and Class B certificates with a lower payment priority. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the Class M and Class B certificates may be adversely affected by losses even if such classes of certificates do not ultimately bear such loss.

The applicable servicer (or its assignee) or the holders of a majority of the Class X certificates will have the option to purchase any mortgage loan that becomes 90 days or more delinquent or that has been converted to an REO property. Any such purchase would have the same effect on the holders of certificates as a prepayment of the mortgage loans. The person exercising such option, or on whose behalf the option is being exercised, might benefit from the removal of such delinquent mortgage loans or REO property. The removal of any delinquent mortgage loan or REO property pursuant to this option may have an effect on whether or not there exists, or continues to exist, a loss and delinquency loss trigger event, which determines the required level of overcollateralization. Therefore, depending on the circumstances, the exercise of this purchase option may adversely affect the market value of your certificates.

**Delay in receipt of liquidation proceeds; liquidation proceeds may be less than the mortgage loan balance.**

Substantial delays could be encountered in connection with the liquidation of delinquent mortgage loans. Further, reimbursement of advances made on a mortgage loan, liquidation expenses such as legal fees, real estate taxes, hazard insurance and maintenance and preservation expenses may reduce the portion of liquidation proceeds payable on the certificates. If a mortgaged property fails to provide adequate security for the mortgage loan, you will incur a loss on your investment if the credit enhancements described in this prospectus supplement are insufficient to cover the loss.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 11 of 23

**A portion of the mortgage loans are secured by subordinate mortgages; in the event of a default, these mortgage loans are more likely to experience losses.**

Approximately 5.96% of the group I mortgage loans and approximately 5.99% of the group II mortgage loans are secured by second-lien mortgages, which are subordinate to the rights of the holder of the related senior mortgages. As a result, the proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the principal balance of the mortgage loan only to the extent that the claims, if any, of each related senior mortgagee are satisfied in full, including any related foreclosure costs. In addition, a holder of a subordinate or junior mortgage may not foreclose on the mortgaged property securing such mortgage unless it either pays the entire amount of the senior mortgages to the senior mortgagees at or prior to the foreclosure sale or undertakes the obligation to make payments on each senior mortgage in the event of a default under any senior mortgage. The issuing entity will have no source of funds to satisfy any senior mortgage or make payments due to any senior mortgagee.

An overall decline in the residential real estate markets could adversely affect the values of the mortgaged properties and cause the outstanding principal balances of the second-lien mortgage loans, together with the senior mortgage loans secured by the same mortgaged properties, to equal or exceed the value of the mortgaged properties. This type of a decline would adversely affect the position of a second mortgagee before having the same effect on the related first mortgagee. A rise in interest rates over a period of time and the general condition of a mortgaged property as well as other factors may have the effect of reducing the value of the mortgaged property from the appraised value at the time the mortgage loan was originated. If there is a reduction in value of the mortgaged property, the ratio of the amount of the mortgage loan to the value of the mortgaged property may increase over what it was at the time the mortgage loan was originated. This type of increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the second-lien mortgage loan after satisfaction of any senior liens.

**High loan-to-value ratios increase risk of loss.**

Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below. Approximately 45.30% of the group I mortgage loans and approximately 44.68% of the group II mortgage loans had loan-to-value ratios at origination, or with respect to second-lien mortgage loans, combined loan-to-value ratios at origination, in excess of 80% but not more than 100% at origination. Additionally, the determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios or combined loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties.

**Some of the mortgage loans have an initial interest-only period, which may result in increased delinquencies and losses.**

Approximately 29.15% of the group I mortgage loans and approximately 18.26% of the group II mortgage loans have an initial interest-only period of up to five years after the date of origination. During this period, the payment made by the related borrower will be less than it would be if the principal of the mortgage loan was required to amortize. In addition, the mortgage loan principal balance will not be reduced because there will be no scheduled monthly payments of principal during this period. As a result, no principal payments will be made on the LIBOR certificates with respect to these mortgage loans during their interest-only period unless there is a principal prepayment.

After the initial interest-only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related borrowers, particularly if interest rates have increased and the borrower is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of there being no principal amortization during the early years of these mortgage loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate, the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by excess interest, after taking into account certain payments received or paid by the issuing entity pursuant to the interest rate swap agreement, or overcollateralization, will be allocated to the LIBOR certificates in reverse order of seniority.

58

Mortgage loans with an initial interest-only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may be significantly different from mortgage loans that amortize from origination. In particular, there may be a greater expectation by these borrowers of refinancing their mortgage loans with a new mortgage loan, in particular, one with an initial interest-only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure by the related borrower to build equity in the property may affect the delinquency, loss and prepayment experience with respect to these mortgage loans.

**Payments in full of a balloon loan depend on the borrower's ability to refinance the balloon loan or sell the mortgaged property.**

Approximately 39.65% of the group I mortgage loans and approximately 47.81% of the group II mortgage loans will not be fully amortizing over their terms to maturity and, thus, will require substantial principal payments, *i.e.*, balloon payments, at their stated maturity. Mortgage loans with balloon payments involve a greater degree of risk because the ability of a borrower to make a balloon payment typically will depend upon the borrower's ability either to timely refinance the loan or to timely sell the related mortgaged property. The ability of a borrower to accomplish either of these goals will be affected by a number of factors, including:

- the level of available interest rates at the time of sale or refinancing;

- the borrower's equity in the related mortgaged property;

- the financial condition of the borrower;

- tax laws;

- prevailing general economic conditions; and

- the availability of credit for single family real properties generally.

