the effectiveness of the releases in the Barclays Letter Agreement is subject to the satisfaction of certain preconditions, including that (i) New Century Financial and its subsidiaries shall have made certain payments to Barclays, including forwarding to Barclays all amounts received by New Century Financial and its subsidiaries after March 1, 2007 with respect to the mortgage loans under the Barclays Agreement, and (ii) New Century Financial and its subsidiaries shall have taken certain actions to facilitate the transfer of the servicing function with respect to the mortgage loans under the Barclays Agreement to a third party appointed by Barclays. New Century Financial stated that as of March 22, 2007, New Century Financial was still in the process of satisfying these preconditions.

According to the March 22nd Announcement, the Barclays Letter Agreement provides that the outstanding mortgage loans financed under the Barclays Agreement are being transferred to Barclays "as is", without any representations or warranties by New Century Financial or its subsidiaries, and without any holdback by Barclays. New Century Financial stated that New Century Financial and its subsidiaries have agreed, that if they enter into a settlement or release with any of New Century Financial's other lenders and any such release contains materially more favorable terms for the benefit of any such lender than those in the Barclays Letter Agreement, then Barclays will be entitled to such more favorable terms. According to the March 22nd Announcement, New Century Financial stated that the Barclays Letter Agreement provides that a release with another lender will not be deemed to have terms that are materially more favorable to that lender from an economic standpoint if the terms of such release do not provide for more to such lender than the amount of the outstanding mortgage loans financed by such lender, plus accrued price differential or interest and the transmittal of the principal portion of any loan payments received. New Century Financial stated that the continuing effectiveness of the release by Barclays under the Barclays Letter Agreement is subject to New Century Financial's compliance with this provision. According to New Century Financial, upon the effectiveness of the releases contemplated by the Barclays Letter Agreement, the aggregate repurchase obligation (the outstanding mortgage loans financed) of New Century Financial under its credit facilities will be reduced by approximately $0.9 billion and New Century Financial will have realized a loss from this transaction of approximately $46 million.

In addition, according to the March 22nd Announcement, New Century Financial has received cease and desist orders from several states and entered into consent agreements with several states (the "**Previous Orders and Consent Agreements**"), and on March 20, 2007, certain of New Century Financial's subsidiaries entered into a consent agreement with the State of Maine's Office of Consumer Credit Regulation, respectively (the "**March 20 Consent Agreement**").

According to the March 22nd Announcement, consistent with the Previous Orders and Consent Agreements, the March 20 Consent Agreement contains allegations that certain of New Century Financial's subsidiaries have engaged in violations of state law, including, among other things, failure to fund mortgage loans after closing. Consistent with the Previous Orders and Consent Agreements, the March 20 Consent Agreement seeks to restrain New Century Financial's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction. The March 20 Consent Agreement also seeks to cause the New Century Financial subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

Pursuant to a Form 8-K filed on March 28, 2007 (the "**March 28th Announcement**"), New Century Financial stated that on March 26, 2007, New Century Financial notified the Federal Home Loan Mortgage Corp. ("**Freddie Mac**"), that it was voluntarily terminating its eligibility with Freddie Mac. New Century Financial stated that as a result of this termination, New Century Financial and its subsidiaries are no longer able to sell mortgage loans directly to Freddie Mac or act as the primary servicer of any mortgage loans for Freddie Mac.

According to the March 28th Announcement, several of New Century Financial's lenders have notified New Century Financial of their intent to sell the outstanding mortgage loans that have been financed by the respective lender and offset the proceeds from such sale against the New Century Financial's obligations to the lender, while reserving their rights to seek recovery of any remaining deficiency from New Century Financial. New Century Financial stated that it has notified these lenders of its concerns that any such sale be conducted in an appropriate

manner, in accordance with applicable law and in accordance with the terms of the applicable financing agreement between the parties.

According to the March 28th Announcement, on March 27, 2007, New Century Financial announced that it had signed consent agreements with the State of Idaho's Department of Finance, the State of Iowa's Superintendent of Banking, the State of Michigan's Office of Financial and Insurance Services and the State of Wyoming's Banking Commissioner (the "**March 27th Consent Agreements**"). New Century Financial stated that although it has signed the March 27th Consent Agreements and expects to comply with their terms, New Century Financial has not yet received counterpart signatures from the respective states, and accordingly, such March 27th Consent Agreements may not be binding on the respective states. According to New Century Financial, the March 27th Consent Agreements contain allegations that certain of New Century Financial's subsidiaries have engaged in violations of state law, including, among other things, failure to fund mortgage loans after closing. The March 27th Consent Agreements restrain New Century Financial's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction.

In addition, according to the March 28th Announcement, the March 27th Consent Agreements also compel New Century Financial's subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold any up front fees collected in connection with pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

According to the March 28th Announcement, New Century Financial anticipates that cease and desist orders will continue to be received by New Century Financial and its subsidiaries from additional states in the future and that New Century Financial and its subsidiaries may enter into additional consent agreements similar to the consent agreements already entered into by New Century Financial. New Century Financial stated that it intends to continue to cooperate with its regulators in order to mitigate the impact on consumers resulting from New Century Financial's funding constraints.

