---

**FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT**

**Among**

**IXIS REAL ESTATE CAPITAL INC., as Buyer**

**NEW CENTURY MORTGAGE CORPORATION, as Seller**

**NC ASSET HOLDING, L.P., as Seller**

**NC CAPITAL CORPORATION, as Seller**

**NEW CENTURY CREDIT CORPORATION, as Seller**

**and**

**HOME123 CORPORATION, as Seller**

Dated as of November 10, 2006

---

# TABLE OF CONTENTS

Page

1. APPLICABILITY ...........................................................................................1
2. DEFINITIONS ..............................................................................................1
3. INITIATION; TERMINATION ...................................................................18
4. MARGIN AMOUNT MAINTENANCE .......................................................27
5. INCOME PAYMENTS ................................................................................27
6. REQUIREMENTS OF LAW .......................................................................29
7. SECURITY INTEREST ..............................................................................30
8. PAYMENT, TRANSFER AND CUSTODY .................................................31
9. HYPOTHECATION OR PLEDGE OF PURCHASED ASSETS ...................32
10. SELLER'S REPRESENTATIONS ...............................................................33
11. COVENANTS OF SELLER .........................................................................39
12. EVENTS OF DEFAULT ..............................................................................46
13. REMEDIES ..................................................................................................49
14. INDEMNIFICATION AND EXPENSES ......................................................52
15. RECORDING OF COMMUNICATIONS .....................................................53
16. SINGLE AGREEMENT ...............................................................................53
17. NOTICES AND OTHER COMMUNICATIONS ...........................................54
18. ENTIRE AGREEMENT; SEVERABILITY; MODIFICATIONS .................54
19. NON-ASSIGNABILITY ...............................................................................54
20. TERMINABILITY .......................................................................................55
21. GOVERNING LAW .....................................................................................55
22. SUBMISSION TO JURISDICTION; WAIVERS ..........................................55
23. NO WAIVERS, ETC. ...................................................................................56
24. SERVICING .................................................................................................56
25. INTENT .......................................................................................................57
26. BUYER'S REPRESENTATIONS .................................................................58
27. NETTING .....................................................................................................59
28. PERIODIC DUE DILIGENCE REVIEW .....................................................59
29. BUYER'S APPOINTMENT AS ATTORNEY-IN-FACT ..............................60

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 2 of
121

30. MISCELLANEOUS ..................................................................................62

31. CONFIDENTIALITY ..............................................................................62

32. CONFLICTS ...........................................................................................63

33. SET-OFF ................................................................................................63

34. OBLIGATIONS JOINT AND SEVERAL ..............................................63

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 3 of
121

EXHIBITS

SCHEDULE 1                          Representations and Warranties Re:
                                    Mortgage Loans

SCHEDULE 2                          [Reserved]

SCHEDULE 3                          AVM Vendor Categories

EXHIBIT I                           Transaction Request

EXHIBIT II                          Underwriting Guidelines

EXHIBIT III                         Form of Opinion Letter

EXHIBIT IV                          UCC Filing Jurisdictions

EXHIBIT V                           Form of Account Agreement

EXHIBIT VI                          Form of True Sale Certification

EXHIBIT VII-A                       Form of Seller's Release Letter

EXHIBIT VII-B                       Form of Warehouse Lender's Release Letter

EXHIBIT VIII                        Form of Servicer Notice

EXHIBIT IX                          Form of Request for Additional
                                    Transactions for Excess Margin

EXHIBIT X                           Form of Compliance Report

EXHIBIT XI                          Assignee Liability Jurisdictions

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 4 of
121

## FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT

This is a FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT, dated as of November 10, 2006, among IXIS REAL ESTATE CAPITAL INC., a New York corporation (the "Buyer") and NEW CENTURY MORTGAGE CORPORATION, a California corporation ("NCMC"), NC ASSET HOLDING, L.P., a Delaware limited partnership ("NCAH")(as successor in interest to NC Residential II Corporation), NC CAPITAL CORPORATION, a California corporation ("NCCC"), NEW CENTURY CREDIT CORPORATION, a California corporation ("New Century") and HOME123 CORPORATION, a California corporation ("Home123", and together with NCMC, NCAH, NCCC and New Century, the "Seller").

WHEREAS, the Seller and the Buyer are parties to that certain Fourth Amended and Restated Master Repurchase Agreement, dated as of October 11, 2005, by and between the Seller and the Buyer (as amended from time to time, the "Existing Repurchase Agreement," and as amended by this Fifth Amended and Restated Master Repurchase Agreement, as may be amended from time to time, the "Repurchase Agreement").

WHEREAS the Seller has requested the Buyer to agree to amend certain provisions of the Fourth Amended and Restated Repurchase Agreement as set forth in this Fifth Amended and Restated Master Repurchase Agreement. The Buyer is willing to agree to such amendments, but only on the terms and subject to the conditions set forth in this Fifth Amended and Restated Master Repurchase Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

## 1.     APPLICABILITY

From time to time the parties hereto may enter into transactions (the "Committed Transactions") in which the Seller agrees to transfer to the Buyer Mortgage Loans against the transfer of funds by the Buyer, with a simultaneous agreement by the Buyer to transfer to the Seller such Mortgage Loans at a date certain not later than 364 days after the date of transfer, against the transfer of funds by the Seller. Additionally, from time to time, the Buyer is prepared to consider entering into additional transactions (the "Uncommitted Transactions") in which the Seller agrees to transfer to the Buyer Mortgage Loans against the transfer of funds by the Buyer, with a simultaneous agreement by the Buyer to transfer to the Seller such Mortgage Loans on demand by the Buyer, against the transfer of funds by the Seller. Each such Committed Transaction and Uncommitted Transaction shall be referred to herein as a "Transaction" and shall be governed by this Agreement, unless otherwise agreed in writing.

## 2.     DEFINITIONS

As used herein, the following terms shall have the following meanings (all terms defined in this Section 2 or in other provisions of this Agreement in the singular to have the same

meanings when used in the plural and vice versa).  Terms otherwise not defined herein shall have the meanings assigned thereto in the Custodial and Disbursement Agreement.

"30 Plus Mortgage Loan" shall mean any Mortgage Loan that has been delinquent in its scheduled monthly payments of principal and/or interest for more than 29 calendar days but less than 60 calendar days as of any date of determination.

"40/30 Mortgage Loan" shall mean a Mortgage Loan with a balloon payment feature that requires principal and interest payments sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than 40 years from commencement of amortization.

"50/30 Mortgage Loan" shall mean a Mortgage Loan with a balloon payment feature that requires principal and interest payments sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than 50 years from commencement of amortization.

"Account Agreement" shall mean that certain Amended and Restated Account Agreement, dated as of November 10, 2006, by and among NCCC, NCMC, NCAH, New Century, Home123, the Buyer and the Bank, as the same shall be modified and supplemented and in effect from time to time.

"Act of Insolvency" shall mean, with respect to any Person or any Material Subsidiary, (i) the filing of a petition, commencing, or authorizing the commencement of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, dissolution or similar law relating to the protection of creditors, or suffering any such petition or proceeding to be commenced by another which is consented to, not timely contested or results in entry of an order for relief which is not discharged within forty-five (45) days; (ii) the seeking or consenting to the appointment of a receiver, trustee, custodian or similar official for such Person or any Material Subsidiary or any substantial part of the property of such Person or any Material Subsidiary; (iii) the appointment of a receiver, conservator, or manager for such Person or any Material Subsidiary by any governmental agency or authority having the jurisdiction to do so; (iv) the making or offering by such Person or any Material Subsidiary of a composition with its creditors or a general assignment for the benefit of creditors; (v) the admission by such Person or any Material Subsidiary of its inability to pay its debts or discharge its obligations as they become due or mature; or (vi) that any governmental authority or agency or any person, agency or entity acting or purporting to act under governmental authority shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the property of such Person or any Material Subsidiary, or shall have taken any action to displace the executive officers of such Person or any Material Subsidiary or the ultimate parent of such Person or any Material Subsidiary to curtail its authority in the conduct of the business of such Person or any Material Subsidiary.

"Additional Purchased Assets" shall mean Mortgage Loans or cash provided by the Seller to the Buyer or its designee pursuant to Section 4.

USActive 5595045.16

"Affiliate" shall mean with respect to any Person, any "affiliate" of such Person, as such term is defined in the Bankruptcy Code.

"Agreement" shall mean this Fifth Amended and Restated Master Repurchase Agreement, as the same may be further amended, supplemented or otherwise modified in accordance with the terms hereof.

"ALTA" shall mean the American Land Title Association.

"Appraised Value" shall mean (i) the value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property, or (ii) with respect to any Second Lien Mortgage Loan, the value described pursuant to clause (i) and if no appraisal was made, then the value set forth in the AVM supplied.

"Asset Schedule and Exception Report" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Asset Value" shall have the meaning given thereto in the Letter Agreement.

"Assignment of Mortgage" shall mean, with respect to any Mortgage, an assignment of the Mortgage in blank, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment of the Mortgage to the Buyer.

"AVM" shall mean, solely in connection with a Second Lien Mortgage Loan, an automated valuation model, conducted in accordance with the Underwriting Guidelines provided by the vendors set forth on Schedule 3 and in the categories as set forth on Schedule 3, as may be amended from time to time to add vendors approved by the Buyer in its sole discretion. The use of AVM's in lieu of appraisals must be strictly in accordance with Underwriting Guidelines approved by the Buyer in its sole discretion.

"AVM Mortgage Loan" shall mean a Second Lien Mortgage Loan subject to an AVM valuation.

"Bank" shall mean Union Bank of California, N.A., a national banking association, and its successors in interest, or such other depository institution as may be acceptable to the Buyer in its sole discretion, and their respective successors in interest.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Business Day" shall mean any day other than (i) a Saturday or Sunday or (ii) a day on which banks in the State of New York (or state in which any of the Custodian, the Disbursement Agent, the Seller or the Buyer is located) are authorized or obligated by law or executive order to be closed.

"Buyer" shall mean IXIS Real Estate Capital Inc., a New York corporation, and its successors in interest and assigns.

USActive 5595045.16

"C Credit Mortgage Loan" shall mean each Mortgage Loan originated in accordance with the Underwriting Guidelines criteria for "C" credit mortgage loans.

"C Minus Credit Mortgage Loans" shall mean each Mortgage Loan originated in accordance with the Underwriting Guidelines criteria for "C-" credit mortgage loans.

"Capital Lease Obligations" shall mean, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash" shall mean all cash and Cash Equivalents, as shown on the balance sheet of the Seller prepared in accordance with GAAP.

"Cash Equivalents" shall mean (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the date of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A2 by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Change of Control" shall mean the occurrence, after the Effective Date, of any of the following circumstances: (a) the Guarantor not owning, directly or indirectly, all of the issued and outstanding capital stock of NCMC; or (b) any Person, or two or more Persons acting in concert, other than the Management Shareholders, acquiring beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended), directly or indirectly, of securities of the Guarantor (or other securities convertible into such securities) representing 35% or more of the combined voting power of all securities of the

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 8 of 121

Guarantor entitled to vote in the election of directors; or (c) any Person, or two or more Persons acting in concert, other than the Management Shareholders, acquiring by contract or otherwise, or entering into a contract or arrangement which upon consummation will result in its or their acquisition of and, control over securities of the Guarantor (or other securities convertible into such securities) representing 35% or more of the combined voting power of all securities of the Guarantor entitled to vote in the election of directors.

"Class" shall mean with respect to a Purchased Asset, the designation of such Purchased Asset as one or more of the following: (i) a Mortgage Loan, (ii) a Wet-Ink Mortgage Loan, (iii) a Second Lien Mortgage Loan, (iv) a Jumbo(500) Mortgage Loan, (v) a Jumbo(750) Mortgage Loan, (vi) a Super Jumbo Mortgage Loan, (vii) a C Credit Mortgage Loan, (viii) a C Minus Credit Mortgage Loan, (ix) a Non-owner Occupied Mortgage Loan, (x) a Manufactured Home Mortgage Loan, (xi) a Condominium Mortgage Loan, (xii) a PUD Mortgage Loan, (xiii) a FICO Loan, (xiv) an Interest-Only Loan, (xv) a 40/30 Mortgage Loan, (xvi) a 50/30 Mortgage Loan, (xvii) an AVM Mortgage Loan, (xviii) a Jumbo Mortgage Loan and/or (xix) a 30 Plus Mortgage Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collection Account" shall mean the account established by the Bank subject to an Account Agreement, into which all Income shall be deposited.

"Combined Loan-to-Value Ratio or CLTV" shall mean with respect to any Second Lien Mortgage Loan, the sum of the original principal balance of such Mortgage Loan and the outstanding principal balance of any related first lien as of the date of origination of the Mortgage Loan, divided by the lesser of the Appraised Value of the Mortgage Property as of the Origination Date or the purchase price of the Mortgaged Property if the related Mortgaged Property was purchased within twelve (12) months prior to the Origination Date.

"Committed Transaction" as defined in the recitals hereto.

"Commonly Controlled Entity" shall mean an entity, whether or not incorporated, which is under common control with the Seller within the meaning of Section 4001 of ERISA or is part of a group which includes the Seller and which is treated as a single employer under Section 414 of the Code.

"Condominium Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is a unit in a condominium project.

"Confirmation" shall have the meaning specified in Section 3(c).

"Custodial and Disbursement Agreement" shall mean that certain Amended and Restated Custodial and Disbursement Agreement, dated as of November 10, 2006, by and among the Buyer, NCCC, NCAH, NCMC, New Century, Home123, the Disbursement Agent and the Custodian, as the same shall be modified and supplemented and in effect from time to time.

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 9 of 121

"Custodial Identification Certificate" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Custodian" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as the custodian under the Custodial and Disbursement Agreement, and any successor Custodian under the Custodial and Disbursement Agreement.

"Default" shall mean an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Disbursement Agent" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as disbursement agent under the Custodial and Disbursement Agreement, and any successor Disbursement Agent under the Custodial and Disbursement Agreement.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Due Diligence Review" shall mean the performance by the Buyer of any or all of the reviews permitted under Section 27 with respect to any or all of the Mortgage Loans, as desired by the Buyer from time to time.

"Effective Date" shall mean the date upon which the conditions precedent set forth in Section 3(a) shall have been satisfied.

"Electronic Agent" shall mean MERSCORP, INC., and its successors in interest.

"Electronic Tracking Agreement" shall mean the Electronic Tracking Agreement, in a form substantially similar to the form set forth in Annex 19 to the Custodial and Disbursement Agreement, to be entered into among the Buyer, the Seller, the Electronic Agent and MERS, if any, as the same shall be amended, supplemented or otherwise modified from time to time; provided that if no Mortgage Loans are or will be MERS Designated Mortgage Loans, all references herein to the Electronic Tracking Agreement shall be disregarded.

"Electronic Transmission" shall mean the delivery of information in an electronic format acceptable to the applicable recipient thereof. An Electronic Transmission shall be considered written notice for all purposes hereof (except when a request or notice by its terms requires execution). Any document that requires signature that is delivered by Electronic Transmission via email that includes the sender's name shall satisfy such signature requirement.

"Eligible Asset" shall mean a Mortgage Loan, including a Wet-Ink Mortgage Loan, (i) as to which the representations and warranties in Schedule 1 attached hereto are true and correct, (ii) which is underwritten strictly in accordance with the Underwriting Guidelines of the Seller, and (iii) which is secured by a Residential Dwelling.

-6-

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which the Seller is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which the Seller is a member.

"Eurodollar Rate" shall mean, with respect to each day a Transaction is outstanding, the rate per annum equal to the rate appearing at page 5 of the Telerate Screen as one-month LIBOR at or about 9:00 a.m., New York time, on such date (and if such date is not a Business Day, the Eurodollar Rate in effect on the Business Day immediately preceding such date), and if such rate shall not be so quoted, the average rate per annum at which three mutually acceptable banks are offered Dollar deposits at or about 9:00 a.m., New York City time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency exchange operations in respect of its Transactions are then being conducted for delivery on such day for a period of thirty (30) days and in an amount comparable to the amount of the Transactions to be outstanding on such day. The Eurodollar Rate shall be reset by the Buyer as described above and the Buyer's determination of Eurodollar Rate shall be conclusive upon the parties absent manifest error on the part of the Buyer

"Event of Default" has the meaning specified in Section 12.

"Excess Margin" has the meaning specified in Section 3(o).

"Existing Financing Facility" has the meaning specified in Section 10(t).

"Fannie Mae" shall mean the Federal National Mortgage Association, and its successors in interest.

"FICO Loan" shall mean a Mortgage Loan with a FICO score less than 550 and greater than or equal to 500.

"First Lien Mortgage Loan" shall mean an Eligible Asset secured by a first lien on the related Mortgaged Property.

"Foreclosed Loan" shall mean a loan the property securing which has been foreclosed upon by the Seller.

"Freddie Mac" shall mean the Federal Home Loan Mortgage Corporation, and its successors in interest.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

-7-

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over NCCC, NCAH, NCMC, New Century, Home123, the Guarantor, any of their respective Subsidiaries or any of their properties.

"Guarantee" shall mean, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well another Person, to purchase assets, goods, securities or services, or to agree to a take-or-pay arrangement or otherwise); provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, or other principal and interest advances made in the ordinary course of servicing the Mortgage Loans. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"Guarantor" shall mean New Century Financial Corporation, Inc., a Maryland corporation.

"Guaranty" shall mean the Amended and Restated Guarantee, dated as of November 10, 2006, made by the Guarantor in favor of the Buyer.

"Home123" shall mean Home123 Corporation, a California corporation, and its successors in interest.

"Income" shall mean, with respect to any Mortgage Loan at any time, all collections and proceeds on or in respect of the Mortgage Loans, including, without limitation, any principal thereof then payable and all interest or other distributions payable thereon less any related servicing fee(s) charged by the Servicer.

"Indebtedness" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days after the date the respective goods are delivered or the respective services are rendered; (c) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of

such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) obligations of such Person under repurchase agreements, sale/buy-back agreements or like arrangements; (f) Indebtedness of others Guaranteed by such Person; (g) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; and (h) Indebtedness of general partnerships of which such Person is a general partner; and (i) Capital Lease Obligations of such Person; provided, however, that for any period, the aggregate Indebtedness of the Guarantor during such period maintained in accordance with GAAP shall be calculated less the aggregate amount of any such Indebtedness that is reflected on the balance sheet of the Guarantor in respect of obligations incurred pursuant to a securitization transaction, solely to the extent such obligations are secured by the assets securitized thereby and are non-recourse to the Guarantor. In the event that any Indebtedness would be excluded from the calculation of Indebtedness but for the existence of recourse, the Guarantor shall be entitled nonetheless to exclude the amount of such Indebtedness that is not subject to recourse. The amount of any recourse shall be the stated or determinable amount thereof or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the Guarantor in good faith. Any calculations of Indebtedness provided pursuant to this Agreement shall also separately set forth any Indebtedness of the Guarantor excluded from such calculation pursuant to the proviso in the definition thereof.

"Interest-Only Loan" shall mean any Mortgage Loan as to which scheduled payments only include interest for an initial period of not more than 10 years, after which such Mortgage Loan will fully amortize to maturity.

"Interest Rate Protection Agreement" shall mean, with respect to any or all of the Mortgage Loans, any short sale of US Treasury securities, or futures contract, or options related contract, or interest rate swap, cap or collar agreement or similar arrangement providing for protection against fluctuations in interest rates or the exchange of nominal interest obligations, either generally or under specific contingencies and acceptable to the Buyer.

"Interim Funder" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the interim funder pursuant to the MERS Procedures Manual.

"Investor" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the investor pursuant to the MERS Procedures Manual.

"Investment" shall mean with respect to any Person, any direct or indirect purchase or other acquisition by that Person of a beneficial interest in stock or other securities of any other Person, or any direct or indirect loan, advance (other than advances to employees for moving and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by that Person to any other Person, including all Indebtedness and accounts receivable from that other Person which are not

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 13 of 121

current assets or did not arise from sales to that other Person in the ordinary course of business.

"Jumbo Mortgage Loans" shall mean, collectively, Jumbo(500) Mortgage Loans, Jumbo(750) Mortgage Loans and Super Jumbo Mortgage Loans.

"Jumbo(500) Mortgage Loans" shall mean each Mortgage Loan with a principal balance as of origination of more than $500,000 and less than or equal to $750,000.

"Jumbo(750) Mortgage Loans" shall mean each Mortgage Loan with a principal balance as of origination of more than $750,000.

"Late Payment Fee" has the meaning specified in Section 5(b).

"Letter Agreement" shall mean the Second Amended Pricing Side Letter, dated as of November 10, 2006, by and among the Buyer, NCCC, NCAH, NCMC, New Century and Home123 and acknowledged by the Guarantor.

"Leverage Ratio" shall mean on any date of determination, the ratio of (a) Total Liabilities to (b) Tangible Net Worth.

"Lien" shall mean any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"Loan-to-Value Ratio" or "LTV" means with respect to any Mortgage Loan, the ratio of the original outstanding principal amount of such Mortgage Loan at the time of origination to the lesser of (a) the Appraised Value of the related Mortgaged Property at origination of such Mortgage Loan and (b) if the related Mortgaged Property was purchased within twelve (12) months of the origination of such Mortgage Loan, the purchase price of the related Mortgaged Property.

"Management Shareholders" shall mean Robert K. Cole, Brad A. Morrice, and Edward F. Gotschall.

"Manufactured Home Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is a manufactured home.

"Margin Base" shall mean the aggregate Asset Value of all Purchased Assets which are Eligible Assets.

"Margin Deficit" has the meaning specified in Section 4.

"Market Value" shall mean, as of any date in respect of any Mortgage Loan, the price at which such Mortgage Loan could readily be sold as determined in the Buyer's sole discretion using its reasonable business judgment, which price may be determined to be zero. The Buyer's determination of Market Value shall be conclusive upon the parties absent manifest error on the part of the Buyer.

USActive 5595045.16

"Material Adverse Effect" shall mean a material adverse effect on (a) the Property, business, operations, financial condition or prospects of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, (b) the ability of NCCC, NCAH, NCMC, New Century or Home123 to perform its obligations under any of the Repurchase Documents to which it is a party, (c) the validity or enforceability of any of the Repurchase Documents, (d) the rights and remedies of the Buyer under any of the Repurchase Documents, (e) the timely payment of any amounts payable under the Repurchase Documents, (f) the Asset Value of the Purchased Assets or (g) the ability of the Guarantor to perform its obligations under the Guaranty.

"Material Subsidiary" shall mean a "significant subsidiary" as defined in Rule 1-02 of Regulation S-X (17 CFR §210.1-01, et seq), of the Seller or any of its subsidiaries.

"Maximum Amount" shall mean the sum of the Maximum Committed Amount and the Maximum Uncommitted Amount.

"Maximum Committed Amount" shall mean $1,000,000,000.

"Maximum Uncommitted Amount" shall mean $0.

"MERS" shall mean Mortgage Electronic Registration Systems, Inc., and its successors in interest.

"MERS Designated Mortgage Loan" shall mean a Mortgage Loan for which the Seller has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Seller, in accordance with the MERS Procedures Manual.

"MERS Procedures Manual" shall mean the MERS Procedures Manual attached as Exhibit B to the Electronic Tracking Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"MERS Report" shall mean the schedule listing MERS Designated Mortgage Loans and other information prepared by the Electronic Agent pursuant to the Electronic Tracking Agreement.

"MERS® System" shall mean the Electronic Agent's mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

"Minimum Pricing Amount" has the meaning specified in the Letter Agreement.

"Mortgage" shall mean the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien or second lien on a fee simple Residential Dwelling securing the Mortgage Note.

"Mortgage File" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 15 of 121

"Mortgage Loan" shall mean a mortgage loan originated in accordance with the Underwriting Guidelines which the Custodian has been instructed to hold for the Buyer pursuant to the Custodial and Disbursement Agreement including any Wet-Ink Mortgage Loan listed on a Transaction Request, and which Mortgage Loan includes, without limitation, (i) a Mortgage Note and the related Mortgage, and (ii) all right, title and interest of the Seller in and to the Mortgaged Property covered by such Mortgage.