**NC Capital Corporation may not be able to repurchase mortgage loans that have early payment defaults.**

NC Capital Corporation may be obligated to repurchase mortgage loans as to which an early payment default occurs, as described in *"Description of the Certificates—Representations and Warranties Relating to the Mortgage Loans"* in this prospectus supplement. NC Capital Corporation may not be capable of repurchasing any such mortgage loans, for financial or other reasons. The inability of NC Capital Corporation to repurchase such mortgage loans would likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on the certificates could occur.

**The interest rate swap agreement and the interest rate cap agreement are subject to counterparty risk.**

The assets of the issuing entity include an interest rate swap agreement and an interest rate cap agreement that will require the interest rate swap provider or the interest rate cap provider, as applicable, to make certain payments for the benefit of the holders of the LIBOR certificates. To the extent that payments on the LIBOR certificates depend in part on payments to be received by the securities administrator under the interest rate swap agreement or the interest rate cap agreement, the ability of the securities administrator to make such payments on such classes of certificates will be subject to the credit risk of the interest rate swap provider or the interest rate cap provider, as applicable.

**The credit rating of the interest rate swap provider could affect the rating of the LIBOR certificates.**

Morgan Stanley, the guarantor of the interest rate swap provider under the interest rate swap agreement, is rated "A+" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and "Aa3" by Moody's Investors Service, Inc. The ratings on the LIBOR certificates are dependent in part upon these credit ratings. If a credit rating of the guarantor of the interest rate swap provider is qualified, reduced or withdrawn and a substitute interest rate swap provider is not obtained in accordance with the terms of the interest rate swap agreement, the ratings of the LIBOR certificates may be qualified, reduced or withdrawn. As a result, the value and

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 13 of 23

marketability of the LIBOR certificates may be adversely affected. See *"Description of the Certificates—Interest Rate Swap Agreement"* in this prospectus supplement.

### Bankruptcy of borrowers may adversely affect distributions on certificates.

The application of federal and state laws, including bankruptcy and debtor relief laws, may interfere with or adversely affect the ability to realize on the mortgaged properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted loans. As a consequence, borrowers who have defaulted on their mortgage loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their mortgage loans. As a result, these mortgage loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

### Bankruptcy of the depositor or the sponsor may delay or reduce collections on the mortgage loans.

Each of the depositor and the sponsor may be eligible to become a debtor under the United States Bankruptcy Code. If the depositor or the sponsor were to become a debtor under the United States Bankruptcy Code, the bankruptcy court could be asked to determine whether the mortgage loans that support the certificates constitute property of the debtor, or whether they constitute property of the related issuing entity. If the bankruptcy court were to determine that the mortgage loans constitute property of the estate of the debtor, there could be delays in payments to certificateholders of collections on the mortgage loans and/or reductions in the amount of the payments paid to certificateholders. The mortgage loans would not constitute property of the estate of the depositor or of the sponsor if the transfers of the mortgage loans from the sponsor to the depositor and from the depositor to the issuing entity are treated as true sales, rather than pledges, of the mortgage loans.

The transactions contemplated by this prospectus supplement and the prospectus will be structured so that, if there were to be a bankruptcy proceeding with respect to the sponsor or the depositor, the transfers should be treated as true sales, and not as pledges. The mortgage loans should accordingly be treated as property of the issuing entity and not as part of the bankruptcy estate of the depositor or sponsor. In addition, the depositor is operated in a manner that should make it unlikely that it would become the subject of a bankruptcy filing.

However, we cannot assure you that a bankruptcy court would not recharacterize the transfers as borrowings of the depositor or the sponsor secured by pledges of the mortgage loans. Any request by the debtor (or any of its creditors) for such a recharacterization of these transfers, if successful, could result in delays in payments of collections on the mortgage loans and/or reductions in the amount of the payments paid to certificateholders, which could result in losses on the certificates. Even if a request to recharacterize the transfers were to be denied, delays in payments on the mortgage loans and resulting delays or losses on the certificates could result.

### The sponsor and its affiliates may have conflicts of interest.

Recent developments in the subprime mortgage market have led to a deterioration in the financial performance of many subprime loan originators. See "—*Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies and defaults; increased use of new mortgage products by borrowers may result in higher levels of delinquencies and losses generally*" above. Due to these developments affecting these subprime loan originators, including the original loan seller, certain conflicts of interest may exist or may arise as a result of transactions or relationships that the sponsor and its affiliates may have or may enter into in the future with one or more of these loan sellers.

In taking any actions or engaging in other transactions with the original loan seller, the sponsor and its affiliates are not required to take into account the effect of such actions or transactions on the issuing entity or the certificateholders. Among other things, the sponsor and its affiliates may purchase, as principal, loans originated or sold by the original loan seller that are not included in the issuing entity, and may seek to enforce against the original loan seller any remedies they may have if an early payment default or breach of representation and warranty occurs with respect to such other mortgage loans. The sponsor or its affiliates may provide secured or unsecured financing to the original loan seller, and may seek to enforce remedies against the original loan seller if an event of default occurs in respect of that financing. The sponsor and its affiliates will not have any obligation to account to the issuing entity for any amounts they collect in respect of any loans, financing or other transactions they may have

S-26

with the original loan seller, and the sponsor and its affiliates will have no obligation to pursue any claims against the original loan seller on behalf of the issuing entity or with respect to loans included in the issuing entity.