Pursuant to a Form 8-K filed on March 30, 2007 (the "**March 30th Announcement**"), New Century Financial announced that it and certain of its subsidiaries, including New Century (collectively, the "**Defendants**"), filed a motion for dissolution of modified temporary restraining order and motion for an emergency hearing, and opposition to a preliminary injunction in connection with the Ohio Complaint. New Century Financial announced that on March 28, 2007, the Defendants and the State of Ohio reached agreement on a stipulated preliminary injunction effective for 90 days (the "**Ohio SPI**"), which was entered by the Ohio court. New Century Financial stated that the Ohio SPI replaces the Ohio TRO and provides for a stay of the litigation for 90 days. New Century Financial stated that the Ohio SPI restrains the Defendants from taking certain actions, including, among other things, engaging in alleged violations of Ohio state law and taking new applications for mortgage loans.

According to the March 30th Announcement, New Century Financial announced that the Ohio SPI also compels the Defendants to take certain actions, including the transfer to other lenders of any outstanding mortgage applications and unfunded mortgage loans, the placement in escrow of any upfront fees collected in connection with pending mortgage applications, and the provision of regular information to the state regarding New Century Financial's activities in Ohio, including the status of all outstanding mortgage applications and unfunded mortgage loans. New Century Financial announced that the Ohio SPI also requires the Defendants to submit certain categories of mortgage loans (and related information) as to which it intends to foreclose to the State of Ohio for the State of Ohio to review. New Century Financial announced that the State of Ohio may object for cause to the New Century Financial proceeding with a particular foreclosure and if New Century Financial is unable to convince the State of Ohio to permit it to proceed, the foreclosure will not proceed for the duration of the Ohio SPI. In addition, New Century Financial announced that the Ohio SPI also provides for the State of Ohio to review and object for cause to the Defendants selling, transferring or assigning certain categories of mortgage loans that are more than 60 days delinquent.

In addition, according to the March 30th Announcement, New Century Financial announced that in the event that the State of Ohio or the Defendants believe the other is not acting in good faith, the Ohio SPI provides that the complaining party should notify the other of such concern and if the concern is not resolved, then either party may

notify the other of their intent to file a motion with the court to terminate the Ohio SPI and request to reschedule the previously canceled preliminary injunction hearing. In addition, New Century Financial announced that the Ohio SPI provides that in such event neither party will object to the scheduling of a prompt preliminary injunction hearing or the termination of the Ohio SPI at such a preliminary injunction hearing.

Pursuant to a Form 8-K filed on April 6, 2007 (the "**April 6th Announcement**"), New Century Financial announced that on April 2, 2007, New Century Financial and certain of its subsidiaries, including NC Capital, filed voluntary petitions for reorganization (the "**Bankruptcy Filings**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Bankruptcy Filings are being jointly administered by the Honorable Kevin J. Carey under the caption "In re New Century TRS Holdings, Inc., et al., Case No. 07-10416." According to the April 6th Announcement, New Century Financial and its subsidiaries will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

According to the April 6th Announcement, in connection with the Bankruptcy Filings, New Century Financial and certain of its subsidiaries reduced their workforce by a total of approximately 3,200 people nationwide (approximately 54% of their total aggregate workforce). New Century Financial announced that although estimates are subject to change as additional information becomes available, New Century Financial expects to incur severance pay expenses and make related cash expenditures of approximately $4.6 million in connection with the reduction in its workforce.

According to the April 6th Announcement, New Century Financial and New Century entered into an agreement with Carrington Capital Management, LLC ("**CCM**") and its affiliate (collectively, "**Carrington**") for the sale of its servicing assets and servicing platform (the "**Servicing Assets**") to Carrington for approximately $133 million based on mortgage servicing rights and advances outstanding at the time of the execution of that agreement. New Century Financial announced that it owns a 36.75% interest in CCM and, as of February 28, 2007, an approximately 4.2% interest in Carrington Investment Partners, LP, a fund managed by CCM, through New Century Financial's investments in Carrington Investment Partners (US), LP. New Century Financial stated that the consummation of the transaction is subject to higher and better bids, approval by the Bankruptcy Court and other customary closing conditions.

According to the April 6th Announcement, New Century Financial and certain of its subsidiaries entered into an asset purchase agreement with Greenwich Capital Financial Products, Inc. ("**Greenwich**") to sell certain mortgage loans originated by New Century Financial as well as residual interests in certain securitization trusts owned by New Century Financial for approximately $50 million (the "**Greenwich Agreement**"). New Century Financial stated that the consummation of the transaction is subject to higher and better bids and approval by the Bankruptcy Court.

According to the April 6th Announcement, New Century Financial announced that it obtained a commitment from The CIT Group/Business Credit, Inc. ("**CIT Group**") and Greenwich (together with CIT Group, the "**Lenders**") to provide New Century Financial with up to $150 million in debtor-in-possession financing (the "**DIP Credit Facility**"), subject to Bankruptcy Court approval. New Century Financial subsequently received interim approval from the Bankruptcy Court on April 5, 2007, to enter into the DIP Credit Facility. In addition, New Century Financial announced that as of April 3, 2007, New Century Financial has disposed of all of the mortgage loans in its inventory.