"Mortgage Note" shall mean the original executed promissory note or other evidence of the indebtedness of a Mortgagor with respect to a Mortgage Loan.

"Mortgage-backed Security" shall mean a security (including, without limitation, a participation certificate) that is an interest in a pool of Mortgage Loans or is secured by such an interest.

"Mortgaged Property" shall mean a fee simple interest in the real property (including all improvements, buildings, fixtures, building equipment and personal property thereon and all additions, alterations and replacements made at any time with respect to the foregoing) and all other collateral securing repayment of the debt evidenced by a Mortgage Note.

"Mortgagee" shall mean the record holder of a Mortgage Note secured by a Mortgage.

"Mortgagor" shall mean the obligor or obligors on a Mortgage Note, including any person who has assumed or guaranteed the obligations of the obligor thereunder.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by the Seller or any ERISA Affiliate and that is covered by Title IV of ERISA.

"NCAH" shall mean NC Asset Holding, L.P., a Delaware limited partnership, and its successors in interest.

"NCCC" shall mean NC Capital Corporation, a California corporation, and its successors in interest.

"NCMC" shall mean New Century Mortgage Corporation, a California corporation, and its successors in interest.

"Net Income" shall mean, with respect to any Person for any period, the net income of such Person for such period as determined in accordance with GAAP.

"Net Worth" shall mean with respect to any Person, on any date of determination, the net worth of such Person as of such date, determined in accordance with GAAP.

"New Century" shall mean New Century Credit Corporation, a California corporation, and its successors in interest.

USActive 5595045.16

"Non-owner Occupied Mortgage Loans" shall mean each Mortgage Loan with respect to which the improvements on the Mortgaged Property are not occupied by the owner of such Mortgaged Property.

"Origination Date" shall mean the date a Mortgage Loan is funded by any originator and the proceeds are disbursed to a borrower under such Mortgage Loan.

"Payment Calculation Date" shall mean the tenth (10th) day of each month.

"Payment Date" shall mean two (2) Business Days after the Payment Calculation Date.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Periodic Advance Repurchase Payment" has the meaning specified in Section 5(b).

"Person" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Plan" shall mean an employee benefit or other plan established or maintained by any the Seller or any ERISA Affiliate and covered by Title IV of ERISA, other than a Multiemployer Plan.

"Post-Default Rate" shall mean, in respect of any day a Transaction is outstanding or any other amount under this Agreement or any other Repurchase Document that is not paid when due to the Buyer at the stated Repurchase Date or otherwise when due (a "Post-Default Day"), a rate per annum on a 360 day per year basis during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 4% per annum plus the Eurodollar Rate on such Post-Default Day.

"Price Differential" means, with respect to any Transaction hereunder as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the Repurchase Date (reduced by any amount of such Price Differential previously paid by the Seller to the Buyer with respect to such Transaction).

"Pricing Rate" shall mean a rate per annum equal to the sum of (a) the Eurodollar Rate plus (b) the Pricing Spread.

"Pricing Spread" has the meaning specified in the Letter Agreement.

"Prime Rate" shall mean the prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal.

-13-

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"PUD Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is an attached single family dwelling in a planned unit development.

"Purchase Agreement" shall mean any purchase agreement by and between NCCC, NCAH, NCMC, New Century or Home 123 and any third party, including without limitation, any Affiliate of NCCC, NCAH, NCMC, New Century or Home123, pursuant to which NCCC, NCAH, NCMC, New Century or Home123 has purchased assets subsequently sold to the Buyer hereunder.

"Purchase Date" shall mean the date on which Purchased Assets are transferred by the Seller to the Buyer or its designee (including the Custodian).

"Purchase Percentage" has the meaning specified in the Letter Agreement.

"Purchase Price" shall mean on each Purchase Date, the price at which Purchased Assets are transferred by the Seller to the Buyer or its designee (including the Custodian) which shall equal the Asset Value for such Purchased Assets on the Purchase Date.

"Purchased Assets" shall mean the Mortgage Loans sold by the Seller to the Buyer in a Transaction, and any Additional Purchased Assets.

"Purchased Items" has the meaning specified in Section 7.

"Regulations T, U and X" shall mean Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"REIT" shall mean a real estate investment trust, as defined in Section 856(a) of the Code.

"REO Property" shall mean real property acquired by the Seller, including a Mortgaged Property acquired through foreclosure of a Mortgage Loan or by deed in lieu of such foreclosure.

"Reportable Event" shall mean any of the events set forth in Section 4043(b) of ERISA or a successor provision thereof, other than those events as to which the thirty day notice period is waived under subsections .13, .14, .16, .18, .19 or .20 of PBGC Reg. § 2615 or one or more successor provisions thereof.

"Repurchase Date" shall mean the date on which the Seller is to repurchase the Purchased Assets from the Buyer as specified in the related Confirmation, including any date determined by application of the provisions of Sections 3 or 13; which date shall be specified as "open" unless otherwise requested by the Seller and agreed by the Buyer; provided that in no event shall the Repurchase Date be in excess of 364 days after the Purchase Date. If the Transaction is "open", the Repurchase Date shall be one (1)

-14-

Business Day after the date upon which either the Buyer (in its sole discretion) or the Seller (in its sole discretion) provides to the other written notice of its intention to sell or repurchase, as applicable, the applicable Mortgage Loans; provided that the Repurchase Date shall not, in any event, exceed 364 days from the date hereof.

"Repurchase Documents" shall mean this Agreement, the Custodial and Disbursement Agreement, the Guaranty, the Electronic Tracking Agreement, the Account Agreement and all other documents or agreements executed in connection therewith.

"Repurchase Obligations" shall have the meaning specified in Section 7(b).

"Repurchase Price" means the price at which Purchased Assets are to be transferred from the Buyer or its designee (including the Custodian) to the Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination, including any amounts paid pursuant to Requests for Additional Transactions for Excess Margin under Section 3(o), decreased by all cash, Income and Periodic Advance Repurchase Payments (including Late Payment Fees, if any) actually received by the Buyer pursuant to Sections 5(a) or 5(b), respectively.

"Requirement of Law" shall mean as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residential Dwelling" shall mean any one of the following: (i) a detached single family dwelling, (ii) a two-to-four family dwelling, (iii) a unit in a condominium project, (iv) a detached single family dwelling in a planned unit development or (v) manufactured housing units. Mortgaged Properties that consist of the following property types are not Residential Dwellings: (a) co-operative units, (b) log homes, (c) earthen homes, (d) underground homes, and (e) any dwelling situated on more than ten acres of property.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, the chief operating officer or an executive vice-president of such Person.

"SEC" shall mean the Securities and Exchange Commission.

"Second Lien Mortgage Loans" shall mean an Eligible Asset secured by a lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property.

"Security Agreement" shall mean with respect to any Mortgage Loan, any contract, instrument or other document related to security for repayment thereof (other than the related Mortgage and Mortgage Note), executed by the Mortgagor and/or others in connection with such Mortgage Loan, including without limitation, any security agreement, guaranty, title insurance policy, hazard insurance policy, chattel mortgage,

-15-

USActive 5595045.16

letter of credit or certificate of deposit or other pledged accounts, and any other documents and records relating to any of the foregoing.

"Seller" shall mean NCCC, NCAH, NCMC, New Century and Home123.

"Seller Asset Schedule" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Seller-Related Obligations" shall mean any obligations, representations, warranties and covenants of NCCC, NCAH, NCMC, New Century or Home123 hereunder and under any other arrangement between NCCC, NCAH, NCMC, New Century or Home123 or a Subsidiary of NCCC, NCAH, NCMC, New Century or Home123 on the one hand and the Buyer or an Affiliate of the Buyer on the other hand.

"Servicer" shall have the meaning specified in Section 24.

"Servicer Account" shall mean any account established by the Servicer in connection with the servicing of the Mortgage Loans.

"Servicing Agreement" has the meaning specified in Section 24.

"Servicing Contract" shall mean a contract or agreement purchased by NCCC, NCAH, NCMC, New Century or Home123 or entered into by NCCC, NCAH, NCMC, New Century or Home123 for its own account (and not as nominee or subservicer), whether now existing or hereafter purchased or entered into, pursuant to which NCCC, NCAH, NCMC, New Century or Home123 services Mortgage Loans or Mortgage Loan pools for Persons other than itself or the other Seller.

"Servicing File" means with respect to each Mortgage Loan, the file retained by the Seller consisting of originals of all documents in the Mortgage File which are not delivered to a Custodian and copies of all documents in the Mortgage File set forth in Section 2 of the Custodial and Disbursement Agreement.

"Servicing Records" has the meaning specified in Section 24.

"Settlement Agent" shall mean, with respect to any Transaction, the entity, which may be a title company, escrow company or attorney in accordance with local law and practice in the jurisdiction where the related Wet-Ink Mortgage Loan is being originated, which funds such Mortgage Loan with amounts wired pursuant to the terms of an Existing Financing Facility.

"Sub-Limit Percentage" shall mean the aggregate Asset Value multiplied by a percentage equal to the percentage of all outstanding Transactions which are Committed Transactions or Uncommitted Transactions, as applicable.

"Subordinated Debt" shall mean any Indebtedness of NCCC, NCAH, NCMC, New Century or Home123, now existing or hereafter created, incurred or arising, which is subordinated in right of payment to the payment of all obligations hereunder in a manner

-16-

USActive 5595045.16

and to an extent that the Buyer has approved in writing prior to the creation of such Indebtedness.

"<u>Subsidiary</u>" shall mean, with respect to any Person, any corporation, partnership, limited liability company or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership, limited liability company or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"<u>Super Jumbo Mortgage Loans</u>" shall mean each Mortgage Loan with a principal balance as of origination of more than $1,000,000 but less than $1,500,000.

"<u>Tangible Net Worth</u> " shall mean, with respect to any Person, as of any date of determination, the consolidated net worth of such Person and its subsidiaries, less the consolidated net book value of all assets of such Person and its subsidiaries (to the extent reflected as an asset on the balance sheet of such Person or any subsidiary of such Person at such date) which will be treated as intangibles under GAAP, including, without limitation, such items as deferred financing expenses, net leasehold improvements, goodwill, trademarks, trade names, service marks, copyrights, patents, licenses and unamortized debt discount and expense; *provided that* residual securities owned by such Person shall not be treated as intangibles for purposes of this definition.

"<u>Term Purchased Asset</u>" shall mean any Purchased Asset for which the Buyer and the Seller shall have agreed that the Repurchase Date is not "open".

"<u>Termination Date</u>" shall mean the date which is 364 days from the date hereof which shall be November 10, 2007 or such earlier date on which this Agreement shall terminate in accordance with the provisions hereof or by operation of law, as may be extended pursuant to Section 3(m).

"<u>Test Period</u>" has the meaning specified in Section 11(s).

"<u>Total Liabilities</u>" shall mean on any date of determination with respect to any Person, the amount, on a consolidated basis, of the liabilities of such Person and its respective Subsidiaries, determined in accordance with GAAP, minus Subordinated Debt; provided, however, that for any period, the aggregate Total Liabilities of any Person during such period maintained in accordance with GAAP shall be calculated less the aggregate amount of any such Total Liabilities that are reflected on the balance sheet of such Person in respect of obligations incurred pursuant to a securitization transaction, solely to the extent such obligations are secured by the assets securitized thereby and are non-recourse to such Person. In the event that any liabilities would be excluded from the calculation of Total Liabilities but for the existence of recourse, such Person shall be entitled

-17-

nonetheless to exclude the amount of such liabilities that are not subject to recourse. The amount of any recourse shall be the stated or determinable amount thereof or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. Any calculations of Total Liabilities provided pursuant to this Agreement shall also separately set forth any liabilities of such Person excluded from such calculation pursuant to the proviso in the definition thereof.

"Transaction" has the meaning specified in Section 1.

"Transaction Request" means a request from the Seller to the Buyer, in the form attached as Exhibit I hereto, to enter into a Transaction, which may be delivered via Electronic Transmission.

"True Sale Certification" shall mean a true sale certification in the form of Exhibit VI attached hereto.

"Trust Receipt" shall mean a trust receipt issued by the Custodian to the Buyer confirming the Custodian's possession of certain Mortgage Files which are held by the Custodian for the benefit of the Buyer or the registered holder of such trust receipt.

"Uncommitted Transaction" has the meaning set forth in the recitals hereto.

"Underwriting Guidelines" shall mean the underwriting guidelines delivered by the Seller to the Buyer on or prior to the Effective Date and as may be modified or supplemented from time to time thereafter as approved by the Buyer in its sole discretion attached hereto as Exhibit II.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection and the priority of the security interest in any Purchased Item is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection and the priority of the security interest.

"Wet-Ink Mortgage Loan" shall mean an Eligible Asset which is sold to the Buyer on the origination date thereof by the Seller, which origination is in accordance with the Underwriting Guidelines and is funded in part or in whole with cash advanced directly to an escrow agent, Settlement Agent, or Warehouse Lender approved by the Buyer in its sole discretion.

3.      **INITIATION; TERMINATION**

(a)      Conditions Precedent to the Effective Date.  The Effective Date hereof is subject to the satisfaction, immediately prior to or concurrently therewith, of the conditions precedent that the Buyer shall have received from the Seller any fees and expenses payable hereunder (including, without limitation, the fee required

USActive 5595045.16

pursuant to Section 4 of the Letter Agreement), and all of the following documents, each of which shall be satisfactory in form and substance to the Buyer and its counsel:

(1)    <u>Fifth Amended and Restated Master Repurchase Agreement</u>.  This Fifth Amended and Restated Master Repurchase Agreement duly completed and executed by the parties thereto.  In addition, the Seller shall have taken such other action as the Buyer shall have requested in order to perfect the security interests created pursuant to this Agreement;

(2)    <u>Opinions of Counsel</u>.  An opinion or opinions of outside counsel to each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor, substantially in the form of <u>Exhibit III</u>;

(3)    <u>Organizational Documents</u>.  A good standing certificate and certified copies of the charter and by-laws (or equivalent documents) of each of NCCC, NCMC, NCAH, New Century, Home123 and the Guarantor and of all corporate or other authority for NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor, as applicable, with respect to the execution, delivery and performance of the Repurchase Documents to which it is a party and each other document to be delivered by NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor from time to time in connection herewith (and the Buyer may conclusively rely on such certificate until it receives notice in writing from NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor, as applicable, to the contrary); provided that corporate resolutions with respect to the execution, delivery and performance of the Repurchase Documents by the Guarantor may be provided by the Seller to the Buyer within 10 days of the Effective Date;

(4)    <u>Underwriting Guidelines</u>.  A copy of the Seller's current Underwriting Guidelines, and any material changes to the Underwriting Guidelines made since the Underwriting Guidelines were last delivered to the Buyer;

(5)    <u>Servicing Agreement(s)</u>.  Any Servicing Agreement, certified as a true, correct and complete copy of the original;

(6)    <u>Consents and Waivers</u>.  Any and all irrevocable consents and waivers required under the Existing Financing Facilities;

(7)    <u>UCC Amendments and Releases</u>.  Any and all amendments or terminations of UCC financing statements required by the Buyer;

(8)    <u>Other Documents</u>.  Such other documents as the Buyer may reasonably request, in form and substance reasonably acceptable to the Buyer; and

(9)    <u>Custodial and Disbursement Agreement</u>.  The Custodial and Disbursement Agreement duly completed and executed by the parties thereto.

USActive 5595045.16

(10)    <u>Letter Agreement</u>.  The Letter Agreement duly completed and executed by the parties thereto.

(11)    <u>Guaranty</u>.  The Guaranty duly completed and executed by the Guarantor.

(12)    <u>Account Agreement</u>.  The Account Agreement duly completed and executed by the parties thereto.

(13)    <u>Electronic Tracking Agreement</u>.  The Electronic Tracking Agreement duly completed and executed by the parties thereto.

(b)    <u>Conditions Precedent to all Transactions</u>. The Buyer's obligation to enter into each Committed Transaction (including the initial Transaction) and, in the event the Buyer chooses, in its sole discretion, to enter into an Uncommitted Transaction pursuant to Section 3(c) below, the Buyer's obligation to enter into each Uncommitted Transaction, is subject to the satisfaction of the following further conditions precedent, both immediately prior to entering into such Transaction and also after giving effect to the consummation thereof and the intended use of the proceeds of the sale:

(1)    the Seller shall have delivered a Transaction Request via Electronic Transmission in accordance with the procedures set forth in Section 3(c);

(2)    no Default or Event of Default shall have occurred and be continuing under the Repurchase Documents;

(3)    after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Maximum Amount;

(4)    both immediately prior to the requested Transaction and also after giving effect thereto and to the intended use thereof, the representations and warranties made by the Seller in Section 10, shall be true, correct and complete on and as of such Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(5)    after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Asset Value of all the Purchased Assets subject to outstanding Transactions;

(6)    subject to the Buyer's right to perform one or more Due Diligence Reviews pursuant to Section 28, the Buyer shall have completed its due diligence review of the Mortgage File for each Purchased Asset, and such other documents, records, agreements, instruments, mortgaged properties or information relating to such Purchased Asset as the Buyer in its sole

-20-

discretion deems appropriate to review and such review shall be satisfactory to the Buyer in its sole discretion;

(7)     the Buyer shall have received from the Seller certified copies of any Servicing Agreement relating to the Eligible Assets and the Buyer shall have reviewed and approved each such Servicing Agreement in its sole discretion;

(8)     the Buyer shall have received all fees and expenses of counsel to the Buyer as contemplated by Section 14(b) which amount, at the Buyer's option, may be withheld from the sale proceeds of any Transaction hereunder;

(9)     the Buyer shall have approved, in its sole discretion, all exceptions to the Underwriting Guidelines;

(10)    none of the following shall have occurred and/or be continuing:

      (A)     an event or events shall have occurred in the good faith determination of the Buyer resulting in the effective absence of a "repo market" or comparable "lending market" for financing debt obligations secured by mortgage loans or securities or an event or events shall have occurred resulting in the Buyer not being able to finance Purchased Assets through the "repo market" or "lending market" with traditional counterparties at rates which would have been reasonable prior to the occurrence of such event or events; or

      (B)     an event or events shall have occurred resulting in the effective absence of a "securities market" for securities backed by mortgage loans or an event or events shall have occurred resulting in the Buyer not being able to sell securities backed by mortgage loans at prices which would have been reasonable prior to such event or events; or

      (C)     there shall have occurred a material adverse change in the financial condition of the Buyer which affects (or can reasonably be expected to affect) materially and adversely the ability of the Buyer to fund its obligations under this Agreement;

(11)    with respect to each Eligible Asset, the Buyer shall have received from the Custodian on each Purchase Date an Asset Schedule and Exception Report or Trust Receipt and Basic Status Report, as applicable, dated the Purchase Date, duly completed and with exceptions acceptable to the Buyer in its sole discretion in respect of Eligible Assets to be purchased hereunder on such Business Day;

(12)    the Buyer shall have received from the Seller a Warehouse Lender's Release Letter substantially in the form of Exhibit VII-B hereto (or such other form acceptable to the Buyer) or a Seller's Release Letter

substantially in the form of Exhibit VII-A hereto (or such other form acceptable to the Buyer) covering each Eligible Asset to be sold to the Buyer;

(13)    The aggregate requested Purchase Price of Eligible Assets that are not Wet-Ink Mortgage Loans that the Seller has requested the Buyer purchase pursuant to the Transaction Request is equal to or in excess of $1,000,000;

(14)    the Buyer shall not have determined that the introduction of, or a change in, any Requirement of Law or in the interpretation or administration of any Requirement of Law applicable to the Buyer has made it unlawful, and no Governmental Authority shall have asserted that it is unlawful, for the Buyer to enter into Transactions;

(15)    The Repurchase Date for such Transaction shall not be later than the Termination Date;

(16)    after giving effect to the requested Committed Transaction, the aggregate amount of outstanding Committed Transactions shall not have Purchase Prices in excess of the Maximum Committed Amount;

(17)    after giving effect to the requested Uncommitted Transaction, the aggregate amount of outstanding Uncommitted Transactions shall not have Purchase Prices in excess of the Maximum Uncommitted Amount;

(18)    to the extent there are any MERS Designated Mortgage Loans, the Buyer shall have received from the Seller a copy of a fully executed Electronic Tracking Agreement; and

(19)    the Buyer shall have received from the Seller, with respect to the MERS Designated Mortgage Loans, a MERS Report reflecting the Seller as the Investor and no Person named in the Interim Funder field for each such MERS Designated Mortgage Loan.

(20)    None of NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall be in default under any Seller-Related Obligation equal to or in excess of $2,000,000

Each Transaction Request delivered by the Seller hereunder shall constitute a certification by each of NCCC, NCAH, NCMC, New Century and Home123 that all the conditions set forth in this Section 3(b) have been satisfied (both as of the date of such notice or request and as of the date of such purchase) and shall be deemed to be a request for a Committed Transaction; provided that if after giving effect to the requested Committed Transaction, the aggregate amount of outstanding Committed Transactions shall have Purchase Prices in excess of the Maximum Committed Amount, such latest request shall be deemed a request for an Uncommitted Transaction.

-22-

Each of NCCC, NCAH, NCMC, New Century and Home123 hereby requests that the Buyer, on each Business Day, convert each Eligible Asset which is a Wet-Ink Mortgage Loan for which the Mortgage File has been received by the Custodian in accordance with the Custodial and Disbursement Agreement to a dry Mortgage Loan and this request shall constitute a certification by each of NCCC, NCAH, NCMC, New Century and Home123 that all the conditions set forth in this Section 3(b) have been satisfied (both as of the date hereof and as of the date of such conversion).

(c)     This Agreement is not a commitment by the Buyer to enter into the Uncommitted Transactions with the Seller but rather sets forth the procedures to be used in connection with periodic requests for the Buyer to enter into the Uncommitted Transactions with the Seller.  The Seller hereby acknowledges that the Buyer is under no obligation to agree to enter into, or to enter into, any Uncommitted Transaction pursuant to this Agreement.  The Seller shall request a Transaction by delivering to the Custodian, the Disbursement Agent and the Buyer via Electronic Transmission a request in the form of Exhibit I attached hereto (a "Transaction Request") in accordance with the timeframe set forth in Section 3(a) of the Custodial and Disbursement Agreement. Such Transaction Request shall describe the Purchased Assets in a Seller Asset Schedule and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, (iv) the Pricing Rate applicable to the Transaction, (v) the applicable Purchase Percentages and (vi) additional terms or conditions not inconsistent with this Agreement.  Each such Transaction Request in respect of Eligible Assets that are not Wet-Ink Mortgage Loans shall be for an aggregate Purchase Price equal to or in excess of $1,000,000.

With respect to any request for an Uncommitted Transaction, unless otherwise agreed in writing, upon receipt of the Transaction request, the Buyer may, in its sole discretion, agree to enter into that portion of the requested Transaction representing a request for an Uncommitted Transaction and such agreement shall be evidenced by a Confirmation to be delivered to the Seller on the Purchase Date as described below.

On each Purchase Date, the Buyer shall forward to the Seller a confirmation (a "Confirmation") by Electronic Transmission setting forth with respect to each Transaction funded on such date, (1) the mortgage loan numbers, (2) the Purchase Price for such Purchased Assets, (3) the Market Value of the related Mortgage Loans as of the date of such Confirmation, (4) the outstanding principal amount of the related Mortgage Loans, (5) the Repurchase Date, (6) the Pricing Rate and (7) the Class designations of such Purchased Assets.  The Buyer shall forward to the Seller a revised Confirmation by Electronic Transmission notifying the Seller as to any changes made by the Buyer in the Pricing Spread, Purchase Percentage or Reduction Amount pursuant to the terms hereof.

On each date that all the documents set forth in Section 2(a)(i) of the Custodial and Disbursement Agreement are received by the Custodian with respect to any Wet-Ink Mortgage Loan, and the Custodian delivers to the Buyer a Trust Receipt attaching an Asset Schedule and Exception Report or Basic Status Report and Exception Report, as applicable, with respect to such Eligible Assets, the Buyer shall forward to the Seller a

USActive 5595045.16

Case: 09-05050     Doc# 75-4     Filed: 06/08/10     Entered: 06/08/10 14:45:43     Page 27
of 121

new Confirmation by Electronic Transmission setting forth the following information, updated to reflect the revised Pricing Rate, and, if applicable, Market Value as a result of the conversion of such Mortgage Loan, (1) the mortgage loan numbers, (2) the Purchase Price for such Purchased Assets, (3) the Market Value of the related Mortgage Loans, (4) the outstanding principal amount of the related Mortgage Loans, (5) the Repurchase Date, (6) the Pricing Rate and (7) the Class designations of such Purchased Assets.