**External events may increase the risk of loss on the mortgage loans.**

In response to previously executed and threatened terrorist attacks in the United States and foreign countries, the United States has initiated military operations and has placed a substantial number of armed forces reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. To the extent that a member of the military, or a member of the armed forces reserves or National Guard who is called to active duty is a borrower of a mortgage loan in the issuing entity, the interest rate limitation of the Servicemembers Civil Relief Act, and any comparable state law, will apply. Substantially all of the mortgage loans have mortgage interest rates which exceed such limitation, if applicable. The servicers will not be obligated to cover shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act or any comparable state laws. This may result in interest shortfalls on the mortgage loans, which may result in shortfalls of interest on your certificates. None of the original loan seller, the depositor, the underwriter, the trustee, the sponsor, the servicers, the master servicer, the securities administrator or any other party has taken any action to determine whether any of the mortgage loans would be affected by such interest rate limitation. See *"Description of the Certificates—Distributions of Interest and Principal"* in this prospectus supplement and *"Material Legal Aspects of the Loans—Servicemembers' Civil Relief Act and the California Military and Veterans Code"* in the prospectus.

**Drug, RICO and money laundering violations could lead to property forfeitures.**

Federal law provides that property purchased or improved with assets derived from criminal activity or otherwise tainted, or used in the commission of certain offenses, can be seized and ordered forfeited to the United States of America. The offenses which can trigger such a seizure and forfeiture include, among others, violations of the Racketeer Influenced and Corrupt Organizations Act, the Bank Secrecy Act, the anti-money laundering laws and regulations, including the USA Patriot Act of 2001 and the regulations issued pursuant to that Act, as well as the narcotic drug laws. In many instances, the United States may seize the property even before a conviction occurs.

In the event of a forfeiture proceeding, a lender may be able to establish its interest in the property by proving that (1) its mortgage was executed and recorded before the commission of the illegal conduct from which the assets used to purchase or improve the property were derived or before the commission of any other crime upon which the forfeiture is based, or (2) the lender, at the time of the execution of the mortgage, did not know or was reasonably without cause to believe that the property was subject to forfeiture. However, there is no assurance that such a defense would be successful.

**The certificates are obligations of the issuing entity only.**

The certificates will not represent an interest in or obligation of the depositor, the servicers, the master servicer, the securities administrator, the sponsor, the underwriter, the original loan seller, the trustee or any of their respective affiliates. Neither the certificates nor the underlying mortgage loans will be guaranteed or insured by any governmental agency or instrumentality or by the depositor, the servicers, the master servicer, the securities administrator, the sponsor, the underwriter, the trustee or any of their respective affiliates. Proceeds of the assets included in the issuing entity (including, to the extent set forth in this prospectus supplement, the interest rate swap agreement and the interest rate cap agreement for the benefit of the LIBOR certificates) will be the sole source of payments on the certificates, and there will be no recourse to the depositor, the servicers, the master servicer, the securities administrator, the sponsor, the underwriter, the original loan seller, the trustee or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all payments provided for under the certificates.

**Your investment may not be liquid.**

The underwriter intends to make a secondary market in the offered certificates, but it will have no obligation to do so. We cannot assure you that such a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 15 of 23

desired yield. The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity means that there may not be any purchasers for the certificates you may purchase. Although any class of certificates may experience illiquidity, it is more likely that classes of certificates that are more sensitive to prepayment, credit or interest rate risk or that have been structured to meet the investment requirements of limited categories of investors, will experience illiquidity. You should consider that illiquidity may also result from legal or regulatory changes, or from the adoption or change of accounting rules, that affect some or all of the classes of the certificates generally or particular types of investors. Illiquidity can have a severely adverse effect on the prices of securities.

The offered certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended. Accordingly, many institutions that lack the legal authority to invest in securities that do not constitute "mortgage related securities" will not be able to invest in the offered certificates, thereby limiting the market for those certificates. If your investment activities are subject to legal investment laws and regulations, regulatory capital requirements, or review by regulatory authorities, then you may be subject to restrictions on investment in the offered certificates. See "*Legal Investment*" in this prospectus supplement and in the prospectus. You should consult your own tax, accounting, legal and financial advisors for assistance in determining the suitability of and consequence to you of the purchase, ownership, and sale of the offered certificates.

**The ratings on your certificates could be reduced or withdrawn.**

Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency qualifies, reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.

**The servicing fee may be insufficient to engage replacement servicers.**

To the extent that this prospectus supplement indicates that the fee payable to the servicers is based on a fee rate that is a percentage of the outstanding mortgage loan balances, no assurance can be made that such fee rate in the future will be sufficient to attract replacement servicers to accept an appointment. In addition, to the extent the mortgage pool of any series has amortized significantly at the time that a replacement servicer is sought, the aggregate fee that would be payable to any such replacement may not be sufficient to attract a replacement to accept an appointment.