Pursuant to a Form 8-K filed on April 26, 2007 (the "**April 26th Announcement**"), New Century Financial announced that on April 20, 2007, it executed the DIP Credit Facility, with an effective date of April 13, 2007, to borrow up to $150 million from the Lenders and any other lenders thereafter becoming a party to the DIP Credit Facility.

According to the April 26th Announcement, the DIP Credit Facility consists of one tranche under which New Century Financial may borrow up to $50 million for general corporate purposes and to fund an orderly Section 363 sales process ("**Tranche A**") and may include a second tranche under which New Century Financial will be advanced up to $50 million to repay that certain Servicer Advance Financing Facility Agreement by and between New Century and Citigroup Global Markets Realty Corp. and to fund new qualifying servicing advances ("**Tranche B**"). The April 26th Announcement further stated that outstanding advances under the DIP Credit Facility may not

S-38

Case: 09-05050    Doc# 53-3    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 3 of 18

exceed $50 million, provided that the Lenders may in their sole discretion increase the maximum amounts that may be advanced to $100 million by either increasing Tranche A by up to $50 million and/or making advances available under Tranche B. According to the April 26th Announcement, if the New Century Financial and the Lenders agree, the maximum amounts that may be advanced under the DIP Credit Facility may be further increased to $150 million.

According to the April 26th Announcement, each of New Century Financial and its direct or indirect subsidiaries that is a debtor in the previously disclosed Chapter 11 bankruptcy proceeding is a joint and several obligor under the DIP Credit Facility. The April 26th Announcement further stated that pursuant to the DIP Credit Facility each obligor granted a first priority lien on its unencumbered assets and a junior lien on its encumbered assets as security for its obligations under the DIP Credit Facility.

Pursuant to a Form 8-K filed on May 3, 2007 (the "**May 3rd Announcement**"), New Century Financial announced that on April 27, 2007, the chairman of the Audit Committee received notification from KPMG that KPMG had resigned and received a letter from KPMG in which KPMG stated that the client–auditor relationship between New Century Financial and KPMG had ceased.

According to the May 3rd Announcement, New Century Financial announced that the audit reports of KPMG on New Century Financial's consolidated financial statements as of and for the years ended December 31, 2005 and 2004, did not contain any adverse opinion or a disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, New Century Financial announced that the audit reports of KPMG on management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of December 31, 2005 and 2004 did not contain any adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope, or accounting principles, except as described in the following paragraph.

According to the May 3rd Announcement, New Century Financial announced that KPMG's report on management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of December 31, 2005, contains an explanatory paragraph that states that New Century Financial acquired certain assets and assumed certain liabilities of RBC Mortgage Company during 2005, and management excluded from its assessment of the effectiveness of New Century Financial's internal control over financial reporting as of December 31, 2005, RBC Mortgage Company's internal control over financial reporting associated with total assets of $1.2 billion and total revenues of $59.6 million included in New Century Financial's consolidated financial statements as of and for the year ended December 31, 2005. In addition, New Century Financial announced that KPMG's audit of internal control over financial reporting of New Century Financial also excluded an evaluation of the internal control over financial reporting of RBC Mortgage Company.

According to the May 3rd Announcement, the audit of New Century Financial's financial statements for the fiscal year ended December 31, 2006 has not been completed.

In addition, according to the May 3rd Announcement, New Century Financial announced that during the period from January 1, 2005 through April 27, 2007, there were no reportable events, as such term is defined in Item 304 of Regulation S-K, except as described in the following paragraph.

According to the May 3rd Announcement, New Century Financial announced that pursuant to the February 7th Announcement, the Audit Committee, on the advice of its independent counsel, initiated its own independent investigation into the issues giving rise to New Century Financial's need to restate the Interim Financial Statements, and subsequently expanded the investigation, at the request of KPMG, to include issues pertaining to New Century Financial's valuation of residual interests in securitizations in 2006 and prior periods (the "**Internal Investigation**"). New Century Financial stated that its Audit Committee retained independent counsel, forensic accountants and other professionals to assist it in connection with the Internal Investigation (collectively, the "**Investigative Team**").

According to the May 3rd Announcement, New Century Financial announced that subsequent to New Century Financial's discovery of the accounting errors and initiation of the Internal Investigation, KPMG communicated to New Century Financial that as a result of the Internal Investigation, KPMG would likely need to reassess its audit plan, and perform additional audit procedures, in order to obtain sufficient evidence concerning any conclusions reached by the investigating team. New Century Financial stated that KPMG also communicated to it that (i) the

pending regulatory investigations into the matters under investigation in connection with the Internal Investigation or (ii) the pendency of the Internal Investigation itself, could also impact KPMG's ability to conclude on the financial statement implications of the matters under investigation, including whether or not KPMG would be able to continue to rely on representations from management. New Century Financial also announced that as of April 27, 2007, the date of KPMG's resignation, the Internal Investigation was ongoing and accordingly New Century Financial had not received from KPMG its determination on these matters. New Century Financial stated that it has also been advised by KPMG that it expects that the evaluation of the impact of this matter on New Century Financial's internal control over financial reporting and disclosure controls and procedures for the applicable periods could constitute a material weakness in New Century Financial's internal control over financial reporting.