In the event the Seller disagrees with any terms of the Confirmation, the Seller shall notify the Buyer in writing of such disagreement within one (1) Business Day after receipt of such Confirmation unless a corrected Confirmation is sent by the Buyer. An objection sent by the Seller must state specifically that it is an objection, must specify the provision(s) being objected to by the Seller, must set forth such provision(s) in the manner that the Seller believes they should be stated, and must be received by the Buyer no more than one (1) Business Day after the Confirmation was received by the Seller.

(d)     Any Confirmation by the Buyer shall be deemed to have been received by the Seller on the date actually received by the Seller.

(e)     Except as set forth in Section 3(c), each Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between the Buyer and the Seller with respect to the Transaction to which the Confirmation relates, and the Seller's acceptance of the related proceeds shall constitute the Seller's agreement to the terms of such Confirmation. It is the intention of the parties that each Confirmation shall not be separate from this Agreement but shall be made a part of this Agreement.

(f)     On the Repurchase Date, termination of a Transaction will be effected by transfer to the Seller or its designee of the Purchased Assets (and any Income in respect thereof received by the Buyer not previously credited or transferred to, or applied to the obligations of, the Seller pursuant to Section 5) which amount shall be netted against the simultaneous receipt of the Repurchase Price by the Buyer. To the extent a net amount is owed to one party, the other party shall pay such amount to such party. The Seller is obligated to obtain the Mortgage Files from the Buyer or its designee (including the Custodian) at the Seller's expense on the Repurchase Date.

Any payment made by the Seller to repurchase Purchased Assets shall be first applied to repurchase Purchased Assets under the Uncommitted Transactions until all outstanding Uncommitted Transactions have been terminated; it being understood that it is the intention of the parties hereto that at no time shall there be any outstanding Uncommitted Transactions when the aggregate amount of the Purchase Price with respect to all outstanding Committed Transactions is less than the Maximum Committed Amount.

(g)     Subject to the terms and conditions of this Agreement, during the term of this Agreement, the Seller may sell to the Buyer, repurchase from the Buyer and resell to the Buyer Eligible Assets hereunder.

-24-

(h)     In no event shall a Transaction be entered into when any Default or Event of Default has occurred and is continuing or when the Repurchase Date for such Transaction would be later than the Termination Date.

(i)     With respect to each Eligible Asset that is not a Wet-Ink Mortgage Loan, the Seller shall deliver to the Custodian the Mortgage File pertaining to each Eligible Asset to be purchased by the Buyer no later than the time set forth in the Custodial and Disbursement Agreement.

(j)     With respect to each Eligible Asset that is not a Wet-Ink Mortgage Loan, pursuant to the Custodial and Disbursement Agreement, the Custodian shall deliver to the Buyer and the Seller an Asset Schedule and Exception Report with respect to the Eligible Assets which the Seller has requested the Buyer purchase on such Purchase Date, and no later than 5 p.m., New York City time, on each Purchase Date, the Custodian shall deliver to the Buyer a Trust Receipt in respect of all such Eligible Assets purchased by the Buyer on such Purchase Date. Subject to the provisions of this Section 3 and Section 11 of the Custodial and Disbursement Agreement, the Purchase Price for each Eligible Asset that is not a Wet-Ink Mortgage Loan will be made available to the Seller by the Disbursement Agent transferring the aggregate amount of such Purchase Price in accordance with the Custodial and Disbursement Agreement.

(k)     With respect to each Eligible Asset that is a Wet-Ink Mortgage Loan, the Seller shall cause the Settlement Agent to send the Custodian a facsimile of the associated Escrow Instruction Letter on each Purchase Date. Subject to the provisions of this Section 3 and Section 11 of the Custodial and Disbursement Agreement, the Purchase Price for each Eligible Asset which is a Wet-Ink Mortgage Loan will then be made available to the Seller by the Disbursement Agent transferring the aggregate amount of such Purchase Price in accordance with the Custodial and Disbursement Agreement. The Seller shall deliver the Mortgage File related thereto to the Custodian, for receipt by the Custodian no later than eight (8) Business Days following the Purchase Date of such Wet-Ink Mortgage Loan.

(l)     The Seller may repurchase any individual Purchased Asset without penalty or premium, but subject to the last sentence of this Section 3(l), on any date. The Repurchase Price payable for the repurchase of any such Purchased Asset shall be reduced as provided in Section 5(d). If the Seller intends to make such a repurchase, the Seller shall give one (1) Business Day's prior written notice thereof to the Buyer, designating the Purchased Assets to be repurchased. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, and, on receipt, such amount shall be applied to the Repurchase Price for the designated Purchased Assets. The amount of the original Purchase Price of the Purchased Assets thus repurchased shall be available for subsequent Transactions subject to the terms of this Agreement. If any Term Purchased Asset is repurchased on any date other than the Repurchase Date for such Term Purchased Asset, the Seller shall pay to the Buyer any amount

-25-

determined by the Buyer in its sole discretion, exercised in good faith, as necessary to compensate the Buyer for any additional losses, costs or expenses which it may reasonably incur as a result of such repurchase, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Buyer to fund or maintain such Transaction. The Buyer shall deliver to the Seller an invoice setting forth all such losses, costs or expenses.

(m)     At the request of the Seller made at least 10 days, but in no event earlier than 360 days, prior to the then current Termination Date, the Buyer may in its sole discretion extend the Termination Date for a period of 364 additional days or such other period to be determined by the Buyer in its sole discretion by giving written notice of such extension to the Seller. Any failure by the Buyer to deliver such notice of extension shall be deemed to be the Buyer's determination not to extend the then current Termination Date.

(n)     On the Termination Date, including but not limited to a termination pursuant to Section 20 or otherwise hereunder, the Seller shall pay to the Buyer the Minimum Pricing Amount. All such payments pursuant to this clause (o) shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Buyer at the account set forth in Section 8(a) hereof

(o)     On any day on which the Margin Base for such Mortgage Loans exceeds the aggregate outstanding Purchase Price of all Transactions with respect to such Mortgage Loans, so long as no Default or Event of Default has occurred and is continuing:

(1)     the Seller may prepare a Request for Additional Transactions for Excess Margin in the form of Exhibit IX attached hereto ("Request for Additional Transactions for Excess Margin"), (A) specifying (i) the increase in Purchase Price for all outstanding Transactions and the requested Purchase Date, (ii) the Excess Margin with respect to all outstanding Transactions before giving effect to the requested Transaction, (iii) the remaining Excess Margin after giving effect to the requested Transaction, and (iv) the aggregate outstanding Purchase Price of the Transactions after giving effect to the requested Transaction, and (B) including a certification that, upon the consummation of the additional Transactions, the Margin Base will be equal to or greater than the aggregate outstanding Purchase Price of all Transactions, and the excess of the Margin Base over the aggregate outstanding Purchase Price, after giving effect to the Transaction, shall be the "Excess Margin".

(2)     the Seller shall transmit via Electronic Transmission the Request for Additional Transactions for Excess Margin to the Disbursement Agent and the Buyer prior to 12:00 noon, New York City time, on the requested Purchase Date. Upon confirming that the Request for Additional Transactions for Excess Margin correctly reflects the information set forth

-26-

in Section 3(o)(1) and that, after giving effect to the requested Transaction, the amount of the Margin Base would be equal to or greater than the aggregate outstanding Purchase Prices of all Transactions, the Buyer shall cause the Disbursement Agent to remit the additional Purchase Price in the amount set forth in such Request for Additional Transactions for Excess Margin and send a revised Confirmation with respect to such Purchased Assets. In the event that the Buyer's assessment of the Margin Base would alter the information set forth in any Request for Additional Transactions for Excess Margin, the Buyer shall promptly notify the Seller in writing of such assessment.

(3)     the Buyer shall not be obligated to cause the Disbursement Agent to remit the additional Purchase Price requested pursuant to a Request for Additional Transactions for Excess Margin which (i) the Buyer reasonably determines is based on erroneous information or would result in a Transaction other than in accordance with the terms of this Agreement, or (ii) does not reflect the Buyer's current determination of Market Value as provided in the definition thereof.

## 4.     MARGIN AMOUNT MAINTENANCE

(a)     If at any time the Margin Base is less than the aggregate Purchase Price for all outstanding Transactions (a "Margin Deficit"), then the Buyer may by notice to the Seller (as such notice is more particularly set forth below, a "Margin Deficit Notice") require the Seller to transfer to the Buyer or its designee (including the Custodian) cash to be applied to reduce the Purchase Price with respect to all outstanding Transactions such that the Margin Base will thereupon equal or exceed the aggregate Purchase Price for all outstanding Transactions. If the Buyer delivers a Margin Deficit Notice to the Seller on or prior to 6 p.m. (New York time) on any Business Day, then the Seller shall transfer such cash to the Buyer no later than 5 p.m. (New York time) the following Business Day. In the event the Buyer delivers a Margin Deficit Notice to the Seller after 6 p.m. (New York time) on any Business Day, then such Margin Deficit Notice shall be deemed to have been delivered on the following Business Day and the Seller shall be required to transfer cash no later than 5 p.m. (New York time) on the subsequent Business Day. All cash transferred to the Buyer pursuant to this Section 4(a) shall be deposited in the account set forth in Section 8(a) hereof.

(b)     the Buyer's election, in its sole discretion, not to deliver a Margin Deficit Notice at any time there is a Margin Deficit shall not in any way limit or impair its right to deliver a Margin Deficit Notice at any time a Margin Deficit exists.

## 5.     INCOME PAYMENTS

(a)     Where a particular Transaction's term extends over an Income payment date on the Purchased Assets subject to that Transaction, such Income shall be the property of the Buyer. The Buyer agrees that until a Default or an Event of

-27-

Default has occurred and the Buyer otherwise directs as contemplated in each Servicer Notice, each Servicer that is not the Seller shall be permitted to continue to remit Income in accordance with the respective Servicing Agreement. In the event that the Seller is the Servicer of any Mortgage Loans, the Buyer agrees that until a Default or an Event of Default has occurred, the Seller shall be permitted to continue to remit or retain Income with respect to such Mortgage Loans in accordance with its current existing business practice. Upon notice of a Default or an Event of Default to the Seller hereunder or to the Servicer pursuant to a Servicer Notice, the Seller shall, and pursuant to the Servicer Notice, the Servicer shall be required to, deposit promptly all Income in a deposit account (the title of which shall indicate that the funds therein are being held in trust for the Buyer) (the "Collection Account") with the Bank and which is subject to the Account Agreement. All funds in the Collection Account may be withdrawn by the Buyer and applied as determined by the Buyer. The Seller may not give any instruction with respect to the Collection Account after a Default or an Event of Default.

(b)     Notwithstanding that the Buyer and the Seller intend that the Transactions hereunder be sales to the Buyer of the Purchased Assets, the Seller shall pay to the Buyer the accreted value of the Price Differential (less any amount of such Price Differential previously paid by the Seller to the Buyer) of each Transaction through but not including the Payment Calculation Date (each such payment, a "Periodic Advance Repurchase Payment") on each Payment Date. The Buyer shall deliver to the Seller, via Electronic Transmission, notice of the required Periodic Advance Repurchase Payment on or prior to the second Business Day preceding each Payment Date. If the Seller fails to make all or part of the Periodic Advance Repurchase Payment by 5:00 p.m., New York City time, on the Payment Date, the Seller shall be obligated to pay to the Buyer (in addition to, and together with, the Periodic Advance Repurchase Payment) interest on the unpaid amount of the Periodic Advance Repurchase Payment at a rate per annum equal to the Post-Default Rate (the "Late Payment Fee") until the overdue Periodic Advance Repurchase Payment is received in full by the Buyer.

(c)     the Seller shall hold or cause to be held for the benefit of, and in trust for, the Buyer all Income, including without limitation all Income received by or on behalf of the Seller with respect to such Purchased Assets. All such Income shall be held in trust for the Buyer, shall constitute the property of the Buyer and shall not be commingled with other property of the Seller, any affiliate of the Seller or the applicable the Servicer except as expressly permitted above in this Section 5. Funds deposited in the Collection Account during any month shall be held therein, in trust for the Buyer.

(d)     the Buyer shall offset against the Repurchase Price of each such Transaction all Income and Periodic Advance Repurchase Payments actually received by the Buyer for such Transaction pursuant to Sections 5(a) and 5(b) as of the applicable Repurchase Date, respectively, excluding any Late Payment Fees paid pursuant to Section 5(b); it being understood that the Late Payment Fees are properties of the Buyer that are not subject to offset against the Repurchase Price.

-28-

6.    **REQUIREMENTS OF LAW**

(a)    If any Requirement of Law (other than with respect to any amendment made to the Buyer's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by the Buyer with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(1)    shall subject the Buyer to any tax of any kind whatsoever with respect to this Agreement or any Transaction (excluding net income taxes) or change the basis of taxation of payments to the Buyer in respect thereof;

(2)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, or other extensions of credit by, or any other acquisition of funds by, any office of the Buyer which is not otherwise included in the determination of the Eurodollar Rate hereunder;

(3)    shall impose on the Buyer any other condition;

and the result of any of the foregoing is to increase the cost to the Buyer, by an amount which the Buyer deems to be material, of entering, continuing or maintaining any Transaction or to reduce any amount due or owing hereunder in respect thereof, then, in any such case, the Seller shall promptly pay the Buyer such additional amount or amounts as calculated by the Buyer in good faith as will compensate the Buyer for such increased cost or reduced amount receivable. The Buyer shall deliver to the Seller an invoice setting forth all such increased costs and reduced amounts receivable.

(b)    If the Buyer shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made to the Buyer's certificate of incorporation and by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by the Buyer or any corporation controlling the Buyer with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on the Buyer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which the Buyer or such corporation could have achieved but for such adoption, change or compliance (taking into consideration the Buyer's or such corporation's policies with respect to capital adequacy) by an amount deemed by the Buyer to be material, then from time to time, the Seller shall promptly pay to the Buyer such additional amount or amounts calculated by the Buyer in good faith as will compensate the Buyer for such reduction. The Buyer shall deliver to the Seller an invoice setting forth all such additional amounts.

-29-

(c)     Any payments made by the Seller to the Buyer shall be free and clear of, and without deduction or withholding for, any taxes; provided, however, that if the Seller shall be required by law to deduct or withhold any taxes from any sums payable to the Buyer, then the Seller shall (A) make such deductions or withholdings and pay such amounts to the relevant authority in accordance with applicable law, (B) pay to the Buyer the sum that would have been payable had such deduction or withholding not been made, and (C) at the time the Price Differential is paid, pay to the Buyer all additional amounts as specified by the Buyer in good faith to preserve the after-tax yield the Buyer would have been received had such tax not been imposed.

(d)     If the Buyer becomes entitled to claim any additional amounts pursuant to this Section, (i) it shall promptly notify the Seller of the event by reason of which it has become so entitled and (ii) at the sole option of the Buyer, (x) the Buyer may terminate this Agreement and the Seller shall not be required to pay any Termination Fee or (y) this Agreement shall continue in full force and effect. A certificate as to any additional amounts payable pursuant to this Section 6(d) submitted by the Buyer to the Seller shall be conclusive in the absence of manifest error.

## 7.     SECURITY INTEREST

(a)     Each of the following items or types of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, is hereinafter referred to as a "Purchased Item" and all of them are collectively, the "Purchased Items": all Mortgage Loans, all rights under each Purchase Agreement (but not the obligations thereunder), all Interest Rate Protection Agreements, all Mortgage Files, including without limitation all promissory notes, all Servicing Records relating to the Mortgage Loans (as defined in Section 24(b)), all Servicing Agreements relating to the Mortgage Loans and any other collateral pledged hereunder or otherwise relating to such Mortgage Loans, together with all files, documents, instruments, surveys, certificates, correspondence, appraisals, computer programs, computer storage media, accounting records and other books and records relating thereto, all mortgage guaranties and insurance (issued by governmental agencies or otherwise) and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any Mortgage Loan, all servicing fees to which such Seller is entitled and servicing and other rights relating to the Mortgage Loans, all Servicer Accounts established pursuant to any Servicing Agreement and all amounts on deposit therein, from time to time, all Purchase Agreements or other agreements or contracts relating to, constituting, or otherwise governing, any or all of the foregoing to the extent they relate to the Purchased Assets including the right to receive principal and interest payments with respect to the Purchased Assets and the right to enforce such payments, the Collection Account and all monies from time to time on deposit in the Collection Account, all "general intangibles", "accounts", "chattel paper", "deposit accounts" and "investment property" as defined in the Uniform Commercial Code as in effect from time to time relating to or constituting any and

-30-

all of the foregoing, and any and all replacements, substitutions, distributions on or proceeds of any and all of the foregoing.

(b)     The Buyer and the Seller intend that the Transactions hereunder be sales to the Buyer of the Purchased Assets and not loans from the Buyer to the Seller secured by the Purchased Assets.  However, in order to preserve the Buyer's rights under this Agreement in the event that a court or other forum recharacterizes the Transactions hereunder as loans and as security for the performance by the Seller of all of the Seller's obligations to the Buyer hereunder and the Transactions entered into hereunder ("Repurchase Obligations") and the Seller-Related Obligations, each of NCCC, NCAH, NCMC, New Century and Home123 hereby assigns, pledges and grants a security interest in all of its right, title and interest in, to and under the Purchased Items and Purchased Assets to the Buyer to secure the Repurchase Obligations and the Seller-Related Obligations, including without limitation the repayment of all amounts owing to the Buyer hereunder.  The assignment, pledge and grant of security interest contained herein shall be, and each of NCCC, NCAH, NCMC, New Century  and Home123 hereby represents and warrants to the Buyer that it is, a first priority perfected security interest to the extent such security interest relates to the Mortgage Loans.  Each of NCCC, NCAH, NCMC, New Century and Home123 agrees to mark its computer records and tapes to evidence the interests granted to the Buyer hereunder.  All Purchased Items shall secure the payment of all obligations of the Seller now or hereafter existing under this Agreement, including, without limitation, the Seller's obligation to repurchase Purchased Assets, or if such obligation is so recharacterized as a loan, to repay such loan, for the Repurchase Price and to pay any and all other amounts owing to the Buyer hereunder.

(c)     Pursuant to the Custodial and Disbursement Agreement, the Custodian shall hold the Mortgage Files as exclusive bailee and agent for the Buyer pursuant to the terms of the Custodial and Disbursement Agreement and shall deliver to the Buyer Trust Receipts each to the effect that the Custodian has reviewed such Mortgage Files in the manner and to the extent required by the Custodial and Disbursement Agreement and identifying any deficiencies in such Mortgage Files as so reviewed.

## 8.     PAYMENT, TRANSFER AND CUSTODY

(a)     Unless otherwise mutually agreed in writing, all transfers of funds to be made by the Seller hereunder shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Buyer at the following account maintained by the Buyer; Account No. GLA 111569, account name SER, Bank of New York, ABA No. 021000018, Attn:  Eric Seyffer, not later than 3 p.m., New York City time, on the date on which such payment shall become due (and each such payment made after such time shall be deemed to have been made on the next succeeding Business Day).  The Seller acknowledges that it has no rights of withdrawal from the foregoing account.

USActive 5595045.16

(b)    On the Purchase Date for each Transaction, ownership of the Purchased Assets shall be transferred to the Buyer or its designee (including the Custodian) against the simultaneous transfer of the Purchase Price to or on behalf of the Seller not later than 6 p.m., New York City time, simultaneously with the delivery to the Custodian of the Purchased Assets relating to each Transaction in accordance with the terms hereof and of the Custodial and Disbursement Agreement. Each of NCCC, NCAH, NCMC, New Century and Home123 hereby sells, transfers, conveys and assigns to the Buyer or its designee (including the Custodian) without recourse, but subject to the terms of this Agreement, all the right, title and interest of NCCC, NCAH, NCMC, New Century and Home123, as applicable, in and to the Purchased Assets together with all right, title and interest in and to the proceeds of any related Purchased Items.

(c)    In connection with such sale, transfer, conveyance and assignment, on or prior to each Purchase Date, the Seller shall deliver or cause to be delivered and released to the Buyer or its designee (including the Custodian) (i) the Custodial Identification Certificate and (ii) the documents identified in the Custodial and Disbursement Agreement.

(d)    Any Mortgage Files not delivered to the Buyer or its designee (including the Custodian) are and shall be held in trust by the Seller or its designee for the benefit of the Buyer as the owner thereof. The Seller or its designee shall maintain a copy of the Mortgage File and the originals of the Mortgage File not delivered to the Buyer or its designee (including the Custodian). The possession of the Mortgage File by the Seller or its designee is at the will of the Buyer for the sole purpose of servicing the related Purchased Asset, and such retention and possession by the Seller or its designee is in a custodial capacity only. Each Mortgage File retained or held by the Seller or its designee shall be segregated on the Seller's books and records from the other assets of the Seller or its designee and the books and records of the Seller or its designee shall be marked appropriately to reflect clearly the sale of the related Purchased Asset to the Buyer. The Seller or its designee shall release its custody of the Mortgage File only in accordance with written instructions from the Buyer, unless such release is required as incidental to the servicing of the Purchased Assets or is in connection with a repurchase of any Purchased Asset by the Seller.

## 9.    HYPOTHECATION OR PLEDGE OF PURCHASED ASSETS

Title to all Purchased Assets and Purchased Items shall pass to the Buyer and the Buyer shall have free and unrestricted use of all Purchased Assets and Purchased Items. Nothing in this Agreement shall preclude the Buyer from engaging in repurchase transactions with the Purchased Assets and Purchased Items or otherwise pledging, repledging, transferring, hypothecating, or rehypothecating the Purchased Assets and Purchased Items, all on terms that the Buyer may determine in its sole discretion. Nothing contained in this Agreement shall obligate the Buyer to segregate any Purchased Assets and Purchased Items delivered to the Buyer by the Seller.

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 36 of 121

10.    **SELLER'S REPRESENTATIONS**

Each of NCCC, NCAH, NCMC, New Century and Home123 represents and warrants to the Buyer that as of the Purchase Date for the purchase of any Purchased Assets by the Buyer from the Seller and as of the date of this Agreement and any Transaction hereunder and at all times while the Repurchase Documents and any Transaction hereunder are in full force and effect:

(a)    <u>Acting as Principal</u>.  The Seller will engage in such Transactions as principal (or, if agreed in writing in advance of any Transaction by the other party hereto, as agent for a disclosed principal).

(b)    <u>Solvency</u>.  Neither the Repurchase Documents nor any Transaction thereunder are entered into in contemplation of insolvency or with intent to hinder, delay or defraud any of the Seller's creditors.  The transfer of the Mortgage Loans subject hereto and the obligation to repurchase such Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.  The Seller is not insolvent within the meaning of 11 U.S.C. Section 101(32) or any successor provision thereof and the transfer and sale of the Mortgage Loans pursuant hereto and the obligation to repurchase such Mortgage Loan (i) will not cause the Seller to become insolvent, (ii) will not result in the Seller having unreasonably small capital, and (iii) will not result in debts that would be beyond the Seller's ability to pay as the same mature.  The Seller received reasonably equivalent value in exchange for the transfer and sale of the Purchased Assets and Purchased Items subject hereto.

(c)    <u>No Broker</u>.  The Seller has not dealt with any broker, investment banker, agent, or other person, except for the Buyer, who may be entitled to any commission or compensation in connection with the sale of Purchased Assets pursuant to this Agreement.

(d)    <u>Ability to Perform</u>.  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in the Repurchase Documents applicable to it to which it is a party.

(e)    <u>No Defaults</u>.  No Default or Event of Default has occurred and is continuing hereunder.