**The offered certificates may not be suitable investments.**

The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The offered certificates are complex investments that should be considered only by investors who, either alone or with their tax, accounting, legal and financial advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 16
of 23

## THE MORTGAGE LOAN POOL

The statistical information presented in this prospectus supplement concerning the mortgage loans to be transferred to the issuing entity on the closing date is based on the pool of mortgage loans as of the cut-off date, which is May 1, 2007. Unless otherwise indicated in this prospectus supplement, the information regarding the mortgage loans set forth in this prospectus supplement that is based on the principal balance of the mortgage loans as of the cut-off date assumes the timely receipt of principal scheduled to be paid on the mortgage loans on or prior to the cut-off date and no delinquencies, defaults or prepayments from April 1, 2007 through the cut-off date. With respect to the mortgage loan pool as of the cut-off date, some amortization will occur prior to the closing date. Moreover, certain mortgage loans included in the mortgage loan pool as of the cut-off date may prepay in full, or may be determined not to meet the eligibility requirements for the final mortgage loan pool, and may not be included in the final mortgage loan pool, and certain other mortgage loans may be included in the final mortgage loan pool. As a result of the foregoing, the statistical distribution of characteristics as of the closing date for the final mortgage loan pool may vary somewhat from the statistical distribution of such characteristics as of the cut-off date as presented in this prospectus supplement, although such variance should not be material.

### General

On the closing date it is expected that the issuing entity will primarily consist of approximately 6,792 conventional, subprime, adjustable and fixed rate, first-lien and second-lien residential mortgage loans with original terms to maturity from the first scheduled payment due date of not more than 30 years, having an aggregate cut-off date balance (after giving effect to scheduled payments due on such date) of approximately $1,304,294,661. The mortgage loans in the issuing entity were acquired by the sponsor, Morgan Stanley Mortgage Capital Inc., from NC Capital Corporation.

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement. See "—New Century" below for a summary of the underwriting guidelines of the original loan seller. Because, in general, such underwriting guidelines do not conform to Fannie Mae or Freddie Mac guidelines, the mortgage loans are likely to experience higher rates of delinquency, foreclosure and bankruptcy than if they had been underwritten to a higher standard.

Approximately 2,611 (or approximately 22.51%) of the mortgage loans in the issuing entity are fixed rate mortgage loans and approximately 4,181 (or approximately 77.49%) of the mortgage loans are adjustable rate mortgage loans, as described in more detail under "—Adjustable Rate Mortgage Loans" below. All of the mortgage loans have scheduled monthly payment due dates on the first day of the month. Interest on all of the mortgage loans accrues on the basis of a 360-day year consisting of twelve 30-day months.

Approximately 29.15% of the group I and approximately 18.26% of the group II mortgage loans have an initial interest-only period of up to five years after the date of origination.

All of the mortgage loans are secured by first or second mortgages, deeds of trust or similar security instruments creating first-liens or second-liens on residential properties consisting of one- to four-family dwelling units, individual condominium units or individual units in planned unit developments.

Pursuant to its terms, each mortgage loan, other than a loan secured by a condominium unit, is required to be covered by a standard hazard insurance policy in an amount equal to the lower of the unpaid principal amount of that mortgage loan or the replacement value of the improvements on the related mortgaged property.

Generally, a condominium association is responsible for maintaining hazard insurance covering the entire building.

Approximately 44.82% of the mortgage loans have loan-to-value ratios at origination, or with respect to second-lien mortgage loans, combined loan-to-value ratios at origination, in excess of 80%. None of the mortgage loans have loan-to-value ratios at origination, or with respect to second-lien mortgage loans, combined loan-to-value ratios at origination, in excess of 100%. The "loan-to-value ratio" of a mortgage loan at any time is the ratio of the

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 17 of 23

principal balance of such mortgage loan at the date of determination to (a) in the case of a purchase, the lesser of the sale price of the mortgaged property and its appraised value at the time of sale or (b) in the case of a refinancing or modification, the appraised value of the mortgaged property at the time of the refinancing or modification. The "**combined loan-to-value ratio**" of a mortgage loan at any time is the ratio of the principal balance of the second-lien mortgage loan, together with the outstanding balance of the related first-lien mortgage loan, at the date of determination to (a) in the case of a purchase, the lesser of the sale price of the mortgaged property and its appraised value at the time of sale or (b) in the case of a refinancing or modification, the appraised value of the mortgaged property at the time of the refinancing or modification.

66 mortgage loans with an aggregate principal balance as of the cut-off date of $12,934,249.24, which represents approximately 0.992% of the mortgage loans in the final mortgage loan pool, were more than 30 days but less than 60 days Delinquent with respect to their scheduled monthly payments.

Approximately 54.05% of the mortgage loans are fully amortizing, and approximately 45.95% of the mortgage loans are balloon mortgage loans that have substantial principal payments due on their stated maturity dates. Approximately 20.74% of the mortgage loans are interest-only for a period of time.