According to the May 3rd Announcement, New Century Financial announced that if it retains a successor independent accounting firm, it will authorize KPMG to respond fully to any inquiries of the successor accounting firm concerning the foregoing matters.

Pursuant to a Form 8-K filed on May 4, 2007 (the "**May 4th Announcement**"), New Century Financial announced that on April 25, 2007, the Bankruptcy Court approved an order setting bidding procedures in connection with a potential auction of the loan origination platform assets (the "**Loan Origination Platform Assets**") of New Century Financial. New Century Financial stated that the deadline for bids on the Loan Origination Platform Assets expired on May 2, 2007. New Century Financial also stated that no bids on the Loan Origination Platform Assets were received by this deadline.

According to the May 4th Announcement, New Century Financial announced that as a result of a lack of bids to purchase the Loan Origination Platform Assets as a continuing business, New Century Financial, New Century and Home123 Corporation announced on May 3, 2007 a reduction in their aggregate workforce by a total of approximately 2,000 people (approximately 73% of their total aggregate workforce immediately prior to this workforce reduction) nationwide. New Century Financial stated that this reduction in workforce is effective May 4, 2007.

According to the May 4th Announcement, New Century Financial announced that it expects to incur severance pay expenses and make related cash expenditures of approximately $7 million in connection with the reduction in its workforce.

Pursuant to a Form 8-K filed on May 10, 2007 (the "**May 10th Announcement**"), New Century Financial announced that on May 2, 2007, in accordance with the procedures previously approved by the Bankruptcy Court, it held an auction for its mortgage assets. New Century Financial stated that Ellington Management Group, L.L.C. on behalf of its client funds ("**Ellington**"), made the highest and best bid of approximately $58 million. New Century Financial stated that on May 4, 2007 it entered into an asset purchase agreement to sell the mortgage assets to Ellington (the "**Ellington Agreement**").

According to the May 10th Announcement, New Century Financial announced that the Ellington Agreement provides that $3,000,000 of the approximately $58,000,000 purchase price will be placed into an escrow account to be used to indemnify Ellington for claims made under the Ellington Agreement. New Century Financial stated that the balance of the escrow account after reimbursement of any claims submitted by Ellington will be paid to New Century Financial ninety days after the closing date of the mortgage assets sale. New Century Financial stated that on May 7, 2007, the Bankruptcy Court approved the Ellington Agreement, and the sale of the mortgage assets contemplated in the Ellington Agreement. New Century Financial stated that the closing of the sale of the mortgage assets is expected to take place following the satisfaction of certain customary conditions that are set forth in the Ellington Agreement, including the entry of a sale order by the Bankruptcy Court and that New Century Financial expected the closing to occur in May 2007.

According to the May 10th Announcement, New Century Financial also announced that in connection with entering into the Ellington Agreement, New Century Financial terminated the Greenwich Agreement and will be required to pay Greenwich a $945,000 termination fee upon the closing of the sale of the mortgage assets to Ellington.

Pursuant to a Form 8-K filed on May 24, 2007, New Century Financial announced that in connection with the Internal Investigation and based on recent communications with members of the Investigative Team, the Audit

Committee has determined that there were errors in the New Century Financial's previously filed annual financial statements for its fiscal year ended December 31, 2005 (the "**2005 Financial Statements**") with respect to both the accounting and reporting of loan repurchase losses and New Century Financial's valuation of certain residual interests in securitizations. New Century Financial's ability to further investigate these matters is constrained as New Century Financial is currently in liquidation proceedings under Chapter 11 of the Bankruptcy Code. However, based upon the work performed by the Investigative Team, the Audit Committee and management of New Century Financial believe that it is more likely than not that these errors in the aggregate resulted in a material overstatement of pretax earnings in the 2005 Financial Statements. Accordingly, on May 23, 2007, New Century Financial's Board of Directors concluded, based upon the recommendation of the Audit Committee, that the 2005 Financial Statements should no longer be relied upon.

As New Century Financial is currently in liquidation proceedings under Chapter 11 of the Bankruptcy Code, New Century Financial does not expect to complete a restatement of either the 2005 Financial Statements or the Interim Financial Statements.

Pursuant to a Form 8-K filed on May 25, 2007 (the "**May 25th Announcement**"), on May 16, 2007 New Century Financial announced that it had conducted and concluded the auction for the Servicing Assets pursuant to procedures established by the Bankruptcy Court, at which Carrington submitted the highest bid and agreed to acquire the Servicing Assets for approximately $184 million (the "Sale"). Carrington's actual bid at the auction was $188 million, which amount included a $4 million credit relating to Carrington's breakup fee and the reimbursement of certain expenses. On May 21, 2007, New Century Financial, New Century and Carrington entered into a Second Amended and Restated Asset Purchase Agreement with respect to the Sale (the "**Second Carrington Agreement**"), and on May 23, 2007, the Bankruptcy Court entered an order approving the Sale.