(f)    <u>Legal Name; Existence</u>.  NCMC's exact legal name is, and for the immediately preceding four months has been, New Century Mortgage Corporation.  NCAH's exact legal name is, and for the immediately preceding four months has been, NC Asset Holding, L.P..  NCCC's exact legal name is, and for the immediately preceding four months has been, NC Capital Corporation.  New Century's exact legal name is, and for the immediately preceding four months has been, New Century Credit Corporation.  Home123's exact legal name is, and for the immediately preceding four months has been, Home123 Corporation.  Each of NCCC, NCMC, NCAH, New Century and Home123 (a) is a corporation duly and

-33-

exclusively organized, validly existing and in good standing under the laws of California, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify could not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect. NCAH (a) is a corporation duly and exclusively organized, validly existing and in good standing under the laws of Delaware, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify could not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect.

(g)    <u>Financial Condition</u>.  (a) The Seller has heretofore furnished to the Buyer a copy of (a) its consolidated balance sheet for the fiscal year ended December 31, 2005, and the related consolidated statements of income and retained earnings and of cash flows for the Seller and its consolidated Subsidiaries for such fiscal year, each audited by and accompanied by an opinion thereon of KPMG LLP, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Seller and its consolidated Subsidiaries as of the end of, and for, such fiscal year in accordance with GAAP and (b) its consolidated balance sheet and the consolidated balance sheets of its consolidated Subsidiaries for the quarterly fiscal period of the Seller since December 31, 2005 and the related consolidated statements of income and retained earnings and of cash flows for the Seller and its consolidated Subsidiaries for such quarterly fiscal period, setting forth in each case in comparative form the figures for the previous year. All such financial statements are complete and correct and fairly present, in all material respects, the consolidated financial position of the Seller and its Subsidiaries and the consolidated results of their operations as of such dates and for such fiscal periods, all in accordance with GAAP applied on a consistent basis. Since the date of the most recently such delivered balance sheet, there has been no material adverse change in the consolidated business, operations or financial condition of the Seller and its consolidated Subsidiaries taken as a whole from that set forth in said financial statements.

(h)    <u>Litigation</u>.  Except as set forth on the compliance report required under Section 11(y), there are no actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are pending or threatened) or other legal or

USActive 5595045.16

arbitrable proceedings affecting the Seller or any of its Subsidiaries or affecting any of the Property of any of them before any Governmental Authority which (i) questions or challenges the validity or enforceability of the Repurchase Documents or any action to be taken in connection with the transactions contemplated hereby, (ii) makes a claim or claims in an aggregate amount greater than $5,000,000 (provided such claims or claims shall be required to be set forth on the compliance report referenced above only upon the Buyer's request), or (iii) individually or in the aggregate, if adversely determined, could reasonably be likely to have a Material Adverse Effect.

(i)     No Breach.  Neither (a) the execution and delivery of the Repurchase Documents nor (b) the consummation of the transactions therein contemplated to be entered into by the Seller in compliance with the terms and provisions thereof will conflict with or result in a breach of the organizational documents of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or any Servicing Agreement or other material agreement or instrument to which NCCC, NCAH, NCMC, New Century, Home123, the Guarantor or any of their respective Subsidiaries is a party or by which any of them or any of their Property is bound or to which any of them is subject, or constitute a default under any such material agreement or instrument or result in the creation or imposition of any Lien (except for the Liens created pursuant to the Repurchase Documents) upon any Property of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, or any of their respective Subsidiaries pursuant to the terms of any such agreement or instrument, other than a breach or default for which a consent or waiver has been obtained pursuant to Section 3(a)(6).

(j)     Action.  Each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Repurchase Documents to which it is a party, as applicable; the execution, delivery and performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of each of the Repurchase Documents to which it is a party have been duly authorized by all necessary corporate or other action on its part; and each Repurchase Document to which it is  a party has been duly and validly executed and delivered by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, and constitutes a legal, valid and binding obligation of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, enforceable against NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, in accordance with its terms.

(k)     Approvals.  No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery or performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, of the Repurchase Documents to which it is a party or for the legality, validity or enforceability

-35-

thereof, except for filings and recordings in respect of the Liens created pursuant to the Repurchase Documents.

(l) <u>Margin Regulations</u>.  Neither any Transaction hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

(m) <u>Taxes</u>.  Each of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and their respective Subsidiaries have filed all Federal income tax returns and all other material tax returns that are required to be filed by them and have paid all taxes due pursuant to such returns or pursuant to any assessment received by it or any of its Subsidiaries, except for any such taxes as are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided.  The charges, accruals and reserves on the books of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and their respective Subsidiaries in respect of taxes and other governmental charges are, in the opinion of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, adequate.

(n) <u>Investment Company Act</u>. None of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor or any of their respective Subsidiaries is an "investment company", or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(o) <u>Purchased Assets</u>.

    (1) None of NCCC, NCAH, NCMC, New Century or Home123 has assigned, pledged, or otherwise conveyed or encumbered any Mortgage Loan to any other Person (except as between NCCC, NCAH, NCMC, New Century and Home123), and immediately prior to the sale of such Mortgage Loan to the Buyer, NCCC, NCAH, NCMC, New Century and/or Home123 was the sole legal and beneficial owner of such Mortgage Loan and had good and marketable title thereto, free and clear of all Liens, in each case except for Liens to be released simultaneously with the sale to the Buyer hereunder.  No Mortgage Loan sold to the Buyer hereunder was acquired (by purchase or otherwise) by NCCC, NCAH, NCMC, New Century or Home123 from an Affiliate of NCCC, NCAH, NCMC, New Century or Home123 (except as among NCCC, NCAH, NCMC, New Century and Home123), as applicable**.**

    (2) The provisions of this Agreement are effective to either constitute a sale of the Purchased Items to the Buyer or to create in favor of the Buyer a valid and fully perfected first priority security interest in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under the Purchased Items.

USActive 5595045.16

(3) Upon receipt by the Custodian of each Mortgage Note, endorsed in blank by a duly authorized officer of NCCC, NCAH, NCMC, New Century or Home123, as applicable, either a purchase shall have been completed by the Buyer of each Mortgage Note or the Buyer shall have a valid and fully perfected first priority security interest in the applicable Mortgage Note and in such Seller's interest in the related Mortgaged Property.

(4) Upon the filing of financing statements on Form UCC-1 naming the Buyer as the "Secured Party", and NCCC, NCAH, NCMC, New Century and Home123 as the "Debtor" and describing the Purchased Items, in the jurisdictions and recording offices listed on Exhibit IV attached hereto, the security interests granted hereunder in the Purchased Items will constitute valid and fully perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under such Purchased Items, which can be perfected by filing under the Uniform Commercial Code.

(5) Upon execution and delivery of the Account Agreement, the Buyer shall either be the owner of, or have a valid and fully perfected first priority security interest in, all deposit accounts comprising Purchased Items.

(6) With respect to each Purchased Asset, each of the representations and warranties on Schedule 1 is true and correct.

(p) <u>Chief Executive Office/Jurisdiction of Organization</u>. On the Effective Date, and during the four months immediately preceding the Effective Date, each of NCCC's, NCAH's, NCMC's, New Century's and Home123's chief executive office, is, and has been located at, 18400 Von Karman, Suite 1000, Irvine, California 92612. On the Effective Date, each of NCCC's, NCMC's, New Century's and Home123's jurisdiction of organization is California and NCAH's jurisdiction of organization is Delaware.

(q) <u>Location of Books and Records</u>. The location where each of NCCC, NCAH, NCMC, New Century and Home123 keeps its books and records, including all computer tapes and records related to the Purchased Items, is its chief executive office.

(r) <u>Reserved</u>.

(s) <u>Servicing Agreements</u>. The Seller has delivered to the Buyer all Servicing Agreements with respect to the Purchased Assets and no default or event of default exists thereunder.

(t) <u>Existing Financing Facilities</u>. No default or event of default exits under any credit facilities established pursuant to loan and security agreements, repurchase agreements, gestation repurchase agreements, and any other agreements establishing warehouse finance facilities involving the Seller, the Guarantor or their respective Material Subsidiaries which are in effect on the date hereof or any

-37-

similar arrangements now or hereafter existing, including, without limitation, any arrangements under which the Seller, the Guarantor or their respective Material Subsidiaries are required to repurchase mortgage loans from any lender or other counterparty (the "Existing Financing Facilities"). The Seller shall file with the SEC copies of all non-confidential portions of each new Existing Financing Facility to be entered into.

(u) <u>True and Complete Disclosure</u>. (a) The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor to the Buyer in connection with the negotiation, preparation or delivery of this Agreement and the other Repurchase Documents or included herein or therein or delivered pursuant hereto or thereto (other than with respect to the Mortgage Loans), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading. All written information furnished after the date hereof by or on behalf of each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor to the Buyer in connection with this Agreement and the other Repurchase Documents and the transactions contemplated hereby (other than with respect to the Mortgage Loans) and thereby will be true, complete and accurate in every material respect, or (in the case of projections) based on reasonable estimates, on the date as of which such information is stated or certified. There is no fact known to a Responsible Officer of either NCCC, NCAH, NCMC, New Century or Home123, after due inquiry, that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Repurchase Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Buyer for use in connection with the transactions contemplated hereby or thereby.

(v) <u>ERISA</u>. NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and any of their respective ERISA Affiliates are not and will not be in the future, required to contribute to any Plan (including Multiemployer Plans) subject to the applicable provisions of ERISA.

(w) <u>REIT</u>. Neither NCAH nor the Guarantor has engaged in any material "prohibited transactions" as defined in Section 857(b)(6)(B)(iii) and (C) of the Code. Each of NCAH and the Guarantor for their current "tax year" (as defined in the Code) are and for all prior tax years subsequent to their election to be a real estate investment trust have been entitled to a dividends paid deduction under the requirements of Section 857 of the Code with respect to any dividends paid by it with respect to each such year for which it claims a deduction in their Form 1120-REIT filed with the United States Internal Revenue Service for such year.

(x) <u>No Reliance</u>. Each of NCMC, NCAH, NCCC, New Century, Home123 and the Guarantor has made its own independent decision to enter into the Repurchase Documents and each Transaction and as to whether such Transaction is

appropriate and proper for it based upon its own judgment and upon advice from such advisors (including without limitation, legal counsel and accountants) as it has deemed necessary. None of NCMC, NCAH, NCCC, New Century, Home123 or the Guarantor is relying upon any advice from the Buyer as to any aspect of the Transactions, including without limitation, the legal, accounting or tax treatment of such Transactions.

(y) <u>Compliance with Anti-Money Laundering Laws</u>. The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "<u>Anti-Money Laundering Laws</u>"); the Seller has established an adequate anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

(z) <u>Other Security Agreements</u>. The Seller has not become bound under Section 9-203(d) of the UCC by a Security Agreement previously entered into by another Person.

## 11. COVENANTS OF SELLER

On and as of the date of this Agreement and each Purchase Date and until this Agreement is no longer in force with respect to any Transaction, each of NCCC, NCAH, NCMC, New Century and Home123 covenants that it will:

(a) <u>Financial Statements</u>. The Seller shall deliver to the Buyer:

(1) as soon as available and in any event within forty-five (45) calendar days after the end of each calendar month, the unaudited consolidated balance sheets of the Guarantor, the Seller and their consolidated Subsidiaries as of the end of such period and the related unaudited consolidated statements of income and retained earnings and of cash flows for the Guarantor, the Seller and their consolidated Subsidiaries for such period and the portion of the fiscal year through the end of such period, accompanied by a certificate of a Responsible Officer of the Guarantor and the Seller, as applicable, which certificate shall state that said consolidated financial statements fairly present in all material respects the consolidated financial condition and results of operations of the Guarantor or the Seller and its consolidated Subsidiaries, as applicable, in accordance with GAAP, consistently applied, as of the end of, and for, such period (subject to normal year-end adjustments);

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 43 of 121

(2)    as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Guarantor or the Seller, the consolidated balance sheets of the Guarantor and the Seller and their respective consolidated Subsidiaries as of the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Guarantor and the Seller and their respective consolidated Subsidiaries for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Guarantor and the Seller and their respective consolidated Subsidiaries as of the end of, and for, such fiscal year in accordance with GAAP, and a certificate of such accountants stating that, in making the examination necessary for their opinion, they obtained no knowledge, except as specifically stated, of any Default or Event of Default; and

(3)    from time to time such other information regarding the financial condition, operations, or business of the Seller as the Buyer may reasonably request.

The Seller shall furnish to the Buyer, at the time the Seller furnishes each set of financial statements pursuant to paragraphs (a) and (b) above, a certificate of a Responsible Officer of the Seller to the effect that, to the best of such Responsible Officer's knowledge, the Seller during such fiscal period or year has observed or performed in all material respects all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Repurchase Documents to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate (and, if any Default or Event of Default has occurred and is continuing, describing the same in reasonable detail and describing the action the Seller has taken or proposes to take with respect thereto).

(b)    Litigation.  The Seller will promptly, and in any event within ten (10) days after service of process on any of the following, give to the Buyer notice of all litigation, actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are threatened or pending) or other legal or arbitrable proceedings affecting the Seller or any of its Subsidiaries or affecting any of the Property of any of them before any Governmental Authority that (i) questions or challenges the validity or enforceability of any of the Repurchase Documents or any action to be taken in connection with the transactions contemplated hereby, (ii) makes a claim or claims in an aggregate amount greater than $5,000,000 (provided notice with respect to such claim or claims shall be required only upon the Buyer's request), or (iii) which, individually or in the aggregate, if adversely determined, could be reasonably likely to have a Material Adverse Effect.

-40-

(c)     <u>Existence, etc</u>.  Each of NCCC, NCAH, NCMC, New Century and Home123 shall:

(1)     preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises necessary for the operation of its business (provided that nothing in this Section 11(c)(1) shall prohibit any transaction expressly permitted under Section 11(d));

(2)     comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities (including, without limitation, all environmental laws) if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(3)     keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

(4)     not (i) cause or permit any change to be made in its name, organizational identification number, identity or corporate structure, each as described in Section 10(f) or (ii) change its jurisdiction of organization, unless it shall have provided the Buyer thirty (30) days' prior written notice of such change and shall have first taken all action required by the Buyer for the purpose of perfecting or protecting the lien and security interest of the Buyer established hereunder;

(5)     pay and discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained; and

(6)     permit representatives of the Buyer, upon reasonable notice (unless a Default shall have occurred and is continuing, in which case, no prior notice shall be required), during normal business hours, to examine, copy and make extracts from its books and records, to inspect any of its Properties, and to discuss its business and affairs with its officers, all to the extent reasonably requested by the Buyer.

(d)     <u>Restriction on Fundamental Changes</u>.  None of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets; <u>provided</u>, that the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 may merge or consolidate with (i) any wholly owned subsidiary of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123, as applicable, or (ii) any other Person if the Guarantor, NCCC, NCAH, NCMC, New Century or

-41-

Home123 is the surviving corporation; and provided, further, that if after giving effect thereto, no Default would exist hereunder,

(e)     <u>Margin Deficit</u>. If at any time there exists a Margin Deficit, the Seller shall cure the same in accordance with Section 4.

(f)     <u>Notices</u>. The Seller shall give notice to the Buyer:

      (1)     promptly upon receipt of notice or knowledge of the occurrence of any Default or Event of Default;

      (2)     with respect to any Purchased Asset, promptly upon receipt of any principal prepayment (in full or partial) of such Purchased Asset;

      (3)     with respect to any Purchased Asset hereunder, promptly upon receipt of notice or knowledge that the underlying Mortgaged Property has been damaged by waste, fire, earthquake or earth movement, flood, tornado or other casualty, or otherwise damaged so as to affect adversely the Asset Value of such Purchased Asset (provided that the Seller may satisfy its obligations under this clause (3) by causing the Servicer to notify the Buyer of any such damage);

      (4)     promptly upon receipt of notice or knowledge of (i) any material default related to any Purchased Item, (ii) any Lien or security interest on, or claim asserted against, any Purchased Item (other than the Lien created hereby) or (iii) any event or change in circumstances which could reasonably be expected to have a Material Adverse Effect;

      (5)     promptly upon any material change in the market value of any or all of the Seller's assets which could reasonably be expected to have a Material Adverse Effect;

      (6)     [Reserved]

      (7)     upon the termination of any Existing Financing Facility, if such termination would require the Seller to have to file a Form 8-K with the SEC pursuant to the rules governing such filings; provided, however, this notice requirement shall be deemed satisfied once the Seller files the related Form 8-K with the SEC; and

      (8)     promptly upon the occurrence of any default or event of default under the Existing Financing Facilities.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Seller setting forth details of the occurrence referred to therein and stating what action the Seller has taken or proposes to take with respect thereto.

-42-

(g)     Reports.  Within 45 calendar days following the end of each calendar quarter, the Seller shall provide the Buyer with a quarterly report, which report shall include, among other items, (i) a summary of such Seller's delinquency and loss experience with respect to Mortgage Loans serviced by the Seller, any Servicer or any designee of either, operating statements and the occupancy status of such Mortgaged Property and other property level information, including internal quality control reports, (ii) with respect to any MERS Designated Mortgage Loan, MERS Reports, (iii) plus any such additional reports as the Buyer may reasonably request with respect to the Seller or any Servicer's servicing portfolio or pending originations of Mortgage Loans.

(h)     Underwriting Guidelines.  All Eligible Assets will conform with the Underwriting Guidelines.  The Seller shall not make any material change in the Underwriting Guidelines without the prior written consent of the Buyer and shall review the Underwriting Guidelines periodically to confirm that they are being complied with in all material respects and are adequate to meet the Seller's business objectives (and to the extent the Buyer's consent has not yet been obtained, no Mortgage Loan underwritten in accordance with such changed Underwriting Guidelines shall be considered an Eligible Asset).  In the event the Seller makes any amendment or modification to the Underwriting Guidelines, the Seller shall promptly deliver to the Buyer a complete copy of the amended or modified Underwriting Guidelines.

(i)     Transactions with Affiliates.   The Guarantor, NCCC, NCAH, NCMC, New Century and Home123 will not, and will not permit any of their Subsidiaries to, enter into any transaction with an Affiliate of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 (other than another Seller) except transactions in the ordinary course of business on terms no less favorable to the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 than those that would be obtained in an arm's-length transaction.  In no event shall the Seller transfer to the Buyer hereunder any Mortgage Loan acquired by the Seller from an Affiliate of the Seller (other than each other Seller).

(j)     Limitation on Liens.  Immediately upon notice of a Lien or any circumstance which could give rise to a Lien on the Purchased Items to the extent related to the Mortgage Loans, the Seller will defend such Purchased Items against, and will take such other action as is necessary to remove, any Lien, security interest or claim on or to the related Purchased Items (other than any security interest created under this Agreement), and the Seller will defend the right, title and interest of the Buyer in and to any of such Purchased Items against the claims and demands of all persons whomsoever.

(k)     Guarantees. The Guarantor, NCCC, NCAH, NCMC, New Century and Home123 will not create, incur, assume or suffer to exist any Guarantees of any Person other than an Affiliate without ten (10) days' prior written notice to the Buyer of such Guarantee.

(l)     Limitation on Distributions.  After the occurrence and during the continuation of any Default, none of NCCC, NCAH, NCMC, New Century or Home123 shall make any payment on account of, or set apart assets for, a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of any equity or partnership interest of NCCC, NCAH, NCMC, New Century or Home123, as applicable, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of NCCC, NCAH, NCMC, New Century or Home123, as applicable.

(m)     Maintenance of Tangible Net Worth.  The Guarantor will at all times during each fiscal year maintain Tangible Net Worth of not less than the sum of (1) $750,000,000, and (2) fifty percent (50%) of all increases in shareholders' equity in the Guarantor attributable to issuances of common stock and preferred equity since November 1, 2004[; provided, however, that in the event a redemption, repurchase, repayment or other retirement of such preferred equity results in a decrease in shareholders' equity, then any increase in shareholders' equity resulting from the issuance of such preferred equity shall be offset by the amount of such decrease for the purpose of calculating the Tangible Net Worth requirement].

(n)     Minimum Liquidity.  The Seller shall have at all times, on a consolidated basis, Cash, Cash Equivalents and unused borrowing capacity on unencumbered assets that could be drawn against (taking into account the economic terms of committed Existing Financing Facilities, including, without limitation, any margin or overcollateralization requirements) under committed Existing Financing Facilities in an amount equal to not less than $60,000,000.

(o)     Leverage Ratio.  The Guarantor shall not permit the Leverage Ratio of the Guarantor and its consolidated Subsidiaries at any time to be greater than 15:1.

(p)     Servicer; Servicing Tape.  The Seller shall provide to the Buyer and to the Disbursement Agent via Electronic Transmission, a remittance report on a monthly basis by no later than the 12th day of each month (the "Reporting Date") containing servicing information, including without limitation those fields reasonably requested by the Buyer from time to time, on a loan-by-loan basis and in the aggregate, with respect to the Purchased Assets serviced hereunder by the Seller or any Servicer for the month (or any portion thereof) prior to the Reporting Date (such remittance report, an "Asset Tape").  The Seller shall not cause the Mortgage Loans to be serviced by any servicer other than a servicer expressly approved in writing by the Buyer, which approval shall be deemed granted by the Buyer with respect to the Seller with the execution of this Agreement.

(q)     Required Filings.  The Seller shall promptly provide the Buyer with copies of all documents which NCCC, NCAH, NCMC, New Century or Home123 or any Subsidiary of NCCC, NCAH, NCMC, New Century or Home123 is required to file with any regulatory body in accordance with its regulations other than routine

-44-

filings in the ordinary course of business with regulatory bodies (other than the Securities and Exchange Commission (the "SEC")) which related to obtaining or maintaining licenses to do business or corporate qualifications; provided that Seller may satisfy this requirement to provide copies with respect to each such filing with the SEC by sending notice via Electronic Transmission of any filing with the SEC.

(r)     Remittance of Prepayments.  The Seller shall remit or cause to be remitted to the Buyer, with sufficient detail via Electronic Transmission to enable the Buyer to appropriately identify the Mortgage Loan to which any amount remitted applies, all full or partial principal prepayments on any Purchased Asset that the Seller or the Servicer has received on a weekly basis, to be paid on Thursday of the next succeeding week (or the next Business Day).

(s)     Maintenance of Profitability.  The Seller shall not permit, for any two consecutive calendar quarters (each such period, a "Test Period"), Net Income for such Test Period before income taxes for such Test Period and distributions made during such Test Period, to be less than $1.00.

(t)     Independence of Covenants.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default or Default if such action is taken or condition exists.

(u)     [Reserved]

(v)     Reserved.

(w)     Custodial and Disbursement Agreement and Account Agreement.  The Seller shall maintain each of the Custodial and Disbursement Agreement and Account Agreement in full force and effect and shall not amend or modify either of the Custodial and Disbursement Agreement or the Account Agreement or waive compliance with any provisions thereunder without the prior written consent of the Buyer.

(x)     Inconsistent Agreements.  The Guarantor, NCMC, NCAH, NCCC, New Century and Home123 will not, and will not permit any of their Subsidiaries to, directly or indirectly, enter into any agreement containing any provision which would be violated or breached by any Transaction hereunder or by the performance by any of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 of their respective obligations under any Repurchase Document to which it is a party.

(y)     Compliance Report.  The Seller shall provide the Buyer no later than the thirtieth (30th) calendar day of each month a compliance report, in the form of Exhibit X attached hereto, demonstrating therein the calculations the Seller utilized to determine its compliance with the financial covenants set forth in clauses (m), (n), (o) and (s) of this Section 11 as of the end of the immediately preceding month.

USActive 5595045.16

Such compliance report shall be delivered by the Seller to the Buyer in accordance with Section 17 and shall also be delivered by the Seller to the Buyer at 9 West 57th Street, New York, NY 10019, Attn: Michael Friedman, Telecopier No.: (212) 891-6143, Telephone No.: (212) 891-6261.