## Prepayment Premiums

Approximately 72.04% of the mortgage loans provide for payment by the borrower of a prepayment premium (each, a "**Prepayment Premium**") in connection with certain full or partial prepayments of principal. Generally, each such mortgage loan provides for payment of a Prepayment Premium in connection with certain voluntary, full or partial prepayments made within the period of time specified in the related mortgage note, ranging from one to three years from the date of origination of such mortgage loan, or the penalty period, as described in this prospectus supplement. The amount of the applicable Prepayment Premium, to the extent permitted under applicable federal or state law, is as provided in the related mortgage note. Generally, this amount is equal to six months interest on any amounts prepaid in excess of 20% of the original principal balance of the related mortgage loan during any 12-month period during the applicable penalty period. No mortgage loan imposes a Prepayment Premium for a term in excess of three years. Prepayment Premiums collected from borrowers will be paid to the holders of the Class P certificates and will not be available for payment to the LIBOR certificates.

The applicable servicer may waive (or permit a subservicer to waive) a Prepayment Premium in accordance with the pooling and servicing agreement if (i) such waiver relates to a default or reasonably foreseeable default and would, in the applicable servicer's reasonable judgment, maximize recoveries on the related mortgage loan, (ii) the Prepayment Premium may not be collected under applicable federal, state or local law or regulation, or (iii) the collection of the Prepayment Premium would be considered "predatory" pursuant to written guidance published or issued by any applicable federal, state or local regulatory authority acting in its official capacity and having jurisdiction over such matters.

## Adjustable Rate Mortgage Loans

All of the adjustable rate mortgage loans provide for semi-annual adjustment of the related interest rate based on the Loan Index (as described below under "—*The Index*") as specified in the related mortgage note, and for corresponding adjustments to the monthly payment amount, in each case on each applicable adjustment date (each such date, an "**Adjustment Date**").

The first adjustment of the interest rates in the case of approximately 83.48% of the adjustable rate mortgage loans will occur after an initial period of approximately two years following origination (the "**2/28 Adjustable Rate Mortgage Loans**"), in the case of approximately 16.16% of the adjustable rate mortgage loans approximately three years following origination (the "**3/27 Adjustable Rate Mortgage Loans**") or in the case of approximately 0.36% of the adjustable rate mortgage loans approximately five years following origination (the "**5/25 Adjustable Rate Mortgage Loans**").

On each Adjustment Date for an adjustable rate mortgage loan, the interest rate will be adjusted to equal the sum, rounded generally to the nearest multiple of 1/8% of the Loan Index and a fixed percentage amount (the "**Gross Margin**"), provided, that, in the substantial majority of cases, the interest rate on each such adjustable rate mortgage loan will not increase or decrease by more than a fixed percentage (ranging from 1.000% to 1.500%)

Case: 09-05050     Doc# 53-2     Filed: 09/15/09     Entered: 09/16/09 11:36:44     Page 18 of 23

specified in the related mortgage note (the "**Periodic Cap**") on any related Adjustment Date, except in the case of the first such Adjustment Date, and will not exceed a specified maximum interest rate over the life of such mortgage loan (the "**Maximum Rate**") or be less than a specified minimum interest rate over the life of such mortgage loan. The interest rate generally will not increase or decrease on the first Adjustment Date by more than a fixed percentage specified in the related mortgage note (the "**Initial Cap**"); the Initial Caps range from 1.000% to 2.000% for the adjustable rate mortgage loans. Effective with the first monthly payment due on each adjustable rate mortgage loan after each related Adjustment Date or, with respect to the adjustable rate, interest-only mortgage loans – which have initial periods in which payments of only interest are required to be made – following the interest-only period, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding principal balance of the related mortgage loan over its remaining term, and pay interest at the interest rate as so adjusted. Due to the application of the Initial Caps, Periodic Caps, and Maximum Rates, the interest rate on each such adjustable rate mortgage loan, as adjusted on any related Adjustment Date, may be less than the sum of the Loan Index and the related Gross Margin, rounded as described in this prospectus supplement. See "—*The Index*" below. The adjustable rate mortgage loans generally do not permit the related borrowers to convert their adjustable interest rate to a fixed interest rate.

**The Index**

The index used in determining the interest rates of the adjustable rate mortgage loans is the average of the interbank offered rates for six-month United States dollar deposits in the London market, calculated as provided in the related mortgage note (the "**Loan Index**"), as most recently available either as of (1) the first business day occurring in a specified period of time prior to such Adjustment Date, (2) the first business day of the month preceding the month of such Adjustment Date or (3) the last business day of the second month preceding the month in which such Adjustment Date occurs, as specified in the related mortgage note. In the event that the Loan Index becomes unavailable or otherwise unpublished, the applicable servicer will select a comparable alternative index over which it has no direct control and which is readily verifiable.

**New Century**

The mortgage loans were acquired by the sponsor from NC Capital Corporation ("**NC Capital**" or the "**Original Loan Seller**") (which in turn acquired such mortgage loans from its affiliate, New Century Mortgage Corporation)("**New Century**"). The information set forth below regarding New Century and the underwriting standards of New Century has been provided by New Century to the depositor.

*General.* New Century transferred the mortgage loans to its affiliate, NC Capital, which, in turn, sold the mortgage loans to an affiliate of the depositor. New Century is a wholly-owned operating subsidiary of New Century Financial Corporation ("**New Century Financial**"), a publicly traded company. New Century Financial is a real estate investment trust founded in 1995 and headquartered in Irvine, California. Subject to the discussion under "—*Recent Developments Regarding New Century*" below, New Century Financial offers a broad range of mortgage products.