According to the May 25th Announcement, the Second Carrington Agreement provides that $5 million of the approximately $184 million purchase price will be placed in an escrow account to be used to indemnify Carrington for claims made under the Second Carrington Agreement. The balance of the escrow account after reimbursement of any claims submitted by Carrington will be paid to New Century Financial nine months after the closing date of the Sale. The closing of the Sale is expected to take place in June 2007 following the satisfaction of certain customary conditions that are set forth in the Second Carrington Agreement.

*Underwriting Standards.* The mortgage loans originated or acquired by New Century were done so in accordance with the underwriting guidelines established by it (collectively, the "**New Century Underwriting Guidelines**"). The following is a general summary of the New Century Underwriting Guidelines believed to be generally applied, with some variation, by New Century. This summary does not purport to be a complete description of the underwriting standards of New Century.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a borrower's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The mortgage loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner. As a result of New Century's underwriting criteria, changes in the values of the related Mortgaged Properties may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. In addition, there can be no assurance that the value of the related Mortgaged Property estimated in any appraisal or review is equal to the actual value of that Mortgaged Property at the time of that appraisal or review.

Case: 09-05050    Doc# 53-3    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 6 of 18

75

The mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the mortgage loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century. New Century uses the value as determined by the review in computing the loan-to-value ratio of the related mortgage loan if the appraised value of a mortgaged property, as determined by a review, is (i) more than 10% greater but less than or equal to 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio of up to 90%, and (ii) more than 5% greater but less than or equal to 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio of between 91-95%. For mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio greater than 95%, the appraised value as determined by the review is used in computing the loan-to-value ratio of the related mortgage loan. If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then New Century obtains a new appraisal and repeats the review process.

The mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires New Century's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. In general, the maximum loan amount for mortgage loans originated under the programs is $1,500,000 (additional requirements may be imposed in connection with mortgage loans in excess of $1,500,000). The New Century Underwriting Guidelines generally permit loans on one- to four-family residential properties to have a loan-to-value ratio at origination of up to 95% with respect to first-liens loans. The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property. With respect to mortgage loans secured by mortgaged properties acquired by a borrower under a "lease option purchase," the loan-to-value ratio of the related mortgage loan is based on the appraised value at the time of origination of the mortgage loan.

The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full documentation program be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification of stable income for at least 12 months from the applicant's employer for salaried employees and 24 months for self-employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant

Case: 09-05050    Doc# 53-3    Filed: 09/15/09    Entered: 09/16/09 11:36:44    Page 7 of 18

meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

In evaluating the credit quality of borrowers, New Century utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

*"AA" Risk.* Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%. The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% is permitted for a mortgage loan on a non-owner occupied single family or two unit property or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and non-owner occupied three to four family residential properties or high-rise condominiums is 85%. The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80%. The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"A+" Risk.* Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments), are required for loan-to-value ratios above 90%. A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% (or 90% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied property single family or two unit property or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and a non-owner occupied three to four family residential property is 85% (or 80% for mortgage loans

originated under the stated income documentation program). The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80% (or 75% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"A-" Risk.* Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. A maximum of three 30 day late payments within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property or three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and non-owner occupied three to four family residential properties is 85% (or 80% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 80% (or 70% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and 100%, for a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"B" Risk.* Under the "B" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day late payments and a maximum of one 60 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 90 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score less than or equal to 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 may have occurred as long as such bankruptcy has been discharged at least one day prior to funding of the loan. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (such loan may not exceed an 80% loan-to-value ratio for borrowers with a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on an owner occupied singe family or two unit property. A maximum loan-to-value ratio of 85% (or 75% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and a non-owner occupied three to four family property is 80% (or 70% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 75% (or 65% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for a refinance loan and for a purchase money loan. The maximum debt service-to-income ratio is usually 50%, unless the loan-to-value ratio is reduced.

*"C" Risk.* Under the "C" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day and 60 day late payments and a maximum of one 90 day late

payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 120 days late at the time of funding of the loan. All bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. No notice of default filings may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition. In most cases, a maximum loan-to-value ratio of 80% (or 75% for mortgage loans originated under the stated income documentation program) for a mortgage loan on an owner occupied single family or two unit property is permitted. A maximum loan-to-value ratio of 75% is permitted for a mortgage loan on a non-owner occupied single family or 2 unit property (refinance only) or three to four family residential property (or 70% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for owner occupied rural, remote or unique properties, and non-owner occupied three to four family residential properties is 70% (or 65% for mortgages originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property (refinance only) is 65% (or 60% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 85% for a refinance loan and for a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

*"C-" Risk.* Under the "C-" risk category, an applicant must have a FICO score of 500, or greater. Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 150 days late at the time of funding of the loan. There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 70% (55% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on a owner occupied single family or two unit property. A maximum loan-to-value ratio of 65% is permitted for a mortgage loan on a non-owner occupied property single family or two unit property (refinance only), and an owner occupied high-rise condominium or a three to four family residential property (50% for a mortgage loan on a non-owner occupied property, an owner occupied high-rise condominium or a three to four family residential property originated under the stated income documentation program). Rural, remote or unique properties are not allowed. The maximum combined loan-to-value ratio, including any related subordinate lien, is 80% for a refinance loan and 80% for a purchase money loan. The maximum debt service-to-income ratio is usually 55%.