## 12. EVENTS OF DEFAULT

If any of the following events (each, an "<u>Event of Default</u>") occur, the Seller and the Buyer shall have the rights set forth in Section 13, as applicable:

(a)     the Seller shall default in the payment of any Repurchase Price due or any amount under Section 5 when due (whether at stated maturity, upon acceleration or at mandatory or optional prepayment); or

(b)     the Seller shall default in the payment of any other amount payable by it hereunder or under any other Repurchase Document after notification by the Buyer of such default, and such default shall have continued unremedied for one (1) Business Day; or

(c)     any representation, warranty or certification made or deemed made herein or in any other Repurchase Document by the Seller or any certificate furnished to the Buyer pursuant to the provisions hereof or thereof or any information with respect to the Mortgage Loans furnished in writing by or on behalf of the Seller shall prove to have been false or misleading in any material respect as of the time made or furnished (other than the representations and warranties set forth in <u>Schedule 1</u>, which shall be considered solely for the purpose of determining the Asset Value of the Purchased Assets, unless (i) the Seller shall have made any such representations and warranties with actual knowledge that they were materially false or misleading at the time made; or (ii) any such representations and warranties have been determined in good faith by the Buyer in its sole discretion to be materially false or misleading on a regular basis); or

(d)     the Seller shall fail to comply with the requirements of Section 11(c), Section 11(d), Section 11(e), Section 11(f), Section 11(h) (with respect to the Eligible Assets as a whole and not with respect to any single Eligible Asset) or Sections 11(i) through 11(w); and such default shall continue unremedied for a period of 5 Business Days (30 Business Days in the case of Section 11(h), Section 11(p) and Section 11(r)) from the earlier of (i) a responsible officer of the Seller having knowledge of such default and (ii) the Buyer giving notice to the Seller of such default; or except as otherwise set forth in Sections 12(a), 12(b), 12(c) and 12(d), the Seller shall fail to observe or perform any other covenant or agreement contained in this Agreement or any other Repurchase Document and such failure to observe or perform shall continue unremedied for a period of 30 Business Days (10 Business Days in the case of Section 11(a) and Section 11(y)) from the earlier of (i) a responsible officer of the Seller having knowledge of such default and (ii) the Buyer giving notice to the Seller of such default; or

USActive 5595045.16

Case: 09-05050     Doc# 75-4     Filed: 06/08/10     Entered: 06/08/10 14:45:43     Page 50 of 121

(e)     a final judgment or judgments for the payment of money in excess of $10,000,000 in the aggregate shall be rendered against NCCC, NCAH, NCMC, New Century, Home123 or any of their Affiliates by one or more courts, administrative tribunals or other bodies having jurisdiction and the same shall not be satisfied, discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof; or

(f)     an Act of Insolvency shall have occurred with respect to the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 or any of their Subsidiaries; or

(g)     the Custodial and Disbursement Agreement, the Account Agreement or any Repurchase Document shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by NCCC, NCAH, NCMC, New Century or Home123; or

(h)     NCCC, NCAH, NCMC, New Century or Home123 shall grant, or suffer to exist, any Lien on any Purchased Item (except any Lien in favor of the Buyer); or either the Purchased Items shall not have been sold to the Buyer free and clear of any Liens in favor of any Person other than the Buyer, or the Liens contemplated hereby shall cease or fail to be first priority perfected Liens on any Purchased Items (but not the related Mortgaged Properties) in favor of the Buyer or shall be Liens in favor of any Person other than the Buyer; or

(i)     NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall be in default under (i) any Indebtedness in an amount equal to $10,000,000 or more of NCCC, NCAH, NCMC, New Century or Home123 or of such Material Subsidiary which default (1) involves the failure to pay a matured obligation, or (2) permits the acceleration of the maturity of obligations by any other party to or beneficiary with respect to such Indebtedness, (ii) any other contract to which NCCC, NCAH, NCMC, New Century or Home123 or such Material Subsidiary is a party which default (1) involves the failure to pay a matured obligation in excess of $10,000,000, or (2) permits the acceleration of the maturity of obligations in excess of $10,000,000 by any other party to or beneficiary of such contract, or (iii) any Seller-Related Obligation equal to or in excess of $10,000,000; or

(j)     any material adverse change in the Property, business or financial condition of NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall occur, in each case as determined by the Buyer in its sole good faith discretion, or any other condition shall exist which, in the Buyer's sole good faith discretion, constitutes a material impairment of the Seller's ability to perform its obligations under this Agreement or any other Repurchase Document; or

(k)     if the Buyer has purchased MERS Designated Mortgage Loans the Electronic Tracking Agreement has for whatever reason been terminated or ceases to be in

full force and effect and (1) the Buyer (or the Custodian as its designee) shall not have received an assignment of mortgage with respect to each MERS Designated Mortgage Loan, in blank, in recordable form, but unrecorded within ten (10) days of such termination or (2) a new Electronic Tracking Agreement has not been entered into by the Seller, the Buyer and the Electronic Agent within ten (10) days of such termination; or

(l)      upon any event of default or event which, with the passage of time or expiration of any grace periods, would constitute an event of default under any of the Existing Financing Facilities; or

(m)      a Change of Control shall have occurred; or

(n)      upon the failure of the Guarantor at any time to continue to be (i) qualified as a real estate investment trust as defined in Section 856 of the Code and (ii) entitled to a dividend paid deduction under Section 857 of the Code with respect to dividends paid by it with respect to each taxable year for which it claims a deduction on its Form 1120 – REIT filed with the United States Internal Revenue Service for such year, or the entering into by NCAH or the Guarantor of any material "prohibited transactions" as defined in Sections 857(b) and 856(c) of the Code; or

(o)      upon the failure by the Guarantor to satisfy any of the following asset or income tests:

    (1)      At the close of each taxable year, at least 75 percent of such Person's gross income consists of (i) "rents from real property" within the meaning of Section 856(c)(3)(A) of the Code, (ii) interest on obligations secured by mortgages on real property or on interests in real property, within the meaning of Section 856(c)(3)(B) of the Code, (iii) gain from the sale or other disposition of real property (including interests in real property and interests in mortgages on real property) which is not property described in Section 1221(a)(1) of the Code, within the meaning of Section 856(c)(3)(C) of the Code, (iv) dividends or other distributions on, and gain (other than gain from "prohibited transactions" within the meaning of Section 857(b)(6)(B)(iii) of the Code) from the sale or other disposition of, transferable shares (or transferable certificates of beneficial interest) in other qualifying REITs within the meaning of Section 856(d)(3)(D) of the Code, and (v) amounts described in Sections 856(c)(3)(E) through 856(c)(3)(I) of the Code.

    (2)      At the close of each taxable year, at least 95 percent of such Person's gross income consists of (i) the items of income described in paragraph 1 hereof (other than those described in Section 856(c)(3)(I) of the Code), (ii) gain realized from the sale or other disposition of stock or securities which are not property described in Section 1221(a)(1) of the Code, (iii) interest, (iv) dividends, and (v) income derived from payments to such Person on

-48-

interest rate swap or cap agreements, options, futures contracts, forward rate agreements and other similar financial instruments entered into to reduce the interest rate risks with respect to any indebtedness incurred or to be incurred to acquire or carry real estate assets, or gain from the sale or other disposition of such an investment as described in section 856(c)(5)(G), in each case within the meaning of Section 856(c)(2) of the Code.

(3)     At the close of each quarter of such Person's taxable years, at least 75 percent of the value of such Person's total assets (as determined in accordance with Treasury Regulations Section 1.856-2(d)) has consisted of and will consist of real estate assets within the meaning of Sections 856(c)(4) and 856(c)(5)(B) of the Code, cash and cash items (including receivables which arise in the ordinary course of such Person's operations, but not including receivables purchased from another person), and government securities.

(4)     At the close of each quarter of each of such Person's taxable years, (i) not more than 25 percent of such Person's total asset value will be represented by securities (other than those described in paragraph 3), (ii) not more than 20 percent of such Person's total asset value will be represented by securities of one or more taxable REIT subsidiaries, and (iii) (a) not more than 5 percent of the value of such Person's total assets will be represented by securities of any one issuer (other than Government securities and securities of taxable REIT subsidiaries), and (b) such Person will not hold securities possessing more than 10 percent of the total voting power or value of the outstanding securities of any one issuer (other than government securities, securities of taxable REIT subsidiaries, and securities of a qualified REIT subsidiary within the meaning of Section 856(i) of the Code).

## 13.     REMEDIES

(a)     If an Event of Default occurs, the following rights and remedies are available to the Buyer; provided, that an Event of Default shall be deemed to be continuing unless expressly waived by the Buyer in writing.

(1)     At the option of the Buyer, exercised by written notice to the Seller (which option shall be deemed to have been exercised, even if no notice is given, immediately upon the occurrence of an Act of Insolvency of the Seller), the Repurchase Date for each Transaction hereunder, if it has not already occurred, shall be deemed immediately to occur.  The Buyer shall (except upon the occurrence of an Act of Insolvency of the Seller) give notice to the Seller of the exercise of such option as promptly as practicable.

(2)     If the Buyer exercises or is deemed to have exercised the option referred to in subsection (a)(1) of this Section 13,

USActive 5595045.16

(A)　(i) the Seller's obligations in such Transactions to repurchase all Purchased Assets, at the Repurchase Price therefor on the Repurchase Date, and to pay all other amounts owed by the Seller hereunder, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the Buyer and applied to the aggregate unpaid Repurchase Prices and any other amounts owed by the Seller hereunder, and (iii) the Seller shall immediately deliver to the Buyer any Purchased Assets subject to such Transactions then in NCCC's, NCAH's, NCMC's, New Century's or Home123's possession or control;

(B)　to the extent permitted by applicable law, the Repurchase Price with respect to each such Transaction shall be increased by the aggregate amount obtained by daily application of, on a 360 day per year basis for the actual number of days during the period from and including the date of the exercise or deemed exercise of such option to but excluding the date of payment of the Repurchase Price, (x) the Post-Default Rate to (y) the Repurchase Price for such Transaction as of the Repurchase Date (decreased as of any day by (i) any amounts actually in the possession of the Buyer pursuant to clause (C) of this subsection, (ii) any proceeds from the sale of Purchased Assets applied to the Repurchase Price pursuant to subsection (a)(4) of this Section 13, and (iii) any amounts applied to the Repurchase Price pursuant to subsection (a)(4) of this Section 13); and

(C)　all Income actually received by the Buyer pursuant to Section 5 (excluding any Late Payment Fees paid pursuant to Section 5(b)) shall be applied to the aggregate unpaid Repurchase Price owed by the Seller.

(3)　Upon the occurrence of one or more Events of Default, the Buyer shall have the right to obtain physical possession of the Servicing Records (subject to the provisions of the Custodial and Disbursement Agreement) and all other files of the Seller relating to the Purchased Assets and all documents relating to the Purchased Assets which are then or may thereafter come in to the possession of the Seller or any third party acting for the Seller and the Seller shall deliver to the Buyer such assignments as the Buyer shall request and the Buyer shall have the right to appoint any Person to act as the Servicer for the Purchased Assets. The Buyer shall be entitled to specific performance of all agreements of the Seller contained in the Repurchase Documents.

(4)　At any time on the Business Day following notice to the Seller (which notice may be the notice given under subsection (a)(1) of this Section 13), in the event the Seller has not repurchased all Purchased Assets, the Buyer may (A) immediately sell, without demand or further notice of any kind, at a public or private sale and at such price or prices as the Buyer may deem satisfactory any or all Purchased Assets subject to such Transactions

-50-

hereunder and apply the proceeds thereof to the aggregate unpaid Repurchase Price and any other amounts owing by the Seller hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Assets, to give the Seller credit for such Purchased Assets in an amount equal to the Market Value of the Purchased Assets against the aggregate unpaid Repurchase Price and any other amounts owing by the Seller hereunder. The proceeds of any disposition of Purchased Assets shall be applied first to the costs and expenses incurred by the Buyer in connection with the Seller's default; second to costs of related covering and/or related hedging transactions; third to the Repurchase Price; and fourth to any other outstanding obligations of the Seller to the Buyer or its Affiliates. In connection with any sale pursuant to clause (A) of this subsection (a)(4), the Buyer may (i) sell any such Purchased Assets without giving any warranties and (ii) specifically disclaim or modify any warranties of title or the like, and this procedure shall not be considered to adversely affect the commercial reasonableness of any such sale of the Purchased Assets.

(5) the Seller agrees that the Buyer may obtain an injunction or an order of specific performance to compel the Seller to fulfill its obligations as set forth in Section 24, if the Seller fails or refuses to perform its obligations as set forth therein.

(6) the Seller shall be liable to the Buyer, payable as and when incurred by the Buyer, for (A) the amount of all actual out-of-pocket expenses, including legal or other expenses incurred by the Buyer in connection with or as a consequence of an Event of Default, and (B) all costs incurred in connection with hedging or covering transactions.

(7) the Buyer shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

(b) The Buyer may exercise one or more of the remedies available to the Buyer immediately upon the occurrence of an Event of Default and, except to the extent provided in subsections (a)(1) and (4) of this Section 13, at any time thereafter without notice to the Seller. All rights and remedies arising under this Agreement as amended from time to time hereunder are cumulative and not exclusive of any other rights or remedies which the Buyer may have.

(c) the Buyer may enforce its rights and remedies hereunder without prior judicial process or hearing, and the Seller hereby expressly waives any defenses the Seller might otherwise have to require the Buyer to enforce its rights by judicial process. The Seller also waives any defense (other than a defense of payment or performance) the Seller might otherwise have arising from the use of nonjudicial process, enforcement and sale of all or any portion of the Purchased Items, or from any other election of remedies. The Seller recognizes that nonjudicial

USActive 5595045.16

remedies are consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's-length.

(d)     To the extent permitted by applicable law, the Seller shall be liable to the Buyer for interest on any amounts owing by the Seller hereunder, from the date the Seller becomes liable for such amounts hereunder until such amounts are (i) paid in full by the Seller or (ii) satisfied in full by the exercise of the Buyer's rights hereunder.  Interest on any sum payable by the Seller to the Buyer under this paragraph 13(d) shall be at a rate equal to the Post-Default Rate.

## 14.     INDEMNIFICATION AND EXPENSES

(a)     NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, agree to hold the Buyer and its Affiliates and their present and former respective officers, directors, employees, agents, advisors and other representatives (each an "Indemnified Party") harmless from and indemnify any Indemnified Party against all third party liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (including counsel's fees and disbursements) (collectively, "Costs"), relating to or arising out of this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.  Without limiting the generality of the foregoing, each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Costs with respect to all Mortgage Loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation the federal Truth in Lending Act and/or the federal Real Estate Settlement Procedures Act, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.   In any suit, proceeding or action brought by an Indemnified Party in connection with any Mortgage Loan for any sum owing thereunder, or to enforce any provisions of any Mortgage Loan, each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by NCCC, NCAH, NCMC, New Century or Home123 of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from NCCC, NCAH, NCMC, New Century or Home123.  Each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, also agrees to reimburse an Indemnified Party as and when billed by such Indemnified Party for all the Indemnified Party's costs and expenses incurred in connection with the

-52-

enforcement or the preservation of the Buyer's rights under this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel.

(b)     the Seller agrees to pay as and when billed by the Buyer all of the out-of-pocket costs and expenses (including legal fees) incurred by the Buyer in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement, any other Repurchase Document or any other documents prepared in connection herewith or therewith.  The Seller agrees to pay as and when billed by the Buyer all of the out-of-pocket costs and expenses incurred in connection with the consummation and administration of the transactions contemplated hereby and thereby including without limitation all fees, disbursements and expenses of counsel to the Buyer which amount shall be deducted from the Purchase Price paid for the first Transaction hereunder. Subject to the limitations set forth in Section 28, the Seller agrees to pay the Buyer all the out of pocket due diligence, inspection, appraisals, testing and review costs and expenses incurred by the Buyer with respect to Mortgage Loans submitted by the Seller for purchase under this Agreement, including, but not limited to, those out of pocket costs and expenses incurred by the Buyer pursuant to Sections 28.

## 15.     RECORDING OF COMMUNICATIONS

The Buyer and the Seller shall have the right (but not the obligation) from time to time to make or cause to be made tape recordings of communications between its employees and those of the other party with respect to Transactions upon notice to the other party of such recording.  The Buyer and the Seller consent to the admissibility of such tape recordings in any court, arbitration, or other proceedings.  The parties agree that a duly authenticated transcript of such a tape recording shall be deemed to be a writing conclusively evidencing the parties' agreement.

## 16.     SINGLE AGREEMENT

The Buyer and the Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and that each has been entered into in consideration of the other Transactions.  Accordingly, each of the Buyer and the Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transaction hereunder; (iii) that payments, deliveries, and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries, and other transfers may be

-53-

applied against each other and netted and (iv) to promptly provide notice to the other after any such set off or application.

## 17. NOTICES AND OTHER COMMUNICATIONS

Except as otherwise expressly permitted by this Agreement, all notices, requests and other communications provided for herein and under the Custodial and Disbursement Agreement (including without limitation any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including without limitation by email, telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof or thereof); or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Agreement and except for notices given under Section 3 (which shall be effective only upon receipt), all such communications shall be deemed to have been duly given when transmitted by telecopy or personally delivered or, in the case of a mailed notice, upon receipt.

## 18. ENTIRE AGREEMENT; SEVERABILITY; MODIFICATIONS

This Agreement together with the other Repurchase Documents constitutes the entire understanding between the Buyer and the Seller with respect to the subject matter it covers and shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions involving Purchased Assets. By acceptance of this Agreement, the Buyer and the Seller acknowledge that they have not made, and are not relying upon, any statements, representations, promises or undertakings not contained in this Agreement. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement. No amendment, modification or release from any provision of this Agreement shall be effective unless in writing and executed by or on behalf of the party or parties to be charged therewith and shall be effective only in the specific instance and for the specific purpose for which given.

## 19. NON-ASSIGNABILITY

The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by the Seller or the Buyer without the prior written consent of the other party, and any attempted assignment without such consent shall be null and void. Notwithstanding the foregoing, the Buyer may assign its rights and remedies under this Agreement and under any Transaction without the consent of the Seller (a) to any Affiliate of the Buyer (with notice to the Seller), and (b) in connection with any pledge, rehypothecation or other right permitted pursuant to Section 9. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Nothing in this Agreement express or implied, shall give to any person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement.

-54-

## 20. TERMINABILITY

Except as set forth below, this Agreement may be terminated by the Seller upon giving written notice to the Buyer and payment of the Minimum Pricing Amount except that this Agreement shall, notwithstanding such notice, remain applicable to any Transaction then outstanding; provided that the Repurchase Date for any such Transaction outstanding shall be the earlier to occur of (i) the original Repurchase Date pursuant to the applicable Confirmation and (ii) 20 days from the date of such notice of termination. Each representation and warranty made or deemed to be made by entering into a Transaction, herein or pursuant hereto shall survive the making of such representation and warranty, and the Buyer shall not be deemed to have waived any Default that may arise because any such representation or warranty shall have proved to be false or misleading, notwithstanding that the Buyer may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time the Transaction was made. Notwithstanding any such termination or the occurrence of an Event of Default, all of the representations and warranties and covenants hereunder shall continue and survive. The obligations of the Seller under Section 14 shall survive the termination of this Agreement.

## 21. GOVERNING LAW

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES.**

## 22. SUBMISSION TO JURISDICTION; WAIVERS

**EACH OF BUYER, NCCC, NCAH, NCMC, NEW CENTURY AND HOME123 HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

**(A)      SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER REPURCHASE DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;**

**(B)      CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT VENUE AND AGREES NOT TO PLEAD OR CLAIM THE SAME;**

USActive 5595045.16

**(C)**      **AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH BUYER SHALL HAVE BEEN NOTIFIED;**

**(D)**      **AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION; AND**

**(E)**      **WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER REPURCHASE DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**23.**    **NO WAIVERS, ETC.**

No failure on the part of the Buyer or the Seller to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Repurchase Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Repurchase Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law. An Event of Default shall be deemed to be continuing unless expressly waived by the Buyer in writing.

**24.**    **SERVICING**

(a)    Each of NCCC, NCAH, NCMC, New Century and Home123 covenants to maintain or cause the servicing of the Mortgage Loans to be maintained in conformity with accepted and prudent servicing practices in the industry for the same type of mortgage loans as the Mortgage Loans and in a manner at least equal in quality to the servicing the Seller provides for mortgage loans which it owns. In the event that the preceding language is interpreted as constituting one or more servicing contracts, each such servicing contract shall terminate automatically upon the earliest of (i) an Event of Default, (ii) the date on which this Agreement terminates or (iii) the transfer of servicing approved by the Buyer.

(b)    If the Mortgage Loans are serviced by the Seller, the Seller agrees that the Buyer is the owner of all servicing records, including but not limited to any and all servicing agreements, files, documents, records, data bases, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records, and any other records relating to or evidencing the servicing of the Mortgage Loans (the

-56-

USActive 5595045.16

"Servicing Records"). The Seller covenants to safeguard such Servicing Records and to deliver them promptly to the Buyer or its designee (including the Custodian) at the Buyer's request.

(c)     If the Mortgage Loans are serviced by a person other than the Seller (such third party the "Servicer"), the Seller (i) shall, in accordance with Section (3)(b)(7), provide a copy of the servicing agreement to the Buyer, which shall be in form and substance acceptable to the Buyer (the "Servicing Agreement"), and shall provide a Servicer Notice to the Buyer substantially in the form of Exhibit VIII hereto, fully executed by the Seller and the Servicer; and (ii) hereby irrevocably assigns to the Buyer and the Buyer's successors and assigns all right, title and interest of the Seller in, to and under, and the benefits of, any Servicing Agreement with respect to the Mortgage Loans. The Seller agrees that no Person shall assume the servicing obligations with respect to the Mortgage Loans as successor to the Servicer unless such successor is approved in writing by the Buyer prior to such assumption of servicing obligations.

(d)     If the servicer of the Mortgage Loans is the Seller, upon the occurrence of an Event of Default, the Buyer shall have the right to terminate the Seller as servicer of the Mortgage Loans and transfer servicing to the Buyer's designated Servicer, at no cost or expense to the Buyer, at any time thereafter. If the Servicer of the Mortgage Loans is not the Seller, the Buyer shall have the right, as contemplated in the applicable Servicer Notice, upon the occurrence of an Event of Default, to terminate any applicable Servicing Agreement and transfer servicing to the Buyer's designated Servicer, at no cost or expense to the Buyer, it being agreed that the Seller will pay any and all fees required to terminate such Servicing Agreement and to effectuate the transfer of servicing to the Buyer's designated Servicer, as well as any servicing fees and expenses payable to such Servicer.

(e)     After the Purchase Date, until the repurchase of any Mortgage Loan, the Seller will have no right to modify or alter the terms of such Mortgage Loan and the Seller will have no obligation or right to repossess such Mortgage Loan or substitute another Mortgage Loan, in each case except as provided in the Custodial and Disbursement Agreement.

(f)     In the event the Seller or its Affiliate is servicing the Mortgage Loans, the Seller shall permit the Buyer to inspect the Seller's or its Affiliate's servicing facilities, as the case may be, for the purpose of satisfying the Buyer that the Seller or its Affiliate, as the case may be, has the ability to service the Mortgage Loans as provided in this Agreement.

## 25.   INTENT

(a)     The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Purchased Assets subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a

USActive 5595045.16

Case: 09-05050   Doc# 75-4   Filed: 06/08/10   Entered: 06/08/10 14:45:43   Page 61 of 121

"securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of Purchased Assets subject to such Transaction would render such definition inapplicable).

(b)     It is understood that either party's right to liquidate Purchased Assets delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Section 16 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c)     The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of Purchased Assets subject to such Transaction would render such definition inapplicable).

(d)     It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA or regulations promulgated thereunder).

## 26.    BUYER'S REPRESENTATIONS

The Buyer represents and warrants to the Seller that as of the Effective Date and as of the Repurchase Date for the repurchase of any Purchased Assets by the Seller from the Buyer hereunder:

(a)     Action.  The Buyer has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Repurchase Documents to which it is a party; the execution, delivery and performance by the Buyer of each of the Repurchase Documents to which it is a party have been duly authorized by all necessary corporate or other action on its part; and each Repurchase Document to which it is  a party has been duly and validly executed and delivered by the Buyer, and constitutes a legal, valid and binding obligation of the Buyer, enforceable against the Buyer, in accordance with its terms.