Subject to the discussion under "—*Recent Developments Regarding New Century*" below, New Century is a consumer finance and mortgage banking company that originates, purchases, sells and services first-lien and second-lien mortgage loans and other consumer loans. New Century emphasizes the origination of mortgage loans commonly referred to as non-conforming "B&C" mortgage loans or subprime mortgage loans.

As of September 30, 2006, New Century Financial employed approximately 7,100 associates and originated loans through its wholesale network of more than 55,000 independent mortgage brokers through 33 regional processing centers operating in 19 states. Its retail network operates through 235 sales offices in 36 states. For the nine months ending September 30, 2006, New Century Financial originated $45.4 billion in mortgage loans.

The following table describes the size, composition and growth of New Century Financial's total residential mortgage loan production over the periods indicated.

| | September 2006 | | December 31, 2005 | | December 31, 2004 | | December 31, 2003 | |
| | Number | Total Mortgage Loan Production ($) (in thousands) | Number | Total Mortgage Loan Production ($) (in thousands) | Number | Total Mortgage Loan Production ($) (in thousands) | Number | Total Mortgage Loan Production ($) (in thousands) |
|---|---|---|---|---|---|---|---|---|
| Residential Mortgage Loans ....... | 245,839 | 45,443,272 | 310,389 | 56,108,241 | 242,877 | 42,199,640 | 164,373 | 27,382,838 |

*Recent Developments Regarding New Century.* Pursuant to a Form 8-K filed on February 7, 2007 (the "**February 7th Announcement**"), New Century Financial, the parent of NC Capital, announced that it would restate its consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 (collectively, the "**Interim Financial Statements**") to correct errors New Century Financial discovered in the application of generally accepted accounting principles regarding its allowance for mortgage loan repurchase losses. Specifically, New Century Financial announced that it did not include the expected discount upon disposition of such mortgage loans when estimating its allowance for loan repurchase losses. In addition, New Century Financial stated that its methodology for estimating the volume of repurchase claims to be included in the repurchase calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006. As a result of the foregoing, New Century Financial announced that it expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

Pursuant to a Form 12b-25 filed on March 2, 2007 (the "**March 2nd Announcement**"), New Century Financial stated that it had previously reported that it had been served with a complaint for a purported securities class action and was aware of nine additional purported class action lawsuits that had been filed against it and certain of its officers and directors alleging certain violations of federal securities laws.

According to the March 2nd Announcement, New Century Financial stated that since that time, it has become aware of four related derivative complaints against certain of its directors and officers, making essentially the same allegations as the federal securities cases relating to New Century Financial's restatements. New Century Financial stated that it believes that the derivative cases have been or will be filed in Orange County Superior Court, and that it anticipates that similar actions may be filed in the future.

New Century Financial also announced that it was delaying the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

New Century Financial announced that, although a full review is ongoing, it expects that the modifications to the allowance for loan repurchase losses will result in restated net income for the first three quarters of 2006 that is significantly lower than previously reported in New Century Financial's 2006 interim financial statements.

In addition, New Century Financial announced that although New Century Financial's mortgage loan origination volume increased in 2006 when compared to 2005, New Century Financial's results of operations for the quarter and year ended December 31, 2006 will reflect declines in earnings and profitability when compared to the same periods in 2005. New Century Financial currently expects that it will report a pretax loss for both the fourth quarter and the full year ended December 31, 2006.

According to the March 2nd Announcement, in the event New Century Financial is unable to obtain satisfactory amendments to and/or waivers of the covenants in its financing arrangements from a sufficient number of its lenders, or obtain alternative funding sources, New Century Financial's auditor, KPMG LLP ("**KPMG**"), has informed New Century Financial's Audit Committee (the "**Audit Committee**") that its report on New Century Financial's financial statements will include an explanatory paragraph indicating that substantial doubt exists as to New Century Financial's ability to continue as a going concern.

Pursuant to a Form 8-K filed on March 8, 2007 by New Century Financial, New Century Financial stated that as a result of its current constrained funding capacity, New Century Financial elected to cease accepting loan applications from prospective borrowers effective immediately while it sought to obtain additional funding capacity.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 20 of 23

Pursuant to a Form 8-K filed on March 13, 2007 (the "**March 13th Announcement**"), by New Century Financial, New Century Financial received a letter from the staff of the Pacific Regional Office of the Securities Exchange Commission ("SEC") on March 12, 2007, stating that the staff was conducting a preliminary investigation involving New Century Financial and requesting production of certain documents. In addition, New Century Financial stated that the staff of the SEC had also previously requested a meeting with New Century Financial to discuss the events leading up to the announcement by New Century Financial of the restatement of its financial statements and New Century Financial intends to comply with the SEC's request.

In addition, New Century Financial stated in the March 13th Announcement that, on February 28, 2007, New Century Financial received a letter from the United States Attorney's Office for the Central District of California ("U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in New Century Financial's securities, as well as accounting errors regarding New Century Financial's allowance for repurchase losses. New Century Financial also stated that it has subsequently received a grand jury subpoena requesting production of certain documents. New Century Financial stated that it intends to cooperate with the requests of the U.S. Attorney's Office.