*Special Programs.* New Century originates loans which it calls "special programs" to enable borrowers with higher FICO scores and good mortgage histories, the ability to obtain larger loan amounts or higher loan-to-value ratios. Special programs extend loan-to-value ratios to a maximum of 100%, and combined 80/20 (first/second) loan combinations to 100% CLTV and loan amounts to $1,500,000 with higher minimum FICO scores and paid-as-agreed minimum tradeline requirements. No bankruptcy filing may have occurred during the preceding two years for borrowers with FICO scores less than 600, under the full income documentation program, or 620, under the limited income, and 640 under the stated income documentation programs (Chapter 13 bankruptcies may not be paid off with loan proceeds) for combined 80%/20% (first/second) loan combinations. For first mortgage loans having 100% loan-to-value ratios, no bankruptcy filing may have occurred during the preceding two years. No notice of default filings may have occurred during the preceding two years. The mortgaged property must be in at least average condition. The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50%.

*Exceptions.* As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a borrower may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the mortgage loans will represent these kinds of exceptions.

**The Mortgage Loans in the Aggregate**

The mortgage loans are expected to have the following approximate aggregate characteristics as of the cut-off date:

| | |
|---|---:|
| Cut-off date principal balance of the mortgage loans | $1,304,294,661 |
| Cut-off date principal balance of the fixed rate mortgage loans | $293,534,032 |
| Cut-off date principal balance of the adjustable rate mortgage loans | $1,010,760,629 |
| Interest Rates: | |
| Weighted Average | 8.217% |
| Range | 5.500% to 13.450% |
| Weighted average stated remaining term to maturity (in months) | 355 |

The scheduled principal balances of mortgage loans range from approximately $16,732 to approximately $963,968. The mortgage loans had an average scheduled principal balance of approximately $192,034.

The weighted average loan-to-value ratio (or, with respect to second-lien mortgage loans, combined loan-to-value ratio) at origination of the mortgage loans is approximately 82.03% and approximately 44.82% of the mortgage loans have loan-to-value ratios (or, with respect to second-lien mortgage loans, combined loan-to-value ratios) at origination exceeding 80.00%.

Approximately 94.02% of the mortgage loans are secured by first liens. Approximately 5.98% of the mortgage loans are secured by second liens.

No more than approximately 0.36% of the mortgage loans are secured by mortgaged properties located in any one zip code area.

None of the mortgage loans has a Prepayment Premium period at origination in excess of three years.

Morgan Stanley Mortgage Capital Inc. will represent with respect to each mortgage loan sold by it that

- none of the mortgage loans sold by it is (a) covered by the Home Ownership and Equity Protection Act of 1994 or (b) classified as a "high cost home," "threshold," "covered," "high risk home" or "predatory" loan under any other applicable federal, state or local law; and

- in connection with the origination of the mortgage loans, no proceeds from a mortgage loan were used to purchase a single-premium credit life insurance policy.

See "*Description of the Certificates-Representations and Warranties Relating to the Mortgage Loans*" in this prospectus supplement.

The tables on Annex IV attached to this prospectus supplement set forth certain statistical information with respect to the mortgage loans in the aggregate. Due to rounding, the percentages shown may not precisely total 100.00%.

## The Group I Mortgage Loans

The group I mortgage loans are expected to have the following approximate aggregate characteristics as of the cut-off date:

| | |
|---|---:|
| Cut-off date principal balance of group I mortgage loans | $297,188,000 |
| Cut-off date principal balance of group I fixed rate mortgage loans | $66,289,599 |
| Cut-off date principal balance of group I adjustable rate mortgage loans | $230,898,401 |
| Interest Rates: | |
|   Weighted Average | 8.366% |
|   Range | 5.500% to 13.250% |
| Weighted average stated remaining term to maturity (in months) | 354 |

The scheduled principal balances of the group I mortgage loans range from approximately $19,518 to approximately $538,916. The group I mortgage loans had an average scheduled principal balance of approximately $169,725.

The weighted average loan-to-value ratio (or, with respect to second-lien mortgage loans, combined loan-to-value ratio) at origination of the group I mortgage loans is approximately 81.34% and approximately 45.30% of the group I mortgage loans have loan-to-value ratios (or, with respect to second-lien mortgage loans, combined loan-to-value ratios) at origination exceeding 80.00%.

Approximately 94.04% of the group I mortgage loans are secured by first liens. Approximately 5.96% of the group I mortgage loans are secured by second liens.

No more than approximately 0.50% of the group I mortgage loans are secured by mortgaged properties located in any one zip code area.

None of the group I mortgage loans has a Prepayment Premium period at origination in excess of three years.

The tables on Annex IV attached to this prospectus supplement set forth certain statistical information with respect to the group I mortgage loans. Due to rounding, the percentages shown may not precisely total 100.00%.

Case: 09-05050   Doc# 53-3   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 12 of 18

### The Group II Mortgage Loans

The group II mortgage loans are expected to have the following approximate aggregate characteristics as of the cut-off date:

| | |
|---|---:|
| Cut-off date principal balance of group II mortgage loans | $1,007,106,661 |
| Cut-off date principal balance of group II fixed rate mortgage loans | $227,244,433 |
| Cut-off date principal balance of group II adjustable rate mortgage loans | $779,862,228 |
| Interest Rates: | |
|   Weighted Average | 8.173% |
|   Range | 5.500% to 13.450% |
| Weighted average stated remaining term to maturity (in months) | 355 |

The scheduled principal balances of the group II mortgage loans range from approximately $16,732 to approximately $963,968. The group II mortgage loans had an average scheduled principal balance of approximately $199,783.