(b)     Approvals.   No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery or performance by the Buyer of the Repurchase Documents to which it is a party or for the legality, validity or enforceability thereof, except for filings and recordings in respect of the Liens created pursuant to the Repurchase Documents.

-58-

(c)    <u>No Breach</u>.  Neither (a) the execution and delivery of the Repurchase Documents nor (b) the consummation of the transactions therein contemplated to be entered into by the Buyer in compliance with the terms and provisions thereof will conflict with or result in a breach of the organizational documents of the Buyer, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority or other material agreement or instrument to which the Buyer or any of its Subsidiaries is a party or by which the Buyer or any of its Property is bound or to which the Buyer is subject, or constitute a default under any such material agreement or instrument or result in the creation or imposition of any Lien upon any Property of the Buyer, or any of its respective Subsidiaries pursuant to the terms of any such agreement or instrument.

(d)    <u>Purchased Assets</u>. Immediately prior to the repurchase of any Purchased Assets by the Seller, the Buyer was the sole owner of such Purchased Assets and had good and marketable title thereto, free and clear of all Liens, in each case except for Liens to be released simultaneously with the repurchase by the Seller hereunder.

## 27. NETTING

If the Buyer and the Seller are "financial institutions" as now or hereinafter defined in Section 4402 of Title 12 of the United States Code ("Section 4402") and any rules or regulations promulgated thereunder,

(a)    All amounts to be paid or advanced by one party to or on behalf of the other under this Agreement or any Transaction hereunder shall be deemed to be "payment obligations" and all amounts to be received by or on behalf of one party from the other under this Agreement or any Transaction hereunder shall be deemed to be "payment entitlements" within the meaning of Section 4402, and this Agreement shall be deemed to be a "netting contract" as defined in Section 4402.

(b)    The payment obligations and the payment entitlements of the parties hereto pursuant to this Agreement and any Transaction hereunder shall be netted as follows.  In the event that either party (the "<u>Defaulting Party</u>") shall fail to honor any payment obligation under this Agreement or any Transaction hereunder, the other party (the "<u>Nondefaulting Party</u>") shall be entitled to reduce the amount of any payment to be made by the Nondefaulting Party to the Defaulting Party by the amount of the payment obligation that the Defaulting Party failed to honor.

## 28. PERIODIC DUE DILIGENCE REVIEW

The Seller acknowledges that the Buyer has the right to perform continuing due diligence reviews with respect to the Mortgage Loans, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and the Seller agrees that upon reasonable (but no less than one (1) Business Day's) prior notice unless an Event of Default shall have occurred, in which case no notice is required, to the Seller, the Buyer or its authorized representatives will be permitted during normal

-59-

business hours to examine, inspect, and make copies and extracts of, the Mortgage Files and any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession or under the control of the Seller and/or the Custodian. The Seller also shall make available to the Buyer a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Mortgage Files and the Mortgage Loans. Without limiting the generality of the foregoing, the Seller acknowledges that the Buyer may purchase Mortgage Loans from the Seller based solely upon the information provided by the Seller to the Buyer in the Seller Asset Schedule and the representations, warranties and covenants contained herein, and that the Buyer, at its option, has the right at any time to conduct a partial or complete due diligence review on some or all of the Mortgage Loans purchased in a Transaction, including without limitation ordering new credit reports and new appraisals on the related Mortgaged Properties and otherwise re-generating the information used to originate such Mortgage Loan. The Buyer may underwrite such Mortgage Loans itself or engage a mutually agreed upon third party underwriter to perform such underwriting. The Seller agrees to cooperate with the Buyer and any third party underwriter in connection with such underwriting, including, but not limited to, providing the Buyer and any third party underwriter with access to any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession, or under the control, of the Seller. The Buyer shall pay all out-of-pocket costs and expenses incurred by the Buyer in connection with the Buyer's activities pursuant to this Section 28 ("Due Diligence Costs"); provided that, (i) in the event that a Default or an Event of Default shall have occurred or (ii) in the event that the Buyer shall determine the need to confirm compliance with local, state or federal laws concerning the regulation of predatory lending practices, the Seller shall reimburse the Buyer for all Due Diligence Costs for any and all reasonable out-of-pocket costs and expenses incurred by the Buyer in connection with the Buyer's activities pursuant to this Section 28; provided further, that the Buyer shall not be obligated to pay such costs and expenses in any 12-month period in excess of $50,000 unless an Event of Default shall have occurred.

## 29. BUYER'S APPOINTMENT AS ATTORNEY-IN-FACT

(a) Each of NCCC, NCAH, NCMC, New Century and Home123 hereby irrevocably constitutes and appoints the Buyer and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Seller and in the name of the Seller or in its own name, from time to time in the Buyer's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, the Seller hereby gives the Buyer the power and right, on behalf of the Seller, without assent by, but with notice to, the Seller, to do the following:

(1) in the name of the Seller, or in its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under

-60-

any mortgage insurance with respect to a Purchased Item or with respect to any other Purchased Items and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Buyer for the purpose of collecting any and all such moneys due under any such mortgage insurance with respect to a Purchased Item or with respect to any other Purchased Items whenever payable;

(2) to pay or discharge taxes and Liens levied or placed on or threatened against the Purchased Items;

(3) (A) to direct any party liable for any payment under any Purchased Items to make payment of any and all moneys due or to become due thereunder directly to the Buyer or as the Buyer shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Purchased Items; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Purchased Items; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Purchased Items or any proceeds thereof and to enforce any other right in respect of any Purchased Items; (E) to defend any suit, action or proceeding brought against the Seller with respect to any Purchased Items; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Buyer may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Purchased Items as fully and completely as though the Buyer were the absolute owner thereof for all purposes, and to do, at the Buyer's option and the Seller's expense, at any time, and from time to time, all acts and things which the Buyer deems necessary to protect, preserve or realize upon the Purchased Items and the Buyer's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as such the Seller might do;

(4) after a Default or an Event of Default, to direct the actions of the Custodian with respect to the Purchased Items under the Custodial and Disbursement Agreement; and

(5) to execute, from time to time, in connection with any sale provided for in Section 13, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Purchased Items.

Each of NCCC, NCAH, NCMC, New Century and Home123 hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable. Until the occurrence of a Default or Event of Default, the Buyer shall not direct a Servicer in its servicing of the

-61-

Purchased Assets or commence any servicing actions with respect to the Mortgage Loans pursuant to this Section 29(a). Neither the Buyer nor any of its officers, directors, employers or agents shall be responsible to the Seller for any failure to act hereunder prior to a Default or Event of Default.

(b)     The powers conferred on the Buyer hereunder are solely to protect the Buyer's interests in the Purchased Items and Purchased Assets and shall not impose any duty upon it to exercise any such powers. The Buyer shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Seller for any act or failure to act hereunder, except for its or their own gross negligence or willful misconduct.

## 30.     MISCELLANEOUS

(a)     If there is any conflict between the terms of this Agreement or any Transaction entered into hereunder and the Custodial and Disbursement Agreement, this Agreement shall prevail.

(b)     This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

(c)     The captions and headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

(d)     Each of NCCC, NCAH, NCMC, New Century and Home123 hereby acknowledges that:

(1)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Repurchase Documents;

(2)     the Buyer has no fiduciary relationship to the Seller; and

(3)     no joint venture exists between the Buyer and the Seller.

## 31.     CONFIDENTIALITY

Each of the Seller and the Buyer hereby acknowledges and agrees that all information regarding the terms set forth in any of the Repurchase Documents or the Transactions contemplated thereby (the "Confidential Terms") shall be kept confidential and shall not be divulged to any party without the prior written consent of such other party except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies or regulatory bodies or in order to comply with any applicable federal or state laws, (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant, (iii) in the event of a Default or an Event of Default, the Buyer determines such information to be necessary or

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 66 of 121

desirable to disclose in connection with the re-hypothecation or marketing and sales of the Purchased Assets or to enforce or exercise the Buyer's rights hereunder. The provisions set forth in this Section 31 shall survive the termination of this Agreement for a period of one year following such termination. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Repurchase Document, the parties hereto may disclose to any and all Persons, without limitation of any kind, the federal income tax treatment of the Transactions, any fact relevant to understanding the federal tax treatment of the Transactions, and all materials of any kind (including opinions or other tax analyses) relating to such federal income tax treatment; provided that the Seller may not disclose the name of or identifying information with respect to the Buyer or any pricing terms (including, without limitation, the Pricing Spread, Purchase Percentage and Purchase Price) or other nonpublic business or financial information (including any sublimits and financial covenants) that is unrelated to the purported or claimed federal income tax treatment of the Transactions and is not relevant to understanding the purported or claimed federal income tax treatment of the Transactions, without the prior written consent of the Buyer. The Buyer acknowledges that this Agreement will be filed with the SEC.

**32. CONFLICTS**

In the event of any conflict among the terms of this Agreement, any other Repurchase Document and any Confirmation, the documents shall control in the following order of priority:  first, the terms of the Confirmation shall prevail, then the terms of this Agreement shall prevail, and then the terms of the other Repurchase Documents shall prevail.

**33. SET-OFF**

In addition to any rights and remedies of the Buyer provided by this Agreement and by law, the Buyer shall have the right, without prior notice to the Seller, any such notice being expressly waived by the Seller to the extent permitted by applicable law, upon any amount becoming due and payable by the Seller to the Buyer hereunder or otherwise (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all monies and other property of the Seller, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any and all other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, and in each case at any time held or owing by the Buyer or any Affiliate thereof to or for the credit or the account of the Seller. The Buyer agrees promptly to notify the Seller after any such set-off and application made by the Buyer; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**34. OBLIGATIONS JOINT AND SEVERAL**

(a) Each of NCCC, NCAH, NCMC, New Century and Home123 hereby acknowledges and agrees that it shall be jointly and severally liable to the Buyer

-63-

for all representations, warranties, covenants, obligations and indemnities of the Seller hereunder.

(b)    Each Seller waives any and all notice of the creation, renewal, extension or accrual of any of the Repurchase Obligations and notice of or proof of reliance by the Buyer upon the obligations of such Seller set forth herein or acceptance of such obligations by such Seller hereunder.    Each Seller waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon each other Seller with respect to the Repurchase Obligations.    Each Seller's obligations shall be construed as continuing, absolute and unconditional obligations without regard to  (i) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Seller against the Buyer, or (ii) any other circumstance whatsoever (with or without notice to or knowledge of any Seller) which constitutes, or might be construed to constitute, an equitable or legal discharge of such Seller for the Repurchase Obligations.    Each Seller hereby waives any defense arising by reason of, and any and all right to assert against the Buyer any claim or defense based upon, an election of remedies by the Buyer which in any manner impairs, affects, reduces, releases, destroys and/or extinguishes such Seller's subrogation rights, rights to proceed against such Seller or any other party for reimbursement or contribution, and/or any other rights of such Seller to proceed against any other Seller, against any other guarantor, or against any other person or security.

(c)    The parties intend that each of NCCC's, NCAH's, NCMC's, New Century's and Home 123's Repurchase Obligations are primary obligations and not in the nature of a guaranty or suretyship.

[SIGNATURE PAGE FOLLOWS]

USActive 5595045.16

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date set forth above.

BUYER:

**IXIS REAL ESTATE CAPITAL INC.**

By: _____
Name:  ANTHONY MALANGA
Title:  MANAGING DIRECTOR

By: _____
Name:  Christopher Hayden
Title:  Managing Director

Address for Notices:
9 West 57th Street
New York, NY 10019
Attn: Ray Sullivan
Telecopier No.: (212) 891-3347
Telephone No.: (212) 891-5815
Email: r.sullivan@ixiscm.com

with a copy to:
9 West 57th Street
New York, NY 10019
Attn: Al Zakes, Esq., General Counsel
Telecopier No.: (212) 891-1922
Telephone No.: (212) 891-6137
Email: albert.zakes@ixiscm.com

and with a copy to:
9 West 57th Street
New York, NY 10019
Attn: Michael Friedman
Telecopier No.: (212) 891-6143
Telephone No.: (212) 891-6261
Email: m.friedman@ixiscm.com

(Ixis-New Century Master Purchase Agreement)

SELLER:

**NEW CENTURY MORTGAGE CORPORATION**

By: _____

Name: KEVIN CLOYD

Title: EXECUTIVE VICE PRESIDENT


Address for Notices:

    18400 Von Karman, Suite 1000

    Irvine, California 92612

    Attn: General Counsel

    Telecopier No.: (949) 440-7033

    Telephone No: (949) 225-7808


**NC CAPITAL CORPORATION**

By: _____

Name: Kevin Cloyd

Title: President


Address for Notices:

    18400 Von Karman, Suite 1000

    Irvine, California 92612

    Attn: General Counsel

    Telecopier No.: (949) 440-7033

    Telephone No: (949) 225-7808

(Ixis-New Century Master Purchase Agreement)

**NC ASSET HOLDING, L.P.**

**By: NC DELTEX, its general partner**

**By: NC CAPITAL CORPORATION, its sole member**

By: _____
   Name:      Kevin Cloyd
   Title:      President

Address for Notices:
   18400 Von Karman, Suite 1000
   Irvine, California 92612
   Attn: General Counsel
   Telecopier No.: (949) 440-7033
   Telephone No: (949) 225-7808

**NEW CENTURY CREDIT CORPORATION**

By: _____
   Name:      Kevin Cloyd
   Title:      President

Address for Notices:
   18400 Von Karman, Suite 1000
   Irvine, California 92612
   Attn: General Counsel
   Telecopier No.: (949) 440-7033
   Telephone No: (949) 225-7808

(Ixis-New Century Master Purchase Agreement)

**HOME123 CORPORATION**

By: _____

Name:   KEVIN CLOYD

Title:   EXECUTIVE VICE PRESIDENT

<u>Address for Notices:</u>

18400 Von Karman, Suite 1000

Irvine, California 92612

Attn:  General Counsel

Telecopier No.:  (949) 440-7033

Telephone No:  (949) 225-7808

The undersigned guarantor hereby (a) consents and agrees to the foregoing Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "Repurchase Agreement"), and (b) acknowledges that the terms of the Repurchase Agreement shall be covered by the Guaranty, as defined therein:

NEW CENTURY FINANCIAL CORPORATION

By: _____
Name: KEVIN CLOYD
Title: EXECUTIVE VICE PRESIDENT

By: _____
Name: Brad A. Morrice
Title: President & CEO

**REPRESENTATIONS AND WARRANTIES RE:  MORTGAGE LOANS**

**Part I:  Residential Mortgage Loans**

For purposes of this Schedule 1 and the representations and warranties set forth herein, a breach of a representation or warranty shall be deemed to have been cured with respect to a Mortgage Loan if and when the Seller has taken or caused to be taken action such that the event, circumstance or condition that gave rise to such breach no longer adversely affects such Mortgage Loan.

Each of NCCC, NCAH, NCMC, New Century and Home123 represents and warrants to the Buyer, with respect to each Mortgage Loan, that as of the Purchase Date for the purchase of any Purchased Assets by the Buyer from the Seller and as of the date of this Agreement and any Transaction hereunder and at all times while the Repurchase Documents and any Transaction hereunder is in full force and effect:

(1)  Mortgage Loans as Described.  The information set forth in the Seller Asset Schedule is complete, true and correct;

(2)  Payments Current.  All payments required to be made up to the related Purchase Date for the Mortgage Loan under the terms of the Mortgage Note have been made and credited.  No payment required under the Mortgage Loan is delinquent nor has any payment under the Mortgage Loan been delinquent for 30 days or more than once in the 12 months preceding the related Purchase Date.  In no event has a payment been more than 59 days delinquent for such Mortgage Loan.  The first Monthly Payment shall be made, or shall have been made, with respect to the Mortgage Loan on its Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note;

(3)  No Outstanding Charges.  There are no defaults in complying with the terms of the Mortgage securing the Mortgage Loan, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.  Except for (A) payments in the nature of escrow payments and (B) interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is greater to the day which precedes by one month the Due Date of the first installment of principal and interest, including, without limitation, taxes and insurance payments, the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the

Sch. 1-1

Mortgagor, directly or indirectly, for the payment of any amount required under the Mortgage Loan.  No escrow account has a material imbalance;

(4)     Original Terms Unmodified.  The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by a written instrument which has been recorded, if necessary, to protect the interests of the Buyer and which has been delivered to the Custodian and the terms of which are reflected in the Seller Asset Schedule.  The substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the policy, and its terms are reflected on the Seller Asset Schedule.  No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File delivered to the Custodian and the terms of which are reflected in the Seller Asset Schedule;

(5)     No Defenses.  The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at, or subsequent to, the time the Mortgage Loan was originated;

(6)     Hazard Insurance.  Pursuant to the terms of the Mortgage, all buildings or other improvements upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located pursuant to insurance policies conforming to the requirements of Fannie Mae and Freddie Mac in an amount not less than the greater of (i) 100% of the replacement cost of all improvements to the Mortgaged Property or (ii) the outstanding principal balance of the Mortgage Loan, but in any event at least equal to the amount necessary to avoid the operation of any co-insurance provisions with respect to the Mortgaged Property, and consistent with the amount that would have been required as of the date of origination in accordance with the requirement of Fannie Mae and Freddie Mac.  If upon origination of the Mortgage Loan, the Mortgaged Property was in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), a flood insurance policy meeting the requirements of the current guidelines of the Federal Flood Insurance Administration is in effect

Sch. 1-2

which policy conforms to the requirements of Fannie Mae and Freddie Mac. All individual insurance policies contain a standard mortgagee clause naming the Seller and its successors and assigns as mortgagee, and all premiums thereon have been paid and such policies may not be reduced, terminated or cancelled without 30 days' prior written notice to the mortgagee. The Mortgage obligates the Mortgagor thereunder to maintain the hazard insurance policy at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Mortgagor's cost and expense, and to seek reimbursement therefor from the Mortgagor. Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering the common facilities of a planned unit development. The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Buyer upon the consummation of the transactions contemplated by this Agreement. The Seller has not engaged in, and has no knowledge of the Mortgagor's or any subservicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for therein, or the validity and binding effect of either, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Seller;

(7)  <u>Compliance with Applicable Laws</u>.  Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending, equal credit opportunity and disclosure laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to prepayment penalties, have been complied with, the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations and the Seller shall maintain in its possession, available for the Buyer's inspection, and shall deliver to the Buyer upon demand, evidence of compliance with all such requirements;

(8)  <u>No Satisfaction of Mortgage</u>.  The Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. The Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage

Sch. 1-3

Loan to be in default, nor has the Seller waived any default resulting from any action or inaction by the Mortgagor;

(9) <u>Location and Type of Mortgaged Property</u>.  The Mortgaged Property is a fee simple property located in the state identified in the Seller Asset Schedule, the mortgaged property consists of a single parcel of real property with a detached single family residence erected thereon, or a two- to four-family dwelling, or an individual residential condominium unit in a low-rise condominium project, or an individual unit in a planned unit development, a manufactured home, provided, however, that any condominium unit or planned unit development shall not fall within any of the "Ineligible Projects" of part XII, Section 102 of the Fannie Mae Selling Guide and shall conform with the Underwriting Guidelines.  In the case of any Mortgaged Properties that are manufactured homes (a "<u>Manufactured Home Mortgage Loan</u>"), (i) such Manufactured Home Mortgage Loan conforms with the applicable Fannie Mae or Freddie Mac requirements regarding mortgage loans related to manufactured dwellings, (ii) the related manufactured dwelling is permanently affixed to the land, (iii) the related manufactured dwelling and the related land are subject to a Mortgage properly filed in the appropriate public recording office and naming the Seller (or in the case of MERS Designated Mortgage Loans, MERS) as mortgagee, (iv) the applicable laws of the jurisdiction in which the related Mortgaged Property is located will deem the manufactured dwelling located on such Mortgaged Property to be a part of the real property on which such dwelling is located, (v) such Manufactured Home Mortgage Loan is (x) a qualified mortgage under Section 860G(a)(3) of the Internal Revenue Code of 1986, as amended and (y) secured by manufactured housing treated as a single family residence under Section 25(e)(10) of the Code (i.e., such manufactured home has a minimum of 400 square feet of living space, a minimum width in excess of 102 inches and which is of a kind customarily used at a fixed location) and (vi) as of the origination date of the related Mortgage Loan, the related Mortgagor occupied the related manufactured home as its primary residence.  No portion of the Mortgaged Property is used for commercial purposes; provided, that Mortgaged Properties which contain a home office shall not be considered as being used for commercial purposes as long as the Mortgaged Property has not been altered for commercial purposes and is not storing any chemicals or raw materials other than those commonly used for homeowner repair, maintenance and/or household purposes;

(10) <u>Valid First or Second Lien</u>.  The Mortgage is a valid, subsisting, enforceable and perfected first or second lien and first or second priority security interest on the Mortgaged Property, including all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any

Sch. 1-4

time with respect to the foregoing. The lien of the Mortgage is subject only to:

> (A) the lien of current real property taxes and assessments not yet due and payable;

> (B) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and (i) referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan or (ii) which do not adversely affect the appraised value of the Mortgaged Property set forth in such appraisal;

> (C) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property; and

> (D) with respect to each Second Lien Mortgage Loan, a prior mortgage lien on the Mortgaged Property.

Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting and enforceable (A) first lien and first priority perfected security interest with respect to each First Lien Mortgage Loan, or (B) second lien and second priority perfected security interest with respect to each Second Lien Mortgage Loan, in either case on the property described therein and the Seller has full right to sell and assign the same to the Buyer. The Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(11) <u>Validity of Mortgage Loan Documents</u>. The Mortgage Note, the Mortgage and any other agreement executed and delivered by a Mortgagor or guarantor, if applicable, in connection with the Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Mortgage Note, the Mortgage and any other related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any other related agreement, and the Mortgage Note, the Mortgage and any other related agreement have been duly and properly executed by such parties. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the information and

Sch. 1-5

statements therein not misleading. No fraud, error, negligence, misrepresentation or omission of fact with respect to a Mortgage Loan has taken place on the part of the Seller or the Mortgagor or any other party involved in the origination or servicing of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(12) <u>Full Disbursement of Proceeds</u>. The Mortgage Loan has been closed and the proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(13) <u>Ownership</u>. The Seller is the sole owner of record and holder of the Mortgage Loan. The Mortgage Loan is not assigned or pledged, and the Seller has good, indefeasible and marketable title thereto, and has full right to transfer and sell the Mortgage Loan therein to the Buyer free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest, and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan pursuant to this Agreement and following the sale of each Mortgage Loan, the Buyer will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest;

(14) <u>Doing Business</u>. All parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) organized under the laws of such state, or (3) qualified to do business in such state, or (4) federal savings and loan associations or national banks having principal offices in such state, or (5) not doing business in such state;

(15) <u>LTV; CLTV; FICO</u>. No First Lien Mortgage Loan has a LTV greater than 100%, and no Second Lien Mortgage Loan has a CLTV, greater than 100%. At origination of the Mortgage Loan, the Mortgagor did not have a FICO score of less than 500.