Pursuant to a Form 8-K/A filed on March 13, 2007 (the "**March 13th Form 8-K/A Announcement**") by New Century Financial, New Century Financial stated that as of March 9, 2007, all of New Century Financial's lenders under its short-term repurchase agreements and aggregation credit facilities had discontinued their financing with New Century Financial or had notified New Century Financial of their intent to do so. It further stated in the March 13th Form 8-K/A Announcement that New Century Financial has received notices from certain of its lenders asserting that New Century Financial and/or its subsidiaries have violated their respective obligations under certain of these financing arrangements and that such violations amount to events of default. According to the March 13th Form 8-K/A Announcement, certain of these lenders have further advised New Century Financial that they are accelerating New Century Financial's obligation to repurchase all outstanding mortgage loans financed under the applicable agreements.

Pursuant to a Form 8-K filed on March 14, 2007 (the "**March 14th Announcement**") by New Century Financial, New Century Financial stated that the staff of the New York Stock Exchange ("NYSE") issued a press release, dated March 13, 2007, announcing its determination that New Century Financial's common stock is no longer suitable for continued listing on the NYSE and will be suspended immediately. New Century Financial announced that the NYSE's press release cited New Century Financial's recent disclosures regarding its liquidity position, as well as New Century Financial's prior announcement regarding the need to restate certain of its historical financial statements, in support of its determination that New Century Financial's common stock and preferred stock are no longer suitable for continued listing on the NYSE.

In addition, New Century Financial announced that the NYSE's press release also stated that an application to the SEC to delist New Century Financial's stock from the NYSE is pending the completion of the applicable procedures, including any appeal by New Century Financial of the NYSE staff's decision. New Century Financial stated that it is reviewing the NYSE staff's decision and accordingly has not yet determined whether it will appeal the staff's decision to delist New Century Financial's stock.

According to the March 14th Announcement, New Century Financial has been engaged in recent ongoing discussions with its state regulators regarding New Century Financial's funding constraints and the impact on consumers who are in various stages of the loan origination process with New Century Financial. New Century Financial stated that it has advised these regulators that it has ceased accepting loan applications and that as of March 14, 2007, New Century Financial and its subsidiaries are unable to fund any mortgage loans, including mortgage loans for those consumers who were already in the loan origination process with New Century Financial.

According to the March 14th Announcement, on March 13, 2007, New Century Financial and certain of its subsidiaries received cease and desist orders from regulators in the States of Massachusetts, New Hampshire, New Jersey and New York. New Century Financial stated that the cease and desist orders contain allegations that certain of New Century Financial's subsidiaries have engaged in violations of applicable state law, including, among other things, failure to fund mortgage loans after a mortgage closing, failure to meet certain financial requirements, including net worth and available liquidity, and failure to timely notify the state regulators of defaults and terminations under certain of its financing arrangements.

Case: 09-05050    Doc# 53-2    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 21
of 23

According to the March 14th Announcement, the cease and desist orders seek to restrain the New Century Financial subsidiaries from taking certain actions, including, among other things, engaging in further violations of state law, taking new applications for mortgage loans in the relevant jurisdiction, and paying dividends or bonuses to officers, directors or shareholders of the applicable subsidiaries. In addition, the cease and desist orders also seek to cause the New Century Financial subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the New Century Financial subsidiaries, and the provision of regular information to the state regulators regarding the New Century Financial subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. Furthermore, certain of the cease and desist orders also require one or more of the New Century Financial subsidiaries to show cause why their license should not be revoked or why administrative penalties should not be assessed.

According to the March 14th Announcement, the cease and desist orders generally become permanent if not promptly appealed by the applicable subsidiaries. New Century Financial stated that it is reviewing these orders and accordingly has not yet determined whether it will appeal all or any portion of any of the orders. New Century Financial announced that, subject to its funding limitations, it intends to comply with the orders pending any such appeal.

Pursuant to a Form 8-K filed on March 19, 2007 (the "March 19th Announcement") by New Century Financial, New Century Financial stated that on March 14, 2007 and March 15, 2007, it received additional cease and desist orders from the States of Connecticut, Maryland, Rhode Island and Tennessee (collectively, the "March 14–15 Orders"). New Century Financial stated that the cease and desist orders contain allegations that certain of New Century Financial's subsidiaries have engaged in violations of applicable state law, including, among other things, failure to fund mortgage loans after a mortgage closing. Additionally, New Century Financial stated that on March 14, 2007, certain of New Century Financial's subsidiaries, entered into a Consent Agreement and Order, dated March 14, 2007, with the Commonwealth of Pennsylvania Department of Banking, Bureau of Supervision and Enforcement (the "Consent Agreement").

The March 19th Announcement indicated that the March 14–15 Orders and the Consent Agreement seek to restrain New Century Financial's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of applicable state law and taking new applications for mortgage loans in the relevant jurisdiction. New Century Financial stated that the March 14–15 Orders and the Consent Agreement also seek to cause the subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. According to New Century Financial, certain of the March 14–15 Orders also seek to revoke the licenses of one or more of New Century Financial's subsidiaries or assess administrative penalties.