The weighted average loan-to-value ratio (or, with respect to second-lien mortgage loans, combined loan-to-value ratio) at origination of the group II mortgage loans is approximately 82.24% and approximately 44.68% of the group II mortgage loans have loan-to-value ratios (or, with respect to second-lien mortgage loans, combined loan-to-value ratios) at origination exceeding 80.00%.

Approximately 94.01% of the group II mortgage loans are secured by first liens. Approximately 5.99% of the group II mortgage loans are secured by second liens.

No more than approximately 0.33% of the group II mortgage loans are secured by mortgaged properties located in any one zip code area.

None of the group II mortgage loans has a Prepayment Premium period at origination in excess of three years.

The tables on Annex IV attached to this prospectus supplement set forth certain statistical information with respect to the group II mortgage loans. Due to rounding, the percentages shown may not precisely total 100.00%.

**Credit Scores**

Credit scores are obtained by many lenders in connection with mortgage loan applications to help them assess a borrower's creditworthiness (the "Credit Scores"). Credit Scores are generated by models developed by a third party which analyzed data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a Credit Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, *i.e.*, a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. Lenders have varying ways of determining Credit Scores and, as a result, the determination of Credit Scores across the industry is not consistent. In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two-year period, which does not correspond to the life of a mortgage loan. Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's past credit history. Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower. There can be no assurance that the Credit Scores of the borrowers will be an accurate predictor of the likelihood of repayment of the related mortgage loans.

The tables on Annex IV attached to this prospectus supplement set forth information as to the Credit Scores of the related borrowers obtained in connection with the origination of each mortgage loan.

## THE SPONSOR

The sponsor is Morgan Stanley Mortgage Capital Inc., a New York corporation ("MSMC"). MSMC is an affiliate, through common parent ownership, of Morgan Stanley Capital Services Inc., the interest rate swap provider and the interest rate cap provider, and Morgan Stanley & Co. Incorporated, the underwriter. MSMC is also an affiliate of the depositor and a direct, wholly-owned subsidiary of Morgan Stanley (NYSE:MS). As a result of a merger, completed on December 4, 2006, between a subsidiary of MSMC and Saxon Capital, Inc., MSMC is an affiliate, through common parent ownership, of Saxon Mortgage Services, Inc., one of the servicers. The executive offices of MSMC are located at 1585 Broadway, New York, New York 10036, telephone number (212) 761-4000. MSMC provides warehouse and repurchase financing to mortgage lenders and purchases closed, first- and subordinate-lien residential mortgage loans for securitization or resale, or for its own investment. MSMC also originates commercial mortgage loans. MSMC does not currently service loans. Instead, MSMC contracts with other entities to service the loans on its behalf.

MSMC acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program. The mortgage loans purchased through its conduit program generally conform to the conduit origination standards.

Prior to acquiring any residential mortgage loans, MSMC conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MSMC's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. The scope of the mortgage loan due diligence varies based on the credit quality of the mortgage loans.

The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

As mentioned above, MSMC currently contracts with third party servicers for servicing the mortgage loans that it originates or acquires. Third party servicers are also assessed based upon the servicing rating and the credit

quality of the servicing institution. The servicers may be reviewed for their systems and reporting capabilities, review of collection procedures and confirmation of servicers' ability to provide loan-level data. In addition, MSMC may conduct background checks, meet with senior management to determine whether the servicer complies with industry standards or otherwise monitor the servicer on an ongoing basis.

MSMC has been the sponsor or co-sponsor of securitizations backed by residential mortgage loans, including subprime mortgage loans, since 2000. The following table sets forth the approximate aggregate scheduled principal balance, as of the applicable cut-off date, of mortgage loans transferred by MSMC or its affiliates to subprime mortgage loan securitizations sponsored or co-sponsored by MSMC since 2000.

| Year | Approximate Initial Principal Amount of Securities |
| --- | --- |
| 2000 | $ 0.36 billion |
| 2001 | $ 2.65 billion |
| 2002 | $ 8.24 billion |
| 2003 | $11.32 billion |
| 2004 | $27.02 billion |
| 2005 | $23.09 billion |
| 2006 | $29.99 billion |
| 2007 (through April 30) | $32.05 billion |

As a sponsor or co-sponsor, MSMC acquires mortgage loans and initiates their securitization by transferring the mortgage loans to the depositor or another entity that acts in a similar capacity as the depositor, which mortgage loans will ultimately be transferred to the issuing entity for the related securitization. In coordination with Morgan Stanley & Co. Incorporated, MSMC works with rating agencies, co-sponsors, other underwriters (if any), mortgage loan sellers and servicers in structuring the securitization transaction.