(16) <u>Title Insurance</u>. The Mortgage Loan is covered by an ALTA lender's title insurance policy or, with respect to Mortgaged Properties located in

Sch. 1-6

California, a CLTA lender's title insurance policy, or other generally acceptable form of policy of insurance acceptable to Fannie Mae or Freddie Mac, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Seller, its successors and assigns, as to the first or second priority lien of the Mortgage in the original principal amount of the Mortgage Loan, and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment, subject only to the exceptions contained in clauses (A), (B), and (C), and with respect to each Second Lien Mortgage Loan clause (D) of Paragraph (10) of this <u>Schedule I</u>. Where required by state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of the required mortgage title insurance. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The title policy does not contain any special exceptions (other than the standard exclusions) for zoning and uses and has been marked to delete the standard survey exception or to replace the standard survey exception with a specific survey reading. The Seller, its successors and assigns is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder or servicer of the Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other Person, and no such unlawful items have been received, retained or realized by the Seller;

(17)   <u>No Defaults</u>.   There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor its predecessors have waived any default, breach, violation or event of acceleration. With respect to each Second Lien Mortgage Loan, (i) the prior mortgage is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such prior mortgage or the related mortgage note, (iii) there is no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the prior mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the Second Lien Mortgage Loan to receive

Sch. 1-7

notice of, and affords such mortgagee an opportunity to cure any default by payment in full or otherwise under the prior mortgage;

(18)    No Mechanics' Liens.  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(19)    Location of Improvements; No Encroachments.  All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property.  No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning and building law, ordinance or regulation;

(20)    Origination:  Payment Terms. At the time the Mortgage Loan was originated either (a) the originator was a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act or a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a Federal or State authority, or (b) the following requirements have been met with respect to the Mortgage Loan: the Seller meets the requirements set forth in clause (a), and (i) such Mortgage Loan was underwritten in accordance with standards established by the Seller, using application forms and related credit documents approved by the Seller, (ii) the Seller approved each application and the related credit documents before a commitment by the correspondent was issued, and no such commitment was issued until the Seller agreed to fund such Mortgage Loan, (iii) the closing documents for such Mortgage Loan were prepared on forms approved by the Seller, and (iv) such Mortgage Loan was actually funded by the Seller or was purchased by the Seller at closing or soon thereafter.   No Mortgage Loan contains terms or provisions which would result in negative amortization.  Unless such Mortgage Loan is an Interest-Only Loan, principal payments on the Mortgage Loan commenced no more than 60 days after funds were disbursed in connection with the Mortgage Loan.  The Mortgage Interest Rate is adjusted, with respect to adjustable rate Mortgage Loans, on each Interest Rate Adjustment Date to equal the applicable index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Maximum Mortgage Interest Rate.  Unless such Mortgage Loan is an Interest-Only Loan, the Mortgage Note is payable on the first day of each month in equal monthly installments of principal and interest, which installments of interest, with respect to adjustable rate Mortgage Loans, are subject to change due to the adjustments to the Mortgage Interest Rate on each Interest Rate Adjustment Date, with interest calculated and

Sch. 1-8

payable in arrears, sufficient to amortize the Mortgage Loan, unless such Mortgage Loan is an Interest-Only Loan, fully by the stated maturity date, over an original term of not more than 30 years (other than with respect to 40/30 Mortgage Loans or 50/30 Mortgage Loans) from commencement of amortization. The due date of the first payment under the Mortgage Note is no more than 60 days from the date of the Mortgage Note;

(21)     <u>Customary Provisions</u>.  The Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and marketable title to the Mortgaged Property.  There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption;

(22)     <u>Conformance with Underwriting Guidelines and Agency Standards</u>.  The Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time the Mortgage Loan was originated, a copy of which underwriting guidelines are attached as <u>Exhibit II</u> hereto.  The Mortgage Note and the Mortgage are on forms acceptable to Fannie Mae or Freddie Mac and the Seller has not made any representations to a Mortgagor that are inconsistent with the mortgage instruments used;

(23)     <u>Occupancy of the Mortgaged Property</u>.  As of the related Purchase Date, the Mortgaged Property is lawfully occupied under applicable law.  All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities.  The Seller has not received notification from any Governmental Authority that the Mortgaged Property is in material non-compliance with such laws or regulations, is being used, operated or occupied unlawfully or has failed to have or obtain such inspection, licenses or certificates, as the case may be.  The Seller has not received notice of any violation or failure to conform with any such law, ordinance, regulation, standard, license or certificate;

(24)     <u>No Additional Collateral</u>.  The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage

Sch. 1-9

and the security interest of any applicable security agreement or chattel mortgage referred to in Paragraph (10) above;

(25) <u>Deeds of Trust</u>. In the event the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Custodian or the Buyer to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(26) <u>Acceptable Investment</u>. The Mortgagor is not in bankruptcy or insolvent and the Seller has no knowledge of any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan. No Mortgaged Property is located in a state, city, county or other local jurisdiction which the Buyer has determined in its sole good faith discretion would cause the related Mortgage Loan to be ineligible for whole loan sale or securitization in a transaction consistent with the prevailing sale and securitization industry (including, without limitation, the practice of the rating agencies) with respect to substantially similar mortgage loans;

(27) <u>Delivery of Mortgage Loan Documents</u>. Other than with respect to the Wet-Ink Mortgage Loans, the Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered by the Seller under this Agreement have been delivered to the Buyer or its Custodian. The Seller is in possession of a complete, true and accurate Mortgage File in compliance with Section 2 of the Custodial and Disbursement Agreement, except for such documents the originals of which have been delivered to the Buyer or its Custodian;

(28) <u>Due on Sale</u>. The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the Mortgagee thereunder;

(29) <u>Transfer of Mortgage Loans</u>. The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(30) <u>No Buydown Provisions; No Graduated Payments or Contingent Interests</u>. The Mortgage Loan does not contain provisions pursuant to which Monthly Payments are paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor or anyone on

Sch. 1-10

behalf of the Mortgagor, or paid by any source other than the Mortgagor nor does it contain any other similar provisions currently in effect which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(31)     <u>Consolidation of Future Advances</u>.  Any future advances made prior to the related Purchase Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term.   The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae and Freddie Mac.  The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(32)     <u>Mortgaged Property Undamaged</u>.   There is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property.   The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended;

(33)     <u>Collection Practices; Escrow Deposits; Adjustable Rate Mortgage Loan Adjustments</u>.  The origination and collection practices used with respect to the Mortgage Loan have been in accordance with Accepted Servicing Practices and in all respects in compliance with all applicable laws and regulations.  With respect to escrow deposits and Escrow Payments (other than with respect to Second Lien Mortgage Loans for which the mortgagee under the prior mortgage lien is collecting Escrow Payments), all such payments are in the possession of the Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. Each Mortgage Loan is covered by a life of loan tax service contract.  All Escrow Payments have been collected in full compliance with state and federal laws.  An escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every item which remains unpaid and which has been assessed but is not yet due and payable.  No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under the Mortgage or the Mortgage Note.  All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal laws and the terms of the related Mortgage Note.  Any interest required to be paid pursuant to state and local laws has been properly paid and credited;

Sch. 1-11

(34) <u>Appraisal</u>.  Except with respect to AVM Mortgage Loans, the Servicing File includes an appraisal of the Mortgaged Property signed prior to the approval of the Mortgage application by an appraiser qualified under Fannie Mae and Freddie Mac guidelines who (i) is licensed in the state where the Mortgaged Property is located, (ii) has no interest, direct or indirect, in the Mortgaged Property or in any Mortgage Loan or the security therefor, and (iii) does not receive compensation that is affected by the approval or disapproval of the Mortgage Loan.  The appraisal shall have been made within one hundred and eighty (180) calendar days of the origination of the Mortgage Loan and shall be completed in compliance with the Uniform Standards of Professional Appraisal Practice, and all applicable Federal and state laws and regulations.  If the appraisal was made more than one hundred and twenty (120) calendar days before the origination of the Mortgage Loan, the Seller shall have received and included in the Servicing File a recertification of the appraisal;

(35) <u>Servicemembers Civil Relief Act</u>.  The Mortgagor has not notified the Seller, and the Seller has no knowledge of, any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act, or any similar state statute;

(36) <u>Environmental Matters</u>.  The Mortgaged Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation.  There is no pending action or proceeding directly involving any Mortgaged Property of which the Seller is aware in which compliance with any environmental law, rule or regulation is an issue; and to the best of the Seller's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation consisting of a prerequisite to the use and enjoyment of said property;

(37) <u>No Construction Loans.</u> No Mortgage Loan was made in connection with (a) facilitating the trade-in or exchange of a Mortgaged Property or (b) the construction or rehabilitation of a Mortgaged Property, unless the Mortgage Loan is a construction-to-permanent mortgage loan listed on the Seller Asset Schedule which has been fully disbursed, all construction work is complete and a completion certificate has been issued;

(38) <u>No Denial of Insurance</u>.  No action, inaction, or event has occurred and no state of fact exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to, coverage under any applicable pool insurance policy, primary mortgage insurance policy, special hazard insurance policy, or bankruptcy bond, irrespective of the cause of such failure of coverage.  In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by the Seller or any designee of the Seller or any corporation in

Sch. 1-12

which the Seller or any officer, director, or employee had a financial interest at the time of placement of such insurance;

(39) <u>Regarding the Mortgagor</u>. The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts;

(40) <u>Mortgagor Acknowledgment</u>. The Mortgagor has received all disclosure materials required by applicable law with respect to the making of Adjustable Rate Mortgage Loans. The Seller shall maintain such documents in the Mortgage File;

(41) <u>Predatory Lending Regulations; High Cost Loans</u>. No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, and no Mortgage Loan originated on or after October 1, 2003 through March 6, 2003 is governed by the Georgia Fair Lending Act.. No Mortgage Loan is covered by the Home Ownership and Equity Protection Act of 1994 and no Mortgage Loan is in violation of any comparable state or local law. The Mortgaged Property is not located in a jurisdiction where a breach of this representation with respect to the related Mortgage Loan may result in additional assignee liability to the Buyer, as determined by the Buyer in its reasonable discretion and as set forth on Exhibit XI hereto, as such Exhibit may be revised from time to time;

(42) <u>Qualified Mortgage</u>. The Mortgage Loan is a "qualified mortgage" within the meaning of Section 860G(a)(3) or any successor provision thereof of the Internal Revenue Code of 1986, as amended;

(43) <u>Insurance</u>. The Seller has caused or will cause to be performed any and all acts required to preserve the rights and remedies of the Buyer in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of the Buyer;

(44) <u>Simple Interest Mortgage Loans</u>. None of the Mortgage Loans are simple interest Mortgage Loans;

(45) <u>Prepayment Fee</u>. With respect to each Mortgage Loan that has a prepayment penalty feature, each such prepayment penalty is enforceable and will be enforced by the Seller for the benefit of the Buyer, and each prepayment penalty is permitted pursuant to federal, state and local law. Each such prepayment penalty is in an amount not more than the maximum amount permitted under applicable law and no such prepayment penalty may provide for a term in excess of five (5) years with respect to Mortgage Loans originated prior to October, 1, 2002. With respect to

Sch. 1-13

Mortgage Loans originated on or after October 1, 2002, the duration of the prepayment penalty period shall not exceed three (3) years from the date of the Mortgage Note unless the Mortgage Loan was modified to reduce the prepayment penalty period to no more than three (3) years from the date of the related Mortgage Note and the Mortgagor was notified in writing of such reduction in prepayment penalty period. With respect to any Mortgage Loan that contains a provision permitting imposition of a prepayment penalty upon a prepayment prior to maturity: (i) the Mortgage Loan provides some benefit to the Mortgagor (e.g., a rate or fee reduction) in exchange for accepting such prepayment penalty, (ii) prior to the Mortgage Loan's origination, the Mortgagor was offered the option of obtaining a mortgage loan that did not require payment of such a penalty and (iii) the prepayment penalty was adequately disclosed to the Mortgagor in the mortgage loan documents pursuant to applicable federal state and local law;

(46)     Flood Certification Contract. The Seller shall have obtained a life of loan, transferable flood certification contract for each Mortgage Loan and shall assign all such contracts to the Buyer;

(47)     CLTV. No Second Lien Mortgage Loan has a CLTV in excess of 100%;

(48)     Consent. Either (a) no consent for the Second Lien Mortgage Loan is required by the holder of the related first lien or (b) such consent has been obtained and is contained in the Mortgage File.

(49)     Wet-Ink Mortgage Loans. With respect to each Mortgage Loan that is a Wet-Ink Mortgage Loan, the Settlement Agent has been instructed in writing by the Seller to hold the related Mortgage File as agent and bailee for the Buyer or the Buyer's agent and to promptly forward such Mortgage File in accordance with the provisions of the Custodial and Disbursement Agreement and the Escrow Instruction Letter;

(50)     No Equity Participation. No document relating to the Mortgage Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Mortgaged Property or a sharing in the appreciation of the value of the Mortgaged Property. The indebtedness evidenced by the Mortgage Note is not convertible to an ownership interest in the Mortgaged Property or the Mortgagor and the Seller has not financed nor does it own directly or indirectly, any equity of any form in the Mortgaged Property or the Mortgagor;

(51)     Origination Date. The Origination Date is no earlier than ninety (90) days prior to the date the Mortgage Loan is initially purchased by the Buyer;

(52)     No Exception. The Custodian has not noted any material exceptions on the Seller Asset Schedule and Exception Report, as applicable (as defined

in the Custodial and Disbursement Agreement), with respect to the Mortgage Loan which would materially and adversely affect the Mortgage Loan or the Buyer's ownership of the Mortgage Loan, unless consented to by the Buyer;

(53)     Mortgage Submitted for Recordation.  The Mortgage either has been or will promptly be submitted for recordation in the appropriate governmental recording office of the jurisdiction where the Mortgaged Property is located;

(54)     Endorsements.  Each Mortgage Note has been endorsed by the Seller for its own account and not as a fiduciary, trustee, trustor or beneficiary under a trust agreement;

(55)     Accuracy of Information.  All information provided to Buyer by Seller with respect to the Mortgage Loans is accurate in all material respects;

(56)     Fair Credit Reporting Act.  As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the Seller to the Buyer, that Seller has full right and authority and is not precluded by law or contract from furnishing such information to the Buyer and the Buyer is not precluded by the terms of the related loan documents from furnishing the same to any subsequent or prospective purchaser of such Mortgage Loan.  The Seller has (or has caused the Servicer to), in its capacity as servicer, for each Mortgage Loan, fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (*e.g.,* favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis;

(57)     [Reserved];

(58)     Accuracy of Information.  All information provided to the Buyer by the Seller with respect to the Mortgage Loans is accurate in all material respects;

(59)     Single-Premium Credit Insurance.  No Mortgagor was required to purchase any single-premium credit insurance policy (e.g., life, disability, accident, unemployment or property insurance policy) or debt cancellation agreement as a condition of obtaining the extension of credit.  No Mortgagor obtained a prepaid single-premium credit insurance policy (e.g., life, disability, accident, unemployment or property insurance policy) in connection with the origination of the Mortgage Loan.  No proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan

Sch. 1-15

(60)    <u>No Arbitration</u>.  No Mortgagor with respect to any Mortgage Loan originated on or after August 1, 2004 agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction;

(61)    <u>Origination Practices/No Steering</u>.  No Mortgagor was encouraged or required to select a Mortgage Loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Mortgage Loan's origination, such Mortgagor did not qualify taking into account credit history and debt-to-income ratios for a lower-cost credit product then offered by the Mortgage Loan's originator or any affiliate of the Mortgage Loan's originator.  If, at the time of loan application, the Mortgagor may have qualified for a lower-cost credit product then offered by any mortgage lending affiliate of the Mortgage Loan's originator, the Mortgage Loan's originator referred the Mortgagor's application to such affiliate for underwriting consideration;

(62)    <u>Underwriting Methodology</u>.  The methodology used in underwriting the extension of credit for each Mortgage Loan does not rely solely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit.  Such underwriting methodology confirmed that at the time of origination (application/approval) the Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan;

(63)    <u>Points and Fees</u>.  No Mortgagor was charged "points and fees" (whether or not financed) in an amount greater than (i) $1,000, or (ii) 5% of the principal amount of such Mortgage Loan, whichever is greater.  For purposes of this representation, such 5% limitation is calculated in accordance with Fannie Mae's anti-predatory lending requirements as set forth in the Fannie Mae Guides and "points and fees" (x) <u>include</u> origination, underwriting, broker and finder fees and charges that the mortgagee imposed as a condition of making the Mortgage Loan, whether they are paid to the mortgagee or a third party; and (y) <u>exclude</u> bona fide discount points, fees paid for actual services rendered in connection with the origination of the Mortgage Loan (such as attorneys' fees, notaries' fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections), the cost of mortgage insurance or credit-risk price adjustments, the costs of title, hazard, and flood insurance policies, state and local transfer taxes or fees, escrow deposits for the future payment of taxes and insurance premiums, and other miscellaneous fees and charges which miscellaneous fees and charges, in total, do not exceed 0.25% of the principal amount of such Mortgage Loan;

Sch. 1-16

(64)     Fees and Charges.  All fees and charges (including finance charges), whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Mortgage Loan has been disclosed in writing to the Mortgagor in accordance with applicable state and federal law and regulation; and

(65)     Second Lien Mortgage Loans.  With respect to each Second Lien Mortgage Loan: (1) the related First Lien Mortgage Loan does not permit negative amortization; (2) where required or customary in the jurisdiction in which the Mortgaged Property is located, the original lender has filed for record a request for notice of any action by the related senior lienholder, and the Seller has notified such senior lienholder in writing of the existence of the Second Lien Loan and requested notification of any action to be taken against the Mortgagor by such senior lienholder; either (a) no consent for the Second Lien Mortgage Loan is required by the holder of the related First Lien Loan or (b) such consent has been obtained and is contained in the related Mortgage File; (3) to the best of the Seller's knowledge, the related First Lien Loan is in full force and effect, and there is no default, lien, breach, violation or event which would permit acceleration existing under such First Lien Loan or Mortgage Note, and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration under such First Lien Loan; (4) the related first lien Mortgage contains a provision which provides for giving notice of default or breach to the Mortgagee under the Mortgage Loan and allows such Mortgagee to cure any default under the related First Lien Mortgage; and (5) the related Mortgaged Property was the Mortgagor's principal residence at the time of the origination of such Second Lien Loan.

## Part II:  Defined Terms

In addition to terms defined elsewhere in the Repurchase Agreement, the following terms shall have the following meanings when used in this Schedule 1:

"Accepted Servicing Practices" shall mean, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loans in the jurisdiction where the related Mortgaged Property is located.

"Adjustable Rate Mortgage Loan" shall mean an adjustable rate Mortgage Loan purchased pursuant to this Agreement.

"Covered Loan" shall mean a Mortgage Loan categorized as Covered pursuant to Appendix E of Standard & Poor's Glossary.

Sch. 1-17

"Due Date" shall mean the day on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Escrow Payments" shall mean with respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water charges, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and other payments as may be required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of any Mortgage Note, Mortgage or any other document.

"First Lien Mortgage Loan" shall mean a Mortgage Loan secured by a first lien Mortgage on the related Mortgaged Property.

"Fixed Rate Mortgage Loan" shall mean a fixed rate Mortgage Loan purchased pursuant to this Repurchase Agreement.

"Gross Margin" shall mean, with respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the index in accordance with the terms of the related Mortgage Note to determine on each Interest Rate Adjustment Date the Mortgage Interest Rate for such Mortgage Loan.

"Ground Lease" shall mean the original executed instrument evidencing a leasehold estate with respect to a Mortgaged Property.

"High Cost Loan" shall mean a Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994, (b) a "high cost home," "threshold," "covered," (excluding New Jersey "Covered Home Loans" as that term is defined in clause (1) of the definition of that term in the New Jersey Home Ownership Security Act of 2002), "high risk home," "predatory" or similar loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) a Mortgage Loan categorized as High Cost pursuant to Appendix E of Standard & Poor's Glossary. For avoidance of doubt, the parties agree that this definition shall apply to any law regardless of whether such law is presently, or in the future becomes, the subject of judicial review or litigation.

"Home Loan" shall mean a Mortgage Loan categorized as a Home Loan pursuant to Appendix E of Standard & Poor's Glossary.

"Interest Rate Adjustment Date" shall mean with respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on the Mortgage Loan is adjusted in accordance with the terms of the Mortgage Note.

"Maximum Mortgage Interest Rate" shall mean with respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Seller Asset Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Interest Rate Adjustment Date.

Sch. 1-18

"Minimum Mortgage Interest Rate" shall mean with respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Seller Asset Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Interest Rate Adjustment Date.

"Monthly Payment" shall mean with respect to any Mortgage Loan, the scheduled combined payment of principal and interest payable by a Mortgagor under the related Mortgage Note on each Due Date.

"Mortgage Interest Rate" shall mean with respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

"Standard & Poor's Glossary" shall mean the Standard & Poor's LEVELS® Glossary, as may be in effect from time to time.

USActive 5595045.16

[Reserved]

**AVM VENDORS**

C&S Marketing

USActive 5595045.16

EXHIBIT I

## FORM OF TRANSACTION REQUEST

[Date]

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019
Attention:

Ladies/Gentlemen:

This letter is a request for you to purchase from us the Mortgage Loans listed in Appendix I hereto, pursuant to the Fifth Amended and Restated Master Repurchase Agreement governing purchases and sales of Mortgage Loans between us, dated as of November 10, 2006 (the "Agreement"), as follows:

Requested Purchase Date:

Eligible Assets requested to be Purchased:  See Appendix I hereto.
[Appendix I to Transaction Request will list Mortgage Loans]

Aggregate Principal Amount of Eligible Assets requested to be purchased:

Purchase Price:

Pricing Rate:

Repurchase Date[1]:

Repurchase Price:

Purchase Percentage:

---

[1] If marked as "open", the Repurchase Date shall be one (1) Business Day after the date upon which either Buyer (in its sole discretion) or the Seller (in its sole discretion) provides to the other written notice of its intention to sell or repurchase, as applicable, the Mortgage Loans on Appendix I hereto; provided that the Repurchase Date shall not, in any event, exceed 364 days from the date hereof.

USActive 5595045.16

Names and addresses for communications:

Buyer:
        IXIS Real Estate Capital Inc.
        9 West 57th Street
        New York, NY 10019
        Attention: Ray Sullivan
        Email: r.sullivan@ixiscm.com

with copies to:
        John Racy
        Email:  jracy@ixiscm.com

Seller:
        New Century Mortgage Corporation
        18400 Von Karman
        Suite 1000
        Irvine, California 92612
        Attn:
        Email:

This Transaction Request constitutes certification by the Seller that:

1. No Default or Event of Default has occurred and is continuing on the date hereof nor will occur after giving effect to such Transaction as a result of such Transaction.

2. Each of the conditions precedent set forth in Section 3 with respect to the Transaction has been satisfied.

3. Each of the representations and warranties made by the Seller in or pursuant to the Agreement is true and correct in all material respects on and as of such date and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

4. The Seller is in compliance with all governmental licenses and authorizations and is qualified to do business and is in good standing in all required jurisdictions.

All capitalized terms used herein shall have the meaning assigned thereto in the Agreement.

Sch. 3-2

EXHIBIT II

**UNDERWRITING GUIDELINES**

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 97
of 121

EXHIBIT III

# FORM OF OPINIONS

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

Dear Sirs and Mesdames:

You have requested our opinion as counsel to New Century Mortgage Corporation ("NCMC") , NC Asset Holding, L.P. ("NCAH"), NC Capital Corporation ("NCCC"), New Century Credit Corporation ("New Century"), Home123 Corporation ("Home123") and New Century Financial Corporation (the "Guarantor"), each a corporation organized and existing under the laws of California, with respect to certain matters in connection with that certain Fifth Amended and Restated Master Repurchase Agreement governing purchases and sales of certain Mortgage Loans, dated as of November 10, 2006 (the "Repurchase Agreement"), by and among NCCC, NCAH, NCMC, New Century, and Home123 and IXIS Real Estate Capital Inc. (the "Buyer"), the Amended and Restated Custodial and Disbursement Agreement, dated as of November 10, 2006, as amended (the "Custodial Agreement"), among NCCC, NCAH, NCMC, New Century, Home123, the Buyer and Deutsche Bank National Trust Company, as custodian and disbursement agent and the Account Agreement, dated as of September 10, 2004, as amended, (the "Account Agreement"), among NCCC, NCAH, NCMC, New Century, Home123, the Buyer and Union Bank of California, N.A.. The Master Repurchase Agreement, the Custodial Agreement and the Account Agreement are hereinafter collectively referred to as the "Governing Agreements." Capitalized terms not otherwise defined herein have the meanings set forth in the Repurchase Agreement.

[We] [I] have examined the following documents:

1.   the Repurchase Agreement;

2.   the Custodial and Disbursement Agreement;

3.   the Account Agreement;

4.   unfiled copies of the financing statements listed on Schedule 1 (collectively, the "Financing Statements") naming each of NCCC, NCAH, NCMC, New Century and Home123 as Debtor and the Buyer as Secured Party and describing the Purchased Items (as defined in the Master Repurchase Agreement) as to which security interests may be perfected by filing under the Uniform Commercial Code of the States listed on Schedule 1 attached hereto (the "Filing Collateral"), which I understand will be filed in the filing offices listed on Schedule 1 attached hereto (the "Filing Offices");

5.   the reports listed on Schedule 2 as to UCC financing statements (collectively, the "UCC Search Report"); and

USActive 5595045.16

6.      such other documents, records and papers as we have deemed necessary and relevant as a basis for this opinion.