According to the March 19th Announcement, the March 14–15 Orders generally become permanent if not promptly appealed by the applicable subsidiaries. New Century Financial and its subsidiaries are reviewing the March 14–15 Orders and accordingly have not yet determined whether they will appeal all or any portion of the March 14–15 Orders.

According to the March 19th Announcement, on March 14, 2007, in connection with a civil action filed against New Century Financial and certain of its subsidiaries in an Ohio state court (the "Ohio Complaint") by the Attorney General of Ohio and the Ohio Division of Commerce, Division of Financial Institutions, such Ohio state court issued a temporary restraining order, which was subsequently modified by the court on March 16, 2007, against New Century Financial (as modified, the "Ohio TRO"). New Century Financial stated that the Ohio Complaint and the Ohio TRO contain allegations that New Century Financial has engaged in violations of applicable Ohio state law, including, among other things, failure to fund mortgage loans after closing. New Century Financial stated that the Ohio TRO restrains New Century Financial from taking certain actions, including, among other things, (i) engaging in violations of Ohio state law, (ii) soliciting applicants and taking new applications for mortgage loans in Ohio and (iii) initiating, prosecuting or enforcing foreclosure actions in Ohio. New Century Financial announced that the Ohio TRO also requires New Century Financial to confer with the Ohio Attorney

General and Division of Commerce by March 22, 2007 regarding the treatment of Ohio loans that are more than 60 days delinquent and are held for sale. New Century Financial stated that the restraints imposed by the Ohio TRO could further harm New Century Financial's business. In addition, New Century Financial announced that it is reviewing the Ohio Complaint and the Ohio TRO and accordingly has not yet determined whether it will appeal all or any portion of the Ohio TRO. Subject to its funding limitations, New Century Financial stated that it intends to comply with the Ohio TRO pending any appeal.

Pursuant to a Form 8-K filed on March 20, 2007 (the "**March 20th Announcement**") by New Century Financial, New Century Financial stated that it received a Notice of Breach and Termination of Mortgage Selling and Servicing Contract, dated March 14, 2007, from the Federal National Mortgage Association ("**Fannie Mae**"). New Century Financial stated that the Fannie Mae notice purports to terminate its mortgage selling and servicing contract (the "**Fannie Mae Contract**") with New Century, a subsidiary of New Century Financial, for cause, based on alleged breaches of the Fannie Mae Contract as well as alleged breaches by New Century under other contracts with Fannie Mae. New Century Financial stated that as a result of the purported termination, New Century Financial and its subsidiaries are no longer able to sell mortgage loans directly to Fannie Mae or act as the primary servicer of any mortgage loans for Fannie Mae.

In addition, according to the March 20th announcement, on March 16, 2007, New Century Financial received additional cease and desist orders from the State of California (the "**California Orders**") and certain of New Century Financial's subsidiaries entered into consent agreements with the State of Florida's Office of Financial Regulation and the State of Washington's Department of Financial Institutions, respectively, each dated March 16, 2007 (the "**March 16 Agreements**," and together with the California Orders, the "**March 16 Orders and Consent Agreements**").

According to the March 20th Announcement, consistent with certain other previous consent agreements, the March 16 Orders and Consent Agreements contain allegations that certain of New Century Financial's subsidiaries have engaged in violations of state law, including, among other things, failure to fund mortgage loans after closing. New Century Financial stated that consistent with certain other previous consent agreements, the March 16 Orders and Consent Agreements seek to restrain New Century Financial's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction. New Century Financial announced that the March 16 Orders and Consent Agreements also seek to cause the New Century Financial subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the New Century Financial subsidiaries, and the provision of regular information to the state regulators regarding the New Century Financial subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. New Century Financial stated that the California Orders become permanent if not promptly appealed by the applicable subsidiaries. According to the March 20th Announcement, New Century Financial and its subsidiaries are reviewing the California Orders and accordingly have not yet determined whether they will appeal all or any portion of the California Orders.

Pursuant to a Form 8-K filed on March 22, 2007 (the "**March 22nd Announcement**") by New Century Financial, New Century Financial announced that it had received notices from Barclays Bank PLC ("**Barclays**"), in which Barclays alleged that certain events of default had occurred, as defined in that certain Master Repurchase Agreement, dated as of March 31, 2006 (as amended to date), by and among New Century Financial, certain of New Century Financial's subsidiaries, Barclays and Sheffield Receivables Corporation (the "**Barclays Agreement**"), and purported to accelerate to March 14, 2007 the obligation of New Century Financial's subsidiaries to repurchase all outstanding mortgage loans financed under the Barclays Agreement and to terminate the Barclays Agreement as of that same date. New Century Financial estimated that the aggregate repurchase obligation (the outstanding mortgage loans financed) of its subsidiaries under the Barclays Agreement was approximately $0.9 billion as of March 12, 2007.

According to the March 22nd Announcement, on March 16, 2007, the parties to the Barclays Agreement entered into a letter agreement (the "**Barclays Letter Agreement**") pursuant to which Barclays and Sheffield Receivables Corporation agreed to release New Century Financial and its subsidiaries from its aggregate repurchase obligation under the Barclays Agreement and New Century Financial and its subsidiaries agreed to release their rights to outstanding mortgage loans that had been financed under the Barclays Agreement. New century stated that

Case: 09-05050   Doc# 53-2   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 23 of 23