## STATIC POOL INFORMATION

Information concerning MSMC's prior residential mortgage loan securitizations involving fixed and adjustable rate subprime mortgage loans secured by first- or second-lien mortgages or deeds of trust in residential real properties issued by the depositor is available on the internet at http://www.morganstanley.com/institutional/abs_spi/Subprime.html. On this website, you can view for each of these securitizations, summary pool information as of the applicable securitization cut-off date and delinquency, cumulative loss, and prepayment information as of each distribution date by securitization for the past five years, or since the applicable securitization closing date if the applicable securitization closing date occurred less than five years from the date of this prospectus supplement. These prior transactions include, among other transactions, prior securitizations of the sponsor of mortgage loans purchased from NC Capital (see, in particular, those securitizations with a "NC" series designation). Each of the mortgage loan securitizations identified on this website is unique, and the characteristics of each securitized mortgage loan pool varies from each other as well as from the mortgage loans to be included in the issuing entity that will issue the certificates offered by this prospectus supplement. In addition, the performance information relating to the prior securitizations described above may have been influenced by factors beyond the sponsor's control, such as housing prices and market interest rates. Therefore, the performance of these prior mortgage loan securitizations is likely not to be indicative of the future performance of the mortgage loans to be included in the issuing entity related to this offering.

In the event any changes or updates are made to the information available on the website, the depositor will provide to any person a copy of the information as it existed as of the date of this prospectus supplement upon request who writes or calls the depositor at 1585 Broadway, New York, New York 10036, Attention: Prospectus Department, telephone number (212) 761-4000.

The information available on the website relating to any mortgage loan securitizations issued prior to January 1, 2006 is not deemed to be part of this prospectus supplement, the accompanying prospectus or the depositor's registration statement.

## THE DEPOSITOR

The depositor is Morgan Stanley ABS Capital I Inc., a Delaware corporation. The depositor is an affiliate, through common parent ownership, of the sponsor, Morgan Stanley Capital Services Inc. (the interest rate swap provider and the interest rate cap provider) and Morgan Stanley & Co. Incorporated (the underwriter) and is a direct, wholly-owned subsidiary of Morgan Stanley (NYSE:MS). See *"The Sponsor"* in this prospectus supplement.

The depositor has been engaged since its incorporation in the securitization of mortgage loans and other asset types included within the description of the trust fund assets in this prospectus supplement. The depositor is engaged in the business of acting as depositor of trusts that issue series of notes that are secured by, or certificates that represent interests in, the assets of the trusts. The depositor acquires assets specifically for inclusion in a securitization from the sellers in privately negotiated transactions.

The certificate of incorporation of the depositor limits its activities to those necessary or convenient to carry out its securitization activities. The depositor will have limited obligations with respect to a series of securities. The depositor will obtain the mortgage loans from the sponsor, and may also assign to the trustee certain rights of the sponsor with respect to the mortgage loans. See *"Description of the Certificates—Assignment of the Mortgage Loans"* in this prospectus supplement. In addition, after the issuance of a series of securities, the depositor may have limited obligations with respect to the issuing entity, which may include appointing a successor trustee if the trustee resigns or is otherwise removed and preparing, or causing to be prepared, certain reports filed under the Securities Exchange Act of 1934, as amended.

## THE ISSUING ENTITY

Morgan Stanley ABS Capital I Inc. Trust 2007-NC3, the issuing entity, will be formed on the closing date pursuant to the pooling and servicing agreement. The issuing entity will be a New York common law trust with no officers or directors and no continuing duties other than to hold and service the mortgage loans and related assets and issue the certificates. The fiscal year end for the issuing entity will be December 31, commencing with December 31, 2007.

## THE SERVICERS

### General

The mortgage loans will be serviced by Saxon Mortgage Services, Inc. ("**Saxon**") and Countrywide Home Loans Servicing LP ("**Countrywide Servicing**"). Saxon will act as servicer for approximately 98.46% of the mortgage loans. Countrywide Servicing will act as servicer for approximately 1.54% of the mortgage loans.

Set forth below is certain information relating to Saxon, which will be servicing 20% or more of the mortgage loans as of the cut-off date.

### Saxon Mortgage Services, Inc.

The information under this subheading "—*Saxon Mortgage Services, Inc.*" has been provided by Saxon.

*History*

Saxon, a Texas corporation, is an indirect subsidiary of Saxon Capital, Inc. On December 4, 2006, Saxon Capital, Inc. became a direct subsidiary of MSMC, which is a direct subsidiary of Morgan Stanley (NYSE: MS). As a result, Saxon is an affiliate of the sponsor, the depositor, Morgan Stanley Capital Services Inc., the interest rate swap provider and the interest rate cap provider and Morgan Stanley & Co. Incorporated, the underwriter. Saxon began its mortgage loan servicing operations in 1960 under the name Cram Mortgage Service, Inc., changed its name in September 1994 to Meritech Mortgage Services, Inc., and changed its name to the current name in May 2002. Saxon services mortgage loans for its affiliates as well as other non-affiliated lenders and investors.

Case: 09-05050   Doc# 53-3   Filed: 09/15/09   Entered: 09/16/09 11:36:44   Page 16 of 18

EXHIBIT "C"

Pay to the order of, without recourse

New Century Mortgage Corporation
By: *[signature]*
Steve Nagy
V.P. Records Management