To the extent [we] [I] have deemed necessary and proper, [we] [I] have relied upon the representations and warranties of NCCC, NCAH, NCMC, New Century and Home123 contained in the Repurchase Agreement.  [We] [I] have assumed the authenticity of all documents submitted to me [us] as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents.

Based upon the foregoing, it is [our] [my] opinion that:

1.      Each of NCCC, NCMC, New Century and Home123 is a corporation duly organized, validly existing and in good standing under the laws of the State of California and is qualified to transact business in, and is in good standing under, the laws of the State of California.  NCAH is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to transact business in, and is in good standing under, the laws of the State of Delaware.

2.      The Guarantor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to transact business in, and is in good standing under, the laws of the State of Delaware.

3.      The execution, delivery and performance by each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor of the Governing Agreements to which it is a party, and the sales by NCCC, NCAH, NCMC, New Century and Home123 and the pledge of the Purchased Items under the Repurchase Agreement have been duly authorized by all necessary corporate action on the part of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor, as applicable.  Each of the Governing Agreements to which it is a party have been executed and delivered by NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor and are legal, valid and binding agreements enforceable in accordance with their respective terms against the Seller, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance, none of which will materially interfere with the realization of the benefits provided thereunder or with the Buyer's purchase of the Purchased Assets and/or security interest in the Purchased Assets.

4.      No consent, approval, authorization or order of, and no filing or registration with, any court or governmental agency or regulatory body is required on the part of NCCC, NCMC, New Century, Home123 or the Guarantor for the execution, delivery or performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of the Governing Agreements to which it is a party or for the sales by NCCC, NCAH, NCMC, New Century or Home123 under the Repurchase Agreement or the sale of the Purchased Items to the Buyer and/or granting of a security interest to the Buyer in the Purchased Items, pursuant to the Repurchase Agreement.

5.      The execution, delivery and performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of, and the consummation of the transactions contemplated

Exh. III-2

by the Governing Agreements to which it is a party do not and will not (a) violate any provision of NCCC's, NCAH's, NCMC's, New Century's, Home123's or the Guarantor's, as applicable, charter or by-laws, (b) violate any applicable law, rule or regulation, (c) violate any order, writ, injunction or decree of any court or governmental authority or agency or any arbitral award applicable to NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of which I [we] have knowledge (after due inquiry) or (d) result in a breach of, constitute a default under, require any consent under, or result in the acceleration or required prepayment of any indebtedness pursuant to the terms of, any agreement or instrument of which I have knowledge (after due inquiry) to which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is a party or by which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is bound or to which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is subject, or (except for the Liens created pursuant to the Repurchase Agreement) result in the creation or imposition of any Lien upon any Property of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor pursuant to the terms of any such agreement or instrument.

6.      There is no action, suit, proceeding or investigation pending or, to the best of [our] [my] knowledge, threatened against NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor which, in [our] [my] judgment, either in any one instance or in the aggregate, could be reasonably likely to result in any material adverse effect on (a) the Property, business, operations, financial condition or prospects of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, (b) the ability of NCCC, NCAH, NCMC, New Century or Home123 to perform its obligations under any of the Repurchase Documents to which it is a party, (c) the validity or enforceability of any of the Repurchase Documents, (d) the rights and remedies of the Buyer under any of the Repurchase Documents, (e) the timely payment of any amounts payable under the Repurchase Documents, (f) the Asset Value of the Purchased Assets or (g) the ability of the Guarantor to perform its obligations under the Guaranty.

7.      The Repurchase Agreement is effective to create, in favor of the Buyer, either a valid sale of the Purchased Items to the Buyer or a valid security interest under the Uniform Commercial Code in all of the right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under the Purchased Items as collateral security for the payment of NCCC's, NCAH's, NCMC's, New Century's and Home123's obligations under the Repurchase Agreement, except that (a) such security interests will continue in Purchased Items after its sale, exchange or other disposition only to the extent provided in Section 9-306 of the Uniform Commercial Code, (b) the security interests in Purchased Items in which the Seller acquires rights after the commencement of a case under the Bankruptcy Code in respect of NCCC, NCAH, NCMC, New Century or Home123 may be limited by Section 552 of the Bankruptcy Code.

8.      When the Mortgage Notes are delivered to the Custodian, endorsed in blank by a duly authorized officer of NCCC, NCAH, NCMC, New Century or Home123, as applicable, the security interest referred to in Section 7 above in the Mortgage Notes will constitute a fully perfected first priority security interest in all right, title and interest of the Seller therein.

9.      (a)      Upon the filing of financing statements on Form UCC-1 naming the Buyer as "Secured Party" and NCCC, NCAH, NCMC, New Century and Home123 as

USActive 5595045.16

"Debtor", and describing the Purchased Items, in the jurisdictions and recording offices listed on Schedule 1 attached hereto, the security interests referred to in Section 7 above will constitute fully perfected security interests under the Uniform Commercial Code in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under such Purchased Items, which can be perfected by filing under the Uniform Commercial Code, or, will demonstrate a completion of the sale of the Mortgage Loans to the Buyer.

(b)     The UCC Search Report sets forth the proper filing offices and the proper debtors necessary to identify those Persons who have on file in the jurisdictions listed on Schedule 1 financing statements covering the Purchased Items as of the dates and times specified on Schedule 2.  The UCC Search Report identifies no Person who has filed in any Filing Office a financing statement describing the Purchased Items prior to the effective dates of the UCC Search Report.

10.     None of NCCC, NCAH, NCMC, New Century, Home123 nor the Guarantor is an "investment company", or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

11.     Commencing with NCAH's initial taxable year ended [_____], the Company is organized in conformity with the requirements for qualification as a real estate investment trust (a "REIT") under the Code, and the Company's actual method of operations and its proposed method of operations will enable the Company to meet the requirements for qualification and taxation as a REIT under the Code.

Very truly yours,

USActive 5595045.16

EXHIBIT IV

UCC FILING JURISDICTIONS

Secretary of State of California
Secretary of State of Delaware

USActive 5595045.16

EXHIBIT V

# FORM OF ACCOUNT AGREEMENT

[date]

New Century Mortgage Corporation, as Seller
NC Capital Corporation, as Seller
18400 Von Karman,
Suite 1000
Irvine, California 92612
Attn: General Counsel

[BANK], as Bank
[ADDRESS]
Attn:

> Re: Collection Account Established by NEW CENTURY MORTGAGE CORPORATION ("NCMC"), NC ASSET HOLDING, L.P. ("NCAH"), NC CAPITAL CORPORATION ("NCCC"), NEW CENTURY CREDIT CORPORATION ("New Century") and HOME123 CORPORATION ("Home123", and together with NCMC, NCAH, NCCC and New Century, the "Seller") at [BANK] (the "Bank") pursuant to that certain Fifth Amended and Restated Master Repurchase Agreement (as amended, supplemented or otherwise modified from time to time, the "Repurchase Agreement"), dated as of November 10, 2006, among IXIS IXIS Real Estate Capital Inc. (the "Buyer") and the Seller.

Ladies and Gentlemen:

The Seller has entered into a Repurchase Agreement pursuant to which the Buyer may from time to time purchase mortgage loans (the "Purchased Assets") secured by, among other things, the payments made by mortgagors on account of Purchased Assets sold to the Buyer under the Repurchase Agreement. As a requirement of such transactions, upon a default or an event of default under the Repurchase Agreement, all such payments are required to be forwarded daily to the Buyer at the Collection Account identified below within one (1) Business Day of receipt.

The Seller has established a collection account, Account No. [___], for the account of the Buyer, with the Bank, ABA# [_____] (the "Collection Account") which the Bank maintains in the name of, and in trust for, the Buyer as the Bank's customer. The Seller has granted to the Buyer a security interest in all payments deposited in the Collection Account with respect to the Purchased Assets sold to the Buyer under the Repurchase Agreement.

USActive 5595045.16

In the event the Bank receives notice from the Buyer that a default or an event of default has occurred and is continuing under the Repurchase Agreement (a "Notice of Event of Default") from the Buyer, the Bank shall in no event (a) transfer funds from the Collection Account to the Seller or any other person other than pursuant to the Buyer's direction, (b) act on the instruction of the Seller or any person other than the Buyer or (c) cause or permit withdrawals from the Collection Account in any manner not approved by the Buyer in writing. Until receipt of a Notice of an Event of Default, the Seller shall be permitted to withdraw funds or cause funds to be transferred from the Collection Account without the Buyer's approval.

The Bank hereby waives any right that the Bank may now or hereafter have to security interest, bank's or other possessory liens, rights to offset or other claims against the funds in the Collection Account.

In addition, the Bank acknowledges that (a) the Seller has granted to the Buyer a security interest in all of the Seller's right, title and interest in and to any funds from time to time on deposit in the Collection Account with respect to the Purchased Assets sold to the Buyer under the Repurchase Agreement, (b) that such funds are received by the Bank in trust for the benefit of the Buyer and, except as provided below, are for application against the Seller's obligations to the Buyer, and (c) that the Bank shall comply with the Buyer's instructions regarding the disposition of funds in the Collection Account in accordance with the Buyer's instructions, without the consent of the Seller until the Bank receives notice from the Buyer that it has released its lien on the Collection Account and all funds deposited therein.

All bank statements in respect to the Collection Account shall be sent to the Buyer at:

> IXIS Real Estate Capital Inc.
> 9 West 57th Street
> New York, NY 10019
> Attention: Ray Sullivan
> Email: r.sullivan@ixiscm.com

with copies to the Seller at:

> [Seller]
>
> _____
>
> _____
>
> Attention:
> Email:

**This account agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.**

USActive 5595045.16

Kindly acknowledge your agreement with the terms of this agreement by signing the enclosed copy of this letter and returning it to the undersigned.

Very truly yours,

IXIS REAL ESTATE CAPITAL INC.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Agreed and acknowledged:

NEW CENTURY MORTGAGE CORPORATION

By:_____
Name:
Title:

NC CAPITAL CORPORATION

By:_____
Name:
Title:

NC ASSET HOLDING, L.P.

By:_____
Name:
Title:

Exh. V-3

NEW CENTURY CREDIT CORPORATION


By:_____
Name:
Title:

HOME123 CORPORATION


By:_____
Name:
Title:


Agreed and acknowledged:

[BANK], as Bank


By:_____
Name:
Title:

[SERVICER]


By: _____
Name:
Title:

EXHIBIT VI

## FORM OF TRUE SALE CERTIFICATION

### CERTIFICATE OF [NEW CENTURY MORTGAGE CORPORATION]

In connection with the transaction pursuant to the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 between IXIS Real Estate Capital Inc., NC Capital Corporation [(the "Purchaser")], New Century Mortgage Corporation [(the "Purchaser")], NC Residential II Corporation [(the "Purchaser")] and New Century Credit Corporation [(the "Purchaser")], the undersigned certifies, on behalf of Purchaser that:

1. I personally participated as the _____ of the Purchaser in the transaction (the "Transaction"), pursuant to which [INSERT NAME OF SELLING ENTITY] (the "Seller") sold [DESCRIBE ASSETS] (the "Assets") to the Purchaser. In such capacity, I reviewed the purchase and sale agreement relating to the Transaction dated as of _____ __, 200[_] (the "Purchase and Sale Agreement").

2. Due to my close involvement in the Transaction, I can accurately and diligently certify the facts listed herein on behalf of the Purchaser.

3. The Seller has shifted all of the risks and burdens which are associated with the ownership of the Assets to the Purchaser.

4. The Seller has shifted all of the benefits and rewards which are associated with the Assets to the Purchaser. Subsequent to the consummation of the Transaction, the Seller had no control or other rights with respect to the Assets, and all legal rights and title with respect to the Assets vested in the Purchaser.

5. There has been no recourse to the Seller with respect to the performance of the Assets.

6. As of the date of the consummation of the Transaction, the Seller received from the Purchaser reasonably equivalent value for the transferred Assets, in the form of [DESCRIBE CONSIDERATION].

7. The Purchase and Sale Agreement represented the intention of the Seller and the Purchaser to accomplish a complete and irrevocable sale of the Assets.

8. The Seller neither was obligated to repurchase, nor had any "call" rights with respect to, the Assets.

9. The Purchaser neither was obligated to sell the Assets back to the Seller, nor had any "put" rights with respect to the Assets.

10. The Purchaser's books and records reflect that the Transaction was a purchase of the Assets from the Seller, rather than a secured financing or a loan.

USActive 5595045.16

11.     The Purchaser treated the Transaction as a purchase for accounting and tax purposes.

12.     The Transaction was duly authorized by the Purchaser's officers and directors, as required by the Purchaser's organizational documents and applicable law.

I have been duly authorized to execute this certificate on behalf of Purchaser.

[NEW CENTURY MORTGAGE
  CORPORATION]


By:_____
    Name:
    Title:

USActive 5595045.16

**CERTIFICATE OF [NAME OF SELLING ENTITY]**

In connection with the transaction pursuant to the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 between IXIS Real Estate Capital Inc., NC Capital Corporation [(the "Purchaser"), New Century Mortgage Corporation [(the "Purchaser")], NC Residential II Corporation [(the "Purchaser")] and New Century Credit Corporation [(the "Purchaser")], the undersigned certifies, on behalf of [NAME OF SELLING ENTITY] (the "Seller") that:

1.　　I personally participated as the _____ of the Seller in the transaction (the "Transaction") pursuant to which the Seller sold [DESCRIBE ASSETS] (the "Assets") to the Purchaser.  In such capacity, I reviewed the purchase and sale agreement relating to the Transaction dated as of _____ __, 200[_] (the "Purchase and Sale Agreement").

2.　　Due to my close involvement in the Transaction, I can accurately and diligently certify the facts listed herein on behalf of the Seller.

3.　　The Seller has shifted all of the risks and burdens which are associated with the ownership of the Assets to the Purchaser.

4.　　The Seller has shifted all of the benefits and rewards which are associated with the Assets to the Purchaser.  Subsequent to the consummation of the Transaction, the Seller had no control or other rights with respect to the Assets, and all legal rights and title with respect to the Assets vested in the Purchaser.

5.　　There has been no recourse to the Seller with respect to the performance of the Assets.

6.　　As of the date of the consummation of the Transaction, the Seller received from the Purchaser reasonably equivalent value for the transferred Assets, in the form of [DESCRIBE CONSIDERATION].

7.　　The Purchase and Sale Agreement represented the intention of the Seller and the Purchaser to accomplish a complete and irrevocable sale of the Assets.

8.　　The Seller neither was obligated to repurchase, nor had any "call" rights with respect to, the Assets.

9.　　The Purchaser neither was obligated to sell the Assets back to the Seller, nor had any "put" rights with respect to the Assets.

10.　　The Seller's books and records reflect that the Transaction was a sale of the Assets to the Purchaser, rather than a secured financing or a loan.

11.　　The Seller treated the Transaction as a sale for accounting and tax purposes.

USActive 5595045.16

12.     The Transaction was duly authorized by the Seller's officers and directors, as required by the Seller's organizational documents and applicable law.

I have been duly authorized to execute this certificate on behalf of **[Insert name of Selling Entity]**.

[INSERT NAME OF SELLING ENTITY]

By: _____
     Name:
     Title:

Exh. VI-4

EXHIBIT VII-A

FORM OF SELLER'S RELEASE LETTER

**[Date]**

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

Re: Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "Repurchase Agreement"), by and among New Century Mortgage Corporation ("NCMC"), NC Asset Holding, L.P. ("NCAH"), NC Capital Corporation ("NCCC") and New Century Credit Corporation ("New Century") and Home123 Corporation ("Home123", and together with NCMC, NCAH, NCCC and New Century, the "Seller") and IXIS Real Estate Capital Inc. (the "Buyer").

Ladies and Gentlemen:

With respect to the mortgage loans described in the attached Schedule A (the "Mortgage Loans") (a) we hereby certify to you that the Mortgage Loans are not subject to a lien of any third party and (b) we hereby release all right, interest or claim of any kind with respect to such Mortgage Loans, such release to be effective automatically without further action by any party upon payment from IXIS Real Estate Capital Inc., of the amount of the Purchase Price contemplated under the Repurchase Agreement (calculated in accordance with the terms thereof) in accordance with the wiring instructions set forth in the Repurchase Agreement.

Very truly yours,

NEW CENTURY MORTGAGE
CORPORATION

By: _____
    Name:
    Title:

Exh. VII-A-1

NC ASSET HOLDING, L.P.

By: _____
    Name:
    Title:

NC CAPITAL CORPORATION

By: _____
    Name:
    Title:

NEW CENTURY CREDIT CORPORATION

By: _____
    Name:
    Title:

HOME123 CORPORATION

By: _____
    Name:
    Title:

USActive 5595045.16

Case: 09-05050    Doc# 75-4    Filed: 06/08/10    Entered: 06/08/10 14:45:43    Page 112 of 121

EXHIBIT VII-B

FORM OF WAREHOUSE LENDER'S RELEASE LETTER

**[Date]**

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

Re:    Certain Mortgage Loans Identified on Schedule A hereto and owned by [Seller]

The undersigned hereby releases all right, interest, lien or claim of any kind with respect to the mortgage loan(s) described in the attached Schedule A, such release to be effective automatically without any further action by any party upon payment in one or more installments, in immediately available funds of $_____, in accordance with the following wire instructions:

_____

_____

Very truly yours,

[WAREHOUSE LENDER]

By: _____
    Name:
    Title:

EXHIBIT VIII

## FORM OF SERVICER NOTICE

[_____], 200[_]

[SERVICER], as the Servicer
[ADDRESS]
Attention:

      Re:    Fifth Amended and Restated Master Repurchase Agreement, dated as of [_____], 2006 (the "Agreement"), by and between [the Seller] (the "Seller") and [the Buyer] (the "Buyer").

Ladies and Gentlemen:

[SERVICER] (the "Servicer") is servicing certain mortgage loans for the Seller pursuant to certain [name servicing agreements] (the "Servicing Agreement") between the Servicer and the Seller.  Pursuant to the Agreement between the Buyer and the Seller, the Servicer is hereby notified that the Seller has sold to the Buyer certain mortgage loans which are serviced by the Servicer.

Upon receipt of a notice (a "Default Notice") from the Buyer in which the Buyer shall (a) represent that a default or an event of default has occurred with respect to the Seller's obligations to the Buyer and (b) identify the mortgage loans which are then owned by the Buyer under the Agreement (the "Mortgage Loans"), the Servicer shall segregate all amounts collected on account of such Mortgage Loans, hold them in trust for the sole and exclusive benefit of the Buyer, and remit such collections in accordance with the Buyer's written instructions.  Following receipt of such Default Notice, the Servicer shall follow the instructions of the Buyer with respect to the Mortgage Loans, and shall deliver to the Buyer any information with respect to the Mortgage Loans reasonably requested by the Buyer.

Upon a receipt of a Default Notice, the Buyer shall have the right to terminate the Servicing Agreement and transfer servicing to its designee, at no cost or expense to the Buyer, and the Seller shall pay any and all fees required to terminate the Servicing Agreement and to effectuate the transfer of servicing to the designee of the Buyer.

Notwithstanding any contrary information which may be delivered to the Servicer by the Seller, the Servicer may conclusively rely on any information or Default Notice delivered by the Buyer, and the Seller shall indemnify and hold the Servicer harmless for any and all claims asserted against it for any actions taken in good faith by the Servicer in connection with the delivery of such information or Default Notice.

USActive 5595045.16

Please acknowledge receipt of this instruction letter by signing in the signature block below and forwarding an executed copy to the Buyer promptly upon receipt.  Any notices to the Buyer should be delivered to the following address:  9 West 57th Street, New York, New York  10019, Attention: Ray Sullivan.

Very truly yours,

NEW CENTURY MORTGAGE
    CORPORATION


By: _____
    Name:
    Title:


NC CAPITAL CORPORATION


By: _____
    Name:
    Title:


NC ASSET HOLDING, L.P.


By: _____
    Name:
    Title:


NEW CENTURY CREDIT CORPORATION


By: _____
    Name:
    Title:


HOME123 CORPORATION


By: _____
    Name:
    Title:

Exh. VIII-2

ACKNOWLEDGED AND AGREED:


[SERVICER]
as the Servicer


By:_____
     Name:
     Title:
     Telephone:
     Facsimile:

USActive 5595045.16

EXHIBIT IX

FORM OF REQUEST FOR ADDITIONAL TRANSACTIONS FOR EXCESS MARGIN

       Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed thereto in the Fifth Amended and Restated Master Repurchase Agreement dated as of November 10, 2006 between [SELLER] (the "Seller") and IXIS Real Estate Capital Inc. (the "Buyer").

       Pursuant to Section 3(o) of the Repurchase Agreement, the Seller hereby requests the advance of additional Transactions, and in connection with such request provides the following information:

| | |
|---|---|
| Requested Increase in Purchase Price | $_____ |
| Requested Purchase Date | _____ |
| Excess Margin prior to giving effect to Requested Transaction | $_____ |
| Remaining Excess Margin after giving effect to such Transaction | $_____ |
| Aggregate Outstanding Purchase Price of the Transactions as of the Date Hereof after giving effect to the Requested Transaction | $_____ |

       The Seller hereby certifies that, after giving effect to the Transaction requested pursuant hereto, the Margin Base will be equal to or greater than the aggregate Purchase Price of the Transactions.

       This Request For Additional Transactions For Excess Margin is dated _____.

USActive 5595045.16

EXHIBIT X

## FORM OF COMPLIANCE CERTIFICATE

## OFFICER'S CERTIFICATE

I, _____, _____ of [SELLER ENTITY], do hereby certify that:

(i)      the Seller is in compliance with all provisions and terms of the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "Repurchase Agreement"), between the Seller and IXIS;

(ii)     the Guarantor has at all times maintained a Tangible Net Worth of not less than the sum of (1) $750,000,000, and (2) fifty percent (50%) of all increases in shareholders' equity in the Guarantor attributable to issuances of common stock and preferred equity since November 1, 2004;

(iii)    the Seller has at all times, on a consolidated basis, Cash, Cash Equivalents and unused borrowing capacity on unencumbered assets that could be drawn against (taking into account the economic terms of committed Existing Financing Facilities, including, without limitation, any margin or overcollateralization requirements) under committed Existing Financing Facilities in an amount equal to not less than $60,000,000;

(iv)    the Leverage Ratio of the Guarantor and its consolidated Subsidiaries at any time has not been greater than 15:1;

(v)     the Seller has not permitted, for any two consecutive calendar quarters (each such period, a "Test Period"), Net Income for such Test Period before income taxes for such Test Period and distributions made during such Test Period, to be less than $1.00;

(vi)    compliance by the Seller or the Guarantor, as applicable, with the financial covenants in paragraphs (ii) through (v) above is accurately calculated on Schedule 1 attached hereto;

(vii)   NCAH is, and has been since _____, organized and operating in conformity with the requirements for qualification and taxation as a real estate investment trust (a "REIT") under the Internal Revenue Code of 1986, as amended ("Code").  Attached hereto as Schedule 1 is a true and correct summary of the calculations for REIT qualification of NCAH;

(viii)  there have not been any material modifications to the Underwriting Guidelines that have not been provided to the Buyer; and

(ix)    all additional modifications to the Underwriting Guidelines since the date of the most recent disclosure to the Buyer of any modification to the Underwriting Guidelines have been provided to the Buyer pursuant to Section 11(h) hereof.

Capitalized terms used herein without definition have the meanings given them in the Repurchase Agreement.]

[SIGNATURE PAGE FOLLOWS]

Exh. X-2

USActive 5595045.16

IN WITNESS WHEREOF, I have executed this certificate on behalf of the Company this [__] day of [_____], 200_.

[_____]

By:_____
    Name:
    Title:

EXHIBIT XI

ASSIGNEE LIABILITY JURISDICTIONS

[none]